# United States Court of Appeals for the Federal Circuit

BTG INTERNATIONAL LIMITED, JANSSEN BIOTECH, INC.,
JANSSEN ONCOLOGY, INC., JANSSEN RESEARCH & DEVELOPMENT, LLC,

*Plaintiffs-Appellants*

v.

AMNEAL PHARMACEUTICALS LLC, AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, DR. REDDY'S LABORATORIES, INC., DR. REDDY'S LABORATORIES, LTD., WOCKHARDT BIO AG, WOCKHARDT USA LLC, WOCKHARDT LTD., MYLAN PHARMACEUTICALS INC., MYLAN INC., WEST-WARD PHARMACEUTICALS CORP., nka Hikma Pharmaceuticals USA Inc., HIKMA PHARMACEUTICALS LLC, TEVA PHARMACEUTICALS USA, INC.

*Defendants-Appellees*

PAR PHARMACEUTICAL, INC., PAR PHARMACEUTICAL COMPANIES, INC., RISING PHARMACEUTICALS, INC.,

*Defendants*

No. 2019-1147

Appeals from the United States District Court for the District of New Jersey in Nos. 2:15-cv-05909-KM-JBC, 2:16-cv-02449-KM-JBC, and 2:17-cv-06435-KM-JBC, Judge Kevin McNulty.

---

BTG INTERNATIONAL LIMITED, JANSSEN BIOTECH, INC.,
JANSSEN ONCOLOGY, INC., AND JANSSEN RESEARCH & DEVELOPMENT, LLC,

*Plaintiffs-Appellants*

v.

AMERIGEN PHARMACEUTICALS, INC., AMERIGEN PHARMACEUTICALS LIMITED,

*Defendants-Appellees*

No. 2019-1148

*Caption continued on inside cover*

Appeal from the United States District Court for the District of New Jersey in No. 2:16-cv-02449-KM-JBC, Judge Kevin McNulty.

---

JANSSEN ONCOLOGY, INC.,
*Appellant*

v.

AMERIGEN PHARMACEUTICALS LIMITED, ARGENTUM PHARMACEUTICALS LLC,

*Appellees*

---

No. 2019-1323

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2016-00286 and IPR2016-01317.

---

JANSSEN ONCOLOGY, INC.,
*Appellant*

v.

MYLAN PHARMACEUTICALS INC., AMNEAL PHARMACEUTICALS LLC, AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, DR. REDDY'S LABORATORIES, INC., DR. REDDY'S LABORATORIES, LTD., TEVA PHARMACEUTICALS USA, INC., WEST-WARD PHARMACEUTICAL CORPORATION, HIKMA PHARMACEUTICALS LLC,

*Appellees*

---

No. 2019-1324

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2016-01332 and IPR2017-00853.

---

*Caption continued on next page*

JANSSEN ONCOLOGY, INC.,

*Appellant*

v.

WOCKHARDT BIO AG,

*Appellee*

No. 2019-1325

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2016-01582.

**NON-CONFIDENTIAL OPENING BRIEF OF PLAINTIFFS-APPELLANTS**


Carter G. Phillips
(cphillips@sidley.com)
Paul J. Zegger
(pzegger@sidley.com)
Ryan C. Morris
(rmorris@sidley.com)
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, D.C. 20005
Tel: (202) 736-8940

Constantine L. Trela, Jr.
(ctrela@sidley.com)
David T. Pritikin
(dpritikin@sidley.com)
Thomas D. Rein
(trein@sidley.com)
Steven J. Horowitz
(shorowitz@sidley.com)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Tel: (312) 853-7000

*Counsel for Janssen Biotech, Inc., Janssen Oncology, Inc. and Janssen Research & Development, LLC*


*Additional counsel listed on next page*

Alyssa B. Monsen
(amonsen@sidley.com)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Tel: (212) 839-5300
*Counsel for Janssen Biotech, Inc., Janssen Oncology, Inc. and Janssen Research & Development, LLC*

Anthony C. Tridico
(anthony.tridico@finnegan.com)
Jennifer H. Roscetti
(jennifer.roscetti@finnegan.com)
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, D.C. 20001
Tel: (202) 408-4000
*Counsel for BTG International Ltd.*

January 18, 2019

## CERTIFICATE OF INTEREST

I, Constantine L. Trela, Jr., counsel for Plaintiffs-Appellants Janssen Biotech, Inc., Janssen Oncology, Inc., and Janssen Research & Development, LLC, certify the following:

1. The full name of every party or *amicus* represented by me is:

Janssen Biotech, Inc., Janssen Oncology, Inc., and Janssen Research & Development, LLC

2. The name of the real party in interest (if the party named in the caption is not the real part in interest) represented by me is:

N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Janssen Biotech, Inc. and Janssen Oncology, Inc. are wholly owned subsidiaries of Johnson & Johnson, which is a publicly held corporation. No other publicly held corporation owns 10% or more of the stock of Janssen Oncology, Inc.

Janssen Research & Development, LLC is a wholly owned subsidiary of Centocor Research & Development, which is a wholly owned subsidiary of Janssen Biotech, Inc., which is a wholly owned subsidiary of Johnson & Johnson, which is a publicly held corporation. No other publicly held corporation owns 10% or more of the stock of Janssen Research & Development.

4. The names of all law firms and the partners or associates that appeared for the party or *amicus* now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

**Sidley Austin LLP:** Bindu Donovan, Todd L. Krause, Lisa A. Schneider, S. Isaac Olson, H. Ashley Chi, Andrew T. Langford**,** Amanda A. Potter, Jesselyn C. Pe

**Akin Gump Strauss Hauer & Feld:** Dianne B. Elderkin, Barbara L. Mullin, Ruben H Munoz

**Robinson Miller LLC:** Donald A. Robinson, Keith J. Miller, Justin T. Quinn, Michael J. Gesualdo

**Desmarais LLP:** Bindu Donovan

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.

*BTG International Limited, et al. v. MSN Pharmaceuticals Inc. & MSN Laboratories Private Ltd.,* Civil Action No. 18-02372-KM-JBC (D.N.J.); *Janssen Biotech, Inc. et al. v. Mylan Pharms., Inc. et al.*, Civil Action No. 1:15-cv-00130 (N.D. W.Va.); *BTG International Limited, et al. v. Qilu Pharmaceutical Co., Ltd. & Qilu Pharma, Inc.,* Civil Action No. 2:18-cv-16521 (D.N.J.).

Dated: January 18, 2019

Respectfully submitted,

/s/ Constantine L. Trela, Jr.
Constantine L. Trela, Jr.
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Tel: (312) 853-7000

*Counsel for Plaintiffs-Appellants Janssen Biotech, Inc., Janssen Oncology, Inc., and Janssen Research & Development, LLC*

## CERTIFICATE OF INTEREST

I, Anthony C. Tridico, counsel for Plaintiffs-Appellants BTG International Ltd., certify the following:

1. The full name of every party or *amicus* represented by me is:

BTG International Limited

2. The name of the real party in interest (if the party named in the caption is not the real part in interest) represented by me is:

N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

BTG International Ltd. is a subsidiary of BTG plc. BTG plc is a publicly held corporation that holds 100% of BTG International (Holdings) Ltd, which in turns owns 100% of BTG International Ltd.

4. The names of all law firms and the partners or associates that appeared for the party or *amicus* now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

**Robinson Miller LLC:** Donald A. Robinson, Keith J. Miller, Justin T. Quinn, Michael J. Gesualdo

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.

*BTG International Limited, et al. v. MSN Pharmaceuticals Inc. & MSN Laboratories Private Ltd.,* Civil Action No. 18-02372-KM-JBC (D.N.J.); *Janssen Biotech, Inc. et al. v. Mylan Pharms., Inc. et al.*, Civil Action No. 1:15-cv-00130 (N.D. W.Va.); *BTG International Limited, et al. v. Qilu Pharmaceutical Co., Ltd. & Qilu Pharma, Inc.,* Civil Action No. 2:18-cv-16521 (D.N.J.).

Dated: January 18, 2019

Respectfully submitted,

/s/ Anthony Tridico

Anthony C. Tridico
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, D.C. 20001
Tel: (202) 408-4000

*Counsel for Plaintiffs-Appellants BTG International Ltd.*

**TABLE OF CONTENTS**

CERTIFICATES OF INTEREST .......... i

TABLE OF AUTHORITIES .......... viii

STATEMENT OF RELATED CASES .......... xiii

JURISDICTIONAL STATEMENT .......... 1

STATEMENT OF ISSUES .......... 2

INTRODUCTION .......... 3

STATEMENT OF THE CASE .......... 6

I. The ’438 Patent’s Life-Extending Discovery .......... 6

II. The ’438 Patent and Asserted Claims .......... 12

III. Procedural Background .......... 13

A. District Court Proceedings .......... 14

B. Agency Proceedings .......... 18

1. *Amerigen* .......... 18

2. *Mylan* .......... 21

3. *Wockhardt* .......... 21

Summary of Argument .......... 22

Standard of Review .......... 27

Argument .......... 28

I. The Board’s Decisions Rest on an Erroneous Claim Construction. .......... 28

A. The Claimed Invention Is a Combination Therapy in Which Both Abiraterone and Prednisone Have Anti-Cancer Effects. .......... 28

1. “Treatment” Requires An Anti-Cancer Effect. .......... 29

2. The Board's Contrary Reasoning Does Not Withstand Scrutiny. ....31

B. The Board's Erroneous Construction Infected Its Analysis of Obviousness....35

1. The Board Did Not Find the Required Reasonable Expectation of Success in Achieving the Invention as Claimed. ....36

2. The Board Did Not Assess the Objective Evidence Demonstrating the Non-Obviousness of the Invention as Claimed. ....39

II. The District Court Should Not Have Considered an Obviousness Challenge That Was Barred by 35 U.S.C. § 315(e)(2). ....45

A. The Plain Language of § 315(e)(2) Precludes Defendants' Obviousness Arguments....45

B. The District Court's Reasoning Confirms Its Error. ....46

1. Section 315(e)(2) Applies to Successful Petitioners. ....46

2. Section 315(e)(2) Is Triggered by a "Final Written Decision Under Section 318(a)," Not Final and Appealable Decisions or Final Agency Action. ....50

C. The District Court's Judgment Should Be Reversed, and Judgment Should Be Entered for Janssen....52

III. In the Alternative, the District Court's Ruling on the Merits of Defendants' Obviousness Defenses Should Be Reversed. ....52

A. The District Court Erroneously Assumed that a Skilled Artisan Would Have Selected Abiraterone for Development. ....53

B. The District Court's Conclusions Regarding Reasonable Expectation of Success Rest on Legal Error. ....56

C. The District Court's Evaluation of the Objective Indicia Was Plagued by Legal Errors. ....59

CONCLUSION ....65

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## STATEMENT CONCERNING CONFIDENTIAL MATERIAL

Pursuant to Fed. Cir. R. 28(d)(2)(B), Janssen Biotech, Inc., Janssen Oncology, Inc. and Janssen Research & Development, LLC state that the confidential material redacted on pages Appx318, Appx319, Appx320, Appx321 of the Addendum concerns certain identity and third-party information that was redacted by the Patent Trial and Appeal Board from the public version of its decision.

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*,
903 F.3d 1310 (Fed. Cir. 2018) ....................................................42, 61

*Amgen Inc. v. F. Hoffman-La Roche Ltd.*,
580 F.3d 1340 (Fed. Cir. 2009) ..........................................................36

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003) ..........................................................33

*Aventis Pharm. Inc. v. Amino Chems. Ltd.*,
715 F.3d 1363 (Fed. Cir. 2013) ..........................................................34

*Bhd. of R.R. Trainmen v. Balt. & Ohio R.R.*,
331 U.S. 519 (1947)...............................................................................47

*Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*,
769 F.3d 1339 (Fed. Cir. 2014) ..........................................................59

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*,
229 F.3d 1120 (Fed. Cir. 2000) ..........................................................41

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
676 F.3d 1063 (Fed. Cir. 2012) ......................................................5, 59

*Digital Biometrics, Inc. v. Identix, Inc.*,
149 F.3d 1335 (Fed. Cir. 1998) ..........................................................29

*Edwards Lifesciences LLC v. Cook Inc.*,
582 F.3d 1322 (Fed. Cir. 2009) ..........................................................31

*Eli Lilly & Co. v. Medtronic, Inc.*,
496 U.S. 661 (1990)...............................................................................49

*Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*,
471 F.3d 1369 (Fed. Cir. 2006) ..........................................................63

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
93 F.3d 1572 (Fed. Cir. 1996) ........................................................................31

*In re Fulton*,
391 F.3d 1195 (Fed. Cir. 2004) ......................................................................55

*Galderma Labs., L.P. v. Tolmar, Inc.*,
737 F.3d 731 (Fed. Cir. 2013) ........................................................................64

*Honeycutt v. United States*,
137 S. Ct. 1626 (2017)......................................................................................47

*In re Huang*,
100 F.3d 135 (Fed. Cir. 1996) ........................................................................63

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
558 F.3d 1368 (Fed. Cir. 2009) ......................................................................31

*Institut Pasteur & Universite Pierre et Marie Curie v. Focarino*,
738 F.3d 1337 (Fed. Cir. 2013) ......................................................................38

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ......................................................26, 56, 59

*Interconnect Planning Corp. v. Feil*,
774 F.2d 1132 (Fed. Cir. 1985) ......................................................................58

*In re Kahn*,
441 F.3d 977 (Fed. Cir. 2006) ........................................................................37

*Kinetic Concepts, Inc. v. Blue Sky Med. Grp.*,
554 F.3d 1010 (Fed. Cir. 2009) ......................................................................31

*Leo Pharm. Prods., Ltd. v. Rea*,
726 F.3d 1346 (Fed. Cir. 2013) ......................................................................55

*Liberty Ammunition, Inc. v. United States*,
835 F.3d 1388 (Fed. Cir. 2016), *cert. denied*, 137 S. Ct. 1825
(2017)................................................................................................................33

*L.A. Biomedical Research Inst. v. Eli Lilly & Co.*,
849 F.3d 1049 (Fed. Cir. 2017) ......................................................................38

*Lucent Techs., Inc. v. Gateway, Inc.*,
525 F.3d 1200 (Fed. Cir. 2008) ........................................................................33

*Merck & Cie v. Gnosis S.P.A.*,
808 F.3d 829 (Fed. Cir. 2015) ..........................................................................59

*Microsoft Corp. v. i4i Ltd. P'ship*,
131 S. Ct. 2238 (2011)......................................................................................49

*New Hampshire v. Maine*,
532 U.S. 742 (2001)..........................................................................................47

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*,
719 F.3d 1346 (Fed. Cir. 2013) ........................................................................27

*Orexo AB v. Actavis Elizabeth LLC*,
903 F.3d 1265 (Fed. Cir. 2018) ........................................................................64

*Perez v. Volvo Car Corp.*,
247 F.3d 303 (1st Cir. 2001)..............................................................................51

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) ..................................................................42, 43

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ..................................................................29, 30

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ........................................................................39

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
815 F.3d 747 (Fed. Cir. 2016) ...............................................................27, 34, 44

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
136 S. Ct. 1938 (2016)......................................................................................47

*Res-Care, Inc. v. United States*,
735 F.3d 1384 (Fed. Cir. 2013) ........................................................................27

*Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co.*,
856 F.3d 1019 (Fed. Cir. 2017) ........................................................................38

*SiOnyx, LLC v. Hamamatsu Photonics K.K.*,
330 F. Supp. 3d 574 (D. Mass. 2018) ........ 47

*In re Stepan Co.*,
868 F.3d 1342 (Fed. Cir. 2017) ........ 36, 37

*Stratoflex, Inc. v. Aeroquip Corp.*,
713 F.2d 1530 (Fed. Cir. 1983) ........ 39, 60

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*,
617 F.3d 1296 (Fed. Cir. 2010) ........ 53

*Tripati v. Henman*,
857 F.2d 1366 (9th Cir. 1988) ........ 51

*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016) ........ 53, 61, 62

**Administrative Decisions**

*Apple Inc. v. Personalized Media Commc'ns LLC*,
IPR2016-01520, 2018 WL 922376 (P.T.A.B. Feb. 15, 2018) ........ 51

*Certain Hybrid Electric Vehicles & Components Thereof*,
Inv. No. 337-TA-1042 (USITC Nov. 1, 2017). ........ 47

**Statutes and Regulation**

21 U.S.C. § 355(j)(2)(A)(vii)(IV) ........ 13

35 U.S.C. § 315(c) (2006) ........ 47

35 U.S.C. § 315(e)(2) ........ 4, 45, 50, 52

21 C.F.R. § 314.95 ........ 13

**Rule**

Fed. R. Civ. P. 60 ........ 51

**Legislative Materials**

157 Cong. Rec. 13,187 (2011) (statement of Sen. Kyl) ........ 47

157 Cong. Rec. 3429 (2011) (statement of Sen. Kyl) ............................................48

157 Cong. Rec. 2710 (2011) (statement of Sen. Grassley) ...............................47, 48

**Other Authorities**

18 James William Moore, *Moore's Federal Practice* (3d ed. 1998) ......................51

*Estoppel*, Black's Law Dictionary (10th ed. 2014) ................................................47

Joseph Matal, *A Guide to the Legislative History of the America Invents Act: Part II of II*, 21 Fed. Cir. B.J. 539 (2012) ......................................50

## STATEMENT OF RELATED CASES

These consolidated actions have not previously been before this or any other appellate court. Counsel for Appellants believes the following cases will directly affect or be directly affected by this Court's resolution of the consolidated appeals:

*BTG International Limited, et al. v. MSN Pharmaceuticals Inc. & MSN Laboratories Private Ltd.*, Civil Action No. 18-02372-KM-JBC (D.N.J.);

*Janssen Biotech, Inc. et al. v. Mylan Pharms., Inc. et al.*, Civil Action No. 1:15-cv-00130 (N.D. W.Va.);

*BTG International Limited, et al. v. Qilu Pharmaceutical Co., Ltd. & Qilu Pharma, Inc.*, Civil Action No. 2:18-cv-16521 (D.N.J.).

## JURISDICTIONAL STATEMENT

The district court appeals (Nos. 2019-1147 and 2019-1148) arise from Hatch-Waxman Act suits brought by Plaintiffs-Appellants BTG International Limited, Janssen Oncology, Inc., Janssen Biotech, Inc., and Janssen Research & Development, LLC (collectively, "Janssen"). The district court had jurisdiction under 28 U.S.C. §§ 1331, 1338. The court entered a Rule 54(b) judgment on October 26, 2018, which was amended on October 30. Plaintiffs timely appealed. Defendants' cross-appeals were dismissed on December 21, 2018. This Court has jurisdiction under 28 U.S.C. § 1295(a).

The Board appeals (Nos. 2019-1323, 2019-1324, and 2019-1325) arise from Final Written Decisions issued on January 17, 2018 in three *inter partes* review (IPR) proceedings. The Board had jurisdiction under 35 U.S.C. §§ 311, 316(c). Janssen timely requested rehearing, which the Board denied on December 3, 2018. Janssen timely appealed. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF ISSUES

The Board appeals present the following issues:

1. Whether the Board erred by construing "treating" and "treatment" of prostate cancer to cover a therapy that has no anti-cancer effect.

2. Whether the Board's claim construction and other errors warrant vacatur of its obviousness determination.

The district court appeals present the following issues:

1. Whether the district court was permitted to consider obviousness challenges that had already been resolved in Final Written Decisions of the Board, notwithstanding 35 U.S.C. § 315(e)(2)'s bar on litigation of grounds for invalidity raised in an IPR that results in a "final written decision under section 318(a)."

2. In the alternative, whether the district court's obviousness determination should be vacated because the court applied the wrong legal standards in assessing motivation to combine, reasonable expectation of success, and objective indicia of non-obviousness.

## INTRODUCTION

These appeals involve a breakthrough treatment for advanced prostate cancer. Before the invention of U.S. Patent No. 8,822,438 ("the '438 patent"), patients faced a dismal prognosis, with death likely within 12-18 months and few meaningful treatment options. The invention claimed by the '438 patent changed this picture dramatically. Its method of treating advanced prostate cancer with a combination of abiraterone acetate ("abiraterone") and prednisone offered patients a striking increase in survival and transformed researchers' understanding of the causes of the disease. The invention was counter-intuitive, and it has been a runaway commercial success.

The invention was made in the face of enormous skepticism—not just among academic researchers, but among major pharmaceutical companies, including one that abandoned its rights to abiraterone and others that were offered rights and passed. Researchers at the time were focused in an entirely different direction, generally on chemotherapy-based treatments. Secondary hormonal therapies like the claimed invention were not being pursued and were disparaged as futile and antiquated. The inventors defied expectations and conventional wisdom and produced a cancer treatment that was, and remains, state of the art—a treatment so dramatically successful that the FDA granted it expedited approval three times and the market granted it preeminent status and billions in sales.

The decisions before the Court in these appeals dismiss this life-changing and medical practice-changing invention as obvious, a merely routine step well within the skill of ordinary artisans. They reached this illogical conclusion as a result of fundamental legal errors that this Court can and should correct.

The Board's IPR decisions started with an erroneous claim construction that conflicted with both the claim language and an express definition in the specification (as well as the construction adopted by the district court). The claims require a combination therapy in which each specified component "treats" cancer, yet the Board effectively read this requirement out of the claims. This legal error wholly undermined the Board's obviousness analysis, both because the Board never found that skilled artisans would have had a reasonable expectation of success in achieving the invention *as claimed*, and because the Board's analysis of the nexus between the objective evidence of non-obviousness and the claimed invention rested on its misunderstanding of what invention was claimed. These legal errors require vacatur.

The district court also determined that the invention was obvious, but the court erred by even reaching this issue. Once the Board resolved Defendants' obviousness challenges in Final Written Decisions, 35 U.S.C. § 315(e)(2) barred the court from considering those challenges. Notwithstanding the statute's plain text and unequivocal legislative history, the court refused to apply the statutory bar

based primarily on what the court saw as policy concerns. But those concerns were misplaced and, more fundamentally, cannot override the plain statutory text. The court's obviousness determination should therefore be reversed, and because the court otherwise resolved infringement and validity in Janssen's favor, this Court should direct entry of judgment for Janssen.

Even if § 315(e)(2) did not preclude the district court from addressing obviousness, its decision still cannot stand. The court's analysis was plagued by legal error. Although it properly construed the claims, the court applied the wrong legal standard in assessing motivation to combine and reasonable expectation of success. Indeed, it failed even to consider whether—much less explain why—a skilled artisan would have chosen to pursue development of a combination therapy involving abiraterone in the first place, particularly when hundreds of other paths had been identified as more promising at the time and major pharmaceutical companies had affirmatively passed on abiraterone. Moreover, the court reached a conclusion on obviousness before even considering the objective indicia of non-obviousness, and when it considered objective indicia, it shifted the burden to Janssen to disprove obviousness. In other words, the district court adopted the very mode of analysis that this Court rejected in *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litigation*, 676 F.3d 1063, 1075 (Fed. Cir. 2012), and its progeny.

## STATEMENT OF THE CASE

### I. The ’438 Patent’s Life-Extending Discovery

Prostate cancer is the second leading cause of cancer death in American men, trailing only lung cancer. Metastatic prostate cancer, in which the cancer has spread to other organs, is particularly deadly. Appx758.

The traditional first-line treatment for metastatic prostate cancer is to deprive the cancer cells of androgen hormones, such as testosterone, that those cells need to proliferate. Appx21447-21449. Such “androgen deprivation therapy,” or “ADT,” involves either surgical castration or the administration of drugs to stop androgen production by the testes. Appx21448-21451. ADT is not a cure, however, and eventually stops being effective in almost all patients, at which point the cancer resumes growing. Appx21449. Prostate cancer that reaches this stage is called metastatic castration-resistant prostate cancer, or “mCRPC.” Appx21449-21450.

In 2006, at the time of the invention, the mechanisms underlying prostate cancer’s progression to a castration-resistant state were poorly understood, resulting in great uncertainty as to how to combat it. Appx21017-21019, Appx22763, Appx22768-22769, Appx22793-22795. Researchers had spent decades developing and testing hundreds of different agents with diverse mechanisms of action to attempt to find a treatment, without success. Appx22764,

Appx22766-22773, Appx28488-28495, Appx28505-28514, Appx28532-28537, Appx28555-28559, Appx28560-28570, Appx27916-27935. Other than the cytotoxic chemotherapy docetaxel, which caused terrible side effects, all failed to improve survival. Appx22764-22765. So the search continued.

The prevailing view among researchers by 2006 was that the progression of prostate cancer in mCRPC patients was likely independent of the hormones targeted in first-line ADT treatment. Appx21018; *see* Appx87. Because numerous attempts to develop effective second-line hormonal therapies—*i.e.*, therapies aimed at further reducing hormone levels in a patient who has already received ADT—had failed to produce any survival benefit, Appx22465, Appx22552-22553, researchers hypothesized that the cancer cells adapted to grow without androgens, Appx21018.

The view that such secondary hormonal therapies would not be efficacious was reflected in the terms "hormone-refractory prostate cancer" and "androgen-independent prostate cancer," used at the time to describe the status of mCRPC patients. Appx21018, Appx22764, Appx22793-22795. Thus, by 2006, researchers widely believed that further reductions in androgens below castrate levels would have no clinical benefit in treating mCRPC, and had generally moved away from studying second-line hormonal therapies. Appx21138-21142, Appx22773-22776, Appx28523-28531, Appx27876-27879. This applied in particular to ketoconazole,

an anti-fungal hormonal compound which had been tried as a second-line prostate cancer treatment without success. Appx28546, Appx22829, Appx22817, Appx22827-22834, Appx22176-22177, Appx22552, Appx28705. Researchers at the time concluded that "the next generation of clinical trials should not be futile hormonal manipulations." Appx28529.

Instead, researchers were exploring a wide variety of different therapeutic strategies and pharmacological agents. *See, e.g.*, Appx22767, Appx28488-28495, Appx28560-28570, Appx27916-27935. Indeed, as of 2006, more than 200 compounds for treating mCRPC were in development. Appx28488. A 2005 paper surveying the "most promising agents in clinical development" listed many of these compounds and did not include any second-line hormonal therapy. Appx28560-28570, Appx22769-22770.

Abiraterone, a second-line hormonal compound, was discovered in 1992 at London's prestigious Institute of Cancer Research ("ICR"). Abiraterone blocks the adrenal glands and testes from producing testosterone and other androgens. Appx22886, Appx27737-27755. From 1995 to 1999, abiraterone was licensed to Boehringer Ingelheim, which sponsored the first clinical studies. Appx21143-21144, Appx21147, Appx22887. These Phase I trials focused on abiraterone's safety and effect on testosterone production, not its efficacy in treating prostate cancer. Appx21146, Appx21132, Appx22785, Appx22787, Appx23171-23180.

Boehringer abandoned abiraterone as the studies ended, and the researchers who conducted them had difficulty getting their results published. Appx21022, Appx21138-21142, Appx21144-21145, Appx22887. Over the next five years, ICR's licensing partner, BTG, attempted to license abiraterone to numerous pharmaceutical companies, including major companies like Wyeth and Bristol-Myers Squibb, but none was interested. Appx21022, Appx21025-21026, Appx21147, Appx21145-21146, Appx22887. Finally, in 2004, a small California start-up, Cougar Biotechnology, Inc., took a license. Appx21146-21147.

Around that same time, Dr. Johann de Bono joined ICR to focus on finding an effective prostate cancer therapy. Appx21007. Despite then-conventional wisdom that mCRPC was androgen-independent, Cougar enlisted Dr. de Bono's help in testing abiraterone's efficacy in mCRPC patients. Appx21024. As he was designing the first Cougar clinical trial, Dr. de Bono had an insight that led to the invention of the '438 patent. He hypothesized that abiraterone, while decreasing androgen production, might increase other, non-androgenic steroids and that those steroids might promote the growth of prostate cancer cells—in effect making cancer resistant to abiraterone. Dr. de Bono further hypothesized a way to overcome this resistance and enhance and prolong the efficacy of abiraterone (to the extent it was shown to have any). Adding a glucocorticoid such as dexamethasone or prednisone, he thought, could decrease production of these other

steroids and thereby reverse any resistance to abiraterone. *See generally* Appx21041-21051, Appx28341, Appx28429.

These insights were remarkable. Secondary hormonal therapies in general were viewed as futile. Abiraterone in particular had never been tested for efficacy, and no one had even hypothesized that patients taking abiraterone would develop resistance, much less identified a way to overcome it. Appx21052-21053. Glucocorticoids were approved for inflammation and for palliation of patients with certain unrelated cancers, but not for treatment of any cancer, and prednisone in particular had never been shown to provide a survival benefit in prostate cancer patients. Appx21771, Appx22562, Appx22818, Appx28072-28089. Indeed, as Defendants' expert conceded at trial in the district court, neither he nor other physicians believed that prednisone provided an anti-cancer benefit at the time of the invention. Appx22169-22170, Appx22176. Thus, the notion that abiraterone could be combined with a glucocorticoid like prednisone and that the two compounds in combination would both provide an anti-cancer benefit was wholly unexpected.

Notwithstanding this, Dr. de Bono designed a study that first tested the efficacy of abiraterone alone on prostate cancer, and then added an "extension" phase in which patients whose disease progressed on abiraterone also received a glucocorticoid. Appx21041-21052. The first study used dexamethasone, the

glucocorticoid used most frequently in England, though Dr. de Bono believed prednisone would work the same way. Appx21048-21049. The extension study was an unprecedented success. Some patients in the trial had been taking dexamethasone prior to the study as a palliative, with no durable effect on their cancer. They discontinued dexamethasone before they started taking abiraterone, and their cancers were controlled or reduced for a time with abiraterone alone. But just as Dr. de Bono predicted, they eventually developed resistance to abiraterone, and their cancers resumed progressing. The subsequent co-administration of a glucocorticoid with abiraterone dramatically reversed the resistance in many patients, confirming Dr. de Bono's hypothesis. *See generally* Appx21059-21060, Appx21066-21086, Appx27936-27946, Appx27952-27960.

Building on the results of the extension study, Dr. de Bono and his team conducted further studies in which abiraterone and prednisone were co-administered from the beginning of treatment. Appx21095-21104, Appx21186-21189, Appx21192-21193, Appx21194-21195. The results underscored the unique benefits of the combination. For example, in Phase II studies, the combination more than doubled the time that patients responded, measured by time to PSA progression—an indicator of prostate cancer growth—and provided a larger proportion of patients with long-term progression-free survival relative to patients in an earlier study treated with abiraterone alone. Appx21544-21545. Similarly,

two Phase III clinical trials in which mCRPC patients were co-administered abiraterone and prednisone demonstrated a dramatic overall survival benefit. Appx21569-21573; *see also* Appx21195-21196.

These results were extraordinary. As one researcher wrote, they "dramatically alter[ed] our view of hormonal treatment in advanced-stage prostate cancer." Appx28551, Appx22899-22900. The abiraterone-prednisone combination was the first non-cytotoxic, second-line hormonal therapy to receive FDA approval and extend overall survival and progression-free survival in mCRPC patients. Appx22888-22889. The FDA has thrice recognized the breakthrough nature of the therapy by approving ZYTIGA (Janssen's abiraterone product) in combination with prednisone under its priority review program, which allows expedited review of therapies that would provide significant improvements in the safety or effectiveness of treatment of serious conditions. Appx21308-21310. The market has likewise recognized the therapy's innovativeness by rewarding ZYTIGA with enormous commercial success. Appx22704-22713, Appx28185-28192, Appx28193-28200, Appx28223-28232, Appx29060-29068.

## II. The '438 Patent and Asserted Claims

The '438 patent embodies Dr. de Bono's surprising discovery that the concomitant administration of prednisone with abiraterone is an effective treatment to combat advanced prostate cancer, in which both prednisone and abiraterone

have an anti-cancer effect when used in combination. Claim 1, the '438 patent's only independent claim, provides:

> A method for the treatment of a prostate cancer in a human comprising administering to said human a therapeutically effective amount of abiraterone acetate or a pharmaceutically acceptable salt thereof and a therapeutically effective amount of prednisone.

Appx765. Based on express definitions in the specification, the district court construed the term "therapeutically effective amount" to mean "an amount effective for treating cancer," and the terms "treatment" and "treating" to mean "the eradication, removal, modification, management or control of a tumor or primary, regional, or metastatic cancer cells or tissue and the minimization or delay of the spread of cancer." Appx4052-4081, Appx4082-4083. The Board, by contrast, concluded that the terms "treatment" and "treating" were open-ended and included any effect, even one that had no impact on the cancer at all. Appx30-31.

## III. Procedural Background

Defendants filed abbreviated new drug applications ("ANDAs") to market generic abiraterone products with labeling substantively identical to ZYTIGA's—*i.e.*, calling for concomitant administration of abiraterone and prednisone. As part of their ANDAs, Defendants certified that the '438 patent is invalid or will not be infringed. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(IV); 21 C.F.R. § 314.95. In response,

Janssen filed suit under 35 U.S.C. § 271(e)(2), asserting that Defendants will induce or contribute to infringement of the '438 patent. Each Defendant sought *inter partes* review.

### A. District Court Proceedings

In response to Janssen's infringement claims, Defendants asserted, among other defenses, that the '438 patent is invalid as obvious.

After the Board issued Final Written Decisions in the IPRs, Janssen moved *in limine* under 35 U.S.C. § 315(e)(2) to preclude Defendants from asserting their obviousness challenges because Defendants had admittedly raised those same challenges in the IPRs and thus were now statutorily barred from pursuing them in district court. *See* Appx12776 (Defendants presented "the same three invalidity grounds" to the Board); Appx20999. The court denied Janssen's motion. Appx20944; *see also* Appx19008-19009.

On October 26, 2018, the court issued its Opinion (Appx1-71) and Order (Appx144-145), concluding that (1) the '438 patent is invalid for obviousness; (2) the '438 patent has an adequate written description; and (3) assuming the '438 patent were valid, Defendants' marketing of generic abiraterone products would induce and contribute to infringement. Appx74. In a footnote, the court reaffirmed its holding that § 315(e)(2) does not bar Defendants' obviousness challenges, although the court acknowledged that § 315(e)(2) "may be read" to do

just that. The court asserted—without citing any statutory language or legislative history—that the "manifest statutory intent" is to prevent only unsuccessful IPR petitioners from relitigating invalidity claims. Appx98.

In holding that the asserted claims of the '438 patent are invalid as obvious, the court first found that "abiraterone had been identified in the prior art as a second-line prostate cancer treatment." Appx115. According to the court, two references—Barrie 1994 and O'Donnell 2004—suggested that abiraterone could be used as a second-line therapy. Appx114. Although the court agreed with Janssen that the "prevailing belief" at the time of invention (*i.e.*, years later, in 2006) "was that, once [prostate] cancer resumed growing after ADT, the cancer became androgen independent," Appx87, it concluded that such evidence merely established that abiraterone was not the most promising potential therapy, Appx121. The court did not address Janssen's argument that, at the time of invention, a skilled artisan would not have selected abiraterone in the first place.

The court next found a motivation to combine abiraterone with prednisone, Appx116, and also found that a skilled artisan would expect the drugs could be combined with a reasonable probability of success, Appx118. The court did not specifically address whether a person of ordinary skill in 2006 would have expected both abiraterone and prednisone to have an anti-cancer effect in a combination therapy. Nor did the court address the critical admission of

Defendants' expert that he "do[es] not recall ever feeling that there was any proven anti-cancer benefit for prednisone." Appx22169-22170, Appx22173-22174; *see also* Appx22170 ("physicians that [he] was in contact with also didn't have a sense that there was any proven anti-cancer benefit" from prednisone).

The court then turned to secondary considerations—not to inform its analysis of obviousness in the first instance, but rather to determine whether the "objective considerations presented" by Janssen "alter[ed] [its] conclusion" of obviousness. Appx118. First, the court explained away ZYTIGA's massive commercial success as the product of a patent on abiraterone itself that supposedly blocked others from pursuing abiraterone-based therapies. Appx118-120. The court discounted the fact that Boehringer, which had rights under that patent and was not "blocked," never made the invention, but instead abandoned its rights after the unsuccessful Phase I studies. It also discounted evidence that the patent had thereafter been made widely available for licensing. According to the court, Janssen failed to show that the licensing efforts were more than merely "lackluster" and "desultory," Appx120, even though the efforts included broadly advertising the availability of a license to any interested company and directly contacting various pharmaceutical giants. Appx21022, Appx21145-21146, Appx21147.

Second, the court found the market skepticism factor to be "neutral." Appx121. The court acknowledged evidence of skepticism, but stated that "[m]uch of that skepticism seems to be directed to abiraterone itself, rather than the claimed combination." Appx121. The court did not explain why someone skeptical of abiraterone would not also be skeptical of, much less pursue, a combination therapy in which it was a key component.

Third, the court addressed evidence of long-felt but unmet need and unexpected results. The court found that ZYTIGA plus prednisone yielded a survival benefit sixty percent longer than the existing FDA-approved therapies—four months versus two-and-a-half—but dismissed that improvement as "incremental" and a difference "'merely in degree,'" not "'in kind.'" Appx122 (citation omitted). The court said nothing about the undisputed evidence that ZYTIGA plus prednisone was better tolerated and less toxic than other therapies. Appx22896. Nor did the court address the fact that this therapy "really changed the standard of care" for those with advanced prostate cancer, Appx21103-21104, Appx21576-21577 (invention "was practice changing"); *see also* Appx22898-22900, Appx28551-28554, or that the FDA's multiple priority review approvals for ZYTIGA demonstrated that the invention produced significant improvements in patient care.

Finally, the court found that professional approval of ZYTIGA plus prednisone "weighs somewhat" in favor of non-obviousness. Appx123. Nevertheless, the court found that, on balance, the "foreshadow[ing]" of the combination in the prior art "favors a conclusion of obviousness." Appx123.

The court amended its Opinion on October 31, 2018. Appx72-143. The court's conclusions regarding validity and infringement were unchanged, but the court amended its discussion of § 315(e)(2) to opine that the pendency of rehearing requests before the Board made the statutory bar inapplicable.

**B. Agency Proceedings**

The three IPR proceedings—*Amerigen*, *Mylan*, and *Wockhardt*—raised largely identical issues, and the Final Written Decisions likewise are substantially identical.

**1. *Amerigen***

The *Amerigen* IPR rested on three references: O'Donnell (2004 article reporting the Phase I abiraterone safety studies from the 1990s), Gerber (1990 article regarding use of ketoconazole and prednisone), and Barrie (1997 patent directed to a class of compounds that includes abiraterone).[1] *See* Appx181-182; Appx187-188. Amerigen's theory was that a skilled artisan would have pursued

[1] The *Amerigen* and *Argentum* IPRs were later joined and resolved in a single Final Written Decision. *See* Appx29523-29527.

abiraterone to treat prostate cancer based on the disclosures of either O'Donnell or Barrie, and would have added prednisone to address anticipated side effects of abiraterone, as Gerber had done with ketoconazole. Appx189-191.

A central issue was whether one of ordinary skill in 2006 would have had a reasonable expectation of success in achieving the invention as claimed. That turned in large part on claim construction: none of Amerigen's primary references suggested that prednisone would "treat" cancer—*i.e.*, have an anti-cancer effect—even on its own, let alone in combination with abiraterone. And at the institution stage, it appeared that the Board agreed with Janssen that "treat," "treating," and "treatment" required "the eradication, removal, modification, management or control of a tumor or primary, regional, or metastatic cancer cells or tissue and the minimization or delay of the spread of cancer." Appx156.

In its Final Written Decision, however, the Board explained that its understanding of "treatment" was much broader. In the Board's view, a drug could "treat" cancer "perhaps by an anti-cancer effect, or perhaps by some other mechanism." Appx208. Based on that broader construction, the Board ruled, for example, that Amerigen was not required to show a reasonable expectation that prednisone would have an anti-cancer effect. Appx204-206.

The Board's broad construction rested on two premises. First, the Board noted that the specification suggests that steroids "may have anti-cancer effects,"

but they may "also have other therapeutic effects." Appx207. Second, the Board believed that the patent's use of "include" in its definition of "treatment" made the term entirely open-ended, covering any effect, even one that had no impact on cancer at all. *See* Appx30-31. Based on this construction, the Board concluded that Amerigen "met its burden that the prior art provides a reasonable expectation that prednisone could be used as a therapeutic agent in the treatment of prostate cancer." Appx208. The Board did not find—because its construction did not require it to find—that a skilled artisan in 2006 would have had a reasonable expectation of success in achieving a combination therapy in which *both* prednisone *and* abiraterone have an anti-cancer effect. *See, e.g.*, Appx208 ("Claim 1 … does not require a particular result.").

Janssen presented extensive objective indicia evidence, but the Board concluded that none of it supported non-obviousness. Appx210-220. Its analysis was largely driven by its claim construction, for in assessing the required nexus, the Board viewed the "claimed invention" through the lens of its broad construction of "treatment." Thus, for example, the Board failed to consider that while it might not have been unexpected that prednisone would have a palliative effect of some kind when co-administered with abiraterone, *see* Appx207-208, Appx276, Appx359, that it would have an anti-cancer effect was completely unexpected in 2006, Appx30206-30207, Appx37325, Appx44592.

### 2. *Mylan*

The *Mylan* IPR was filed after *Amerigen* and asserted the same grounds for invalidity,[2] Appx243, and the two Final Written Decisions are largely identical.

### 3. *Wockhardt*

The *Wockhardt* IPR involved an obviousness challenge based on the Gerber and O'Donnell references combined with a third reference, Sartor—a 1998 article that reported modest and short-lived PSA declines in a retrospective analysis of 29 patients on prednisone. *See* Appx330-331, Appx45665-45669. The Board rejected Janssen's claim construction for the same reasons it did in *Amerigen* and *Mylan*. Appx356-359. The Board made an additional finding, based on Sartor, that "prednisone would 'treat' prostate cancer" in the sense of having an anti-cancer effect. Appx359. But the Board did *not* find that a skilled artisan in 2006 would have had a reasonable expectation of success in achieving a combination therapy in which abiraterone and prednisone both have an anti-cancer effect. Again, as in *Amerigen* and *Mylan*, the Board read "the language of the challenged claims" to "not require a particular result." Appx359.

The Board's treatment of objective indicia in *Wockhardt* likewise mirrored *Amerigen* and *Mylan*. *See* Appx360-371. Again, the Board's decision to give the

[2] The *Mylan* and *Actavis* IPRs were later joined and resolved in a single Final Written Decision. *See* Appx35389-35394.

objective indicia no weight was driven by its understanding that the claimed invention did not require each component of the combination therapy to have an anti-cancer effect.

## SUMMARY OF ARGUMENT

*The Board Appeals*. The Board's decisions turn on an erroneous claim construction. The claims cover methods for "treating" cancer, but on the Board's reading, the methods need not have any effect on cancer at all. This construction conflicts not only with the claim language but also with the explicit definition of "treating" and "treatment" in the specification. According to the patent, the "treatment" provided by a compound must "include" one of a number of specifically identified anti-cancer effects. The Board's decision renders this definition meaningless. In the Board's view, the word "include" means that a compound can provide *either* an enumerated anti-cancer effect *or* some other, non-enumerated, effect.

The Board's erroneous construction infected its obviousness analysis. For example, the Board did not even consider whether a skilled artisan would have had a reasonable expectation of success in achieving the inventions of the '438 patent *as claimed*, because the Board did not have the right claimed inventions in mind. That both abiraterone and prednisone would have anti-cancer effects in a combination anti-cancer therapy was entirely counter-intuitive in 2006.

Researchers at the time of the invention had identified hundreds of promising compounds for treating advanced prostate cancer, and although both abiraterone and prednisone were known, neither was among the promising candidates on its own, much less in combination. To the contrary, as of 2006, secondary hormonal therapies like abiraterone were viewed as wholly ineffective, and those in the field did not regard prednisone as an anti-cancer treatment at all. The Board was able to bypass this issue because its construction would cover a therapy in which prednisone had some other therapeutic effect, and the Board's passing suggestion that its assessment would be the same under either construction of "treatment" cannot be squared with either the Board's actual analysis or the undisputed record.

The erroneous construction similarly infected the Board's analysis of objective indicia. As the Board noted, the "weight accorded the objective evidence" depends on the nexus between that evidence and the claimed invention—*i.e.*, the invention as defined by the claim construction. Appx211. Because of its erroneous construction, the Board failed to evaluate the nexus between the actual invention—that is, the invention defined by the correctly construed claims—and the objective evidence demonstrating that the actual invention was not obvious. For example, the Board concluded that the claimed invention did not meet a long-felt need in part because, in the Board's view, the invention was a therapy "based on abiraterone," which had been available long

before 2006. Appx215. But the invention is not merely the administration of abiraterone; it is a particular combination in which abiraterone and prednisone both have a specific anti-cancer effect. Had the Board appreciated that the invention involves a combination in which two drugs both have anti-cancer effects, it would have properly attributed the dramatic survival benefits of the ZYTIGA-prednisone therapy, the unexpected results, and the enormous commercial success to the claimed invention.

*The District Court Appeals*. The district court's judgment that the '438 patent is invalid as obvious rests on several critical legal errors, each of which warrants reversal or vacatur.

I. The court erred at the outset by allowing Defendants to pursue their obviousness challenges. Defendants presented these same challenges in the IPRs, and the Board resolved them in Final Written Decisions. Section 315(e)(2) therefore barred Defendants from pursuing those same obviousness challenges in district court. The court acknowledged that the plain terms of § 315(e)(2) could be read to preclude Defendants' challenges, but it disregarded the statute's language based on its view of the policies it believed motivated Congress to enact the provision. Contrary to the court's policy views, nothing in § 315(e)(2) limits its scope to petitioners who are unsuccessful, nor is there any suggestion in the

legislative history that Congress intended, but forgot to include, such a limitation. The statute is clear and should be applied as written.

Congress created IPRs as an alternative to district court litigation. In doing so, Congress gave parties a choice: they can pursue prior art challenges in an IPR to a final written decision, or in a district court, but not both. If a challenger elects to take advantage of the lower standard of proof and swifter time-to-decision available on the IPR path, and the IPR results in a final written decision, the challenger is precluded from pursuing the same challenge in court.

Whether rehearing requests are pending at the agency is irrelevant. Not only have those requests now been resolved, but nothing in the text or legislative history suggests that rehearing requests bear on the application of § 315(e)(2). The statute's text states that a final written decision issued under § 318(a) triggers the bar—not a "final appealable decision" or "final agency action."

II. Even if the district court could address obviousness, this Court should vacate the decision because it rests on legal errors. At the outset, the district court failed to identify any reason a skilled artisan would have decided to pursue development of abiraterone as of 2006. As Janssen showed, the scientific community at that time believed that second-line hormonal therapies like ketoconazole and abiraterone were not worth pursuing and would not address what was believed to be the core issue with advanced prostate cancer. The district court

acknowledged this, explicitly finding that the "prevailing belief" at the time of invention "was that, once [prostate] cancer resumed growing after ADT, the cancer became androgen independent." Appx87. Nonetheless, the court accepted Defendants' invitation to simply assume a skilled artisan would start with abiraterone. This Court, however, has instructed courts to identify a reason why a skilled artisan would select a particular starting point. The district court erred by failing to do that.

The court compounded its error by concluding that a person of ordinary skill would have had a reasonable expectation of success without ever deciding, as the law requires, whether that person would have had a reasonable expectation of success in achieving "what is claimed" by the patent—namely, a combination therapy in which both abiraterone and prednisone have anti-cancer effects. *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1365-67 (Fed. Cir. 2016). Nor could the court have made such a finding. Defendants' own expert admitted that the sole prior art reference the court discussed did not show prednisone could treat prostate cancer and that practitioners at the time did not view it as a cancer treatment.

Finally, the court's approach to evaluating objective indicia of non-obviousness has been squarely and repeatedly rejected by this Court. The district court concluded that the combination of abiraterone and prednisone was obvious,

and only then turned to objective indicia. In doing so, the court shifted the burden to Janssen to disprove its obviousness conclusion, as the court's approach to each individual indicium confirms.

## STANDARD OF REVIEW

In the Board appeals, this Court reviews legal issues *de novo* and underlying factual determinations for substantial evidence. *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 751 (Fed. Cir. 2016). The primary issue in the Board appeals is claim construction. Where, as here, the Board's construction is based on the intrinsic evidence, this Court reviews claim construction *de novo*. *See id.*

The threshold issue in the district court appeals is the scope of 35 U.S.C. § 315(e)(2). Statutory interpretation is a matter of law, which this Court reviews without deference. *See Res-Care, Inc. v. United States*, 735 F.3d 1384, 1387 (Fed. Cir. 2013). The Court reviews the legal conclusion of obviousness *de novo* and the underlying factual findings for clear error. *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1354 (Fed. Cir. 2013).

# ARGUMENT

## I. The Board's Decisions Rest on an Erroneous Claim Construction.

### A. The Claimed Invention Is a Combination Therapy in Which Both Abiraterone and Prednisone Have Anti-Cancer Effects.

Every claim in the '438 patent concerns a "method for the treatment of a prostate cancer" that involves administering a "therapeutically effective" amount of abiraterone and a "therapeutically effective" amount of prednisone. Appx765-766. As the Board recognized, a "therapeutically effective" amount is an amount that is "effective for *treating* prostate cancer." Appx333 (emphasis added). This means that both the abiraterone and the prednisone must "treat" the prostate cancer. But in the Board's view, "treating" cancer does not require any effect on the cancer itself—"some other mechanism," such as "palliative effects," can also qualify. Appx359.

The Board's unbounded construction cannot be squared with the intrinsic record. To "treat" cancer within the meaning of the '438 patent, a drug must have an effect on the cancer itself, such as by controlling the growth of a tumor or minimizing or delaying the spread of cancer cells. Treating something other than the cancer cannot suffice. That is how the district court construed the claims, Appx4081, and it is the only reasonable construction in light of the claim language and specification.

### 1. "Treatment" Requires An Anti-Cancer Effect.

The claim language makes clear that what is being "treated" is cancer rather than, for example, the side effects of a cancer therapy. *See Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998) ("actual words of the claim are the controlling focus"). Every claim recites a "method for the *treatment of a prostate cancer*." Appx765-766 (emphasis added). Several of the claims go a step further, reciting a method for treating cancer that "is not responding to at least one anti-cancer agent," which further confirms that the purpose of the claimed therapy is to generate an anti-cancer response—even when other drugs have failed. *See* Appx765-766 (claims 13-17, 20). Yet under the Board's construction of "treating" and "treatment," neither the prednisone nor even the abiraterone needs to have any anti-cancer effect at all—providing a patient with palliative therapy alone is enough to practice the patented invention. But if the inventors had intended to claim methods for treating pain suffered by cancer patients, the side effects of a therapy, or something else altogether, they could have done so. *See* Appx4066 (district court noting that "the patent refers to treatment of cancer, as opposed to patients *with* cancer"). They did not do that: they claimed a "method for the treatment of a prostate cancer." Appx765-766; *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (words of the claim are "generally given their ordinary and customary meaning").

Any doubt on this score is resolved by the specification. Most importantly, the specification provides an express definition of the disputed terms. In a section titled "Definitions," the patent explains:

> As used herein, and unless otherwise defined, the terms "treat," "treating" and "treatment" include the eradication, removal, modification, management or control of a tumor or primary, regional, or metastatic cancer cells or tissue and the minimization or delay of the spread of cancer.

Appx759(3:46-50). The patent thus defines "treating" and "treatment" to require direct effects on the growth or spread of the cancer itself. A therapy need not have all of these anti-cancer effects to qualify as a "treatment," but it must have at least one anti-cancer effect. When patentees act as lexicographers, their "lexicography governs." *Phillips*, 415 F.3d at 1316. Here, that means "treating" requires having some effect on the cancer itself.

The patent provides ample evidence beyond this express definition that the invention is directed to treating the cancer itself. The title of the patent is "Methods and Compositions for Treating Cancer," and the Background emphasizes the need for "effective anti-cancer treatment options." Appx755, Appx758(2:1-4). The Detailed Description specifies that a CYP17 inhibitor (such as abiraterone) should be used in "an amount that is sufficient to treat *the cancer*," Appx761(7:34-36) (emphasis added), and it likewise specifies that a steroid (such as prednisone) should be used in "an amount that is sufficient to treat *the cancer,*"

Appx762(10:21-24). Indeed, cancer is the only condition requiring treatment mentioned anywhere in the patent. *Kinetic Concepts, Inc. v. Blue Sky Med. Grp.*, 554 F.3d 1010, 1018-19 (Fed. Cir. 2009) (giving "wound" a narrow construction to fit specification's description); *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1375 (Fed. Cir. 2009) (construing "spike" consistent with specification use); *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329-30 (Fed. Cir. 2009) (construing "graft" to mean the only devices described in the specification). The patent nowhere even mentions pain reduction, palliation, or any other therapeutic effects.

#### 2. The Board's Contrary Reasoning Does Not Withstand Scrutiny.

In the Board's view, treatment "can 'include' a number of actions," such that "prednisone may be used to 'treat' prostate cancer, perhaps by an anti-cancer effect, or perhaps *by some other mechanism*," such as "palliative effects." Appx359 (emphasis added). The Board never explains how one would determine whether a given "other mechanism" would qualify as "treatment"—it may be that any effect on the body would suffice. *Cf. Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1578 (Fed. Cir. 1996) (refusing construction that would render a limitation "meaninglessly empty"). What is clear, however, is that one could practice the claimed method for treating cancer as the Board understands it without having any effect on the cancer at all.

The Board's erroneous construction rests primarily on its misreading of two aspects of the specification. First, the Board leans heavily on the word "include" in the express definition of "treating" and "treatment." Appx359 ("[B]ecause 'treating' can 'include' a number of actions, prednisone may be used to 'treat' prostate cancer, perhaps by an anti-cancer effect, or perhaps by some other mechanism."). As the Board saw it, "include" made the definition entirely open-ended, sweeping in any conceivable therapeutic (or non-therapeutic) effect on a cancer patient, without regard for whether the "treatment" affected the cancer at all. That was a clear legal error. As the district court recognized in its claim construction decision, this Court has made clear that "includes" or "including" cannot "somehow trump[] consideration of the specification and prosecution history and displace[] application of standard claim construction principles." Appx4071 (quoting *Lochner Techs., LLC v. Vizio, Inc.*, 567 F. App'x 931, 939 (Fed. Cir. 2014) (non-precedential)). Based on the intrinsic record, "include" should be read as requiring one of the specified effects; otherwise, "treating" has no boundaries and thus no definition. Appx4072 (holding that "include" does not "do the work of extending the scope of a patent to matters not discussed therein.").

But even if one were to set aside the intrinsic evidence and read "include" as non-limiting, it still could not support the boundless construction the Board adopted. The "plain meaning" of "including," this Court has held, is that the

"named elements are essential, but other elements may be added." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1344-45 (Fed. Cir. 2003); *see also Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1400 (Fed. Cir. 2016); *Lucent Techs., Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1214 (Fed. Cir. 2008). Here, where the list of enumerated elements uses the disjunctive "or," the invention need not include all of those elements, but it must include at least one. Simply put, "include" or "including" does not mean, as the Board thought, that any list that follows is simply exemplary or optional: the listed elements—or at least one of them where the list uses "or"—are required. *Amgen*, 314 F.3d at 1344-45.

Here, every enumerated effect in the patent's express definition targets tumors or cancer cells themselves, and no other type of therapeutic effect is mentioned anywhere. The only possible reading of this definition is that "treatment" *must* include at least one of the enumerated effects, and not that "treatment" *may* include *either* an enumerated effect *or* any other effect, regardless of whether it has anything to do with cancer cells or tumors. The Board erred in concluding that use of "include" in the definition of "treatment" means that "treatment" need not include any enumerated element.

It is no answer to say that abiraterone can treat the cancer while prednisone treats, for example, any side effects. As the Board acknowledged, both the abiraterone and the prednisone must be administered in a "therapeutically

effective" amount, *i.e.*, an amount "effective for treating prostate cancer." Appx333. "Treating prostate cancer" cannot reasonably be understood to have two different meanings in a single claim. *See Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1380 (Fed. Cir. 2013) ("same claim term in the same patent ... [presumptively] carries the same construed meaning"). If "treating" means that one component must have an anti-cancer effect, the other component must have an anti-cancer effect as well.

Second, the Board relies on what it saw as a distinction in the specification between "an anti-cancer agent" and "a steroid." Appx356. But the fact that a steroid may have uses other than as an anti-cancer agent is beside the point. The specification identifies "antibiotic[s]" as anti-cancer agents, Appx761, and specifically identifies prednisone as an antibiotic, Appx762. Moreover, the specification makes clear that, in the invention as claimed, the steroid should be used in "an amount that is sufficient to treat the cancer," Appx762(10:21-24), and the Board correctly interpreted "therapeutically effective amount of prednisone" to mean "an amount of prednisone effective for treating prostate cancer." Appx333. And the express definition of "treating," as explained, requires having some effect on the cancer itself. The distinction on which the Board relied does not exist.

The Board's construction of "treating" is thus erroneous in light of the claim language and specification. *See PPC Broadband*, 815 F.3d at 755 ("[B]roadest

reasonable interpretation must be reasonable in light of the claims and specification."). Under the Board's construction of "treatment," neither abiraterone nor prednisone needs to have an anti-cancer effect, contrary to the entire purpose of the claimed invention.

### B. The Board's Erroneous Construction Infected Its Analysis of Obviousness.

The Board's claim construction error undermines the Board's entire obviousness analysis.

As the Board acknowledged, abiraterone was "underutiliz[ed]" and the subject of "skepticism until the application for the '438 patent was filed in 2006." Appx366, Appx364. Indeed, by 2006 those in the field believed that secondary hormonal therapies (like abiraterone) had failed, and thus used terms such as "hormone-refractory" or "androgen-independent" prostate cancer to describe mCRPC. Appx42587-42588; *see also* Appx45780 (noting, in 2002, that there was "no evidence that secondary hormonal therapies ... improve survival"); Appx42988 (recommending, in 1999, that "[t]he next generation of clinical trials" not "consist of futile hormonal manipulations"). The counter-intuitive hypothesis that led to the inventions of the '438 patent was that a glucocorticoid such as prednisone could produce an anti-cancer effect when co-administered with abiraterone. Appx43560-43561. Dr. de Bono's investigation into this hypothesis led to the breakthrough discovery of the combination therapy claimed in the '438 patent and

approved on a priority basis by the FDA—a therapy that has led to a dramatic survival benefit for advanced prostate cancer patients and has been a runaway commercial success.

Based on its erroneous construction—that a drug can "treat" cancer without having any effect on the cancer itself—the Board concluded that the claims would encompass something else: a therapy in which only abiraterone treats the cancer. Having identified the wrong invention, the Board not surprisingly reached the wrong result. It failed to appreciate, for example, that a skilled artisan in 2006 would have had no reasonable expectation of success in developing a combination therapy in which *both* abiraterone *and* prednisone treat advanced prostate cancer. Moreover, without an accurate understanding of the invention, the Board could not properly evaluate the powerful objective evidence of non-obviousness.

#### 1. The Board Did Not Find the Required Reasonable Expectation of Success in Achieving the Invention as Claimed.

An "obviousness determination requires finding ... that the skilled artisan would have had a reasonable expectation of success" in making the claimed invention. *In re Stepan Co.*, 868 F.3d 1342, 1345-46 (Fed. Cir. 2017); *see also Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1362 (Fed. Cir. 2009). In administrative proceedings, the Board must expressly "articulate why a person of ordinary skill in the art would have had a reasonable expectation of success."

*Stepan*, 868 F.3d at 1347; *see also In re Kahn*, 441 F.3d 977, 986 (Fed. Cir. 2006) (Board "must articulate the basis" for its obviousness determination).

Across three decisions, the Board never found that a skilled artisan in 2006 would have had a reasonable expectation of success in making the invention as claimed, *i.e.*, a combination therapy in which *both* arbiraterone *and* prednisone have an anti-cancer effect. In each case, the Board's findings on expectation of success concerned something other than the claimed invention because of its erroneous claim construction. Appx208 ("prednisone may be used to 'treat' prostate cancer ... by some other mechanism"); Appx276 (same); Appx359 (same). The *Wockhardt* decision tacks on a conclusory finding that, based solely on the 1998 Sartor reference, "prednisone would 'treat' prostate cancer under either definition." Appx359. But that is still *not* equivalent to the necessary finding that a person of skill, at the time of invention in 2006, would have expected both prednisone and abiraterone to have an anti-cancer effect, particularly in combination.

The Board never made that finding. Instead, the Board relied on its erroneous claim construction. Appx359 (claims do "not require a particular result"). Based on that construction, the Board was not convinced that "Petitioner [had] not established"—notably, it never said Petitioners *had* established—"a reasonable expectation of achieving the challenged claims." Appx359. Even

ignoring the Board's clear misapplication of the burden of proof, this conclusion cannot stand because it is based on a misunderstanding of the "challenged claims." As this Court has explained, the "question of a reasonable expectation of success" is "tied to the proper construction of the claim language." *L.A. Biomedical Research Inst. v. Eli Lilly & Co.*, 849 F.3d 1049, 1067 n.8 (Fed. Cir. 2017) (vacating obviousness determination based on erroneous construction); *Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co*., 856 F.3d 1019, 1026 (Fed. Cir. 2017) (vacating Board decision because Board cited no evidence that showed artisans "would have reasonably expected to achieve the specific thermal conductivities recited in the claims."); *cf. Institut Pasteur & Universite Pierre et Marie Curie v. Focarino*, 738 F.3d 1337, 1346 (Fed. Cir. 2013) ("the expectation-of-success analysis must match the highly desired goal").

Under a proper claim construction, the Board could not have found the required expectation of success. By 2006, Sartor himself had acknowledged that glucocorticoids such as prednisone had not "demonstrated a survival advantage," Appx44462, and those in the field recognized that the PSA response to glucocorticoids administered alone (which was all that Sartor 1998 reported) was generally modest and short-lived, Appx42655. Even more fundamentally, Wockhardt's own expert testified that he thought it was "unclear what the prednisone impact would be when combined with abiraterone acetate."

Appx44592; *see also* Appx30206-30207 (Amerigen expert would "not expect that the addition of prednisone to a treatment for prostate cancer that includes abiraterone would result in any clinically significant enhancement of the *anti-cancer or anti-tumor effect*, as opposed to enhancement of the safety and tolerability, of treatment"); Appx37325 (Mylan expert testifying that a person of skill would believe "that prednisone would *not* have any measurable cancer-treating effect when combined with abiraterone acetate") (emphasis added). On this record, the Board could not have found that a skilled artisan in 2006 would have expected both abiraterone and prednisone to have anti-cancer effects when administered together.

#### 2. The Board Did Not Assess the Objective Evidence Demonstrating the Non-Obviousness of the Invention as Claimed.

The Board's erroneous construction also infected its analysis of objective indicia of non-obviousness, which "may often be the most probative and cogent evidence in the record." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983). These indicia cannot be assessed without a clear and correct understanding of the scope of the claims. *See, e.g.*, *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018) ("objective evidence of non-obviousness must be commensurate in scope with the claims"). The Board recognized that the proper assessment of objective evidence depends upon the

scope of the claimed invention, Appx361, but the Board's failure to construe the claims correctly necessarily precluded it from properly assessing the objective indicia.

Because the direct consequence of the Board's construction was that prednisone need not have an anti-cancer effect in the combination, the Board focused solely on abiraterone as the inventive aspect of the invention. This led to several errors in the Board's assessment of objective indicia. For example, in assessing long-felt need, the Board noted that "drugs that contribute to increasing cancer patient survival rates nearly always satisfy a long-felt need," but it concluded that there was not sufficient evidence to support a need for the invention, in part because abiraterone's "availability (and underutilization) for approximately a decade ... undermines [the] argument that a long-felt need existed for any regimen based on abiraterone." Appx366. But that is entirely the wrong inquiry: the need was not for an abiraterone-based regimen—it was for a therapy with improved survival benefits for advanced prostate cancer patients. In any event, the claimed method for treating cancer is not a "regimen based on abiraterone" alone; it is a combination therapy in which *both* abiraterone *and* prednisone treat advanced prostate cancer. Once the scope of the claims is properly defined, the failure of abiraterone by itself to meet the long-felt need for an effective treatment only underscores the non-obviousness of the combination

therapy. Abiraterone was available for over a decade, yet the need for an effective treatment for advanced prostate cancer persisted. In contrast, the combination therapy was a breakthrough.

The Board's analysis of commercial success reflects the same legal error. Having construed the claims to cover a therapy in which abiraterone is the only drug combating the cancer itself, the Board discounted any "anti-cancer role of prednisone." Appx370. This allowed the Board to attribute ZYTIGA's unquestioned commercial success to abiraterone alone—notwithstanding abiraterone's "availability (and underutilization) for approximately a decade," Appx366—rather than to the combination therapy claimed in the '438 patent. Had the Board understood that both drugs in the combination must treat the cancer, then the fact that the commercial embodiment of the patent—ZYTIGA administered "in combination with prednisone for the treatment of patients with [mCRPC]" according to its FDA-approved label, Appx38907—was a runaway success whereas abiraterone alone was not even pursued would be powerful evidence of non-obviousness. *See Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000) (nexus is presumed when marketed product embodies claimed features).

The Board's treatment of commercial success reflects other legal errors as well. Most importantly, the Board shifted the burden of proof onto Janssen in two

distinct ways. *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007) ("burden of proof never shifts to the patentee to prove validity"). First, although the Board acknowledged that nexus was presumed, it determined that Petitioners rebutted the presumed nexus *without* finding that they had presented evidence sufficient to show that ZYTIGA's success was due to something other than the claimed invention. Appx370 (noting that it was "not clear" what drove sales, and concluding "that Petitioner present[ed] sufficient evidence to rebut the presumption of nexus."). If the record is inconclusive, the presumption cannot be displaced.

Second, the Board imposed upon Janssen the burden to show that BTG's efforts to license an asserted "blocking patent" were sufficient to "remove the deterrent effect" of that patent. Appx369. But a "blocking patent may or may not deter innovation in the blocked space," *Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*, 903 F.3d 1310, 1338 (Fed. Cir. 2018), and the extent of a blocking patent's impact is a "fact-specific inquiry," *id.* at 1339. Janssen presented evidence (and the Board assumed) that the asserted blocking patent was "available for licensing and was actively shopped around to other companies" between 2000 and 2004. Appx368-369. Indeed, Boehringer had rights to abiraterone in the 1990s and had every incentive to develop the wildly successful inventions of the '438 patent if it was obvious to do so, but halted its entire development program three years after

taking a license. Appx42683. Against this backdrop, it was incumbent upon *Petitioners* to show that the blocking patent so deterred efforts by others in the field that ZYTIGA's tremendous commercial success should be attributed to that deterrent effect rather than the merits of the combination invention. *Cf. Pfizer*, 480 F.3d at 1359. But the Board flipped the burden, found that Janssen had not met it, and disregarded commercial success altogether.

The Board's erroneous claim construction similarly infected its evaluation of skepticism. Janssen introduced evidence that those in the field in 2006 were skeptical of secondary hormonal therapies (which would include both abiraterone and prednisone), and that many had tried and failed to develop secondary hormonal therapies that would produce a survival benefit for mCRPC patients. *See, e.g.*, Appx41696-41697 (discussing evidence). The Board refused to acknowledge this skepticism by first suggesting that the 1997 Barrie patent on abiraterone showed "at least some in the industry had overcome their skepticism." Appx365. But this is backwards. That the scientific community was skeptical of abiraterone after it was known and patented is what demonstrates the non-obviousness of a combination treatment involving abiraterone. The Board further erred by ignoring that skepticism with respect to combining two secondary hormonal treatments into a combination therapy in which both combat the cancer. This omission stems from the Board's erroneous claim construction. Only by ignoring that prednisone must

have an anti-cancer effect in the combination could the Board conclude that the skepticism toward secondary hormonal therapies did not extend to the combination of abiraterone and prednisone.

Had the Board understood that both elements in the combination therapy must have an anti-cancer effect, it would have been compelled to give the objective evidence substantial weight. The evidence showed that Boehringer, one of the world's largest pharmaceutical companies, was not "blocked," but failed to make the invention and instead abandoned efforts to develop any product involving abiraterone, Appx42683-42684, and Petitioners' own experts testified that they would not have expected prednisone to have an anti-cancer effect when administered with abiraterone. *See* Appx44592, Appx30206-30207, Appx37325. On a proper construction of the claims, skepticism surrounding secondary hormonal therapies strongly supports a finding of non-obviousness. So, too, does the fact that the combination therapy claimed in the '438 patent—in which *both* abiraterone and prednisone fight the cancer—succeeded where others had failed.

Ultimately, the Board's erroneous claim construction alone warrants vacatur and remand for the Board to determine, in the first instance, whether the inventions actually claimed in the '438 patent would have been obvious. *See, e.g.*, *PPC Broadband*, 815 F.3d at 749 (remanding in light of erroneous claim construction).

The fact that the construction infected the Board's evaluation of the evidence confirms the need for vacatur and remand.

## II. The District Court Should Not Have Considered an Obviousness Challenge That Was Barred by 35 U.S.C. § 315(e)(2).

While the Board erred in its obviousness analysis, the district court erred by considering obviousness at all.

### A. The Plain Language of § 315(e)(2) Precludes Defendants' Obviousness Arguments.

Section 315(e)(2) provides:

> The petitioner in an inter partes review … that results in a final written decision under section 318(a) … may not assert … in a civil action … that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during that inter partes review.

35 U.S.C. § 315(e)(2). By its terms, this proscription extends to a petitioner in any IPR "that results in a final written decision under section 318(a)," regardless of whether the petitioner was successful or unsuccessful. When the Board issues a final written decision, estoppel applies and bars relitigation of the same obviousness challenges in a district court.

Here, each Defendant sought *inter partes* review of the '438 patent on several grounds, each of which was also raised in the district court—a point Defendants expressly acknowledged. Appx12776, Appx20999. Those Board proceedings "result[ed] in final written decision[s] under section 318(a)," as § 315(e)(2) requires. *See* Appx12780 (citing § 318(a)), Appx12830, Appx12880.

Therefore, § 315(e)(2) barred Defendants from asserting—and the district court from deciding—that the '438 patent is invalid as obvious in the Hatch-Waxman cases.

### B. The District Court's Reasoning Confirms Its Error.

The district court rejected the conclusion compelled by the statutory text based on its own view of patent policy. But the court's policy concerns cannot override the clear statutory text and were misplaced in any event.

#### 1. Section 315(e)(2) Applies to Successful Petitioners.

Although the statute's text draws no distinction between successful and unsuccessful petitioners, the court refused to "accept … that Congress intended to require a [successful challenger] to stand mute in court because it previously prevailed on the same issue before the PTAB." Appx98. But the statute as written does not require a successful challenger to stand mute in court. Rather, the successful challenger is simply limited to defenses not addressed or addressable in the Board proceedings. Here, for example, Defendants challenged the patent on § 112 grounds and presented their non-infringement defenses to the court without running afoul of the statute. The statute limits only their ability to pursue certain prior art defenses presented in IPR proceedings. And as to that, the statute expresses Congress's clear intent to apply the bar to *all* defendants who pursue an IPR to final written decision. When "the statute's language is plain," that is

"where the inquiry should end."[3] *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1946 (2016); *see also Honeycutt v. United States*, 137 S. Ct. 1626, 1635 n.2 (2017) (courts "cannot construe a statute in a way that negates its plain text").[4]

The legislative history confirms Congress's purpose. IPR preclusion was designed to be stronger than what had existed under the earlier *inter partes* reexamination regime. *See* 157 Cong. Rec. 2710 (2011) (statement of Sen. Grassley) ("strengthened estoppel standard"); 157 Cong. Rec. 13,187 (2011) (statement of Sen. Kyl) (referring to bill's "enhanced estoppels"). That earlier estoppel provision expressly applied only to unsuccessful challengers, barring them from asserting "the invalidity of any claim *finally determined to be valid and patentable* on any ground which [they] raised or could have raised during the inter partes reexamination proceedings." 35 U.S.C. § 315(c) (2006) (emphasis added).

---

[3] Likewise, § 315(e)'s title ("Estoppel") "cannot limit the plain meaning of the text." *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R.*, 331 U.S. 519, 528-29 (1947). In any event, "estoppel" is a general term that refers to "[a] bar that prevents the relitigation of issues"; it does not apply solely to those who litigated and lost. *See Estoppel*, Black's Law Dictionary (10th ed. 2014); *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (applying judicial estoppel to litigant who had prevailed in prior case).

[4] The only other decision-makers to address the issue have held that § 315(e)(2) applies to all petitioners, successful or not. *See SiOnyx, LLC v. Hamamatsu Photonics K.K.*, 330 F. Supp. 3d 574, 599 (D. Mass. 2018); *Certain Hybrid Electric Vehicles & Components Thereof*, Inv. No. 337-TA-1042, at 7 n.12 (USITC Nov. 1, 2017) (Initial Determination).

But that limitation was dropped in the America Invents Act (AIA). Congress plainly knew how to limit preclusion to unsuccessful challengers, and the district court should have respected Congress's decision to drop that limitation and expand the scope of preclusion.

The expanded estoppel provision supported Congress's broader goal of creating "procedures" that would "provide faster, less costly *alternatives* to civil litigation to challenge patents." 157 Cong. Rec. 2710 (2011) (statement of Sen. Grassley) (emphasis added). As Senator Kyl put it, the AIA's expanded estoppel provision would ideally ensure that IPR proceedings would "*completely substitute* for at least the patents-and printed-publications portion of the civil litigation." 157 Cong. Rec. 3429 (2011) (statement of Sen. Kyl) (emphasis added). In the district court's view, however, an IPR is an "alternative" or "substitute" only when the challenger loses. If the challenger succeeds, the court and parties must bear the expense of litigating the same issues again. The statute and legislative history make clear that Congress intended to eliminate such waste.

Nor is there any unfairness in applying the statute as written. As noted above, contrary to the district court's concern, defendants are not required to "stand mute." Appx98. Congress gave defendants a choice of forum for certain prior art-based defenses. The IPR path offers a quicker and less expensive alternative under a more lenient standard of proof, but defendants who choose the

IPR path bear both the benefits and burdens of their choice. *See, e.g.*, *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 672-73 (1990) (interpreting statute to impose both advantages and disadvantages, not only advantages). One of those burdens is forgoing litigation of certain (but not all) defenses in the district court. Defendants who choose to pursue an IPR to final written decision remain free to assert non-infringement, written description, and other non-prior-art defenses—as Defendants here did—but they may not rehash theories that were or could have been raised before the Board.

There is no exception to this general rule for Hatch-Waxman cases. Under Hatch-Waxman, Congress carefully crafted a scheme that would encourage pioneer drug developers to undertake the massive investments necessary to discover and develop new drug products, while streamlining the process for generic entry at the appropriate time. A key feature of this scheme is 35 U.S.C. § 271(e)(4), under which district courts must enjoin the approval of a generic product found to infringe an unexpired patent under § 271(e)(2). Generic manufacturers can avoid a finding of infringement (and thus an injunction) by proving that the patent is invalid in the district court, and if they choose this path, they must prove invalidity by clear and convincing evidence. *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2246 (2011). But if they elect the IPR path, they cannot assert invalidity on printed prior-art grounds in the district court.

Generic manufacturers who pursue an IPR can avoid an injunction under § 271(e)(4) if the district court determines that they do not infringe or that the patent is invalid on other grounds, but otherwise the injunction is automatic—at least until a Final Written Decision of unpatentability is confirmed by this Court. The district court may disapprove of this system, *see* Appx98, but it is the system Congress enacted.

### 2. Section 315(e)(2) Is Triggered by a "Final Written Decision Under Section 318(a)," Not Final and Appealable Decisions or Final Agency Action.

The district court held that Janssen's then-pending rehearing requests made the Board's Final Written Decisions insufficiently "final" for § 315(e)(2) to apply, reasoning that "appealability" triggers preclusion under the statute. Appx98-99. But nothing in the statute or its legislative history suggests that appealability has any relevance at all. *See generally* Joseph Matal, *A Guide to the Legislative History of the America Invents Act: Part II of II*, 21 Fed. Cir. B.J. 539, 616 (2012) (explaining that § 315(e)(2) will "apply *as soon as* the PTAB enters a final written decision" and that its "effect is not delayed pending completion of an appeal to the Federal Circuit" (emphasis added)).

The statute provides that preclusion will arise upon issuance of a "final written decision under section 318(a)." 35 U.S.C. § 315(e)(2). Section 318(a), in turn, provides that the Board shall "issue a final written decision" in any instituted

IPR. Neither provision refers to appealability. Whether a request for rehearing makes a final written decision temporarily non-appealable makes no difference; the statutory trigger is issuance of a "final written decision," not an appealable final written decision or final agency action.

The distinction between finality for preclusion purposes and appealability is a familiar one. For example, the pendency of post-trial motions does not make a district court decision "non-final" for preclusion purposes or prevent it from having preclusive effect, even if the motions make it unappealable. *See Tripati v. Henman*, 857 F.2d 1366, 1367 (9th Cir. 1988) (per curiam) ("A pending Rule 59(e) motion similarly does not deprive a judgment of finality for *res judicata* purposes."); *Perez v. Volvo Car Corp.*, 247 F.3d 303, 309-10 n.4 (1st Cir. 2001) (same); 18 James Wm. Moore, *Moore's Federal Practice* § 131.30[2][c][iv], at 131-100 (3d ed. 1998) ("Finality should attach for claim preclusion purposes at the time of entry of judgment … while such a [post-trial] motion is pending the judgment is unappealable even though it has preclusive effect."); *see also* Fed. R. Civ. P. 60. Indeed, the distinction is reflected in the Board's own practice. The Board applies § 315(e)(1), the sister provision to § 315(e)(2) that bars re-litigation of invalidity grounds in subsequent Patent Office proceedings, even where a rehearing request is pending in the first proceeding. *Apple Inc. v. Personalized Media Commc'ns LLC*, IPR2016-01520, 2018 WL 922376, at *2 (P.T.A.B. Feb.

15, 2018). The operative language is the same in the two provisions, and it should be applied consistently.

The Board's denials of Janssen's rehearing requests—which are styled "Decisions Denying Patent Owner's Request for Rehearing," *not* new "Final Written Decisions"—confirm that the "final written decision[s] under section 318(a)," 35 U.S.C. § 315(e)(2), were those issued prior to trial in the district court.[5]

### C. The District Court's Judgment Should Be Reversed, and Judgment Should Be Entered for Janssen.

Because the only basis for the district court's judgment in favor of Defendants was barred by § 315(e)(2), this Court should reverse and direct entry of judgment for Janssen. The district court has already rejected Defendants' § 112 defenses and concluded that their ANDAs would induce and contribute to infringement; there are no other defenses remaining; and there is no cross-appeal. Appx74, Appx102, Appx123, Appx142. Therefore, the district court should enter judgment and issue an appropriate injunction under § 271(e)(4).

## III. In the Alternative, the District Court's Ruling on the Merits of Defendants' Obviousness Defenses Should Be Reversed.

The combination therapy of the '438 patent revolutionized the treatment of advanced prostate cancer, achieved enormous commercial success, and produced

[5] In any event, now that the Board has denied rehearing, the "Final Written Decisions" are indisputably appealable. Thus, Defendants may not "assert" their obviousness defenses in this ongoing "civil action." 35 U.S.C. § 315(e)(2).

results contrary to the expectations in the art at the time of invention. But in assessing obviousness, the district court erred from the outset by simply assuming that a skilled artisan would pursue a cancer therapy that involved abiraterone, and it compounded the error by failing to engage in any distinct analysis of reasonable expectation of success. And although a proper analysis of the objective evidence of non-obviousness might have avoided the hindsight trap into which the court fell, the court erred again by applying the wrong framework for assessing such evidence. The result is a decision premised on legal error that should be reversed.

### A. The District Court Erroneously Assumed that a Skilled Artisan Would Have Selected Abiraterone for Development.

The court's threshold error was its failure to analyze whether there was any reason a skilled practitioner would have pursued development of a therapy that included abiraterone based on the state of the art in 2006. *See Cyclobenzaprine*, 676 F.3d at 1072 ("Evidence of obviousness … is insufficient unless it indicates that … skilled artisans would have had a reason to select the route that produced the claimed invention."). In other words, the court never identified any reason for "pluck[ing] one reference out of the sea of prior art" for further development or modification. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016); *see also Polaris Indus.*, 882 F.3d at 1069 n.4; *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1303-04 (Fed. Cir. 2010) ("it is not enough to simply show that the [prior art] references disclose the

claim limitation"; it is "important to identify a reason" to pursue it). Instead, the court essentially gave Defendants a pass on establishing this critical foundational step. This is legal error.

Had the court addressed the question, it could not have made the findings required to establish obviousness. A skilled artisan would not have chosen to pursue an anti-cancer therapy using abiraterone in 2006, because abiraterone was in a class of compounds widely regarded as not worth pursuing at that time.

Indeed, as the court itself found, the "prevailing belief" at the time of invention "was that, once [prostate] cancer resumed growing after ADT, the cancer became androgen independent." Appx87. Despite numerous attempts, no secondary hormonal therapy had ever shown a survival benefit or received FDA approval for prostate cancer. Appx22465, Appx22552-22553, Appx22764-22765. As noted above, the terminology used to describe advanced prostate cancer (such as "androgen-independent" or "hormone resistant") reflected this reality, Appx21014-21015, Appx22764, Appx23182, Appx28524, Appx23215, Appx27880, including in articles by Defendants' oncology expert, Appx22576-22577, and researchers considered secondary hormonal therapies "antiquated," Appx21140-21141, Appx22176-22177; Appx28524 (advising to avoid "futile hormonal manipulations"). At the time, over 200 compounds for the treatment of advanced prostate cancer were in development, Appx28488, and a 2005 paper

surveying the "most promising agents in clinical development" did not even mention abiraterone—or any other secondary hormonal drug. Appx28560-28570, Appx22769-22770.

To be sure, the district court did conclude that "abiraterone had been identified in the prior art as a second-line prostate cancer treatment." Appx115. But the court did not consider whether, much less explain *why*, a skilled artisan would have chosen to pursue abiraterone over the hundreds of other, more-promising alternatives identified at the time. At most, the court held that the existence of "other anti-cancer agents, perhaps even more promising ones," fell short of teaching away from abiraterone because it suggested only that abiraterone was not the "'preferred, or most desirable'" option. Appx117 (quoting *In re Fulton*, 391 F.3d 1195, 1200 (Fed. Cir. 2004)). But teaching away is not the issue: the issue is whether a skilled artisan would have been motivated to select abiraterone for development in the first place. And even if teaching away were the issue, the prevailing view in 2006—which saw second-line hormonal therapies as "antiquated" or "futile"—plainly "criticize[d], discredit[ed], or otherwise discourage[d]" the development of abiraterone. *Fulton*, 391 F.3d at 1201.[6]

[6] The court's reliance on earlier references—the 1994 Barrie article and the 2004 O'Donnell paper (based on the 1999 Phase I study)—does not fix this problem. *See Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1356 (Fed. Cir. 2013) ("considerable time lapse" between prior art and invention shows "a resort to

### B. The District Court's Conclusions Regarding Reasonable Expectation of Success Rest on Legal Error.

Although the district court, unlike the Board, properly construed the claims to require that *both* the abiraterone *and* the prednisone have an anti-cancer effect, Appx4081 (construing "treating"), it made the same error as the Board on "reasonable expectation of success": it failed to consider whether a skilled artisan would have had a reasonable expectation of success in achieving the invention *as claimed*. The court made no finding that a skilled artisan—even one motivated to make the combination—would have expected both drugs to have an anti-cancer effect in a combination therapy. That was a legal error. *Intelligent Bio-Sys.*, 821 F.3d at 1367 ("[F]ailure to consider the appropriate scope of the … patent's *claimed invention* in evaluating the reasonable expectation of success … constitutes a legal error.").

Moreover, the record would not have supported such a finding, much less by clear and convincing evidence. Indeed, there was no evidence to support a finding that *either* drug, on its own, would be expected to provide "treatment"—*i.e.*, "the eradication, removal, modification, management or control of a tumor or primary regional or metastatic cancer cells or tissue and the minimization or delay of the spread of cancer," Appx3599—in 2006.

---

hindsight"). By 2006, the prevailing view, as noted, was that secondary hormonal therapies were not worth pursuing.

As noted above, those in the field did not view second-line hormonal therapies, such as abiraterone, as promising. The O'Donnell 2004 paper was not enough to change that prevailing view because the late-1990s studies it reported were not designed to measure anti-cancer effects. Indeed, Boehringer—one of the largest pharmaceutical companies in the world, which had every incentive to develop a drug that could be profitable in a market with no good alternative—abandoned abiraterone shortly after those studies, which it had sponsored, ended. Appx21022, Appx21144-21145, Appx22887. And numerous other pharmaceutical companies passed on licensing abiraterone between 1999 and 2004 before a small smart-up took a chance on it. Appx21022, Appx21025-21026, Appx21145-21147, Appx22887-22888.

And there is even less evidence to suggest that skilled artisans in 2006 would have expected prednisone to provide "treatment" as the district court understood that term. Defendants' own oncology expert testified that Sartor 1998—the primary reference the court cited—does *not* show that prednisone treats prostate cancer and that he "do[es] not recall ever feeling that there was any proven anti-cancer benefit from prednisone." Appx22169-22170. He further conceded that "physicians [he] was in contact with also didn't have a sense that there was any proven anti-cancer benefit" from prednisone. Appx22170. And, by 2006, there were even "more data that [prednisone] doesn't treat mCRPC." Appx22843-

22844, Appx22845-22848 (further studies "confirmed a lack of impact on survival of glucocorticoids for mCRPC"), Appx28705 (2006 reference explaining that "no study with these agents has demonstrated a survival advantage"); *see also Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1138 (Fed. Cir. 1985) (inquiry is "at the time the invention was made" and "the state of the art that existed at the time").

Moreover, even if the prior art had provided a basis for a skilled artisan to expect that abiraterone and prednisone would each "treat" cancer on its own, there was no evidence—and certainly not clear and convincing evidence—to cause a skilled artisan to expect *both* elements to have an anti-cancer effect in combination. Indeed, the undisputed evidence showed that two agents can work at cross purposes. Appx21574, Appx22895, Appx22334. And the sole reference relied on by Defendants at trial for combining abiraterone and prednisone because of alleged anti-cancer effects, Vidal 2004, provides no reason to expect either element (let alone both) to be effective. Vidal, in fact, suggests that hormone-resistant prostate cancer is androgen-independent and thus not likely to respond to a further reduction in androgens (such as with abiraterone), as Defendants' expert conceded. Appx22649-22652. What is more, Vidal suggests avoiding glucocorticoids (like prednisone), because they might make the cancer worse. Defendants' expert

disparaged this as a mere "hypothesis," but did not dispute that Vidal teaches away. Appx22645-22649.

Ultimately, the court did not point to Vidal or anything else to support a finding that a person of ordinary skill would have expected each element of the claimed combination to have an anti-cancer effect. Instead, it simply failed to make the requisite finding. *See Intelligent Bio-Sys.*, 821 F.3d at 1367. This legal error warrants vacatur.

### C. The District Court's Evaluation of the Objective Indicia Was Plagued by Legal Errors.

Objective indicia are often "the most probative and cogent evidence in the record" on the issue of obviousness, *Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*, 769 F.3d 1339, 1343 (Fed. Cir. 2014) (en banc) (per curiam), and they "must always when present be considered," *Merck & Cie v. Gnosis S.P.A.*, 808 F.3d 829, 837 (Fed. Cir. 2015). This Court has held that a district court commits reversible error "by making its finding that the patents in suit were obvious before it considered the objective considerations and by shifting the burden of persuasion to" the patentee. *Cyclobenzaprine*, 676 F.3d at 1075.

The district court did precisely that. Rather than considering objective indicia as part of a comprehensive obviousness analysis, the court reached a conclusion on obviousness and only then turned to "objective considerations presented by plaintiffs," holding that these considerations did "not alter [its]

conclusion." Appx118; *see also* Appx118 (citing *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 719 (Fed. Cir. 1991), for the proposition that "secondary considerations did not carry sufficient weight to *override* obviousness determination based on primary considerations" (emphasis added)). *Cyclobenzaprine* teaches that courts should not reach a "conclusion" to be "alter[ed]" by the objective evidence, and they certainly should not shift the burden to the patentee to "override" an obviousness determination with secondary considerations. *See also Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed. Cir. 1983) (burden of persuasion never shifts to patentee).

The court's improper burden-shifting also permeates its treatment of individual objective indicia. Consider commercial success. The administration of ZYTIGA according to its label (*i.e.*, in combination with prednisone to treat cancer) is the commercial embodiment of the claimed invention—a fact that was necessary to the court's now-undisputed infringement determination. Appx132 ("I find that the combination therapy embodied in the label meets the claim limitations of the patent."). And there is no dispute that ZYTIGA as labeled has been a huge commercial success, generating "billions of dollars in sales." Appx118. When, as here, a patentee presents evidence of the tie between the patented invention and objective indicia, such as commercial success, there is a "presumption of nexus."

*WBIP*, 829 F.3d at 1329. It was therefore Defendants' burden to show that ZYTIGA's success was attributable to something *other than* the claimed invention.

But when Defendants relied on argument—not evidence—to assert that the success was attributable to abiraterone alone, the court shifted the burden to Janssen, ultimately finding Janssen's evidence "suggestive though not conclusive." Appx118. This was error: nexus is presumed in the absence of contrary evidence. It was also inconsistent with the court's finding that "[a]biraterone monotherapy is an off-label use, and there is no evidence in the record that this proposed off-label use is or would be 'substantial.'" Appx141.

Similarly, when Janssen presented undisputed evidence that the asserted "blocking patent" was available for license—indeed, it was actively shopped to major pharmaceutical companies without success, Appx120, Appx21145-21146—the court should have required *Defendants* to show that the patent actually presented an obstacle to those in the field. *See Acorda*, 903 F.3d at 1338 ("the mere existence or sheer number of blocking patents does not, without more, 'necessarily detract from evidence of commercial success of a product or process'"). Instead, the court simply presumed a deterrent effect and concluded that BTG's licensing efforts failed to satisfy some previously unknown standard of enthusiasm and "appear to have been lackluster" and "desultory." Appx120. The court's presumption and standard have no support in the law. Moreover,

regardless of whether BTG was an enthusiastic licensor—and it certainly was—Defendants presented no evidence that a company interested in developing a therapy that included abiraterone would have been unable to obtain a license or even discouraged by the existence of a prior patent.[7] It was Defendants' burden to do so.

The court committed a similar error with respect to skepticism. The evidence of skepticism was extensive, Appx22774-22776, Appx22832, Appx22844-22845, Appx22899-22900, Appx22554, Appx22649-22650, Appx21140-21142, Appx21156-21157, Appx21017-21019, Appx27876-27879, Appx23183, Appx28524, Appx28705, and the court itself found that "the prevailing belief was that" mCRPC was "androgen independent." Appx87. This prevailing belief necessarily means—as the evidence showed—that there was skepticism toward second-line hormonal therapies. The claimed combination is a second-line hormonal therapy, so nexus is presumed. *See WBIP*, 829 F.3d at 1329. Yet the district court surmised that the "skepticism seems to be directed to abiraterone itself, rather than the claimed combination," Appx121, and turned to Janssen to disprove that proposition. This was both illogical and legally wrong.

---

[7] Beyond the fact that the patent had been licensed to Boehringer, which abandoned its efforts, it is undisputed that BTG repeatedly tried to license the patent, including to major pharmaceutical companies like Bristol-Myers Squibb, U.S. BioScience, and Wyeth. *See* Appx120, Appx21145-21146.

As the Board did, the court failed to explain how skepticism toward "abiraterone itself" was not also skepticism toward a combination therapy that included abiraterone, and it erred by imposing the burden on Janssen to rebut its unsupported assumption that it was not.

The court committed even more fundamental errors in its approach to long-felt need and unexpected results. As the court acknowledged, Janssen introduced evidence that ZYTIGA plus prednisone "had less toxicity, was better tolerated, and improved overall survival" compared to existing mCRPC therapies, the chemotherapy drugs Taxotere and Jevtana. Appx122. The FDA's priority review approvals confirm that the claimed invention, as embodied in ZYTIGA plus prednisone, was not merely safe and effective, but a substantial improvement over then-available alternatives. *See Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, 471 F.3d 1369, 1380 (Fed. Cir. 2006). The court, however, gave little weight to this evidence because it viewed the improvement in overall survival, from 2.5 months with chemotherapy to 4 months with ZYTIGA plus prednisone, as "incremental" and a difference "'merely in degree,'" not "'in kind.'" Appx122 (citation omitted).

This analysis was flawed in at least two respects.

First, under this Court's precedent, a mere difference in degree is something "within the capabilities of one skilled in the art." *In re Huang*, 100 F.3d 135, 139

(Fed. Cir. 1996); *see also Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 739 (Fed. Cir. 2013). There was no evidence that improving survival rates by 60 percent was a matter of routine tweaks. *See Orexo AB v. Actavis Elizabeth LLC*, 903 F.3d 1265, 1274 (Fed. Cir. 2018) (finding clear error where a district court discounted a 66% improvement in bioavailability as a difference in degree, not kind).

Second, the court ignored other ways ZYTIGA plus prednisone improved upon chemotherapy, most importantly the combination therapy's undisputed greater tolerability and ease of administration. Indeed, chemotherapy's toxicity meant that many mCRPC patients could not—or chose not to—receive it. Appx22282-22283, Appx21989-21990. For such patients, ZYTIGA plus prednisone increased survival from *zero* months to 4 months or more—undoubtedly a difference in kind. Moreover, the therapy's improvement in overall quality of life undisputedly "changed the standard of care" in this field. Appx21103-21104, Appx21576-21577 (invention "was practice changing").

Given the practice-changing nature of this unexpected and commercially successful combination therapy, proper consideration of the objective indicia would have protected against hindsight bias and would have led the court to appreciate the non-obviousness of the claimed inventions.

## CONCLUSION

The Court should vacate the Board decisions and remand for further proceedings. The Court should reverse the district court's judgments and direct entry of judgment for Janssen, or, alternatively, vacate the judgments of invalidity and remand for further proceedings.

Dated: January 18, 2019

Respectfully submitted,

/s/ Constantine L. Trela, Jr.
Constantine L. Trela, Jr.
(ctrela@sidley.com)
David T. Pritikin
(dpritikin@sidley.com)
Thomas D. Rein
(trein@sidley.com)
Steven J. Horowitz
(shorowitz@sidley.com)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Tel: (312) 853-7000

Carter G. Phillips
(cphillips@sidley.com)
Paul J. Zegger
(pzegger@sidley.com)
Ryan C. Morris
(rmorris@sidley.com)
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, D.C. 20005
Tel: (202) 736-8940

*Counsel for Janssen Biotech, Inc., Janssen Oncology, Inc. and Janssen Research & Development, LLC*

Alyssa B. Monsen
(amonsen@sidley.com)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Tel: (212) 839-5300
*Counsel for Janssen Biotech, Inc., Janssen Oncology, Inc. and Janssen Research & Development, LLC*

Anthony C. Tridico
(anthony.tridico@finnegan.com)
Jennifer H. Roscetti
(jennifer.roscetti@finnegan.com)
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, D.C. 20001
Tel: (202) 408-4000
*Counsel for BTG International Ltd.*

## ADDENDUM

| Appx No. | Description |
|---|---|
| Appx1-Appx71 | (DI 560) 2018-10-26 District Court Opinion finding ’438 patent invalid and infringed |
| Appx72-Appx143 | (DI 571) 2018-10-31 District Court Consolidated Opinion (amending DI 560 opinion) |
| Appx144-Appx145 | (DI 561) 2018-10-26 District Court Order finding ’438 patent invalid and infringed |
| Appx146-Appx148 | (DI 572) 2018-10-31 District Court Final Judgment Under Rule 54(b) |
| Appx149-Appx151 | (DI 568) 2018-10-30 District Court Order granting PI pending appeal |
| Appx152-Appx171 | 2016-05-31 (Paper 014) Board Decision granting institution of IPR |
| Appx172-Appx177 | 2016-07-21 (Paper 023) Board Order denying request for rehearing (AMG) |
| Appx178-Appx225 | 2018-01-17 (Paper 086) Board Final Written Decision holding claims 1-20 unpatentable (AMG) |
| Appx226-Appx234 | 2018-12-03 (Paper 092) Board Decision Denying Request for Rehearing (AMG) |
| Appx235-Appx247 | 2017-01-10 (Paper 21) Board Order instituting IPR, denying Mylan motion for joinder (Mylan) |
| Appx248-Appx297 | 2018-01-17 (Paper 84) Board Final Written Decision holding claims 1-20 unpatentable (Mylan) |
| Appx298-Appx305 | 2018-12-03 (Paper 87) Board Decision Denying Request for Rehearing (Mylan) |

| Appx No. | Description |
|---|---|
| Appx306-Appx326 | 2017-01-19 (Paper 28) Board Decision Instituting IPR (SEALED) (Wockhardt) |
| Appx327-Appx377 | 2018-01-17 (Paper 72) Board Final Written Decision holding claims 1-20 unpatentable (Wockhardt) |
| Appx378-Appx384 | 2018-12-03 (Paper 76) Board Decision Denying Request for Rehearing (Wockhardt) |
| Appx754-Appx766 | Certified U.S. Patent No. 8,822,438 |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **BTG INTERNATIONAL LIMITED, et al.,** Plaintiffs, **v.** **AMNEAL PHARMACEUTICALS LLC, et al.** Defendants. | Civ. No. 15-cv-5909 (KM)(JBC) |
| **BTG INTERNATIONAL LIMITED, et al.,** Plaintiffs, **v.** **AMERIGEN PHARMACEUTICALS, INC., and AMERIGEN PHARMACEUTICALS LTD.,** Defendants. | Civ. No. 16-cv-2449 (KM)(JBC) |
| **BTG INTERNATIONAL LIMITED, et al.,** Plaintiffs, **v.** **TEVA PHARMACEUTICALS USA, INC.,** Defendant. | Civ. No. 17-cv-6435 (KM)(JBC) **CONSOLIDATED OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

These are consolidated Hatch-Waxman actions for infringement of United States Patent No. 8,822,438 ("the '438 patent") brought by Janssen Biotech, Inc.; Janssen Oncology, Inc.; Janssen Research & Development, LLC (collectively, "Janssen"); and BTG International Ltd. ("BTG"). Janssen and BTG co-own the '438 patent. The '438 patent contains twenty claims covering methods for the treatment of prostate cancer by administering various dosages

of abiraterone acetate and prednisone in combination. Patent exclusivity for these medications individually is not at issue.

The defendants are Amerigen Pharmaceuticals, Inc.; Amerigen Pharmaceuticals Ltd. (collectively, "Amerigen"); Amneal Pharmaceuticals LLC; Amneal Pharmaceuticals of New York, LLC (collectively, "Amneal"); Dr. Reddy's Laboratories, Inc.; Dr. Reddy's Laboratories, Ltd. (collectively "DRL"); Mylan Pharmaceuticals Inc.; Mylan, Inc. (collectively, "Mylan"); Teva Pharmaceuticals USA, Inc. ("Teva"); West-Ward Pharmaceutical Corporation, and Hikma Pharmaceuticals, LLC ("West-Ward/Hikman"); Wockhardt Bio AG; Wockhardt USA LLC; and Wockhardt Ltd. (collectively, "Wockhardt"). The defendants are generic drug companies who seek to engage in the commercial manufacture, use, offer for sale, or sale of a generic version of the plaintiffs' branded drug, ZYTIGA®.

Plaintiffs allege infringement of claims 4, 8, 11, 19 and 20, all of which rely on claim 1 of the '438 patent, based on the defendants' filing of Abbreviated New Drug Applications ("ANDAs"). If defendants' ANDAs are approved, defendants will allegedly induce infringement of the asserted claims of the '438 patent under 35 U.S.C. § 271(b) and contribute to infringement of the asserted claims under 35 U.S.C. § 271(c). Defendants deny infringement and claim that the patent claims are invalid for obviousness and for lack of a written description.

On November 3, 2017, defendants moved for summary judgment as to the induced and contributory infringement claims. (DE 364). The Court held a hearing on that motion on February 9, 2018. Because it appeared that there were issues of fact to be tried in any event, and that the issues on summary judgment would subsumed in those to be tried, the motion was terminated without prejudice to reassertion of all contentions therein following trial. (DE 483).

Meanwhile, on January 17, 2018, the Patent Trial and Appeal Board ("PTAB"), in three inter partes proceedings, found the patent invalid. A motion for reconsideration remains pending.

The Court conducted a bench trial beginning on July 23, 2018 and concluding on August 2, 2018. The parties have submitted post-trial briefing, as well as proposed findings of fact and conclusions of law.

This Consolidated Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). The findings of fact are based on the Court's observations and credibility determinations of the witnesses who testified at trial and a thorough review of all the evidence.

Essentially, I rule as follows: Like the PTAB, I find that the '438 patent is invalid for obviousness. I find the patent's written description to be adequate, however. In the alternative, and to facilitate appellate review, I have ruled on the infringement issues that were tried. Assuming that the '438 patent is valid, I find based on the proposed generic labels that the ANDA defendants' marketing of abiraterone would infringe, on either an induced infringement or contributory infringement theory.

## I. FINDINGS OF FACT[1]

---

1 I will cite to the record as follows:

| | | |
|---|---|---|
| DE __ | = | Docket Entry in this action, Civ. No. 15-5909 |
| DBr. | = | Defendants' Opening Post-Trial Brief (DE 533) |
| Def. Response | = | Defendants' Post-Trial Response Brief (DE 552) |
| DPF. | = | Defendants' Proposed Findings of Fact (DE 534) |
| DTX | = | Defendants' trial exhibits |
| JTX | = | Parties' joint trial exhibits |
| PTX | = | Plaintiffs' trial exhibits |
| PBr. | = | Plaintiffs' Opening Post-Trial Brief (DE 535) |
| PPF. | = | Plaintiffs' Proposed Findings of Fact (DE 549) |
| Pl. Response | = | Plaintiffs' Post-Trial Response Brief (DE 552) |
| 1T | = | July 23, 2018 Bench Trial Transcript (DE 539) |
| 2T | = | July 24, 2018 Bench Trial Transcript (DE 540) |
| 3T | = | July 25, 2018 Bench Trial Transcript (DE 547) |
| 4T | = | July 26, 2018 Bench Trial Transcript (DE 541) |

### A. Procedural Background

1. On July 31, 2015, plaintiffs filed a complaint for infringement of the '438 patent based on defendants' ANDA filings, which sought approval to market generic abiraterone acetate[2] 250 mg tablets. (Civil Action No. 15-5909, DE 1). Plaintiffs filed suit against the following ANDA defendants:

a. Actavis Laboratories FL, Inc., Actavis Pharma, Inc., and Actavis, Inc. ("Actavis"), related to ANDA No. 208274[3];

b. Amneal related to ANDA No. 208327;

c. Apotex Corp. and Apotex Inc. ("Apotex") related to ANDA No. 208453;

d. Citron Pharma LLC ("Citron") related to ANDA No. 208371[4];

e. DRL related to ANDA No. 208416;

f. Mylan related to ANDA No. 208446;

g. Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. ("Par") related to ANDA No. 208168;

h. Sun Pharmaceuticals Industries, Ltd. and Sun Pharmaceuticals Industries, Inc. ("Sun") related to ANDA No. 208440;

i. Teva and Teva Pharmaceuticals Industries Limited related to ANDA No. 208432;

j. West-Ward/Hikma, The Arab Pharmaceutical Manufacturing Co. and Hikma Pharmaceuticals, PLC, related to ANDA No. 208339; and

k. Wockhardt related to ANDA No. 208380.

---

| | | |
|---|---|---|
| 5T | = | July 27, 2018 Bench Trial Transcript (DE 542) |
| 6T | = | July 30, 2018 Bench Trial Transcript (DE 543) |
| 7T | = | July 31, 2018 Bench Trial Transcript (DE 544) |
| 8T | = | August 1, 2018 Bench Trial Transcript (DE 545) |
| 9T | = | August 2, 2018 Bench Trial Transcript (DE 546) |

2 Unless otherwise specified, abiraterone and abiraterone acetate, its prodrug, are used interchangeably in this opinion.

3 The complaint also asserted infringement of plaintiffs' U.S. Patent No. 5,604,213 (the "'213 patent") against Actavis related to Actavis's ANDA No. 208274. (DE 1). The '213 patent expired in December 2016, and on March 21, 2017, the Court entered a stipulation dismissing, without prejudice, plaintiffs' claims of infringement of the '213 patent against Actavis. (DE 318).

4 On June 19, 2018, Rising Pharmaceuticals, Inc. was substituted for defendant Citron after Citron transferred its ANDA to Rising. (DE 496, 500).

(DE 1).

2. The complaint was dismissed against certain defendants without prejudice, after they all agreed to be bound by any judgment rendered in the 15-5909 action. Those dismissed defendants are Teva Pharmaceuticals Industries Limited; Arab Pharmaceutical Manufacturing Co.; Hikma Pharmaceuticals, PLC; Actavis Pharma, Inc.; Actavis, Inc.; Par; and Citron. (DE 41, 44, 46, 103, 117).

3. On April 20, 2018, plaintiffs and Apotex entered into a license agreement for the '438 patent, and Apotex was dismissed from the action. (DE 467).

4. On September 28, 2015, plaintiffs filed a first amended complaint against Hetero USA Inc., Hetero Labs Limited Unit-V, and Hetero Labs Limited, asserting infringement of the '438 patent related to Hetero's filing of ANDA No. 208349, which sought approval to market generic abiraterone acetate 250 mg tablets. Hetero subsequently withdrew its ANDA, and on March 13, 2017, the Court entered a stipulation dismissing without prejudice plaintiffs' complaint against Hetero. (DE 308).

5. On May 2, 2016, plaintiffs filed a separate action against Amerigen, asserting infringement of the '438 patent related to Amerigen's filing of ANDA No. 208027, which also sought approval to market generic abiraterone acetate 250 mg tablets. (Civ. No. 16-02449, DE 1). This action was consolidated with the 15-5909 action on July 29, 2016 for discovery purposes. (Civ. No. 16-2449, DE 16).

6. On August 25, 2017, plaintiffs filed a separate complaint against Teva and Teva Pharmaceuticals Industries, Ltd., asserting infringement of the '438 patent related to Teva's filing of ANDA No. 210726 for approval to market generic abiraterone acetate 500 mg tablets. (Civ. No. 17-6435, DE 1). Teva Pharmaceuticals Industries, Ltd. was dismissed from this action after it agreed to be bound by any judgment. (Civ. No. 17-6435, DE 10).

7. On January 8, 2018, the 17-6435 action was consolidated with the 15-5909 action for all purposes, including trial, pursuant to Federal Rule of

Civil Procedure 42(a). (Civ. No. 15-5909. DE 381). Teva's ANDA No. 208432 (at issue in the Civ. No. 15-5909 action) is substantively identical to Teva's ANDA No. 210726 (at issue in the Civ. No. 17-6435 action).

**B. Metastatic Castration-Resistant Prostate Cancer**

8. The invention claimed in the '438 patent treats metastatic castration-resistant prostate cancer ("mCRPC") through a combination of abiraterone and prednisone. (JTX 8000).

9. The prostate is a male genitourinary organ located in the pelvis. (3T530:24-25). Prostate cancer arises when there is an uncontrollable proliferation of prostate tissue. (3T531:2-4). Metastatic prostate cancer occurs when the cancer tumor spreads from the prostate to another organ, such as the bones, liver, or lungs. (3T531:6-8).

10. Male sex hormones, called androgens, promote the growth of prostate cancer cells. (3T531:10, -22 to -24). A first-line treatment for metastatic prostate cancer is androgen deprivation therapy ("ADT"). (1T100:22-25; 3T532:19-20). Starting in the 1940s, the main treatment for prostate cancer was ADT. (1T115:23-116:1). ADT deprives cancer cells of androgens, like testosterone, through either medical or surgical castration. (1T100:24-101:3; 3T532:19-25).

11. ADT is not a cure for prostate cancer; in most patients, ADT eventually loses effectiveness and the cancer may resume growing. (3T533:13-25). At that point the cancer is deemed castration-resistant, as that term is used in mCRPC.

12. Abiraterone, discovered in the early 1990s, is a second-line therapy. (9T1970:24). Abiraterone inhibits the 17α-hydroxylase/$C_{17,20}$-lyase ("CYP17") enzyme. The CYP17 enzyme has a role in the steroid biosynthesis pathway that leads to the production of androgens, including testosterone. (1T123:13-18; 7T1434:4-21; 6T1152:5-9, 1280:1-1281:1; *see* PDX7.5, chart of steroid biosynthesis pathway and abiraterone inhibition, attached as an exhibit to this opinion.)

13. Dr. Johann de Bono, an oncologist and coinventor on the '438 patent, hypothesized that, while abiraterone decreased the production of androgens, it also resulted in an accumulation of "upstream" non-androgenic steroids (*i.e.*, those whose production branches off from the synthesis pathway before the point at which the CYP17 enzyme that is inhibited by abiraterone operates). (1T127:15-16, 128:16-129:3; 3T607:12-14). Those accumulated non-androgenic steroids would activate the androgen receptors on the prostate cancer cells, thereby reducing abiraterone's effectiveness and causing a resistance to abiraterone. (1T128:18-24; 3T607:17-20; *see* top horizontal row of chart, PDX7.5, attached as exhibit.)

14. To combat such resistance, Dr. de Bono hypothesized, a glucocorticoid (the family including prednisone) could be administered to suppress those upstream steroids. (1T127:11-22, 129:8-24).

**C. The '438 Patent and Asserted Claims**

15. On September 2, 2014, the United States Patent and Trademark Office issued the '438 patent. (JTX 8000). The named inventors of the '438 patent were Alan H. Auerbach and Arie S. Belldegrun. (DE 502, at 86 ¶28). Dr. de Bono was added as an inventor by order of the Court in January 2017.

16. The '438 patent, titled "Methods and Compositions for Treating Cancer," has twenty claims and is directed at methods of treating prostate cancer in humans. (JTX 8000).

17. As described in the '438 patent, it is believed that testosterone and dihydrotestosterone promote the growth of prostate cancer. (*Id.* at 1). The '438 patent further states that hormone therapy can be used to suppress the production or block the effects of hormones like testosterone. (*Id.*). It notes that CYP17 inhibitors have been shown to be useful in the treatment of cancer, and specifically in androgen-dependent disorders like prostate cancer. (*Id.* at 5).

18. The '438 patent discloses such methods as the administration of a CYP17 inhibitor, like abiraterone acetate, in combination with at least one other therapeutic agent, such as an "anti-cancer agent or steroid." (*Id.* at 2).

The '438 patent identifies prednisone as one such therapeutic agent that can be combined with abiraterone acetate. (*Id.*)

19. Claim 1 of the '438 patent, the only independent claim, claims the following:

> 1. A method for the treatment of a prostate cancer in a human comprising administering to said human a therapeutically effective amount of abiraterone acetate or a pharmaceutically acceptable salt thereof and a therapeutically effective amount of prednisone.

(*Id.* at 16). Claim 1 is practiced when a "therapeutically effective amount of abiraterone acetate" and a "therapeutically effective amount of prednisone" are administered to a patient with prostate cancer. (3T538:1-11).

20. Dependent claims 2–20 of the '438 patent describe additional limitations of the method, including the amount of abiraterone acetate and the amount of prednisone used, and the type of prostate cancer being treated. Plaintiffs assert infringement of claims 4, 8, 11, 19, and 20 against each defendant.

21. Those dependent claims provide as follows:

a. Claim 4. The method of claim 3, wherein the therapeutically effective amount of the abiraterone acetate or pharmaceutically acceptable salt thereof is about 1000 mg/day.

. . .

b. Claim 8. The method of claim 7, wherein the therapeutically effective amount of the prednisone is about 10 mg/day.

. . .

c. Claim 11. The method of claim 10, comprising administering to said human about 1000 mg/day of abiraterone acetate or a pharmaceutically acceptable salt thereof and about 10 mg/day of prednisone.

. . .

d. Claim 19. The method of claim 18, comprising administering to said human about 1000 mg/day of abiraterone acetate or a pharmaceutically acceptable salt thereof and about 10 mg/day of prednisone.

. . .

e. Claim 20. The method of claim 17, comprising administering to said human about 1000 mg/day of abiraterone acetate or a

pharmaceutically acceptable salt thereof and about 10 mg/day of prednisone.

(*Id.*).

**D. Claim Construction**

22. By Order dated June 27, 2016 (DE 208), the Court adopted the parties' agreed-upon constructions (DE 502, at 89, ¶¶49-51) of the following undisputed '438 patent claim terms:

| Claim Term | Joint Construction |
|---|---|
| Preamble: "a method for the treatment of a prostate cancer in a human" | The preamble of claim 1, on which claims 2-20 depend, is limiting and limits the claims to the treatment of a prostate cancer in a human. |
| "refractory prostate cancer" | "Prostate cancer that is not responding to an anti-cancer treatment or prostate cancer that is not responding sufficiently to an anti-cancer treatment. Refractory prostate cancer can also include recurring or relapsing prostate cancer." |
| "therapeutically effective amount" | "An amount effective for treating cancer." |

23. On November 10, 2016, following a hearing, the Court issued its *Markman*[5] patent claim construction opinion and order. (DE 239, 240, reported at *BTG Int'l Ltd. v. Actavis Labs. Fl, Inc.*, 2016 U.S. Dist. LEXIS 157586 (D.N.J. Nov. 10, 2016)). The parties principally disputed the terms "treatment" and "treating."[6] *Id.* at *5.

---

5 *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976-79 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996).

6 Defendants sought a broad construction of the term to encompass treatments aimed at not only "reducing the actual prostate cancer, but also 'reducing the pain associated with prostate cancer and replacing the normal production of

24. The Court construed the terms "treatment" and "treating" as "the eradication, removal, modification, management or control of a tumor or primary, regional, or metastatic cancer cells or tissue and the minimization or delay of the spread of cancer." *Id.* at *54.

**E. Clinical Trials and Data**

25. There were a number of clinical trials of abiraterone and prednisone. The results of those trials were submitted to the United States Food and Drug Administration ("FDA") to establish the safety and efficacy of abiraterone, with the object of gaining FDA approval to market ZYTIGA®. (2T265:8-12; PDX 2.2 (Summary of Clinical Trials)).

26. Clinical trials proceed in various phases. A Phase I trial is typically the initial drug development, and seeks to determine the safety of administering a particular drug into a human. (2T266:9-12). A Phase II clinical trial uses the findings from Phase I and extends testing to a larger patient population. Those results provide a basis for conducting a Phase III trial, which evaluates clinical efficacy and safety for regulatory approval. (2T266:13-23).

27. In April 2004, Cougar Biotechnology[7] licensed the rights to develop abiraterone from BTG. (1T108:12-13, 230:25-231:4; 8T1817:25-1818:5).

28. In 2004 and 2005, Dr. de Bono designed the first clinical trial of abiraterone, which became known as the COU-AA-001 trial ("001 trial"). (1T108:21-23, 124:17024; PTX 13). The purpose of the 001 trial was to evaluate the safety and efficacy of abiraterone monotherapy in men with mCRPC. (1T126:16-21, 127:23-25).

29. The 001 trial was designed to proceed in two phases. (2T267:3-11). In Phase I of the 001 trial, the dose escalation phase, patients received abiraterone at doses of 250, 500, 750, 1000, or 2000 milligrams. (2T302:7-14).

---

glucocorticoids that is blocked when patients are given CYP17 inhibitors.'" *BTG*, 2016 U.S. Dist. LEXIS 157586, at *7.

7 Cougar Biotechnology is Janssen's predecessor. (2T468:4-5).

In the Phase II portion of the 001 study, all patients received 1000 milligrams of abiraterone acetate. (2T302:20-23).

30. For both phases of the 001 trial, Dr. de Bono proposed an "extension" phase for patients whose cancer had progressed despite the administration of abiraterone. Those patients would receive 0.5 milligrams of a glucocorticoid, dexamethasone.[8] (1T127:11-22, 134:5-14; 2T267:12-18; PTX 11, at 4, 39-40; JTX 8086, at 1).

31. The purpose of this extension study was to evaluate Dr. de Bono's hypothesis that the addition of a glucocorticoid could suppress the upstream steroids, and thus reduce resistance to abiraterone. (1T127:11-22, 128:18-129:3). Dr. de Bono opined that prednisone, another glucocorticoid, would be just as effective as dexamethasone because all glucocorticoids would have a similar effect in terms of suppressing the upstream steroids. (1T132:13-133:20; *see also* 3T618:1-6; 7T1415:5-9). The study was approved by the Institutional Review Board and the Royal Marsden Cancer Research Committee. (1T142:6-8).

32. The 001 study results were published in the Journal of Clinical Oncology. Gerhardt Attard, et al., *Phase I Clinical Trial of a Selective Inhibitor of CYP17, Abiraterone Acetate, Confirms that Castration-Resistant Prostate Cancer Commonly Remain Hormone Driven*, 26 J. of Clinical Oncology 4563 (2008) (JTX 8083) (hereinafter referred to as "Attard 2008"); Gerhardt Attard, et al., *Selective Inhibition of CYP17 with Abiraterone Acetate is Highly Active in the Treatment of Castration-Resistant Prostate Cancer*, 27 J. of Clinical Oncology 3742 (2009) (JTX 8086) (hereinafter referred to as "Attard 2009").

---

[8] Dexamethasone and prednisone are both part of the same class of drugs, known as glucocorticoids. (1T133:7-20). Dexamethasone was the steroid used by the institution with which Dr. de Bono was then affiliated, the Institution of Cancer Research ("ICR"), which is at the college of the University of London and the Royal Marsden Hospital. (1T130:1-12, 132:21-24). Dr. de Bono indicated that as to a synthetic steroid, a patients' blood test would reveal the extent to which hormones came from the drug or from a patient's adrenal gland. Prednisone was not then available in the U.K. (1T140:20-25).

33. Even though the central purpose of the Phase I trial was to establish safety, the results of the trial showed that abiraterone alone had anti-tumor activity, measured by a reduction in Prostate-Specific Antigen ("PSA")[9] levels. (1T143:21-23). The 001 trial involved 54 patients. (1T144:1). All received abiraterone. In phase I (abiraterone dose escalation), 15 of the subjects received dexamethasone as well. In phase II (administration of 1000 mg/day of abiraterone), 30 of the subjects received dexamethasone as well. (1T144:1-4). Assuming complete overlap, then, at least 30 patients received combination therapy.

34. When patients developed a resistance to abiraterone monotherapy and a glucocorticoid was added, the anti-cancer effect, measured by PSA declines of at least fifty percent, returned for 10 of the 30 combination-therapy patients in the Phase II portion of the study. (1T144:4-22; 3T588:13-24; JTX 8086). This suggested that a glutocorticoid such as prednisone, at least when administered in combination with abiraterone, has an anti-cancer effect. The suggested mechanism was the suppression of the "upstream" steroids. These upstream steroids, left unchecked, may stimulate prostate cancer growth. (*Id.*; 3T604:20-24, 608:5-18, 663:12-14; 4T861:1-5; *see* top horizontal line of biosynthesis chart, attached.).[10]

35. The second clinical study submitted to the FDA, the COU-AA-002 trial ("002 trial"), was similar to COU-AA-001. (2T268:12-13). The 002 trial, which was conducted in the United States, received FDA approval. (2T269:8-

---

[9] PSA is one of the modalities used to observe anti-tumor activity for hormone therapy. (1T149:23-25; 2T378:5-18). It is used as a measure of cancer progression. Rising levels of PSA are associated with advancing prostate cancer, while falling levels are associated with control of prostate cancer.

[10] Several peer-reviewed articles addressed this finding. *See* Gerhardt Attard et al., *Antitumor Activity with CYP17 Blockade Indicates that Castration-Resistant Prostate Cancer Frequently Remains Hormone Driven*, Cancer Research (2009) (PTX 461, at 4939); Daniel Danila et al., *Phase II Multicenter Study of Abiraterone Plus Prednisone Therapy in Patients with Docetaxel-Treated Castrate-Resistant Prostate Cancer*, 28 J. of Clinical Oncology 1496, 1497 (2010) (JTX 8090); Oliver Sartor et al., *Novel Therapeutic Strategies for Metastatic Prostate Cancer in the Post-Docetaxel Setting*, The Oncologist (2011) (PTX 344, at 1495).

18). Phase I of the 002 trial tested abiraterone monotherapy to determine the best dosage. (2T268:18-19). As originally designed, the Phase II portion of the study was to consist of further abiraterone monotherapy. (2T268:18-19). However, on May 25, 2007, after the results of the 001 study suggested the effect of the glucocorticoid, the protocol of Phase II of the 002 trial was amended. (2T268:19-21, 271:8-12, 272:1).[11] Under that amended Phase II protocol, abiraterone and prednisone would be jointly administered. (2T268:21-23). Patients received 1,000 milligrams of abiraterone and 10 milligrams of prednisone per day. (2T272:4-6). The results of 002 Phase II were published. Charles J. Ryan, et al., *Phase II Study of Abiraterone Acetate in Chemotherapy-Naive Metastatic Castration-Resistant Prostate Cancer Displaying Bone Flare Discordant with Serologic Response*, Clinical Cancer Research (2011). (JTX 8093).

36. A clinical study report of the 002 trial was submitted to the FDA for its consideration in approving ZYTIGA®. (2T312:16-313:2; DTX 1367). That report included a section that discussed the overall design of the study. (DTX 1367, at 19). In addressing the role of prednisone in Phase II of the 002 trial, the report noted that "all subjects were required to receive low dose glucocorticoids such as prednisone 5 mg twice daily PO or dexamethasone (0.5 mg once daily) with abiraterone acetate to better manage mineralocorticoid side effects." (*Id.*).

37. The conclusion of the 002 study report provided, in full, that:

- In study COU-AA-002, abiraterone acetate demonstrated encouraging antitumor activity as assessed by PSA response by

---

[11] The 001 trial, recall, tended to confirm the hypothesis that the disease progression on abiraterone monotherapy was due to an increase in upstream corticosteroids, and that the effect of this increase could be moderated by the addition of a glucocorticoid. (2T273:8-16).

There was some debate at trial as to whether prednisone was added, not in response to the 001 results, but rather in response to a patient's death from a heart attack associated with hypokalemia in March of 2008. (2T274:19; DTX 1354, at 5). The decision to add prednisone in the 002 trial, however, was made in 2007, nearly a year before that patient's death. (2T275:3-4).

PSAWG criteria; objective response by RECIST criteria; and time to PSA progression in this patient population with advanced castration-resistant prostate cancer who had prior hormonal therapies. Importantly, tumor responses to abiraterone acetate were observed in castrate patients who had prior ketoconazole medication.

- Although corticosteroids were not mandated at the initiation of the study, the incidence of mineralocorticoid excess with abiraterone acetate monotherapy was of sufficient frequency to support the routine use of glucocorticosteroids.
- Although the MTD of abiraterone acetate could not be definitely determined based on available data, the doses administered appear to be well tolerated with no DLTs even at 1000mg/day. The results of the study support the use of the 1000 mg daily dose of abiraterone acetate in the treatment of advanced castration-resistant prostate cancer, in view of the antitumor activity and safety observed at this dose.

(DTX 1367, at 110).

38. Dr. Robert Charnas, ZYTIGA®'s global regulatory leader, suggested that because abiraterone and prednisone were tested in combination, their individual anti-cancer effects could not be determined. (2T323:25-324:8).

39. The COU-AA-003 ("003 trial") trial was another study that evaluated 1000 mg/day or abiraterone acetate in post-chemotherapy mCRPC patients. (DTX 1185). The patients in the COU-AA-003 study were allowed to be on steroids. Eighteen of forty-seven patients (38%) were on a low dose of steroids. (DTX 1185.4). PSA declines were seen in thirty-two of the forty-seven patients (68%). The results of this trial were published. Reid, et al., *Significant and Sustained Antitumor Activity in Post-Docetaxel, Castration-Resistant Prostate Cancer with the CYP17 Inhibitor Abiraterone Acetate*, 20 J. of Clinical Oncology 1 (2010). (DTX 1185).

40. The COU-AA-004 Phase II trial ("004 trial") used the combination of abiraterone and prednisone in post-docetaxel mCRPC patients. (2T272:7-19; 3T614:6-15). The median time to PSA progression reported in the COU-AA-003 trial and the COU-AA-004 trial was the same, approximately 5.6 months. (4T954:22-956:11). The results of the 004 trial were also published. Daniel

Danila et al., *Phase II Multicenter Study of Abiraterone Plus Prednisone Therapy in Patients with Docetaxel-Treated Castrate-Resistant Prostate Cancer*, 28 J. of Clinical Oncology 1496, 1497 (2010). (JTX 8090).

41. The COU-AA-301 clinical trial ("301 trial") was the registration study that compared the combination of abiraterone plus prednisone to a control arm of prednisone plus a placebo. (2T276:19-277:3). The 301 trial was considered the pivotal trial showing efficacy and safety for the NDA application. (2T283:5-6).

42. Like previous trials, the coadministration arm of the 301 trial involved 1000 milligrams of abiraterone and 10 milligrams of prednisone, administered daily. (2T277:6-8).

43. Positive effects were seen in the patients receiving abiraterone plus prednisone. The Independent Data Monitoring Committee, an outside committee that evaluates patient safety throughout a clinical trial, therefore recommended that the placebo control arm of the trial be discontinued for ethical reasons. (2T277:12-278:6). All the participants were then given prednisone plus abiraterone, as opposed to a placebo. (2T277:12-17).

44. The 301 trial demonstrated that abiraterone and prednisone in combination were efficacious. (3T372:5-8). The results of the 301 trial demonstrated a four month increase in median overall survival. (2T278:9-13; 2T376:23-25).

45. The results from the 001, 002, 003, 004 and 301 trials were submitted to the FDA for review as part of the original NDA application. (2T284:9-13). No single study compared abiraterone monotherapy to abiraterone plus prednisone combination therapy. (2T293:5-7). Such a comparison by the FDA would necessarily be less direct, based on a comparison of data from different studies. (2T374:12-22).

46. The final clinical trial was the COU-AA-302 clinical trial ("302 trial"). (2T278:16). The 302 trial was the basis for a change to the indications on the ZYTIGA® label in 2018. (2T308:7-8). In the 302 trial, abiraterone plus prednisone was compared to prednisone plus a placebo. The study subjects

were patients whose disease had not progressed to the point where chemotherapy was required. (2T278:18-23). The same dosages, 1000 milligrams of abiraterone and 10 milligrams of prednisone, were administered. (2T279:1-3).

47. In the 302 trial protocol, it was noted that administration of a corticosteroid "improved symptoms of fatigue and tolerability of abiraterone acetate, including symptoms of mineralocorticosteroid excess. The improved tolerability of abiraterone acetate after concomitant administration of low-dose corticosteroids was associated with suppression of ACTH and upstream adrenal steroids[.]" (DTX 1358, at 20).

48. The comparative control arm of this study, as in the 301 study, was discontinued for ethical reasons, to allow all the patients to take abiraterone plus prednisone. (2T279:8-12). The combination of abiraterone and prednisone in the 302 trial showed a sixty percent reduction in the risk of progression or death, and an overall median survival improvement of about four months. (2T279:23-280:2).

**F. Prior Art**

49. The priority date is August 2006. (DFF at 64, ¶249; PFF at 154, ¶764).

50. Before 2006, there was a significant divergence of opinion within the scientific community as to whether prostate cancer was androgen dependent or independent. (1T116:9-18). However, the prevailing belief was that, once the cancer resumed growing after ADT, the cancer became androgen independent. (1T116:16-18).

51. Prior to the invention described in the '438 patent, there were treatment options for prostate cancer that stopped responding to ADT, but the invention was not among them. (8T1848:18-24; *see* DTX 1135).

52. The relevant prior art consists of the following:

a) Glenn Gerber et al., *Prostate Specific Antigen for Assessing Response to Ketoconazole and Prednisone in Patients with Hormone Refractory Metastatic Prostate Cancer*, 144 J. of Urology 1177 (1990) (DTX 1059) (hereinafter "Gerber 1990");

b) S.E. Barrie et al., *Pharmacology of Novel Steroidal Inhibitors of Cytochrome $P450_{17\alpha}$ (17α-Hydroxylase/C17-20 Lyase)*, 50 J. Steroid Biochem. Molec. Biol. 267 (1994) (DTX 1062) (hereinafter "Barrie 1994");

c) Gerald Potter et al., Novel Steroidal Inhibitors of Human Cytochrome *$P450_{17\alpha}$* (17a-Hydroxylase-$C_{17,20}$-lyase): Potential Agents for the Treatment of Prostatic Cancer, 38 J. Med. Chem. 2463 (1995) (JTX 8037) (hereinafter "Potter 1995");

d) Ian F. Tannock et al., *Chemotherapy with Mitoxantrone Plus Prednisone or Prednisone Alone for Symptomatic Hormone-Resistant Prostate Cancer: A Canadian Randomized Trial with Palliative End Points*, 14 J. Clin. Oncol. 1756 (1996) (DTX 1076) (hereinafter "Tannock 1996");

e) Oliver Sartor, et al., *Effect of Prednisone on Prostate-Specific Antigen in Patients with Hormone-Refractory Prostate Cancer*, 52(2) UROLOGY 252 (1998) (DTX 1087) (hereinafter "Sartor 1998");

f) Michael Jarman et al., *The 16,17-Double Bond Is Needed for Irreversible Inhibition of Human Cytochrome $P450_{17\alpha}$ by Abiraterone (17-(3-Pyridyl)androsta-5,16-dien-3β-ol) and Related Steroidal Inhibitors*, 41 J. Med. Chem. 5375 (1998) (DTX 1085) (hereinafter "Jarman 1998");

g) F.D. Fossa et al., *Flutamide Versus Prednisone in Patients with Prostate Cancer Symptomatically Progressing After Androgen-Ablative Therapy: A Phase III Study of the European Organization for Research and Treatment of Cancer Genitourinary Group*, 19 J. Clin. Oncol. 62 (2001) (JTX 8048) (hereinafter "Fossa 2001");

h) Marwan Fakih et al., *Glucocorticoids and Treatment of Prostate Cancer: A Preclinical and Clinical Review*, 60 Urology 553 (2002) (DTX 1104) (hereinafter "Fakih 2002");

i) Katherine Harris et al., *Low Dose Ketoconazole with Replacement Doses of Hydrocortisone in Patients with Progressive Androgen Independent Prostate Cancer*, 168 J. Urology 542 (2002) (JTX 8053) (hereinafter "Harris 2002");

j) A. O'Donnell et al., *Hormonal Impact of the 17α-Hydroxylase/$C_{17,20}$-lyase Inhibitor Abiraterone Acetate (CB7630) in Patients with Prostate Cancer*, 90 British J. Can. 2317 (2004) (DTX 1129) (hereinafter "O'Donnell 2004");

k) L. Vidal et al., *Reversing Resistance to Targeted Therapy*, 16 J. Chemo. 7 (2004) (DTX 1135) (hereinafter "Vidal 2004");

l) Gerhardt Attard et al., *Selective Blockade of Androgenic Steroid Synthesis By Novel Lyase Inhibitors As A Therapeutic Strategy For*

*Treating Metastatic Prostate Cancer*, Urological Oncology (2005) (JTX 8072) (hereinafter "Attard 2005");

m) Oliver Sartor, *The Continuing Challenge of Hormone-Refractory Prostate Cancer*, Clinical Genitourinary Cancer (2006) (PTX 108) (hereinafter "Sartor 2006"); and

n) Marc B. Garnick & Camille Motta, *Androgen Deprivation Therapy, the Future*, Prostate Cancer Principles and Practice (2006) (DTX 1157) (hereinafter "Garnick 2006").

53. The prior art is further summarized and discussed at Section II.A.2, *infra*.

**G. FDA Approval**

54. The FDA will approve a new medication if there is substantial evidence of safety and effectiveness. (2T388:21-22). In order to obtain approval to market a new drug, a company is required to submit a New Drug Application ("NDA") to the FDA. (2T282:4-10, 387:19-388:4). An NDA application contains proposed labeling, prescribing information, animal and human studies, including phase I, II, and III clinical trials, and toxicity data. (2T282:14-283:2, 388:5-12).

55. ZYTIGA® is sold in the United States pursuant to approved NDA No. 202379. (Civ No. 15-5909, DE 502, at 90, ¶53). The NDA application for ZYTIGA® was submitted in December of 2010 for the use of ZYTIGA® in combination with prednisone for the treatment of men with mCRPC. (2T283:19-20, 284:18-21, 370:9-10). The NDA was specifically submitted for ZYTIGA®, and prednisone was considered a concomitant therapy. (2T411:3-5). The application received priority review as requested.[12] (2T284:22-286:13).

56. On November 9, 2010, the FDA and Cougar Biotechnology had a "pre-NDA" meeting. (2T334:3-23, 335:9; DTX 1331). The purpose of a pre-NDA meeting is for the sponsor of a drug and the FDA to discuss the NDA; for the

12 The standard timeline for review of an NDA was approximately ten months. Priority review expedites that process, resulting in completion in about six months. (2T285:1-6).

sponsor to inform the FDA about the NDA; and for the FDA to provide initial feedback that would aid in the NDA review process. (2T334:15-23).

57. The scientific rationale for developing abiraterone was addressed in the briefing package that was submitted to the FDA for this pre-NDA meeting. (2T336:5-7; DTX 1331, at 11-14). That scientific rationale was described as follows:

> Based on our understanding of abiraterone acetate's mechanism of action and as predicted by the syndrome of congenital deficiency of CYP17, we anticipated that a state of mineralocorticoid excess mediated by increased deoxycorticosteron could occur after pharmacologic inhibition of CYP17, resulting in hypertension, hypokalemia and fluid retention. Indeed, these mechanism-based toxicities were observed in Phase 1 and 2 studies. Accordingly, the Phase 1 studies were designed to allow administration of low dose corticosteroids for disease progression or for palliation of symptoms. The improved tolerability of abiraterone acetate after concomitant administration of low-dose corticosteroids was associated with suppression of ACTH and upstream adrenal steroids, including mineralocorticoids, suggesting that the combination may be better tolerated and safer regimen in this older prostate cancer patient population.
>
> Thus, the regimen of low-dose prednisone 5 mg twice a day and abiraterone acetate 1 g daily was advanced into Phase 2 and 3 testing. Prednisone was selected over other corticosteroids because it is commonly used as standard of care in combination with chemotherapy and often maintained as palliative treatment after chemotherapy is discontinued in patients with advanced metastatic prostate cancer. When abiraterone acetate was administered in a combination with oral prednisone 5 mg twice daily there appeared to be a decreased incidence and severity of mineralocorticoid based side effects, including hypertension, fluid retention and hypokalemia (Danila et al., JCO). Anti-tumor activity was observed across all patient studies as declines in prostate specific antigen levels, and in objective radiographic responses in the subset of men who had measureable disease.

(DTX 1331, at 12).

58. The NDA as submitted included a "summary of clinical efficacy," *i.e.*, a summary of the clinical trials discussed above that established ZYTIGA®'s efficacy. (2T352:16-353:6; JTX 8187). In comparing the various clinical trials

and addressing efficacy, the report noted that "[t]he totality of data from Phase 1/2 studies, Phase 2 studies, and pivotal Study COU-AA-301 consistently demonstrates the benefit of abiraterone acetate and prednisone treatment for patients with mCRPC." (JTX 8187, at 52; 2T375:8-17).

59. The summary of clinical efficacy explained the specific dosing recommendations of 1000mg/day of abiraterone and 10 mg/day of prednisone. (JTX 8187, at 54). In addressing prednisone, the recommendation provided that "concurrent treatment with prednisone" was "administered to ameliorate mineralocorticoid-related toxicity that was observed with abiraterone acetate in early Phase 1/2 studies." (*Id.*). It noted that when abiraterone was administered alone, "[h]ypertension, hypokalemia, and peripheral edema were observed frequently, and were managed with the mineralocorticoid receptor antagonist eplerenone or with low-dose glucocorticosteroids." (*Id.*).

60. On April 26, 2011, the FDA completed its medical review, which is the FDA's analysis and interpretation of the data presented in the clinical section of the NDA. (2T342:17-343:2; DTX 1333). In addressing the potential for overdose, drug abuse and withdrawal, the medical review included the following comment: "Abiraterone acetate is given concurrently with 10mg of prednisone once daily in order to attenuate mineralocorticoid excess resulting from reduced feedback inhibition of ACTH." (DTX 1333, at 107; 2T344:8-12).

61. The FDA approved the NDA on April 28, 2011. (2T286:19). Specifically, the FDA approved ZYTIGA® in combination with prednisone for the treatment of mCRPC. (2T393:12-17).

62. The FDA publishes Approved Drug Products with Therapeutic Equivalence Evaluations in the "Orange Book." (DE 502, at 97, ¶90). The FDA requires NDA holders to identify in the Orange Book "each patent that claims the drug or a method of using the drug that is the subject of the NDA ... and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale of the drug product." (*Id.* at ¶91).

63. The '438 patent is listed in the Orange Book in connection with NDA No. 202379. (*Id.* at ¶92). Each defendant had knowledge of the '438 patent and its listing in the Orange Book when each respective defendant filed its Paragraph IV certification for its ANDA. (*Id.* at 98, ¶¶93-94).

**H. ZYTIGA Labeling**

64. A medication's product label is an FDA-approved document. (2T390:2). The label contains information that the FDA believes is necessary in order for the physician to prescribe a medication properly. (2T390:2-8). The label also reflects the FDA's views about the medication and how it should be used. (2T391:14-17).

65. Physicians look to the Indications and Usage section of a label to determine why a particular therapy is being used. (3T543:8-9). The Warnings and Precautions section of a label provides information about adverse reactions that may occur when using the drug product. (2T420:4-7; PDX 406, at 4). The Dosing and Administration section of a label provides the recommended dose for each indication and subpopulation. (2T412:1-5; 3T543:18-22).

66. On April 28, 2011, the FDA approved NDA 202379, with FDA-approved labeling. (DE 502, at 90, ¶55). The Indications and Usage section provided that, "ZYTIGA is a CYP17 inhibitor indicated for use in combination with prednisone for the treatment of patients with metastatic castration-resistant prostate cancer who have received prior chemotherapy containing docetaxel." (*Id.* at 90, ¶55).

67. On December 12, 2012, the FDA again approved NDA 202379, with FDA-approved labeling stating in the Indications and Usage section that "ZYTIGA is a CYP17 inhibitor indicated in combination with prednisone for the treatment of patients with metastatic castration-resistant prostate cancer." (DE 502, at 90, ¶56).

68. On February 7, 2018, the FDA approved NDA 202379, with FDA-approved labeling stating in the Indications and Usage section that:

> ZYTIGA is indicated in combination with prednisone for the treatment of patients with

- Metastatic castration-*resistant* prostate cancer (CRPC)
- Metastatic high-risk castration-*sensitive* prostate cancer (CSPC)

(PTX 406; emphasis added). This Indications and Usage Section is representative of the Indications and Usage section on the current ZYTIGA® label. (PPF. at 14, ¶68). The Indications and Usage section of the label does not identify any other disease or condition, other than mCRPC and metastatic high-risk CSPC. (4T845:15-17).

69. The approved "Dosage and Administration" section of the 2018 ZYTIGA® label reads, in part:

> **2.1 Recommended Dose for metastatic CRPC**
> The recommended dose of ZYTIGA is 1,000 mg (two 500 mg tablets or four 250 mg tablets) administered orally once daily in combination with prednisone 5 mg administered orally **twice** daily.
>
> **2.2 Recommended Dose for metastatic high-risk CSPC**
> The recommended dose of ZYTIGA is 1,000 mg (two 500 mg tablets or four 250 mg tablets) orally once daily with prednisone 5 mg administered orally **once** daily.

(PTX 406). These are the doses that the FDA has approved for the treatment of these diseases. (2T412:1-2).

70. Section 5 of the ZYTIGA® label, "Warnings and Precautions," warns that it may cause hypertension, hypokalemia, and fluid retention due to mineralocorticoid excess. (PDX 406, at 4). In the 2018 label, the FDA removed the following warning: "[c]o-administration of a corticosteroid suppresses adrenocorticotropic hormone (ACTH) drive, resulting in the reduction in the incidence and severity of these adverse reactions." (2T421:13-19).

71. Section 14 of the label highlights some of the clinical studies that were completed and demonstrated efficacy. (2T415:20-22). This section specifies that "[t]he efficacy and safety of ZYTIGA with prednisone was established in three randomized, placebo-controlled, international clinical studies." (PDX 406, at 21; 2T418:1-4).

**I. Defendants' Labels**

72. Each defendant has filed an ANDA seeking approval to market a generic form of ZYTIGA®, *i.e.*, abiraterone acetate tablets. (DE 502, at 91, ¶65). The FDA requires that a drug manufacturer, when filing for such an application, to prepare a side-by-side comparison of its proposed labels to the brand name labels. (2T398:10-13). Typically, a proposed generic's drug label is substantively the same as the approved branded drug's label. (3T393:10-13).

73. Defendants' proposed ANDA product labels recite the same mCRPC indication as the ZYTIGA® label, except that defendants' labels substitute "abiraterone acetate" for "ZYTIGA." (2T396:18-21, 407:22-24; 3T541:2-24; JTX 8011 (Amerigen's proposed label); PTX 359 (Amneal proposed label); PTX 367 (DRL); PTX 372 (Mylan); PTX 383 (Teva); PTX 393 (West-Ward/Hikman); PTX 397 (Wockhardt)).

74. The proposed Indications and Usage sections of defendants' labels entail that they wish to market abiraterone plus prednisone for the treatment of mCRPC only. (2T408:3-5). The defendants' proposed labels do not contain the mCSPC indication that was added to the ZYTIGA® label in its 2018 version. (2T396:22-397:1).

75. The Dosage and Administration sections of defendants' labels all recommend administering 1000mg/day of abiraterone acetate, and 10mg/day of prednisone. (DE 502, at 94, ¶ 73).

76. Amerigen's, Mylan's, and West-Ward/Hikman's Dosing and Administration sections are identical to the ZYTIGA® pre-2018 labels insofar as they state that the "recommended dosage" is 1,000 milligrams of abiraterone acetate tablets administered orally once daily in combination with 10 milligrams of prednisone administered orally twice daily. (2T413:18-23; JTX 8011; PDX 393).

77. Amneal's, DRL's, Teva's, and Wockhardt's proposed Dosage and Administration sections, like the ZYTIGA® 2018 label, state the same

1000mg/10mg "recommended dosage," while adding the words "for mCRPC." (2T413:23-414:3).

78. The defendants' labels that are based on the ZYTIGA® 2015 label still contain the warning, dropped from the ZYTIGA® 2018 label, that "[c]o-administration of a corticosteroid suppresses adrenocorticotropic hormone (ACTH) drive, resulting in the reduction in the incidence and severity of these adverse reactions." (2T422:16-23). The FDA has already instructed Teva to remove this language from its label. (2T424:20-21).

**J. ZYTIGA Marketing**

79. The FDA requires pharmaceutical companies to submit marketing materials. (2T483:8-10). The materials do not have to be approved in advance, but they cannot mischaracterize a drug's indication. (2T483:23-484:1). Several of ZYTIGA®'s marketing documents discuss the role of prednisone.

80. In a marketing document related to the 2011 indication (*i.e.*, prior to the removal of the warning language related to the "[c]o-administration of a corticosteroid") the role of prednisone was described as reducing "the incidence and severity of mineralocorticoid-related adverse reactions" with ZYTIGA®. (DTX 1260; 2T484:7-23).

81. A ZYTIGA® brochure dedicated to explaining the role of prednisone also notes that prednisone "reduces the incidence and severity of mineralocorticoid-related adverse reactions associated with ZYTIGA." (DTX 1276; 2T488:8-22).

82. A third marketing document explaining the role of prednisone explains that prednisone lessens the system's response to a net cortisol deficit due to abiraterone. (2T489:7-12; DTX 1276).

83. Other ZYTIGA® marketing materials, however, promote ZYTIGA® in combination with prednisone solely as a means to treat prostate cancer. (PDX 424 (stating that "ZYTIGA plus prednisone achieved a statistically significant median overall survival difference"); PDT 447 (stating that "ZYTIGA plus

prednisone significantly increased median radiographic progression for survival")).

## II. CONCLUSIONS OF LAW

The Hatch-Waxman Act strikes a balance between two competing policy interests: "(1) inducing pioneering research and development of new drugs and (2) enabling competitors to bring low-cost, generic copies of those drugs to market." *Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368, 1370-71 (Fed. Cir. 2002). A brand name drug manufacturer seeking FDA approval must submit an NDA that includes, among other things, a statement of the drug's components, proposed labeling describing the uses for which the drug may be marketed, and scientific data showing that the drug is safe and effective. 21 U.S.C. § 355(b)(1); *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,* 566 U.S. 399, 404, 132 S. Ct. 1670, 1676 (2012).

The Hatch-Waxman Act streamlines the FDA approval process for generic manufacturers, who can "bring their products to market without submitting all of the extensive drug and clinical data ordinarily required of an NDA under 21 U.S.C. § 355(b)(1)." *Takeda Pharm. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 629 (Fed. Cir. 2015). A generic drug applicant seeking approval to market may file either an ANDA or "505(b)(2) application." 21 U.S.C. §§ 355(b)(2), (j). An ANDA allows generic drug applicants seeking approval "to rely on the safety and efficacy information for an approved drug listed in the Approved Drug Products with Therapeutic Equivalence Evaluations, or the 'Orange Book.'" *Takeda*, 785 F.3d at 629.

After consulting the Orange Book, a generic company filing an ANDA is required to assure "the FDA that its proposed generic drug will not infringe the brand's patents." *Caraco Pharm. Labs.*, 566 U.S. at 406. To achieve this, a generic manufacturer can file a "paragraph IV certification," which states that a listed patent "is invalid or will not be infringed by the manufacture, use, or sale of the [generic] drug." 21 U.S.C. § 355(j)(2)(A)(vii)(IV). The Act treats such a filing as an act of infringement, providing the brand with a right to sue

immediately. *See* 35 U.S.C. § 271(e)(2)(A). Assuming the brand does so, the FDA may not approve the ANDA until thirty months pass, or until the court finds the patent invalid or not infringed. *See* 21 U.S.C. § 355(j)(5)(B)(iii).

Once invalidity is asserted in a paragraph IV certification, the ANDA applicant takes on the burden of establishing it. *In re Cyclobenzeprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1078 (Fed. Cir. 2012). A patent and each of its claims are presumed to be valid, even where those claims may be dependent upon other invalid claims in the patent. 35 U.S.C. § 282(a). A party may rebut this presumption of validity only by clear and convincing evidence. *Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260 (Fed. Cir. 2012) (citing 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 131 S. Ct. 2238, 2245 (2011)).

Once non-infringement is asserted in a paragraph IV certification, the patentee takes on the burden of establishing infringement by a preponderance of the evidence. *See SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988); *Kegel Co., Inc. v. AMF Bowling, Inc.*, 127 F.3d 1420, 1425 (Fed. Cir. 1997). To prove infringement, the patentee must show that it is more likely than not that the proposed ANDA product would, if commercially marketed, meet the claim limitations of the patent-in-suit. *See Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1287 (Fed. Cir. 2010); *Abbott Labs. v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002).

Plaintiffs allege two kinds of infringement: "induced" and "contributory." *See* 35 U.S.C. § 271(b), (c). Defendants assert the defense of patent invalidity, based on lack of a sufficient written description and obviousness.

I discuss the validity issues first, in section II.A. In subsection II.A.1, I conclude that the '438 patent contains an adequate description. In subsection II.A.2, I hold that the '438 patent is invalid for obviousness. In section II.B, I consider in the alternative whether, if the patent were valid, defendants' activities would infringe. In subsection II.B.1, I hold that the defendants' labels

would result in induced infringement. In subsection II.B.2, I hold that there would be contributory infringement.

### A. Validity

As a defense to infringement, defendants assert that the '438 patent is invalid for lack of a written description and for obviousness. Although asserted as a defense, the issue of patent validity is most profitably discussed in advance of the infringement contentions. The defendants prevailed on those invalidity contentions in three inter partes review proceedings ("IPR") before the PTAB. The parties state that the PTAB decisions, dated January 17, 2018, are subject to a pending motion for reconsideration. (DTX 1562 (Mylan decision); *see also* DE 393 (Amerigen and Wockhardt decisions).)[13]

---

[13] Defendants do not seek to estop the plaintiffs' litigation of the validity issues that they lost before the PTAB. Rather, the plaintiffs seek to estop defendants from asserting the invalidity of the patent, an issue on which the defendants *prevailed* before the PTAB. That argument was raised *in limine* and previously rejected by this Court. (1T25:24-28:12). Nothing about the trial evidence leads me to reconsider that ruling.

The relevant estoppel provision, 35 U.S.C. § 315(e)(2), concededly may be read in the manner that plaintiffs propose. The manifest statutory intent, however, is to prevent abuse of inter partes proceedings, for example through the withholding of grounds and presentation of serial challenges. As I stated on the record, § 315(e)(2) is "designed to prevent parties from using multiple, possibly inconsistent and wasteful means of attacking a patent . . . . I get it that a party to an IPR has to assert all of its invalidity contentions or risk losing the opportunity to do so."

I do not accept, however, that Congress intended to require a party to stand mute in court because it previously prevailed on the same issue before the PTAB. The result would be a decision reached without consideration of legally relevant facts and issues. And if these Court proceedings overtook review of the PTAB decision, this Court could find itself in the position of being required to enter an injunction against infringement based on a patent already found invalid. *See* 1T25:5–8 ("THE COURT: . . . . Let's just say hypothetically that there was prior art squarely on point. . . . You're saying that having lost in an inter partes proceeding, you could come here and prevail? MR. TRELA: We could prevail until the inter partes proceeding runs its course.")

The case law contains no deep analysis of the issue, but it appears to reflect the concept that only unsuccessful or unsubmitted arguments are subsequently barred. *See Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 271 F. Supp. 3d 990, 1027 (E.D. Wis. 2017) (Section 315(e)(2) prohibits an *unsuccessful* IPR petitioner from asserting in the district court "that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during that inter partes review.")(emphasis added);

### 1. Written Description

Defendants allege that the asserted claims in the '438 patent do not meet the written-description requirement of 35 U.S.C. § 112. I disagree.

In pertinent part, 35 U.S.C. § 112 provides:

> The specification shall contain a written description of the invention and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his [or her] invention.

"The purpose of this provision is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the [invention] as described in the patent specification." *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2010); *see also AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1298 (Fed. Cir. 2014). "[T]he test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art. Based on that inquiry, the specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010).

To begin with, the '438 patent clearly sets forth the metes and bounds of the invention. It teaches the administration of a specified dosage of two specified drugs for the treatment of a specified condition in a specified, narrow class of patients, *i.e.*, those suffering from mCRPC. Not even minimal adjustment or experimentation is suggested; a skilled practitioner (assuming regulatory approval) would need little if any additional instruction to practice the method.

---

*Depomed Inc. v. Purdue Pharma LP*, 2014 WL 3729349, at *5 (D.N.J. July 25, 2014) (Bongiovanni, M.J.).

I do not reach the issue of whether in any event the PTAB's decision, which is subject to reconsideration and appeal, is sufficiently "final" for purposes of § 315(e).

In defendants' view, however, the specification is inadequate because it fails to disclose test results showing that prednisone itself provides an anti-cancer benefit. Nor, they say, does it provide sufficient information to permit a POSA to understand that *both* agents, abiraterone and prednisone, "treat" prostate cancer. (DBr. at 68; Def. Response at 38). These challenges fit only awkwardly within a contention that the method is not described so that a practitioner could practice it. Nevertheless, I address them.

First, I find that the specification in the '438 patent sufficiently identifies prednisone as an anti-cancer agent for purposes of the 35 U.S.C. § 122 written-description requirement. As stated in my *Markman* opinion, that is what "treatment," as used here, means. The specification is directed to the administration of abiraterone acetate with "at least one additional therapeutic agent, such as an anti-cancer agent or a steroid." (JTX 8000). The specification defines "anti-cancer agent" as "any therapeutic agent that directly or indirectly kills cancer cells or directly or indirectly prohibits, stops or reduces the proliferation of cancer cells." (*Id.* at 4). The '438 patent provides a list of anti-cancer agents, including mitoxantrone, paclitaxel, docetaxel, leuprolide, goserelin, triptorelin, seocalcitol, bicalutamide, and flutamide. (*Id.* at 3). It further identities additional "anti-cancer" agents as "hormone ablation agents, anti-androgen agents, differentiating agents, . . . antibiotic agents . . . and anti-androgens." (*Id.* at 7). Thus, an antibiotic agent is defined as an anti-cancer agent, and prednisone is explicitly identified as an antibiotic agent. (*Id.* at 9).

Second, the specification provides a list of steroids, including hydrocortisone, prednisone, and dexamethasone. (*Id.* at 3, 10). In discussing the administration of steroids, the specification provides that the "amount of the steroid administered to a mammal having cancer is an amount that is sufficient to treat the cancer whether administered alone or in combination with a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor." (*Id.* at 10). Thus, whether identified as either an "anti-cancer agent" or a "steroid," prednisone is sufficiently identified in the specification as an agent that "treats" cancer.

To this extent, the patent drafter is privileged to act as his or her own lexicographer. "The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Novartis Corp. v. Teva Pharms. USA, Inc.*, 565 F.Supp.2d 595, 604 (D.N.J. 2008) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

Taking the patent's own definitions of terms as my guide, I find that the written description is adequate.

**2. Obviousness**

Defendants allege that the combination therapy claimed in the '438 patent would already have been obvious to a person of ordinary skill in the art ("POSA") under 35 U.S.C. § 103. The burden here, as in other validity challenges, is proof by clear and convincing evidence. *See* p. 26, *supra,* and cases cited. The parties agree that August 25, 2006 is the priority date for the prior art analysis. Defendants assert that, as of that date, a POSA familiar with the prior art would have been motivated to combine abiraterone acetate with prednisone for three reasons: (1) for its anti-cancer effects; (2) to mitigate abiraterone's side effects; or (3) for prednisone's palliative properties. (DBr. at 33).

A patent claim is invalid as "obvious" where the "differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103. "[O]bviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007) (citing *In re Corkill*, 771 F.2d 1496, 1500 (Fed. Cir. 1985) ("Although [the inventor] declared that it cannot be predicted how any candidate will work in a detergent composition, but that it must be tested, this does not overcome [the prior art's] teaching that hydrated zeolites will work.")).

Four factors guide the obviousness inquiry under § 103: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the field of the invention; and (4) objective considerations such as commercial success, long felt need, and the failure of others to develop the invention. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406, 127 S. Ct. 1727 (2007) (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 17-18, 86 S. Ct. 684 (1966)). The evidence at trial focused on factors 1, 2, and 4, the prior-art and objective-considerations factors.[14]

---

[14] The parties make short work of factor 3, the level of skill possessed by a POSA. Under either side's analysis, that level of skill is quite high. A POSA would be a physician specializing in medical oncology or urology with significant practical experience and with access to individuals with expertise in endocrinology, biochemistry, pharmacology, or other related fields of science.

In determining the level of ordinary skill in the art, the following factors may be considered: "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Envtl. Designs, Inc. v. Union Oil Co.*, 713 F.2d 693, 696 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co., Inc. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1382 (Fed. Cir. 1983)), *cert. denied*, 464 U.S. 1043, 104 S. Ct. 709, 79 L. Ed. 2d 173 (1984).

Defendants offered the following definition of a POSA:

> Physician specializing in medical oncology or urology, having an M.D. and/or Ph.D. in pharmacology, biochemistry, or related discipline. Significant practical experience (e.g., 5-6 years' worth) in medical oncology or urology could substitute for an advanced degree. It is understood that the POSA would have access to individuals having expertise in pharmacology, biochemistry, endocrinology, enzymology, and/or molecular biology, and would collaborate with them as necessary.

(DTX 2400). Plaintiffs offered the following definition of a POSA:

> A person of ordinary skill would be a physician specializing in urology or medical oncology who has significant practical experience in the treatment of patients with prostate cancer. Such a person would've worked in a team or setting that includes access to one or more individuals who have expertise in endocrinology, biochemistry, pharmacology and/or molecular biology, or related field of science, and who has experience in prostate cancer treatments or androgen synthesis and action.

(3T537:4-12).

Principles specifically governing the application of those factors to a combination patent, especially a combination-therapy patent, are as follows.

The novelty of a combination therapy in relation to prior art may consist in the idea of putting two known elements together. The POSA's motivation to combine prior art teachings to achieve the "claimed invention does not have to be found explicitly in the prior art references sought to be combined, but rather may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself." *Pfizer*, 480 F.3d at 1362 (internal quotation and citation omitted). *Accord Dystar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1361 (Fed. Cir. 2006) (stating that motivation to modify prior art to arrive at claimed invention "may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself.") Thus the mix of information available to a POSA must be considered.

Relevance, however, has its limits. There must be "a nexus between the claimed invention and the [objective indicia]." *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)). The evidence, moreover, "must be reasonably commensurate with the scope of the claims." *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011). To determine whether the necessary nexus exists, "[o]ur cases require consideration of whether 'the marketed product embodies the claimed features.'" *ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1222 (Fed. Cir. 2016) (quoting *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000)); *see also Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1573 (Fed. Cir. 1996) (noting that whether requisite nexus exists is a question of fact).

In reviewing all these factors, courts use an approach that is not formulaic, but "expansive," "flexible," or "functional." *KSR*, 550 U.S. at 415; *see*

---

The two sides' experts agreed that the discrepancies between their definitions would not affect their opinions.

*also Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1291 (2006) ("There is flexibility in our obviousness jurisprudence because a motivation may be found implicitly in the prior art. We do not have a rigid test that requires an actual teaching to combine."). In describing this flexible approach, the Supreme Court noted that, although "[a] factfinder should be aware, of course, of the distortion caused by hindsight bias" in evaluating obviousness, the proper approach must allow for "recourse to common sense." *KSR*, 550 U.S. at 421 (citing *Graham*, 383 U.S. at 36 (warning against "temptation to read into the prior art the teachings of the invention in issue" and instructing courts to "guard against slipping into use of hindsight")).

The crux of defendants' argument is that the prior art would have motivated a POSA to combine abiraterone with prednisone with a reasonable expectation of success. One component of the defendants' obviousness argument is that the anti-cancer role of prednisone in actual "treatment" of mCRPC could have been anticipated. A second component of the defendants' argument, however, is that the role of prednisone in palliation or reducing side effects would also have motivated a POSA to combine it with abiraterone. Implicit in that second component is the idea that the *motivation* to combine therapies need not have been entirely congruent with the patented *idea* as conceived by the inventor. *See KSR*, 550 U.S. at 420 (stating that it is error to look "only to the problem the patentee was trying to solve"); *In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006) ("[T]he skilled artisan need not be motivated to combine [the prior art] for the same reason contemplated by [the inventor]" (quoting *In re Beattie*, 974 F.2d 1309, 1312 (Fed. Cir. 1992) ("[T]he law does not require that the references be combined for the reasons contemplated by the inventor.")). Thus defendants rely in part on these other effects of prednisone because those effects lent a separate impetus to the administration of abiraterone and prednisone in combination.

The argument can be pushed too far; the proverbial blind pig must at least have been searching for an acorn. The case law does not suggest that

obviousness must be found because an inventor, ignorant of the relevant science and considering an entirely different problem, could have stumbled on the patented method. This case, however, is close to the other end of the spectrum.

The combination therapy, it is true, is patented as a "treatment." But even prednisone's effects as a palliative and a side-effect minimizer would furnish a powerful motivation to combine it with abiraterone. And the idea for such a combination, even if initially motivated only by those two effects, would have gotten the POSA to the same place. That road led straight to the practice of the patented method: the target condition would be prostate cancer; the target population would be the subset of patients who had mCRPC; the dosage would be 1000mg of abiraterone and 10mg of prednisone daily; the object would be to slow the spread of the disease by hormone deprivation; the clinical results would be the same, and would be measured by prolongation of life (or, in the interim, by proxy metrics such as reduction of PSA levels). In short, the anticipated combination therapy—irrespective of what was in the POSA's mind as to the exact mechanism—would have looked precisely the same. So understood, this begins to look less like serendipity and more like inevitability.

I first review the prior art evidence as to abiraterone, prednisone, and combination therapy (subsections a, b, & c). I then review the secondary considerations evidence (subsection d). Finally, I state my overall conclusions as to obviousness (subsection e).

**a. *Prior art: abiraterone***

Barrie 1994,[15] a published study involving mice, disclosed that ketoconazole is a non-selective inhibitor that was used as a treatment for hormone-dependent prostate cancer. As a result, efforts were then being undertaken to discover a more potent and selective inhibitor. (DTX 1062, at 1). In that regard, Barrie 1994 concluded that abiraterone was "worthy of further

---

15 Full citations and abbreviations for the prior art are at Section I.F, *supra*.

study" as a potential agent "for the treatment of hormone-dependent prostate cancer." (7T1563:7-9; DTX 1062, at 5).

Potter 1995 explained that abiraterone is a "strong candidate for further development as a potential drug for the treatment of prostatic carcinoma in humans." (JTX 8037, at 7; 7T1563:10-13). Abiraterone was also noted as an inhibitor of both the hydroxylase and the lyase function of the CYP17 enzyme. (JTX 8037, at 6; 6T1316:6-16; *see* PDX 7.5, chart attached to opinion). A few years later, Jarman 1998 indicated that abiraterone had been selected for clinical evaluation based on animal testing: "its marked reduction of circulating testosterone levels in the male rat and mouse and of androgen-dependent organ weights in the mouse." (DTX 1085, at 5375).

The first human trial of abiraterone, reported in O'Donnell 2004, began in 1997. (1T109:12-110:1, 209:11-13; DTX 1129). The Institute of Cancer Research tested abiraterone in a Phase I clinical trial. (1T205:24-206:6). No patient was given a glucocorticoid during testing. O'Donnell did, however, discuss co-administration of a glucocorticoid with abiraterone. (1T214:9; DTX 1129; *see infra* at 43).

The O'Donnell 2004 trial comprised of multiple parts. (1T211:3-5). In the first portion of the trial, a population of castrate male patients received a single dose of abiraterone, at varying dosage levels, and were monitored for the following ten days. (1T211:15-20; DTX 1129, at 2319). All patients in this portion of the study experienced a reduction in testosterone levels below castrate levels. (1T214:14-16). The second portion of the trial administered a single dose of abiraterone, at various dosages, in non-castrate males. (1T212:5-7; DTX 1129, at 2319). Testosterone levels were reduced there as well, but not to below-castrate levels. (1T215:4-5). In the third and final portion of the study, non-castrate males were given a single dose of 500 milligrams of abiraterone every day for twelve days. (1T212:8-18, -21). Testosterone suppression was not sustained in that non-castrate portion of the study. (1T214:20-21).

The O'Donnell 2004 trial determined that abiraterone was safe. (1T214:11). But because of the failure to attain sustained testosterone

suppression in non-castrate patients, the results suggested that abiraterone was suitable as a second-line (*i.e.*, post-castration) treatment. (1T216:12-19; DTX 1129, at 2317 ("The enhanced testosterone suppression achieved in castrate men merits further clinical study as a second-line hormonal treatment for prostate cancer.")). Specifically, O'Donnell 2004 found that testosterone levels would be suppressed below castrate levels by a daily dose of abiraterone in the amount of 800 milligrams. (DTX 1129, at 2317; *see also* Garnick 2006 (DTX 1157, at 919-20 (recognizing that abiraterone "shows potential in the treatment of cancer," and "has demonstrated [an] ability to selectively inhibit the target enzyme, resulting in inhibition of testosterone production in both the adrenals and the testes"))). After a series of rejections, the O'Donnell results were eventually published in the British Journal of Cancer, four years after the close of the underlying study. (1T208:2, 222:6-227:17, 239:19-240:1).

O'Donnell 2004 specifically compares ketoconazole to abiraterone. (DTX 1129, at 2318). O'Donnell notes that "[i]n addition to ketoconazole, aminoglutethimide and abiraterone, other compounds designed to inhibit general androgen production have been developed and show promise." (DTX 1129, at 2321). In addressing ketoconazole, O'Donnell 2004 observes that it is an "unselective" inhibitor, that it has an antitumor effect (measured by clinical benefit as well as reduction in PSA), and that a more "selective" (*i.e.*, CYP-17) inhibitor, abiraterone, could be used as a second-line agent. (DTX 1129, at 2318).

**b. *Prior art: prednisone***

Tannock 1996 was a palliation study involving patients having refractory prostate cancer with pain. They received mitoxantrone, a chemotherapy drug (not a CYP17 inhibitor) with prednisone, or else prednisone alone. (7T1609:2-12; DTX 1076, at 1756; 8T1742:14-18). Tannock 1996 disclosed that prednisone, dosed at 10 milligrams per day, would provide palliation to hormone-resistant prostate cancer patients, when used with mitoxantrone. (7T1609:1-15; DTX 1076, at 1756). Defendants' expert testified that prednisone

was administered to alleviate the "known effects of mitoxantrone" including nausea, vomiting, hair loss, low blood counts, and neuropathy. (8T1743:2-8).

Sartor 1998 evaluated the effects of prednisone on PSA levels in patients with hormone-refractory prostate cancer. (DTX 1087, at 252). Twenty-nine patients were given ten milligrams of prednisone daily. (*Id.*; 7T1575:5-11). Of those twenty-nine patients, fourteen (48%) achieved a PSA decline of at least 25%, ten (34%) achieved a PSA decline of at least 50%, and four (14%) achieved a PSA decline of at least 75%, measured from baseline. (DTX 1087, at 254). Sartor 1998 reported that four patients (14%) had a duration of response greater than six months. (*Id.* at 254; 7T1575:17-1576:2).

Thus, Sartor 1998 concluded that prednisone could decrease PSA levels. (DTX 1087, at 255; DE 393-3 ("Sartor reasonably stands for the proposition that administration of prednisone is tolerated and effective in a subset of patients, and at the time it was published, indicated some measure of efficacy for certain mCRPC patients."). Sartor 1998 hypothesized that "PSA declines of greater than 50% may be useful in predicting a relatively prolonged survival." (*Id.* at 256).

Fossa 2001 evaluated 201 patients, all of whom had metastatic disease that had progressed after castration. (JTX 8048, at 63). Of those patients, 101 received prednisone and 100 received flutamide, an antiandrogen. (*Id.* at 62). Of the 101 patients treated with twenty milligrams of prednisone per day, twenty-one (20.8%) had a PSA decline of greater than 50%. (7T1578:8-10; JTX 8048, at 63, 67). There was no difference in median overall survival between the two groups of patients, however. (JTX 8048, at 70). Fossa 2001 concluded that "[m]onotherapy with low-cost prednisone should be considered as first-line, standard hormonal manipulation of HRPC, but the combination with tolerable cytotoxic treatment should be explored further." (JTX 8048, at 70).

Fakih 2002, a clinical review article that evaluated "the mechanisms underlying glucocorticoid antitumor effects in prostate cancer," concluded that "[g]lucocorticoids may exert an antitumor effect on androgen-independent prostate cancer by suppression of adrenal androgens. Low-dose glucocorticoids

produce negative feedback on the pituitary gland, leading to a decrease in both testicular and adrenal androgens." (DTX 1104, at 553).

Harris 2002 was a prospective phase II study conducted on twenty-eight men with androgen-independent cancer. It evaluated the efficacy and safety of administering 200 milligrams of ketoconazole, three times a day, with replacement doses of hydrocortisone. (JXT 8053, at 542). Harris 2002 noted that "[g]lucocorticoids alone may have antitumor effects mediated either by direct interaction with androgen receptors or by feedback inhibition of the hypothalamic-pituitary-adrenal axis." (*Id.* at 544).

### c. *Prior art: combination therapy*

The study published in Gerber 1990 evaluated PSA level changes in fifteen men with hormone refractory metastatic prostate cancer that were treated with a combination of ketoconazole and prednisone. (DTX 1059, at 1177). The action of ketoconazole is not as focused as that of abiraterone. Abiraterone acetate is a selective drug that inhibits CYP17, one enzyme with two functions: 17 alpha-hydroxylase and 17,20-lyase. (1T123:13-20; JTX 8072, at 3). Ketoconazole is a non-specific inhibitor; it acts on the CYP17 enzyme, but also on other points in the pathways of adrenal steroid synthesis. (1T105:2; 6T1262:10-17, 1326:4-19). Ketoconazole inhibits adrenal steroid synthesis and causes adrenal insufficiency. (6T1276:3-6).

The patients in the Gerber 1990 study were treated with 600 to 900 milligrams of ketoconazole daily and five milligrams of prednisone twice per day. (DTX 1059, at 1177-78). Of the fifteen patients, twelve (80%) had a decrease in PSA levels with a median duration of response of three months. (DTX 1059, at 1177). The other three patients had a prolonged response, greater than eight months, of decreased PSA levels and improvement in bone pain. (DTX 1059, at 1177). Ultimately, Gerber 1990 concluded that "there appears to be a small subgroup of patients with progressive prostate cancer despite androgen ablation who will benefit from ketoconazole and glucocorticoid treatment." (DTX 1059, at 1177).

O'Donnell 2004, discussed in the preceding section, reported promising results for abiraterone. It also indicated, however, that the treated patients experienced a reduced adrenal reserve. (*Id.*; *see also* Attard 2005 (JTX 8072) (noting that all six patients in O'Donnell 2004 "had a reduced cortisol response to ACTH stimulation on the 11th day after dosing, suggesting reduced adrenocortical reserve."). Researchers speculated that such a deficiency could be addressed with a dose of a steroid, either concomitantly or during times of stress. (1T220:24, 221:7-22, 244:12-19, 249:5-9; DTX 1129, at 2317 ("Adrenocortical suppression may necessitate concomitant administration of replacement glucocorticoid.")). In considering the use of a glucocorticoid, O'Donnell 2004 noted that it was "common practice" to administer supplementary hydrocortisone with aminoglutethimide and ketoconazole. (DTX 1129, at 2323).

O'Donnell 2004 suggested that "further studies with abiraterone acetate will be required to ascertain if concomitant therapy with glucocorticoid is required on a continuous basis, at times of physiological stress, if patients become symptomatic or indeed at all." (*Id.*; *see also* Attard 2005 (JTX 8072, at 1245) (concluding that safety and efficacy of abiraterone should be undertaken where abiraterone was administered daily "to castrate men with advanced prostate cancer" and that patients should "be monitored for the development of glucocorticoid insufficiency"); Garnick 2006 (DTX 1157, at 919-20) (noting that abiraterone was under development "as a second-line hormonal therapy for prostate cancer for patients who are refractory;" and that administration of 800 mg/day resulted in "hypersecretion of luteinizing hormone," which "may necessitate concomitant treatment with replacement glucorticoid").

In 2004, Dr. de Bono,[16] along with Lara Vidal, published a review article titled "Reversing Resistance to Targeted Therapy." Its subject matter was

---

[16] Defendants now request that the Court disregard parts of Dr. de Bono's testimony, which they say was not properly disclosed before trial. In particular, defendants argue that Dr. de Bono offered surprise expert testimony regarding the import of the prior art and clinical trials. Defendants did not raise this particular

methods of fighting resistance to cancer treatment and thereby maximizing the treatment's anti-tumor effect. (1T113:9-225; DTX 1135). It noted that hormone therapy was the "mainstay" of treating metastatic prostate cancer. (DTX 1135, at 17). Vidal 2004 further observed that circulating low levels of adrenal androgens (*i.e.,* those produced by the adrenal glands rather than the testes) can result in failure to respond to hormone therapy. It further stated, however, that adrenal androgen synthesis can be inhibited by low doses of steroids, or through inhibition of key enzymes using either abiraterone or ketoconazole. (DTX1135, at 7-8).

The authors noted generally that combining drugs could improve outcomes. (1T122:3-4). For example, chemotherapy drugs had been combined to treat lymphoma. (1T122:5-6). Vidal 2004 noted that combination therapies entail "major logistical challenge[s]" since they require "more than one industry partner"; as a result, researchers were pursuing "less selective agents that can hit multiple targets." (DTX 1135, at 11).

Finally, Sartor 2006 noted that "[s]econdary hormonal manipulations (i.e, ketoconazole, estrogens, glucocorticoids, antiandrogens, and antiandrogen withdrawal) have long been used in [hormone refractory prostate cancer], but because no study with these agents has demonstrated a survival advantage, their potential role is not agreed upon by all." (PTX 108, at 238).

**d. *Objective considerations***

As to factor 4, objective considerations, plaintiffs raise several arguments related to ZYTIGA®'s commercial success, failure of others, skepticism, long-

---

objection during trial, but I nevertheless consider it. (*See* DBr. at 66 (citing 1T98:12-107:7, 113:9-124:16, 130:2-132:12, 136:23-137:7, 142:4-143:15)). The objected-to portions of Dr. de Bono's testimony, while technical, did not exceed the bounds of his personal observations and involvement in the development of the clinical trials. Such testimony is helpful to the court's understanding of the trials and was properly admitted under Rule 701. Fed. R. Evid. 701. *See generally Asplundh Mfg. Div., a Div. of Asplundh Tree Expert Co. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1193 (3d Cir. 1995) (Under Rule 701, even non-experts who possess helpful specialized knowledge may be permitted "to testify about technical matters that might have been thought to lie within the exclusive province of experts.").

felt need, professional approval and industry praise, and unexpected results. My assessment of these is mixed at best, and I give them correspondingly less weight.

As of today, ZYTIGA® has achieved substantial sales and marketplace success. From April 2011 to the end of 2017, plaintiffs estimate, ZYTIGA® generated over $5.7 billion in net sales. (8T1790:17-20). Plaintiffs presented evidence that approximately 85% to 95% of ZYTIGA® prescriptions were being filled in proximity to a fill of prednisone. (8T1803:14-18).

During most of that period of ZYTIGA®'s market success there was a blocking patent in place. Prior to the '438 combination-therapy patent was the patent on abiraterone itself. That patent, U.S. Patent No. 5,604,213 ("the '213 patent"), titled "17-Substituted Steroids Useful in Cancer Treatment," was issued February 18, 1997, and expired in December 2016. (PPF at 208). The '213 patent discusses seventeen steroids and their use in the treatment of androgen-dependent and estrogen-dependent disorders. (JTX 8042). The '213 patent specifically discloses abiraterone and suggests a method of using abiraterone acetate for the treatment of prostate cancer. (*Id.*). The '213 patent compares the inhibition levels of abiraterone with those of ketoconazole, and reports that abiraterone achieves a superior reduction of testosterone levels. (*Id.*). It was under the '213 patent that BTG granted Cougar Biotechnology an exclusive license to develop abiraterone in 2004. (9T2044:21-25).

Plaintiffs point out that two other CYP17 inhibitors had failed to treat advanced prostate cancer (9T1969:24-25); that various pharmaceutical companies declined to pursue abiraterone after 1999 (1T229:10-230:17); and that the O'Donnell 2004 authors had difficulty getting their results published. The anti-cancer effect of abiraterone plus prednisone, then, was unexpected in plaintiffs' opinion. In countering that the argument that ZYTIGA® met a long-felt need, Defendants note that other treatments, in particular Taxotere and Jevtana, had similar survival benefits.

e. ***Obviousness: Discussion and analysis***

By the priority date of August 25, 2006, abiraterone had been identified in the art as a treatment for prostate cancer. It was understood that abiraterone selectively inhibited the CYP17 enzyme. This was seen as an improvement on ketoconazole, a less selective agent that inhibited CYP17, but also interfered with other metabolic steps. (*See* O'Donnell 2004; Barrier 1994).

Ketoconazole and aminoglutethimide were known treatments. (6T1260:22-24, 1276:3-6, 1325:13-14, 1327:8-15). Both ketoconazole and abiraterone were steroid inhibitors, and both inhibited the CYP17 enzyme (although, as stated, ketoconazole inhibited others steps as well). (6T1262:7-17, 1325:13-1326:19). Barrie 1994 and O'Donnell 2004 both used ketoconazole as a starting point for their discussions regarding abiraterone and its potential to be a more selective inhibitor.[17] (7T1563:7-9; DTX 1062, at 5; DTX 1129, at 2318). Barrie 1994, comparing the inhibition levels of hormone production by abiraterone with ketoconazole, concludes that abiraterone was more effective than ketoconazole in decreasing testosterone levels. (DTX 1062, at 270; *see also* Jarman 1998 (noting that abiraterone caused "marked reduction of circulating testosterone" warranting further clinical evaluations (DTX 1085, at 5375)). O'Donnell 2004 specifically notes that abiraterone's ability to sustain testosterone suppression in castrate males, when given in 500 to 800 milligram doses, suggested that it could be used as a second-line treatment.[18] (DTX 1129, at 2317).

---

17 The '213 patent likewise used ketoconazole as a starting point and relevant comparison in its discussion of abiraterone. (JTX 8042).

18 It is undisputed that publication of the study underlying O'Donnell 2004 was delayed, and that companies did not pursue the marketing of abiraterone immediately after that publication. I do not give weight, however, to the plaintiffs' speculation that those events resulted from skepticism about abiraterone therapy, a conclusion unsupported by any first-hand testimony. (PBr. at 34, 39). Because there are many reasons that a company decided not to pursue a particular drug or publish a study, I cannot assume plaintiffs' speculative explanation is the true one.

From all of this, I conclude that abiraterone had been identified in the prior art as a second-line prostate cancer treatment. I also conclude that it was regarded as a superior swap for ketoconazole, in that it performed a parallel function in a more targeted manner.

As for prednisone itself, Tannock 1996 suggested that corticosteroids provide some level of palliation to cancer patients. Sartor 1998 goes farther, and suggests that prednisone can cause reduced PSA levels, a marker of anti-cancer effect. It further teaches the administration of 20 mg/day of prednisone as a monotherapy in patients with mCRPC. Plaintiffs may be correct that Sartor 1998 was flawed, in that it was not a prospective study but a retrospective analysis of data, and that it carried a risk of sample bias. A reference, however, "is prior art for all that it discloses, and there is no requirement that a teaching in the prior art be scientifically tested . . . or even guarantee success . . . before providing a reason to combine." (internal citations omitted); *Duramed Pharm., Inc. v. Watson Labs., Inc.*, 413 F. App'x 289, 294 (Fed. Cir. 2011).

Sartor 1998 teaches that prednisone monotherapy worked to reduce PSA levels in some mCRPC patients, and a POSA would have known that. Whether firm or shaky, the Sartor results disclosed to a POSA that prednisone can have an anti-cancer effect. That conclusion is supported by three other prior art references: Fossa 2001, Fakih 2002, and Harris 2002.[19]

Reduced PSA levels, to be sure, do not necessarily correspond to a survival benefit. Still, PSA levels are an accepted measure of progression of prostate cancer. I am not convinced that PSA levels are so meaningless that researchers would have been dissuaded from pursuing prednisone in combination therapy.

---

19 The extent to which the biochemical basis for such an effect was understood is less clear, however, and hindsight is not the appropriate test. *See* Findings of Fact ¶ 34, *supra* (post-priority-date citations).

Based on the foregoing, and some additional references (especially O'Donnell 2004), I find that there was more than sufficient motivation for a POSA to combine abiraterone with prednisone.

Gerber 1990 suggests that a patient whose PSA levels are increasing can be treated with a combination of ketoconazole and a glucocorticoid, which can result in a decrease in PSA levels. Gerber 1990 also teaches that the combination of ketoconazole and five milligrams a day of prednisone, twice daily, is safe and effective for treating hormone-refractory advance prostate cancer.

O'Donnell 2004 corroborates that in the clinical use of ketoconazole, it was "common practice" to administer supplementary hydrocortisone. It states cautiously that "further studies with abiraterone acetate will be required to ascertain if concomitant therapy with glucocorticoid is required on a continuous basis, at times of physiological stress, if patients become symptomatic or indeed at all." (DTX 1129, at 2323). The prior art went so far as to identify specific dosages: between ten and twenty milligrams per day of prednisone (Gerber 1990; Tannock 1996; Sartor 1998; Fossa 2001); and 800 milligrams of abiraterone. (Gerber 1990; O'Donnell 2004; Garnick 2006).

A POSA would have interpreted ketoconazole's clinical use as a basis to take the next investigative steps with abiraterone. It made sense to replace ketoconazole with abiraterone, as it became clear that abiraterone was a superior, more selective inhibitor. Co-administration of 10mg per day of prednisone would naturally carry over from the ketoconazole combination therapy to the abiraterone combination therapy.

I believe a POSA would have been concerned about the potential reduction in cortisol as a side effect of abiraterone's inhibition of CYP17. Specifically, a POSA would have seen the potential for resulting excess mineralocorticoid (aldosterone) and adrenal insufficiency. Plaintiffs'

reservations about the Synacthen test for adrenal insufficiency[20] are, I believe, well-taken. They do not, however, outweigh the clear import of O'Donnell 2004. O'Donnell 2004 states that "[s]ome impact on adrenal reserve was predictable from the steroid synthesis pathway." That conclusion is consistent with defendants' expert's testimony and with the literature relied upon by defendants' expert. (6T1287:3-1292:8; DTX 1096). O'Donnell 2004 suggests that a practitioner could address those side effects through coadministration of a glucocorticoid. To be sure, the paper appears to be agnostic about whether coadministration would (or would always) be necessary. It falls far short, however, of concluding that such coadministration is unnecessary or should be avoided. *See Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009) (prior art does not teach away "if it merely expresses a general preference for an alternative invention but does not criticize, discredit, or otherwise discourage investigation into the invention claimed."). I therefore do not agree, as plaintiffs suggest, that prior art "taught away" from the combination therapy. Plaintiffs further suggest that there were other options and theories on how to treat mCRPC, and that there were other anti-cancer agents, perhaps even more promising ones. Nevertheless, the prior art clearly pointed to coadministration of abiraterone with a glucocorticoid. *See, e.g., In re Fulton*, 391 F.3d 1195, 1200 (Fed. Cir. 2004) ("a finding that the prior art as a whole suggests the desirability of a particular combination need not be supported by a finding that the prior art suggests that the combination claimed by the patent applicant is the preferred, or most desirable, combination."); *In re Gurley*, 27 F.3d 551, 552-53 (Fed. Cir. 1994) (upholding obviousness finding where patent was directed to one of two alternative resins disclosed in prior art reference, even though reference described claimed resin as "inferior.").

---

20 The Synacthen test evaluates adrenal insufficiency based on the measurement of serum cortisol before and after an injection of synthetic ACTH. (DTX 1096).

Nor do I agree that prednisone's own side effects would have discouraged its use. The prior art establishes that, despite side effects, glucocorticoids were reasonably well-tolerated. The mere existence of other treatments does not suggest that a POSA would employ these alternatives to the exclusion of prednisone.

In short, to the POSA, the prior art would suggest that abiraterone could be combined with prednisone with a reasonable probability of success.

The factor 4 objective considerations presented by plaintiffs do not alter my conclusion. *See generally Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 719 (Fed. Cir. 1991) (holding that district court did not err when it determined that secondary considerations did not carry sufficient weight to override obviousness determination based on primary considerations).

As to the commercial success factor, there can be no dispute that ZYTIGA® has yielded billions of dollars in sales.[21] "Commercial success is relevant because the law presumes an idea would successfully have been brought to market sooner, in response to market forces, had the idea been obvious to persons skilled in the art." *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1376 (Fed. Cir. 2005). "Evidence of commercial success . . . is only significant if there is a nexus between the claimed invention and the commercial success." *Ormco*, 463 F.3d at 1311-12. "When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the

21 The net sales figures offered by plaintiffs, totaling $5.7 billion for 2011–17, are for ZYTIGA® abiraterone acetate tablets alone. They do not correspond precisely to the patented invention, *i.e.*, ZYTIGA® plus prednisone. *See Merck Sharp & Dohme Corp. v. Sandoz Inc.*, 2015 U.S. Dist. LEXIS 113710, at *118 (D.N.J. Aug. 27, 2015) (Commercial success is measured by sales of a "commercial embodiment of the claimed compound"); *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008) (noting that "failure to link that commercial success to the features of [the] invention that were not disclosed in [the prior art] undermines the probative force of the evidence."). On that score, plaintiffs offer suggestive though not conclusive evidence that approximately 85% to 95% of ZYTIGA® prescriptions were being filled at a pharmacy in temporal proximity to a fill of prednisone.

patented invention." *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997). However, "if the feature that creates the commercial success was known in the prior art, the success is not pertinent." *Ormco*, 463 F.3d at 1311-12; *see also J.T. Eaton*, 106 F.3d at 1571 ("[T]he asserted commercial success of the product must be due to the merits of the claimed invention beyond what was readily available in the prior art"); *see Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011) (noting that if "commercial success is due to an element in the prior art, no nexus exists.").

Specifically, "where 'market entry by others was precluded [due to blocking patents], the inference of non-obviousness of [the asserted claims], from evidence of commercial success, is weak.'" *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 740 (Fed. Cir. 2013) (quoting *Merck*, 395 F.3d at 1377). "A 'blocking patent' is an earlier patent that must be licensed in order to practice a later patent. This often occurs, for instance, between a pioneer patent and an improvement patent." *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1379 n.2 (Fed. Cir. 2000). "The existence of such a blocking patent may deter non-owners and non-licensees from investing the resources needed to make, develop, and market such a later, 'blocked' invention, because of the risk of infringement liability and associated monetary or injunctive remedies." *Acorda Therapeutics Inc. v. Apotex Inc.*, 2011 U.S. Dist. LEXIS 102875, at *61 (D.N.J. Sep. 6, 2011), *aff'd*, 476 F. App'x 746 (Fed. Cir. 2012); *see also id.* at *66 ("if all other variables are held constant, a blocking patent diminishes possible rewards from a non-owner's or non-licensee's investment activity aimed at an invention whose commercial exploitation would be infringing, therefore reducing incentives for innovations in the blocked space by non-owners and non-licensees of the blocking patent.").

To explain the commercial success of the patented ZYTIGA® combination therapy, despite its alleged obviousness, defendants point to the exclusionary effect of the earlier '213 "blocking patent." Abiraterone was previously known in

the art, and indeed was taught by the '213 patent. From 1997 through 2016, that patent granted its holder the exclusive right to market abiraterone. *See Galderma Labs.*, 737 F.3d at 740 (holding that any inference of non-obviousness gleaned from evidence of commercial success is undermined when blocking patent precludes others from entering market).

Janssen contends that the effect of the blocking patent is overstated, because they were willing to license the '213 patent rights at any time from 2000 until 2004, when Cougar Biotechnology was granted its exclusive license. To be sure, licensing opportunities can "dilute the power of the blocking patent" in evaluating commercial success. *Accord Therapeutics*, 2018 U.S. App. LEXIS 25536, at *70. But such licensing efforts appear to have been lackluster. Dr. Ian Judson testified that he met with three drug companies on one occasion in an effort to partner and license abiraterone. (1T229:23-230:3). Dr. Judson pointed to no further attempts to find a licensing partner. (1T229:12-14). And starting in 2004, of course, both the blocking patent and the Cougar license (which was exclusive) prevented non-owners or licensees from entering the market. Between 2004 and 2006, Cougar Biotechnology was the exclusive licensee for abiraterone. So although the commercial possibilities might otherwise have attracted entrants, Cougar's exclusive status surely would have stifled such interest.

The existence of a blocking patent 1997 through 2006 (indeed, through 2016), despite some desultory licensing efforts, would have discouraged entry at the very time when the obviousness of combination therapy was manifesting itself. *See generally Media Techs. Licensing, LLC v. Upper Deck Co.*, 596 F.3d 1334, 1339 (Fed. Cir.) ("Even if Media Tech could establish the required nexus, a highly successful product alone would not overcome the strong showing of obviousness."), *cert. denied*, 562 U.S. 894, 131 S. Ct. 305 (2010). And the sales of ZYTIGA may not be wholly attributable to the patented combination therapy. These are powerful offsetting factors. All in all, however, I must recognize that this abiraterone product has enjoyed commercial success.

I find the market-skepticism factor to be neutral. "Evidence of industry skepticism weighs in favor of non-obviousness. If industry participants or skilled artisans are skeptical about whether or how a problem could be solved or the workability of the claimed solution, it favors non-obviousness." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1335 (Fed. Cir. 2016). Plaintiff advances arguments related to the delayed publication of the study results underlying O'Donnell 2004, a negative comment received in response to those results, the failure to obtain a licensing partner after 1999 and before 2004, the uncertainty of Dr. de Bono's colleagues in proceeding with the extension study, and an article from 1999 that discounted hormonal therapies. Much of that skepticism seems to be directed to abiraterone itself, rather than the claimed combination. And the context is important: as noted above, prior art suggested the combination of abiraterone and glucocorticoids to treat prostate-cancer, and by 1997 industry researchers had patented abiraterone itself. By then, multiple experts had concluded that it was worth pursuing abiraterone as a treatment for prostate cancer. *See* Section II.A.2.a, *supra*. This skepticism factor does not point strongly either way.

I next address the plaintiffs' claims that the patented invention addressed a long-felt need and had unexpected results. "[L]ong-felt need is analyzed as of the date of an articulated identified problem and evidence of efforts to solve that problem." *Tex. Instruments, Inc. v. U.S. ITC*, 988 F.2d 1165, 1178 (Fed. Cir. 1993). In practical terms, courts "look to the filing date of the challenged invention to assess the presence of a long-felt and unmet need." *P&G v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 998 (Fed. Cir. 2009). "Evidence of 'unexpected results' allows a patent-holder to rebut a *prima facie* case of obviousness by showing that the 'claimed invention exhibits some superior property or advantage that a person of ordinary skill in the relevant art would have found surprising or unexpected.'" *Daiichi Sankyo Co., Ltd. v. Mylan Pharm. Inc.*, 670 F. Supp. 2d 359, 382 (D.N.J. 2009) (quoting *In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995), *aff'd*, 619 F.3d 1346 (Fed. Cir. 2010)). To establish this

factor, "the claimed properties or results must be different in 'kind and not merely in degree' from the results of the prior art." *Id.* (quoting *In re Huang*, 100 F.3d 135, 139 (Fed. Cir. 1996)). That is, in order for the results to be "unexpected," they must be proven to be surprising in relation to the closest prior art. *Id.* (citing *In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991)).

Plaintiffs state that the claimed invention was an advance on the prior art in that it had less toxicity, was better tolerated, and improved overall survival. Defendants point to existing contemporaneous alternatives: Jevtana was approved by the FDA in 2010, a year before ZYTIGA® was approved; Xtandi was approved in 2012. (7T1626:13-18). Those drugs were FDA-approved and available for the treatment of prostate cancer patients. *Cf. Pfizer Inc. v. Teva Pharm. United States, Inc.*, 460 F. Supp. 2d 659, 662 (D.N.J. 2006) (noting that failure to obtain FDA approval is "appropriate benchmark in evaluating failure of others"). Taxotere (a chemotherapy drug) and Jevtana were found to extend overall survival of mCRPC patients by 2.5 months, whereas ZYTIGA®-based therapy extended survival by about four months. (7T1622:17-24). That represents a real improvement, but an incremental one. In the context of prostate cancer patients with dire prognoses, it cannot be discounted. Still, it does not suggest that all other efforts had failed, or that the abiraterone/prednisone combination therapy was unexpected "in kind and not merely in degree." *Daichi, supra.* So, although there is evidence supporting the unmet-need or failure-of-others factors, I do not find it to be powerful.

As for the professional-approval factor, plaintiff points to the 301 and 302 studies, as well as the post-priority-date Attard 2008 and 2009 references. "Appreciation by contemporaries skilled in the field of the invention is a useful indicator of whether the invention would have been obvious to such persons at the time it was made." *Vulcan Eng'g Co. v. FATA Aluminium, Inc.*, 278 F.3d 1366, 1373 (Fed. Cir.), *cert. denied*, 537 U.S. 814, 123 S. Ct. 81 (2002). A court may look to "contemporaneous recognition of the achievements of the

[patented] system, including articles in trade journals" and testimony by those skilled in the art that prior to the appearance of the patented technology, it was generally believed the system could not be created. *Id.* This factor weighs somewhat in plaintiffs' favor.

All in all, however, I conclude that the patented combination here was well foreshadowed in peer-reviewed articles. That factor outweighs the others. Balancing all of the prior art and the other indicia, I find that the evidence favors a conclusion of obviousness. *Tokai Corp. v. Easton Enters.*, 632 F.3d 1358, 1370 (Fed. Cir. 2011) ("However, even assuming the existence of a nexus, we see no error in the district court's determination that Tokai failed to establish 'that any of these secondary factors are significant,' . . . in light of the strong showing of prima facie obviousness.").

Defendants' burden of proof to rebut the presumption of validity by clear and convincing evidence is met. The '438 patent is declared invalid for obviousness.

**B. Infringement**

In this section, I assume *arguendo* that the '438 patent is valid and consider whether, if valid, it would have been infringed. Plaintiffs assert both induced and contributory infringement. Both, I find, would be supported by a preponderance of the evidence.

**1. Induced infringement**

The gist of the induced infringement claim here is that the ANDA label, which specifies indications and proper use of the abiraterone/prednisone combination therapy, would induce physicians' direct infringement of the method claimed in the '438 patent. The label by definition embodies the range of uses and indications that are approved by the FDA. Defendants argue that because the allegedly infringing use would fall outside the scope of the FDA-approved use, the ANDA label does not induce infringement.

It's a subtle argument. Both the patent and the label indications, followed faithfully, would lead to the same actions, undertaken in the same manner and for the same reason: the administration of abiraterone and

prednisone, in combination, to treat a class of patients who suffer from mCRPC, with the goal of slowing the progression of the disease. The defendants, however, argue that the '438 patent claims that *each* component (abiraterone, prednisone) has an anti-cancer effect. The FDA, in contrast, allegedly approved administration of the prednisone component of the combination only for its palliative effect, or to address side effects. Therefore, the argument runs, the administration of the combination therapy in accordance with the FDA-approved label would not infringe.

Defendants ask, in effect, that the court look behind the Indications and Usage section of the label, which provides for combination therapy and does not segregate the contribution of each component. That would require the Court to reanalyze the clinical data as if it were a regulatory body, and posit a revised Indication which, in defendants' estimation, would better fit the underlying science. I do not sit to reconstruct a theoretical ruling by an ideal FDA; in assessing the scope of the FDA approval, I am confined to the actual ruling of the actual FDA. In short, this is not an appeal of the FDA's decision, but only an attempt to define its scope.

"Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b); *see Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003). Thus infringement liability falls upon parties who, while not directly infringing a patent themselves, induce others to infringe. *See Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1926 (2015).

"A person induces infringement under § 271(b) by actively and knowingly aiding and abetting another's direct infringement." *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 675 (Fed. Cir. 1990) (emphasis omitted). To succeed on an induced infringement claim, a plaintiff must prove that the defendants' "actions induced infringing acts and that [they] knew or should have known [their] actions would induce actual infringement." *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990). However, it is insufficient that defendants merely have "knowledge of the acts

alleged to constitute infringement." *Id.* "[P]roof of actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement." *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469 (Fed. Cir. 1990); *see ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007). "While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice." *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988).

**a. FDA approval**

The '438 patented method, say defendants, requires that *each* component (abiraterone and prednisone) have an anti-cancer effect. The FDA however, allegedly approved the prednisone component for its palliative effects only, and the proposed ANDA labels reflect that. Thus, according to defendants, their ANDAs do not meet the claim limitation of a "therapeutically effective amount of prednisone," *i.e.*, an amount of prednisone that is, in itself, therapeutically effective *against prostate cancer.*

How do we know that the FDA did not approve a therapy in which prednisone, viewed separately, has an anti-cancer effect? Primarily, defendants say, because (1) the underlying clinical trials and data provided to the FDA would not permit such a conclusion. Relatedly, defendants cite the following evidence: (2) the ZYTIGA® label is vague in its Indications and Usage section as to the role of prednisone; (3) plaintiffs' NDA submissions focused on the efficacy of abiraterone, not prednisone, in treating cancer; (4) the FDA approval package does not suggest that prednisone was approved for its combination effect with abiraterone; and (5) the FDA-approved marketing materials promote prednisone as relieving abiraterone's side effects.

"The FDA-approved label for an approved drug indicates whether the FDA has approved a particular method of use for that drug." *Bayer Schering Pharma AG & Bayer HealthCare Pharm., Inc. v. Lupin, Ltd.*, 676 F.3d 1316, 1322 (Fed. Cir. 2012). Under the Food, Drug, and Cosmetics Act ("FDCA"), new pharmaceutical drugs cannot be marketed or sold unless the sponsor of the

drug demonstrates to the satisfaction of the FDA that the drug is "safe for use under the conditions prescribed, recommended or suggested" on the drug's label. 21 U.S.C. § 355(d). A drug receives FDA approval only for treatment of specified conditions, referred to as "indications." 21 U.S.C. §§ 352, 355(d).

FDA regulations provide guidance on how to interpret a label. The "Indications and Usage" section of the label must set forth indications that are supported by "substantial evidence of effectiveness based on adequate and well-controlled studies." 21 C.F.R. § 201.57(c)(2)(iv). The Indications and Usage section "must state that the drug is indicated for the treatment, prevention, mitigation, cure, or diagnosis of a recognized disease or condition, or of a manifestation of a recognized disease or condition, or for the relief of symptoms associated with a recognized disease or condition." 21 C.F.R. § 201.57(c)(2). "Indications or uses must not be implied or suggested in other sections of the labeling," *i.e.*, sections other than the Indications and Usage section. 21 C.F.R. § 201.57(c)(2)(iv); *cf. Warner-Lambert*, 316 F.3d at 1356 ("The FDA does not grant across-the-board approval to market a drug. Rather, it grants approval to make, use, and sell a drug *for a specific purpose* for which that drug has been demonstrated to be safe and efficacious." (emphasis added)).

The three cases cited by the defendants, *Bayer Schering, supra, Warner-Lambert, supra,* and *Allergan, Inc. v. Alcon Labs., Inc.*, 324 F.3d 1322, 1324-25 (Fed. Cir. 2003), are not precisely on point. To begin with, they involve multiple effects of a single drug, rather than a dispute over the allocation of multiple effects as between two drugs. I take my lead, however, from those cases' shared reluctance to adopt the mode of analysis of the FDA approval that is employed by the defendants here.

Because *Bayer Schering* is the most pertinent of the three, I give it the most extended discussion. There, the defendants sought to market a generic form of Yasmin, a branded oral contraceptive. The FDA had granted plaintiffs' NDA seeking approval of Yasmin "for oral contraception." 676 F.3d at 1319. The defendants' ANDAs sought FDA approval to market generic forms of

Yasmin for the same approved use, "oral contraception." *Id.* Defendants filed paragraph IV certifications, and the plaintiffs filed suit against the ANDA applicants, alleging infringement of a method-of-use patent. That patent's claims recited that the drug "achieves three effects simultaneously: a contraceptive (or gestagenic) effect, an anti-androgenic effect . . . and an anti-aldosterone effect." *Id.* at 1320. Defendants filed a motion for judgment in their favor on the pleadings; they would not infringe, they said, because they sought to market the generic form of Yasmin "only for oral contraception and not for the combination of uses claimed in the [] patent." *Id.* The district court agreed. *Id.*

On appeal, the plaintiffs acknowledged that both the FDA-approved label and the proposed generic labels stated in their Indications and Usage sections that the drug was to be used as an "oral contraceptive." *Id.* at 1320. The "Clinical Pharmacology" section of the label, however, referred to the other two effects, *i.e.*, the anti-androgenic and anti-aldosterone effects. Based on that language, the plaintiffs argued that the FDA had approved "the use of Yasmin to induce those effects" in addition to the contraceptive effect. *Id.* at 1322, 1324.

The Federal Circuit held that, as to this issue, it is the Usages and Indications section that does the real work. The court expressly rejected the notion that an indication could be implied from another section of the label, an approach that would not make regulatory sense. A particular use or indication for a drug is FDA-approved only when the safety and efficacy of that use has been established. The inclusion of such a use in the label's Indications and Usage section constitutes the necessary "[a]cknowledgement of the safety and efficacy of that specific method of use." *Id.* at 1324.

Mention in the Clinical Pharmacology section, the court held, is not the same thing at all:

> The reference in the Clinical Pharmacology section of the label to the anti-mineralocorticoid and anti-androgenic activity of drospirenone is certainly not a direct indication of an appropriate

> use for Yasmin, and even if it could be considered an "implied or suggested" indication of an appropriate use, the regulation expressly states that such implied or suggested uses do not constitute approved uses.

*Id.* at 1323.

The Federal Circuit in *Bayer Schering* discussed extrinsic evidence submitted by the plaintiffs, including physicians' declarations and marketing materials. *Id.* at 1324. These documents, said the plaintiffs, established a context that suggested FDA approval of Yasmin as safe and effective not just for contraception, but for the claimed combination of three effects. *Id.* The Federal Circuit demurred. This evidence, the Court held, demonstrated that the FDA was *aware* that Yasmin could cause the other two effects, not that the FDA had *approved* the safety and efficacy of the medication for the claimed combination of effects. *Id.* Accordingly, the Court held that the FDA had approved Yasmin for use only as an oral contraceptive, and that defendants did not commit infringement. The defendants sought to market their drug solely for that approved use as a contraceptive, while the patent claimed the trio of uses in combination. *Id.* at 1326.

Following the lead of *Bayer,* I will not read an indication into the ZYTIGA® label or ANDA labels that is not there. The Indications and Usage section is clear that abiraterone and prednisone are to be used in combination for the treatment of mCRPC. That indication signifies that these agents are FDA-approved in combination to treat cancer. (2T400:16-24).

Defendants' FDA expert, Dr. Akhilesh Nagaich, testified persuasively that prednisone would not have been identified in the Indications and Usage section if its sole approved purpose were the treatment of side effects, and I agree. (4T861:21-862:2). I also credit Dr. O'Shea's testimony, which is consistent with the FDA regulations, that if prednisone were approved solely to treat side effects of abiraterone, it would probably not appear in the Indications section, but only in the label's dosage and administration section, or the warnings and precautions section. (2T401:19-402:1, 405:1-6). It is also likely that if

prednisone had been approved only to alleviate side effects, the label would simply have said so. (2T402:2-3).

An item's inclusion in the Indications and Usage section cannot be brushed aside; to place it there is a critical regulatory decision. Indeed, as noted above, it's essentially that or nothing; indications *not* listed in the Indications and Usage section cannot be derived by implication from other sections of the labeling. 21 C.F.R. § 201.57(c)(2)(iv) ("Indications or uses must not be implied or suggested in other sections of the labeling"); *see also Bayer Schering*, 676 F.3d at 1323–24; *Warner-Lambert*, 316 F.3d at 13; *Shire LLC v. Amneal Pharm., LLC*, 2014 U.S. Dist. LEXIS 85369, at *18 (D.N.J. June 23, 2014) (rejecting argument that drug was FDA-approved to treat amphetamine abuse based on studies section of label, where the Indications section clearly stated that the drug was "indicated for the treatment of Attention Deficit Hyperactivity Disorder"), *aff'd and reversed on other grounds*, 802 F.3d 1301 (Fed. Cir. 2015).[22]

---

22 I consider with care certain other cases in which courts were considering, *inter alia,* the related but distinct issue of specific *intent* to induce infringement. *See* Section II.C, *infra*. With that caveat, I have given some weight to cases that that have rejected invitations to infer a drug's use from sections of the label other than indications and usage.

Thus, in *United Therapeutics Corp. v. Sandoz, Inc.*, No. 12cv1617, 2014 U.S. Dist. LEXIS 121573, at *49 (D.N.J. Aug. 29, 2014) Judge Sheridan of this court persuasively rejected a plaintiff's argument that an infringing use could be predicated on a label warning, as opposed to an indication. The court noted that there is a "rather significant difference between a warning and an instruction." *Id.* A "warning provides information regarding a potential risk," but stops short of prescribing a specific "course of action." *Id.* An instruction, on the other hand, specifically directs that a particular action, or series of actions be taken. *Id.* at 49-50 (rejecting inducement claim if patentee must engage in "scholarly scavenger hunt" through the label to identify statements that may potentially, but not inevitably, impact a prescribing physician's actions).

To similar effect is *Otsuka Pharm. Co., Ltd. v. Torrent Pharm. Ltd., Inc.*, 99 F. Supp. 3d 461, 476, 490-93 (D.N.J. 2015) (Simandle, C.J.) (finding that warning and safety information is insufficient to establish inducement of claimed method). *See also Sanofi v. Glenmark Pharm. Inc.*, 204 F. Supp. 3d 665, 674 (D. Del. 2016) (finding that physician would look to indications and usage section, but that the indications and usage section explicitly referred physicians to the clinical studies section, which a physician would therefore consider as well), *aff'd*, 875 F.3d 636 (Fed. Cir. 2017).

Also implicit in *Bayer* is my refusal to give controlling weight to the other evidence introduced by defendants. To be sure, there are indications in the record that the FDA was aware of prednisone's palliative benefits. To be sure, underlying NDA submissions emphasize the anti-cancer effect of abiraterone rather than that of prednisone. And there there are marketing materials that tout the palliative effects of prednisone without mentioning its anti-cancer effect. Giving these proofs due latitude, I nevertheless conclude that they do not negate what the FDA actually did in its approval of the label's Indications and Uses. *See Bayer Schering*, 676 F.3d at 1323-24 (refusing to imply indication from marketing materials, clinical pharmacology section of label at issue, and from physician's declarations). I cannot find that prednisone was approved as part of ZYTIGA®'s indication solely for its benefits with respect to palliation and side effects.

Concededly, this Court, like the parties, must wrestle with an irreducible level of ambiguity in a combination-therapy approval. As defendants say, the Indications and Uses do not, for example, attribute a percentage of efficacy to each component; the most that can be said is that the FDA has approved the combination as safe and effective. Similarly, defendants attack plaintiffs' cited combination-study clinical trials which, in defendants' view, are confounded and fail to establish the independent contribution of prednisone to the efficacy of the combination.

Again, the fact remains that the FDA did approve the combination-based treatment of mCRPC based on a combination study. Perhaps the studies could have been better designed. Perhaps the researchers could have found an ethical means of definitively isolating the contribution of each component.[23]

---

For similar reasons, I do not give weight to the warning that was omitted from the 2018 version of the ZYTIGA® label ("Co-administration of a corticosteroid suppresses adrenocorticotropic hormone (ACTH) drive, resulting in the reduction in the incidence and severity of these adverse reactions." (2T421:13-19)).

23 Placebo control studies, for example, were discontinued when the combination therapy began to show therapeutic benefit. *See* Section I.E., *supra*.

But from arguments that the FDA *should* not have approved an indication, I cannot leap to the conclusion that it *did* not. That, to me, is an important methodological lesson to be drawn from the approach of *Bayer*.

I treat defendants' other two cited cases more briefly. In *Warner-Lambert*, the branded manufacturer held a patent for a method of "treating neurodegenerative diseases" using a drug known as gabapentin. 316 F.3d at 1351. Its NDA, however, led to approval of gabapentin for use in "adjunctive therapy in the treatment of partial seizure with and without secondary generalization in adults with epilepsy." *Id.* at 1352. Defendant Apotex's ANDA sought to market generic gabapentin for the same indication, *i.e.*, partial seizure. *Id.* The Federal Court affirmed the grant of summary judgment to Apotex because the two indications were distinct; partial seizure is not a neurodegenerative disease. *Id.* at 1353.

Finally, in *Allergan, Inc. v. Alcon Labs., Inc.*, 324 F.3d 1322, 1324-25 (Fed. Cir. 2003), the Federal Circuit held that an ANDA applicant's labeled indication for reducing intraocular pressure would not induce infringement of patented methods of "protecting the optic nerve and retina" and "providing neural protection." Because the patent-claimed uses were not approved by the FDA, the ANDA applicant could not be held liable for infringement even if the proposed drug in fact had those additional protective effects in patients who took the drug for the approved purpose. *Id.* at 1324.

These three cited cases, *Bayer* in particular, eschewed the kind of searching review of the FDA record and regulatory "do-over" that defendants propose. The common feature of these three cases is that, to decide the induced-infringement issue, those courts compared the wording of the label to the patent claims.[24]

[24] What may be occurring here is a kind of category mistake. This is not an appeal seeking affirmance or reversal of an FDA decision. In this context, what is significant about an FDA approval is its existence and scope.

Following that approach, I find that the combination therapy embodied in the label meets the claim limitations of the patent. The Indication on the ZYTIGA® label is clear: "ZYTIGA is indicated in combination with prednisone for the treatment of patients with Metastatic castration-resistant prostate cancer (CRPC)." (PTX 406). That language aligns with the language of Claim 1 of the patent: "A method for the treatment of a prostate cancer in a human comprising administering to said human a therapeutically effective amount of abiraterone acetate . . . and a therapeutically effective amount of prednisone." (JTX 8000).

Although the Indications and Usage section is paramount, I observe that the dosing section and the clinical studies section corroborate the reasoning above. The 301 study established that the combination of the two drugs has an anti-cancer effect. Section 14 of the label, which highlights the clinical studies that were completed, states that "[t]he efficacy and safety of *ZYTIGA with prednisone* was established in three randomized, placebo-controlled, international clinical studies." (PDX 406 at 21 (emphasis added); 2T418:1-4). The effectiveness seen in the studies is attributed to abiraterone plus prednisone, not simply abiraterone. (2T418:6-7; 3T588:5-7). The dosing section recommends that both drugs be administered in specific doses for the purpose of treating mCRPC. In short, it is the combination, and not one drug to the exclusion of the other, that was found safe and effective as a treatment for mCRPC. The FDA meant what it said when it listed the combination in the approved Indications and Uses.

The ZYTIGA® Indications and Usage section encompasses an FDA-approved method, the administration of abiraterone plus prednisone for the treatment of mCRPC. That being the patented method, I find that the labels encompass infringement.

**b. Intent to induce infringement**

The next, interrelated question is whether the ANDA defendants' proposed abiraterone labels evince a specific intent to encourage physicians to

infringe the '438 patent. To summarize, the '438 patent claims the administration of a "therapeutically effective amount of abiraterone acetate" and a "therapeutically effective amount of prednisone," which is defined in dependent claims as 1000mg/day of abiraterone and 10 mg/day of prednisone, to a mCRPC patient. I find that the labels embody an intent to induce a physician to do just that.

Inducement can be established "where there is '[e]vidence of active steps taken to encourage direct infringement,' which can in turn be found in 'advertising an infringing use or instructing how to engage in an infringing use.'" *Takeda*, 785 F.3d at 630–31 (quoting *Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936, 125 S. Ct. 2764, 162 L.Ed.2d 781 (2005)). "[T]he sale of a product specifically labeled for use in a patented method constitutes inducement to infringe that patent, and usually is also contributory infringement." *Eli Lilly & Co. v. Actavis Elizabeth LLC*, 435 F. App'x 917, 926 (Fed. Cir. 2011) (citing *Astrazeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2010) (finding intent to induce infringement based on product label authorizing patented use, which "would inevitably lead some consumers to practice the claimed method"); *DSU Med. Corp. v. JMS Co. Ltd.*, 471 F.3d 1293, 1305-06 (Fed. Cir. 2006) (*en banc* in relevant part) (finding liability for induced infringement when company "offers a product with the object of promoting its use to infringe, as shown by clear expression or other affirmative steps taken to foster infringement")). If relying on instructions, those instructions must evince an "intent to encourage infringement." *Vita–Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1329 (Fed. Cir. 2009). It is not enough that the instructions happen to encompass an infringing mode; rather, they must "teach an infringing use . . . such that we are willing to infer from those instructions an affirmative intent to infringe the patent." *Vita-Mix*, 581 F.3d at 1329 n.2; *see Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1365 (Fed. Cir. 2012). When proof of intent to encourage depends on the label, "[t]he label must encourage, recommend, or promote infringement." *Takeda*, 785 F.3d at 631 (citations omitted).

Mind-reading, however, is not required to establish the necessary intent. The sale of a product specifically labeled for use *via* a patented method constitutes inducement to infringe that patent. *Astrazeneca*, 633 F.3d at 1060 (finding intent to induce infringement based on the product label authorizing patented use, which "would inevitably lead some consumers to practice the claimed method.").

With this framework in mind, the Court analyzes whether the ANDA labels bespeak an intent to induce infringement by doctors. Defendants' proposed product labels, recall, are substantively identical to the approved ZYTIGA® label, except that the chemical name "abiraterone acetate" is substituted for the trademark "ZYTIGA®."

Defendants' Indications are as follows:

- Amerigen's Indication provides "Abiraterone acetate tablets are a CYP17 inhibitor indicated in combination with prednisone for the treatment of patients with metastatic castration-resistant prostate cancer[.]" (JTX 8011);
- Amneal's Indication provides "Abiraterone acetate tablets are a CYP17 inhibitor indicated in combination with prednisone for the treatment of patients with . . . metastatic castration-resistant prostate cancer (CRPC)." (PTX 359);
- DRL's Indication provides "Abiraterone acetate is a CYP17 inhibitor indicated in combination with prednisone for the treatment of patients with . . . metastatic castration-resistant prostate cancer (CRPC)." (PTX 367);
- Mylan's Indication provides "Abiraterone acetate tablets are a CYP17 inhibitor indicated in combination with prednisone for the treatment of patients with . . . metastatic castration-resistant prostate cancer (CRPC)." (PTX 372);
- Teva's Indication provides "Abiraterone acetate tablets are a CYP17 inhibitor indicated in combination with prednisone for the treatment of patients with . . . metastatic castration-resistant prostate cancer (CRPC)." (PTX 383);
- West-Ward/Hikman's Indication provides "Abiraterone acetate tablets, USP are a CYP17 inhibitor indicated in combination with prednisone for the treatment of patients with . . . metastatic castration-resistant prostate cancer (CRPC)." (PTX 393); and

- Wockhardt's Indication provides "Abiraterone acetate tablets, USP are a CYP17 inhibitor indicated in combination with prednisone for the treatment of patients with . . . metastatic castration-resistant prostate cancer (CRPC)." (PTX 397).

The Indications and Usage section of defendants' labels, no less than that of the ZYTIGA® label itself, clearly express an intent that physicians be authorized to prescribe abiraterone plus prednisone for the treatment of mCRPC. (2T408:3-5).

Again, the Indications and Usage section is paramount, but I find corroboration elsewhere. The approved "Dosage and Administration" section of the 2018 ZYTIGA® label reads, in part: "Recommended Dose for metastatic CRPC . . . The recommended dose of ZYTIGA is 1,000 mg (two 500 mg tablets or four 250 mg tablets) administered orally once daily in combination with prednisone 5 mg administered orally twice daily." (PTX 406).

Defendants' labels all contain Dosage sections that recommend administering 1000mg/day of abiraterone acetate, and 10mg/day of prednisone. (DE 502, at 94 ¶73). Amneal's, DRL's, Teva's, and Wockhardt's proposed Dosage sections track the wording of ZYTIGA®'s 2018 label. (2T413:23-3). They state the recommended "recommended dosage *for mCRPC*." (2T413:25-414:3 (emphasis added)) The other defendants' labels track the pre-2018 ZYTIGA® label in that they state the "recommended dosage" but omit the words "for mCRPC." I do not regard the distinction as significant; everyone agrees that the relevant target group for the ANDA consists of mCRPC patients.[25]

The similarities between plaintiffs' and defendants' Indications and Dosing sections are manifest. Defendants nonetheless contend that this, in

---

25 The 2018 ZYTIGA® label, recall, added an indication for mCSPC (*i.e.*, the castration-sensitive, as opposed to castration-resistant, form of the disease). Presumably the "for mCRPC" language was felt to be necessary for clarity, since the label now had more than one indication. I do not believe it alters the substance of the label. At any rate, the ANDA parties do not seek to market the drug combination for that additional mCSPC indication.

itself, is not sufficient to establish inducement because the labels do not direct doctors to use prednisone to fight cancer, as opposed to addressing abiraterone's side effects. (DBr. at 27). In a similar vein, defendants argue that they do not "know" that prednisone has anti-cancer effects. Lacking such knowledge, defendants say, they cannot be regarded as intentionally promoting such use. (DBr. at 29).

The intent required here is not the kind of specific intent required by the criminal law. In the context of patent infringement litigation involving pharmaceuticals, "the sale of a product specifically labeled for use in a patented method constitutes inducement to infringe that patent." *Eli Lilly*, 435 F. App'x at 926; *see also Astrazeneca*, 633 F.3d at 1060 (product label authorizing patented use sufficient to establish intent, because it "would inevitably lead some consumers to practice the claimed method"); *GlaxoSmithKline LLC v. Glenmark Generics Inc., USA*, 2015 U.S. Dist. LEXIS 52525, at *18 (D. Del. Apr. 22, 2015) ("there is no question that statements 'in a package insert that encourage infringing use of a drug product are alone sufficient to establish intent to encourage direct infringement' for purposes of an induced infringement claim." (citation omitted)).

The key question is whether the label teaches performance of an infringing use. These cases make clear that the instructions in the label itself are sufficient for finding the requisite specific intent. *See In re Depomed Patent Litig.*, 2016 U.S. Dist. LEXIS 166077, at *181-82 (finding defendants possessed specific intent based on "the instructions in the label itself" and that "[i]nformation outside the label (e.g., a physician's knowledge) is not sufficient to meet the standard." (citation omitted)); *see also Sanofi v. Watson Laboratories Inc.*, 875 F.3d 636, 644-46 (Fed. Cir. 2017) (affirming verdict of inducing infringement where label encouraged patient to use drug in manner that infringed claims, relying on data of actual usage of drug product as further evidence that labeling encouraged infringement, and rejecting contention that

because drug had substantial noninfringing uses there could not be inducing infringement).

Here, the content of the ANDA labels virtually compels an inference of specific intent to encourage the infringing use, and I do draw that inference. Claim 1 of the '438 patent, the only independent claim, is a method of treating prostate cancer by the administration of abiraterone and prednisone. (JTX 8000). Dependent claims 2–20 of the '438 patent describe additional limitations of the method, including the amount of abiraterone acetate (1000mg/day) and the amount of prednisone (10mg/day) used, and the type of prostate cancer being treated (mCRPC). (*Id.*). All of the defendants' label Indications promote that exact use. *See Bone Care Int'l, L.L.C. v. Roxane Labs., Inc.*, 2012 U.S. Dist. LEXIS 80450, at *33 (D. Del. June 11, 2012) (finding induced infringement where defendants' proposed labels did not differ from plaintiff's labels "in any relevant way.").

Defendants cite cases in which intent was not inferred from the label's content, but in those cases the infringing use was no more than an option. In none of those cases did the generic defendant successfully interpose an ostrich defense to Indication and Dosing sections that directly instructed infringing use, as they do here.

In *Shire*, for example, the patent claimed a method of administering a certain drug orally, with food. 2014 U.S. Dist. LEXIS 85369 at *15. In contrast, defendants' ANDA labels stated that the drug could be taken with or without food. *Id.* Consistent with the label, physicians could, at their option, infringe or not infringe. The court held accordingly:

> The problem is that the statement that the medication may be taken with or without food cannot be reasonably understood to be an instruction to engage in an infringing use. As Defendants contend, it is indifferent to which option is selected. At most, it may be understood to permit an infringing use, but permission is different from encouragement. . . . [T]he proposed label does not contain any instruction to take the medication with food. Plaintiffs have failed to raise a material factual dispute over whether the

> proposed label encourages infringement of method claims requiring administration with food.

*Id.* at *16.

Similarly, in *Acorda*, the patent taught that a drug be taken with food. 2011 U.S. Dist. LEXIS 102875, at *2. The proposed label directed physicians to "the pharmacokinetics section of the label for information on the differences between the fed and fasted states with capsules and tablets," and stated that physicians should be "thoroughly familiar with the complex effects of food" on the drug. *Id.* at *17. Finding that the labels did not infringe, the court explained that none of the label's statements "direct any action on the part of any physician, but merely call attention to the pharmacokinetics section." *Id.* In addition, the label did not state "a preference of one over the other or a direction to use the capsule form in the fed state." *Id.* Here, too, the options were "with food" or "without food," and the label did not promote one over the other.

The ANDA defendants' abiraterone labels are a far cry from that. The *only* way to follow these labels is to administer abiraterone, together with prednisone, in specified doses, to a mCRPC patient.[26]

I am also unpersuaded by defendants' argument that doctors will prescribe prednisone only for the unpatented purposes of palliation or minimizing side effects. First, this hypothetical possibility is contrary to the labels' explicit Indication, *i.e.*, abiraterone plus prednisone for the treatment of mCRPC. Second, this argument is best considered as a substantial non-infringing use under § 271(c), not as a rebuttal of intent under § 271(b). *See Sanofi*, 875 F.3d at 646 ("a person can be liable for inducing an infringing use of a product even if the product has substantial noninfringing uses") (citing *Grokster*, 545 U.S. at 934-37). Third, courts have found induced infringement

---

26 Nor is there persuasive evidence that the defendants took affirmative steps to avoid infringing uses, as in *Otsuka Pharm.*, 99 F. Supp. 3d at 485 ("The fact that . . . Defendants actively and voluntarily removed any reference to the allegedly infringing indication, in turn, belies any suggestion that these Defendants acted with the specific intention to encourage infringement.")

even in situations where a label did not track the patent's description of an underlying medical condition, but instead sought to treat a symptom. Infringement was found because the use of the product would entail the patented treatment of the underlying condition. *See, e.g., L.A. Biomedical Research Inst. at Harbor-UCLA Med. Ctr. v. Eli Lilly & Co.*, 2014 U.S. Dist. LEXIS 185431, at *13-14 (C.D. Cal. May 12, 2014) (noting that "a once daily dosage of [drug] to treat [symptom] in these patients results directly in treatment of the underlying [condition] and the performance of the patented method.").

Proposed labeling that instructs infringing uses is generally sufficient to support a finding of intentional inducement. The defendants' proposed labels here would infringe each element of the asserted claim. They teach the reader to perform every element of the patented method. With respect to the specific intent element, I conclude that the plaintiffs have sufficiently shown that the defendants "knew or should have known [their] actions would induce actual infringements." *See DSU Med. Corp.*, 471 F.3d at 1306. All defendants filed ANDAs seeking approval to market abiraterone under a label which instructs physicians and medical professionals to administer abiraterone plus prednisone in accordance with the patented method. This indication is the same use set forth in the patent-in-suit, and the labels of the defendants' proposed products are the same as the ZYTIGA® labels. *See* 21 C.F.R. § 314.94(a)(1)(8)(iv).

Accordingly, I find that plaintiffs have proven that, assuming the '438 patent is valid, the defendants would intentionally induce infringement if permitted to market their ANDA products under the proposed labels.

**2. Contributory infringement**

Plaintiffs also claim that abiraterone is a material part of a claimed invention, and that defendants are thus liable for contributory infringement (again, assuming that the '438 patent is valid). The parties give this claim very little attention in their briefing, and my finding of induced infringement renders it redundant. I therefore address it in abbreviated fashion.

Contributory infringement is prohibited by 35 U.S.C. § 271(c):

> Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

Stated simply, "[a] party is liable for contributory infringement if that party sells, or offers to sell, a material or apparatus for use in practicing a patented process." *i4i Ltd. P;ship v. Microsoft Corp.*, 598 F.3d 831, 850-51 (Fed. Cir. 2010). To establish contributory infringement under this subsection, a patent owner must prove the following: "1) that there is direct infringement, 2) that the accused infringer had knowledge of the patent, 3) that the component has no substantial noninfringing uses, and 4) that the component is a material part of the invention." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326, 96 U.S.P.Q.2d 1742 (Fed. Cir. 2010).

Defendants concede, at least *arguendo*, elements 1, 2, and 4. The dispute focuses on the third element. Prednisone, say defendants, has a substantial non-infringing use as a glucocorticoid replacement. (DBr. at 32). "[D]istribution of a component of a patented device will not violate the patent if it is suitable for use in other ways." *Grokster*, 545 U.S. at 932. "[T]he doctrine absolves the equivocal conduct of selling an item with substantial lawful as well as unlawful uses." *Id.* A non-infringing use is substantial if it is "not unusual, far-fetched, illusory, impractical, 'occasional, aberrant, or experimental." *Vita-Mix Corp.*, 581 F.3d at 1327.

I find defendants' argument unpersuasive for several reasons. First, every administration of prednisone as a glucocorticoid replacement to treat mCRPC would factually duplicate the patented method. The noninfringing "use," then, is not so easily separated from the infringing one. This is not like using a patented anvil to moor a boat. The distinction between infringement

and noninfringement seems to turn, not on any external fact, but on the subjective mental processes of the prescribing physician.

Defendants' reliance on *Warner-Lambert* is therefore misplaced; that case involved an off-label use to treat a separate condition. As noted above, the patented method of treating neurodegenerative diseases was distinct from the FDA approval of the drug for "treatment of partial seizure" (which is not itself a neurogenerative disease). 316 F.3d at 1352. The court explained that "it defies common sense to expect that Apotex will actively promote the sale of its approved gabapentin, in contravention of FDA regulations, for a use that (a) might infringe Warner-Lambert's patent and (b) constitutes such a small fraction of total sales." *Id.* at 1365.

There, gabapentin was not approved by the FDA for the patented use in relation to a particular medical condition. Here, by contrast, the label-indicated use *is* the patented combination use. The prednisone does not know why it was administered, and its pharmacological effect when administered to a mCRPC patient with abiraterone will be the same, irrespective of any mental reservation by the physician. *Cf. L.A. Biomedical Research Inst.*, 2014 U.S. Dist. LEXIS 185431, at *13-14 (noting that "a once daily dosage of [drug] to treat [a symptom] in these patients results directly in treatment of the underlying [condition] and the performance of the patented method.").

Defendants argue in the alternative that Section 5.2 of their ANDA labels, the Warnings and Precautions Section, encourages abiraterone monotherapy. (DPF. at 63, ¶244). I look to the Indications. Abiraterone monotherapy is an off-label use, and there is no evidence in the record that this proposed off-label use is or would be "substantial." *Cf. Acorda Therapeutics*, 2011 WL 4074116 at **14, 19 (finding substantial non-infringing use where evidence showed that 75% of the sales of the product were for non-infringing use). If anything, the Warning section discourages such off-label use by suggests that withdrawing the use of prednisone from the combination therapy can have detrimental effects on a patient.

I therefore find that contributory infringement is present here as well.

## III. CONCLUSION

The '438 patent is invalid for obviousness, but contains an adequate written description. The plaintiffs have established by a preponderance of the evidence that if the patent were valid, defendants' activities would constitute induced infringement and contributory infringement.

Dated: October 25, 2018

KEVIN MCNULTY
United States District Judge

# Abiraterone Acetate – Selective Inhibition




PDX7.5

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **BTG INTERNATIONAL LIMITED, et al.,**<br>Plaintiffs,<br>**v.**<br>**AMNEAL PHARMACEUTICALS LLC, et al.**<br>Defendants. | Civ. No. 15-cv-5909 (KM)(JBC) |
| **BTG INTERNATIONAL LIMITED, et al.,**<br>Plaintiffs,<br>**v.**<br>**AMERIGEN PHARMACEUTICALS, INC., and AMERIGEN PHARMACEUTICALS LTD.,**<br>Defendants. | Civ. No. 16-cv-2449 (KM)(JBC) |
| **BTG INTERNATIONAL LIMITED, et al.,**<br>Plaintiffs,<br>**v.**<br>**TEVA PHARMACEUTICALS USA, INC.,**<br>Defendant. | Civ. No. 17-cv-6435 (KM)(JBC)<br><br>**CONSOLIDATED OPINION (Amended)** |

**KEVIN MCNULTY, U.S.D.J.:**

These are consolidated Hatch-Waxman actions for infringement of United States Patent No. 8,822,438 ("the '438 patent") brought by Janssen Biotech, Inc.; Janssen Oncology, Inc.; Janssen Research & Development, LLC (collectively, "Janssen"); and BTG International Ltd. ("BTG"). Janssen and BTG co-own the '438 patent. The '438 patent contains twenty claims covering methods for the treatment of prostate cancer by administering various dosages

of abiraterone acetate and prednisone in combination. Patent exclusivity for these medications individually is not at issue.

The defendants are Amerigen Pharmaceuticals, Inc.; Amerigen Pharmaceuticals Ltd. (collectively, "Amerigen"); Amneal Pharmaceuticals LLC; Amneal Pharmaceuticals of New York, LLC (collectively, "Amneal"); Dr. Reddy's Laboratories, Inc.; Dr. Reddy's Laboratories, Ltd. (collectively "DRL"); Mylan Pharmaceuticals Inc.; Mylan, Inc. (collectively, "Mylan"); Teva Pharmaceuticals USA, Inc. ("Teva"); West-Ward Pharmaceutical Corporation, and Hikma Pharmaceuticals, LLC ("West-Ward/Hikman"); Wockhardt Bio AG; Wockhardt USA LLC; and Wockhardt Ltd. (collectively, "Wockhardt"). The defendants are generic drug companies who seek to engage in the commercial manufacture, use, offer for sale, or sale of a generic version of the plaintiffs' branded drug, ZYTIGA®.

Plaintiffs allege infringement of claims 4, 8, 11, 19 and 20, all of which rely on claim 1 of the '438 patent, based on the defendants' filing of Abbreviated New Drug Applications ("ANDAs"). If defendants' ANDAs are approved, defendants will allegedly induce infringement of the asserted claims of the '438 patent under 35 U.S.C. § 271(b) and contribute to infringement of the asserted claims under 35 U.S.C. § 271(c). Defendants deny infringement and claim that the patent claims are invalid for obviousness and for lack of a written description.

On November 3, 2017, defendants moved for summary judgment as to the induced and contributory infringement claims. (DE 364). The Court held a hearing on that motion on February 9, 2018. Because it appeared that there were issues of fact to be tried in any event, and that the issues on summary judgment would subsumed in those to be tried, the motion was terminated without prejudice to reassertion of all contentions therein following trial. (DE 483).

Meanwhile, on January 17, 2018, the Patent Trial and Appeal Board ("PTAB"), in three inter partes proceedings, found the patent invalid. A motion for reconsideration remains pending.

The Court conducted a bench trial beginning on July 23, 2018 and concluding on August 2, 2018. The parties have submitted post-trial briefing, as well as proposed findings of fact and conclusions of law.

This Consolidated Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). The findings of fact are based on the Court's observations and credibility determinations of the witnesses who testified at trial and a thorough review of all the evidence.

Essentially, I rule as follows: Like the PTAB, I find that the '438 patent is invalid for obviousness. I find the patent's written description to be adequate, however. In the alternative, and to facilitate appellate review, I have ruled on the infringement issues that were tried. Assuming that the '438 patent is valid, I find based on the proposed generic labels that the ANDA defendants' marketing of abiraterone would infringe, on either an induced infringement or contributory infringement theory.

## I. FINDINGS OF FACT[1]

---

[1] I will cite to the record as follows:

| | | |
|---|---|---|
| DE __ | = | Docket Entry in this action, Civ. No. 15-5909 |
| DBr. | = | Defendants' Opening Post-Trial Brief (DE 533) |
| Def. Response | = | Defendants' Post-Trial Response Brief (DE 552) |
| DPF. | = | Defendants' Proposed Findings of Fact (DE 534) |
| DTX | = | Defendants' trial exhibits |
| JTX | = | Parties' joint trial exhibits |
| PTX | = | Plaintiffs' trial exhibits |
| PBr. | = | Plaintiffs' Opening Post-Trial Brief (DE 535) |
| PPF. | = | Plaintiffs' Proposed Findings of Fact (DE 549) |
| Pl. Response | = | Plaintiffs' Post-Trial Response Brief (DE 552) |
| 1T | = | July 23, 2018 Bench Trial Transcript (DE 539) |
| 2T | = | July 24, 2018 Bench Trial Transcript (DE 540) |
| 3T | = | July 25, 2018 Bench Trial Transcript (DE 547) |
| 4T | = | July 26, 2018 Bench Trial Transcript (DE 541) |

### A. Procedural Background

1. On July 31, 2015, plaintiffs filed a complaint for infringement of the '438 patent based on defendants' ANDA filings, which sought approval to market generic abiraterone acetate[2] 250 mg tablets. (Civil Action No. 15-5909, DE 1). Plaintiffs filed suit against the following ANDA defendants:

a. Actavis Laboratories FL, Inc., Actavis Pharma, Inc., and Actavis, Inc. ("Actavis"), related to ANDA No. 208274[3];

b. Amneal related to ANDA No. 208327;

c. Apotex Corp. and Apotex Inc. ("Apotex") related to ANDA No. 208453;

d. Citron Pharma LLC ("Citron") related to ANDA No. 208371[4];

e. DRL related to ANDA No. 208416;

f. Mylan related to ANDA No. 208446;

g. Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. ("Par") related to ANDA No. 208168;

h. Sun Pharmaceuticals Industries, Ltd. and Sun Pharmaceuticals Industries, Inc. ("Sun") related to ANDA No. 208440;

i. Teva and Teva Pharmaceuticals Industries Limited related to ANDA No. 208432;

j. West-Ward/Hikma, The Arab Pharmaceutical Manufacturing Co. and Hikma Pharmaceuticals, PLC, related to ANDA No. 208339; and

k. Wockhardt related to ANDA No. 208380.

---

| | | |
|---|---|---|
| 5T | = | July 27, 2018 Bench Trial Transcript (DE 542) |
| 6T | = | July 30, 2018 Bench Trial Transcript (DE 543) |
| 7T | = | July 31, 2018 Bench Trial Transcript (DE 544) |
| 8T | = | August 1, 2018 Bench Trial Transcript (DE 545) |
| 9T | = | August 2, 2018 Bench Trial Transcript (DE 546) |

2 Unless otherwise specified, abiraterone and abiraterone acetate, its prodrug, are used interchangeably in this opinion.

3 The complaint also asserted infringement of plaintiffs' U.S. Patent No. 5,604,213 (the "'213 patent") against Actavis related to Actavis's ANDA No. 208274. (DE 1). The '213 patent expired in December 2016, and on March 21, 2017, the Court entered a stipulation dismissing, without prejudice, plaintiffs' claims of infringement of the '213 patent against Actavis. (DE 318).

4 On June 19, 2018, Rising Pharmaceuticals, Inc. was substituted for defendant Citron after Citron transferred its ANDA to Rising. (DE 496, 500).

(DE 1).

2. The complaint was dismissed against certain defendants without prejudice, after they all agreed to be bound by any judgment rendered in the 15-5909 action. Those dismissed defendants are Teva Pharmaceuticals Industries Limited; Arab Pharmaceutical Manufacturing Co.; Hikma Pharmaceuticals, PLC; Actavis Pharma, Inc.; Actavis, Inc.; Par; and Citron. (DE 41, 44, 46, 103, 117).

3. On April 20, 2018, plaintiffs and Apotex entered into a license agreement for the '438 patent, and Apotex was dismissed from the action. (DE 467).

4. On September 28, 2015, plaintiffs filed a first amended complaint against Hetero USA Inc., Hetero Labs Limited Unit-V, and Hetero Labs Limited, asserting infringement of the '438 patent related to Hetero's filing of ANDA No. 208349, which sought approval to market generic abiraterone acetate 250 mg tablets. Hetero subsequently withdrew its ANDA, and on March 13, 2017, the Court entered a stipulation dismissing without prejudice plaintiffs' complaint against Hetero. (DE 308).

5. On May 2, 2016, plaintiffs filed a separate action against Amerigen, asserting infringement of the '438 patent related to Amerigen's filing of ANDA No. 208027, which also sought approval to market generic abiraterone acetate 250 mg tablets. (Civ. No. 16-02449, DE 1). This action was consolidated with the 15-5909 action on July 29, 2016 for discovery purposes. (Civ. No. 16-2449, DE 16).

6. On August 25, 2017, plaintiffs filed a separate complaint against Teva and Teva Pharmaceuticals Industries, Ltd., asserting infringement of the '438 patent related to Teva's filing of ANDA No. 210726 for approval to market generic abiraterone acetate 500 mg tablets. (Civ. No. 17-6435, DE 1). Teva Pharmaceuticals Industries, Ltd. was dismissed from this action after it agreed to be bound by any judgment. (Civ. No. 17-6435, DE 10).

7. On January 8, 2018, the 17-6435 action was consolidated with the 15-5909 action for all purposes, including trial, pursuant to Federal Rule of

Civil Procedure 42(a). (Civ. No. 15-5909. DE 381). Teva's ANDA No. 208432 (at issue in the Civ. No. 15-5909 action) is substantively identical to Teva's ANDA No. 210726 (at issue in the Civ. No. 17-6435 action).

**B. Metastatic Castration-Resistant Prostate Cancer**

8. The invention claimed in the '438 patent treats metastatic castration-resistant prostate cancer ("mCRPC") through a combination of abiraterone and prednisone. (JTX 8000).

9. The prostate is a male genitourinary organ located in the pelvis. (3T530:24-25). Prostate cancer arises when there is an uncontrollable proliferation of prostate tissue. (3T531:2-4). Metastatic prostate cancer occurs when the cancer tumor spreads from the prostate to another organ, such as the bones, liver, or lungs. (3T531:6-8).

10. Male sex hormones, called androgens, promote the growth of prostate cancer cells. (3T531:10, -22 to -24). A first-line treatment for metastatic prostate cancer is androgen deprivation therapy ("ADT"). (1T100:22-25; 3T532:19-20). Starting in the 1940s, the main treatment for prostate cancer was ADT. (1T115:23-116:1). ADT deprives cancer cells of androgens, like testosterone, through either medical or surgical castration. (1T100:24-101:3; 3T532:19-25).

11. ADT is not a cure for prostate cancer; in most patients, ADT eventually loses effectiveness and the cancer may resume growing. (3T533:13-25). At that point the cancer is deemed castration-resistant, as that term is used in mCRPC.

12. Abiraterone, discovered in the early 1990s, is a second-line therapy. (9T1970:24). Abiraterone inhibits the 17α-hydroxylase/$C_{17,20}$-lyase ("CYP17") enzyme. The CYP17 enzyme has a role in the steroid biosynthesis pathway that leads to the production of androgens, including testosterone. (1T123:13-18; 7T1434:4-21; 6T1152:5-9, 1280:1-1281:1; *see* PDX7.5, chart of steroid biosynthesis pathway and abiraterone inhibition, attached as an exhibit to this opinion.)

13. Dr. Johann de Bono, an oncologist and coinventor on the '438 patent, hypothesized that, while abiraterone decreased the production of androgens, it also resulted in an accumulation of "upstream" non-androgenic steroids (*i.e.*, those whose production branches off from the synthesis pathway before the point at which the CYP17 enzyme that is inhibited by abiraterone operates). (1T127:15-16, 128:16-129:3; 3T607:12-14). Those accumulated non-androgenic steroids would activate the androgen receptors on the prostate cancer cells, thereby reducing abiraterone's effectiveness and causing a resistance to abiraterone. (1T128:18-24; 3T607:17-20; *see* top horizontal row of chart, PDX7.5, attached as exhibit.)

14. To combat such resistance, Dr. de Bono hypothesized, a glucocorticoid (the family including prednisone) could be administered to suppress those upstream steroids. (1T127:11-22, 129:8-24).

**C. The '438 Patent and Asserted Claims**

15. On September 2, 2014, the United States Patent and Trademark Office issued the '438 patent. (JTX 8000). The named inventors of the '438 patent were Alan H. Auerbach and Arie S. Belldegrun. (DE 502, at 86 ¶28). Dr. de Bono was added as an inventor by order of the Court in January 2017.

16. The '438 patent, titled "Methods and Compositions for Treating Cancer," has twenty claims and is directed at methods of treating prostate cancer in humans. (JTX 8000).

17. As described in the '438 patent, it is believed that testosterone and dihydrotestosterone promote the growth of prostate cancer. (*Id.* at 1). The '438 patent further states that hormone therapy can be used to suppress the production or block the effects of hormones like testosterone. (*Id.*). It notes that CYP17 inhibitors have been shown to be useful in the treatment of cancer, and specifically in androgen-dependent disorders like prostate cancer. (*Id.* at 5).

18. The '438 patent discloses such methods as the administration of a CYP17 inhibitor, like abiraterone acetate, in combination with at least one other therapeutic agent, such as an "anti-cancer agent or steroid." (*Id.* at 2).

The '438 patent identifies prednisone as one such therapeutic agent that can be combined with abiraterone acetate. (*Id.*)

19. Claim 1 of the '438 patent, the only independent claim, claims the following:

> 1. A method for the treatment of a prostate cancer in a human comprising administering to said human a therapeutically effective amount of abiraterone acetate or a pharmaceutically acceptable salt thereof and a therapeutically effective amount of prednisone.

(*Id.* at 16). Claim 1 is practiced when a "therapeutically effective amount of abiraterone acetate" and a "therapeutically effective amount of prednisone" are administered to a patient with prostate cancer. (3T538:1-11).

20. Dependent claims 2–20 of the '438 patent describe additional limitations of the method, including the amount of abiraterone acetate and the amount of prednisone used, and the type of prostate cancer being treated. Plaintiffs assert infringement of claims 4, 8, 11, 19, and 20 against each defendant.

21. Those dependent claims provide as follows:

a. Claim 4. The method of claim 3, wherein the therapeutically effective amount of the abiraterone acetate or pharmaceutically acceptable salt thereof is about 1000 mg/day.

. . .

b. Claim 8. The method of claim 7, wherein the therapeutically effective amount of the prednisone is about 10 mg/day.

. . .

c. Claim 11. The method of claim 10, comprising administering to said human about 1000 mg/day of abiraterone acetate or a pharmaceutically acceptable salt thereof and about 10 mg/day of prednisone.

. . .

d. Claim 19. The method of claim 18, comprising administering to said human about 1000 mg/day of abiraterone acetate or a pharmaceutically acceptable salt thereof and about 10 mg/day of prednisone.

. . .

e. Claim 20. The method of claim 17, comprising administering to said human about 1000 mg/day of abiraterone acetate or a

pharmaceutically acceptable salt thereof and about 10 mg/day of prednisone.

(*Id.*).

**D. Claim Construction**

22. By Order dated June 27, 2016 (DE 208), the Court adopted the parties' agreed-upon constructions (DE 502, at 89, ¶¶49-51) of the following undisputed '438 patent claim terms:

| **Claim Term** | **Joint Construction** |
|---|---|
| Preamble: "a method for the treatment of a prostate cancer in a human" | The preamble of claim 1, on which claims 2-20 depend, is limiting and limits the claims to the treatment of a prostate cancer in a human. |
| "refractory prostate cancer" | "Prostate cancer that is not responding to an anti-cancer treatment or prostate cancer that is not responding sufficiently to an anti-cancer treatment. Refractory prostate cancer can also include recurring or relapsing prostate cancer." |
| "therapeutically effective amount" | "An amount effective for treating cancer." |

23. On November 10, 2016, following a hearing, the Court issued its *Markman*[5] patent claim construction opinion and order. (DE 239, 240, reported at *BTG Int'l Ltd. v. Actavis Labs. Fl, Inc.*, 2016 U.S. Dist. LEXIS 157586 (D.N.J. Nov. 10, 2016)). The parties principally disputed the terms "treatment" and "treating."[6] *Id.* at *5.

---

5 *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976-79 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996).

6 Defendants sought a broad construction of the term to encompass treatments aimed at not only "reducing the actual prostate cancer, but also 'reducing the pain associated with prostate cancer and replacing the normal production of

24. The Court construed the terms "treatment" and "treating" as "the eradication, removal, modification, management or control of a tumor or primary, regional, or metastatic cancer cells or tissue and the minimization or delay of the spread of cancer." *Id.* at *54.

**E. Clinical Trials and Data**

25. There were a number of clinical trials of abiraterone and prednisone. The results of those trials were submitted to the United States Food and Drug Administration ("FDA") to establish the safety and efficacy of abiraterone, with the object of gaining FDA approval to market ZYTIGA®. (2T265:8-12; PDX 2.2 (Summary of Clinical Trials)).

26. Clinical trials proceed in various phases. A Phase I trial is typically the initial drug development, and seeks to determine the safety of administering a particular drug into a human. (2T266:9-12). A Phase II clinical trial uses the findings from Phase I and extends testing to a larger patient population. Those results provide a basis for conducting a Phase III trial, which evaluates clinical efficacy and safety for regulatory approval. (2T266:13-23).

27. In April 2004, Cougar Biotechnology[7] licensed the rights to develop abiraterone from BTG. (1T108:12-13, 230:25-231:4; 8T1817:25-1818:5).

28. In 2004 and 2005, Dr. de Bono designed the first clinical trial of abiraterone, which became known as the COU-AA-001 trial ("001 trial"). (1T108:21-23, 124:17024; PTX 13). The purpose of the 001 trial was to evaluate the safety and efficacy of abiraterone monotherapy in men with mCRPC. (1T126:16-21, 127:23-25).

29. The 001 trial was designed to proceed in two phases. (2T267:3-11). In Phase I of the 001 trial, the dose escalation phase, patients received abiraterone at doses of 250, 500, 750, 1000, or 2000 milligrams. (2T302:7-14).

---

glucocorticoids that is blocked when patients are given CYP17 inhibitors.'" *BTG*, 2016 U.S. Dist. LEXIS 157586, at *7.

7 Cougar Biotechnology is Janssen's predecessor. (2T468:4-5).

In the Phase II portion of the 001 study, all patients received 1000 milligrams of abiraterone acetate. (2T302:20-23).

30. For both phases of the 001 trial, Dr. de Bono proposed an "extension" phase for patients whose cancer had progressed despite the administration of abiraterone. Those patients would receive 0.5 milligrams of a glucocorticoid, dexamethasone.[8] (1T127:11-22, 134:5-14; 2T267:12-18; PTX 11, at 4, 39-40; JTX 8086, at 1).

31. The purpose of this extension study was to evaluate Dr. de Bono's hypothesis that the addition of a glucocorticoid could suppress the upstream steroids, and thus reduce resistance to abiraterone. (1T127:11-22, 128:18-129:3). Dr. de Bono opined that prednisone, another glucocorticoid, would be just as effective as dexamethasone because all glucocorticoids would have a similar effect in terms of suppressing the upstream steroids. (1T132:13-133:20; *see also* 3T618:1-6; 7T1415:5-9). The study was approved by the Institutional Review Board and the Royal Marsden Cancer Research Committee. (1T142:6-8).

32. The 001 study results were published in the Journal of Clinical Oncology. Gerhardt Attard, et al., *Phase I Clinical Trial of a Selective Inhibitor of CYP17, Abiraterone Acetate, Confirms that Castration-Resistant Prostate Cancer Commonly Remain Hormone Driven*, 26 J. of Clinical Oncology 4563 (2008) (JTX 8083) (hereinafter referred to as "Attard 2008"); Gerhardt Attard, et al., *Selective Inhibition of CYP17 with Abiraterone Acetate is Highly Active in the Treatment of Castration-Resistant Prostate Cancer*, 27 J. of Clinical Oncology 3742 (2009) (JTX 8086) (hereinafter referred to as "Attard 2009").

---

[8] Dexamethasone and prednisone are both part of the same class of drugs, known as glucocorticoids. (1T133:7-20). Dexamethasone was the steroid used by the institution with which Dr. de Bono was then affiliated, the Institution of Cancer Research ("ICR"), which is at the college of the University of London and the Royal Marsden Hospital. (1T130:1-12, 132:21-24). Dr. de Bono indicated that as to a synthetic steroid, a patients' blood test would reveal the extent to which hormones came from the drug or from a patient's adrenal gland. Prednisone was not then available in the U.K. (1T140:20-25).

33. Even though the central purpose of the Phase I trial was to establish safety, the results of the trial showed that abiraterone alone had anti-tumor activity, measured by a reduction in Prostate-Specific Antigen ("PSA")[9] levels. (1T143:21-23). The 001 trial involved 54 patients. (1T144:1). All received abiraterone. In phase I (abiraterone dose escalation), 15 of the subjects received dexamethasone as well. In phase II (administration of 1000 mg/day of abiraterone), 30 of the subjects received dexamethasone as well. (1T144:1-4). Assuming complete overlap, then, at least 30 patients received combination therapy.

34. When patients developed a resistance to abiraterone monotherapy and a glucocorticoid was added, the anti-cancer effect, measured by PSA declines of at least fifty percent, returned for 10 of the 30 combination-therapy patients in the Phase II portion of the study. (1T144:4-22; 3T588:13-24; JTX 8086). This suggested that a glutocorticoid such as prednisone, at least when administered in combination with abiraterone, has an anti-cancer effect. The suggested mechanism was the suppression of the "upstream" steroids. These upstream steroids, left unchecked, may stimulate prostate cancer growth. (*Id.*; 3T604:20-24, 608:5-18, 663:12-14; 4T861:1-5; *see* top horizontal line of biosynthesis chart, attached.).[10]

35. The second clinical study submitted to the FDA, the COU-AA-002 trial ("002 trial"), was similar to COU-AA-001. (2T268:12-13). The 002 trial, which was conducted in the United States, received FDA approval. (2T269:8-

---

9 PSA is one of the modalities used to observe anti-tumor activity for hormone therapy. (1T149:23-25; 2T378:5-18). It is used as a measure of cancer progression. Rising levels of PSA are associated with advancing prostate cancer, while falling levels are associated with control of prostate cancer.

10 Several peer-reviewed articles addressed this finding. *See* Gerhardt Attard et al., *Antitumor Activity with CYP17 Blockade Indicates that Castration-Resistant Prostate Cancer Frequently Remains Hormone Driven*, Cancer Research (2009) (PTX 461, at 4939); Daniel Danila et al., *Phase II Multicenter Study of Abiraterone Plus Prednisone Therapy in Patients with Docetaxel-Treated Castrate-Resistant Prostate Cancer*, 28 J. of Clinical Oncology 1496, 1497 (2010) (JTX 8090); Oliver Sartor et al., *Novel Therapeutic Strategies for Metastatic Prostate Cancer in the Post-Docetaxel Setting*, The Oncologist (2011) (PTX 344, at 1495).

18). Phase I of the 002 trial tested abiraterone monotherapy to determine the best dosage. (2T268:18-19). As originally designed, the Phase II portion of the study was to consist of further abiraterone monotherapy. (2T268:18-19). However, on May 25, 2007, after the results of the 001 study suggested the effect of the glucocorticoid, the protocol of Phase II of the 002 trial was amended. (2T268:19-21, 271:8-12, 272:1).[11] Under that amended Phase II protocol, abiraterone and prednisone would be jointly administered. (2T268:21-23). Patients received 1,000 milligrams of abiraterone and 10 milligrams of prednisone per day. (2T272:4-6). The results of 002 Phase II were published. Charles J. Ryan, et al., *Phase II Study of Abiraterone Acetate in Chemotherapy-Naive Metastatic Castration-Resistant Prostate Cancer Displaying Bone Flare Discordant with Serologic Response*, Clinical Cancer Research (2011). (JTX 8093).

36. A clinical study report of the 002 trial was submitted to the FDA for its consideration in approving ZYTIGA®. (2T312:16-313:2; DTX 1367). That report included a section that discussed the overall design of the study. (DTX 1367, at 19). In addressing the role of prednisone in Phase II of the 002 trial, the report noted that "all subjects were required to receive low dose glucocorticoids such as prednisone 5 mg twice daily PO or dexamethasone (0.5 mg once daily) with abiraterone acetate to better manage mineralocorticoid side effects." (*Id.*).

37. The conclusion of the 002 study report provided, in full, that:

- In study COU-AA-002, abiraterone acetate demonstrated encouraging antitumor activity as assessed by PSA response by

---

[11] The 001 trial, recall, tended to confirm the hypothesis that the disease progression on abiraterone monotherapy was due to an increase in upstream corticosteroids, and that the effect of this increase could be moderated by the addition of a glucocorticoid. (2T273:8-16).

There was some debate at trial as to whether prednisone was added, not in response to the 001 results, but rather in response to a patient's death from a heart attack associated with hypokalemia in March of 2008. (2T274:19; DTX 1354, at 5). The decision to add prednisone in the 002 trial, however, was made in 2007, nearly a year before that patient's death. (2T275:3-4).

PSAWG criteria; objective response by RECIST criteria; and time to PSA progression in this patient population with advanced castration-resistant prostate cancer who had prior hormonal therapies. Importantly, tumor responses to abiraterone acetate were observed in castrate patients who had prior ketoconazole medication.

- Although corticosteroids were not mandated at the initiation of the study, the incidence of mineralocorticoid excess with abiraterone acetate monotherapy was of sufficient frequency to support the routine use of glucocorticosteroids.
- Although the MTD of abiraterone acetate could not be definitely determined based on available data, the doses administered appear to be well tolerated with no DLTs even at 1000mg/day. The results of the study support the use of the 1000 mg daily dose of abiraterone acetate in the treatment of advanced castration-resistant prostate cancer, in view of the antitumor activity and safety observed at this dose.

(DTX 1367, at 110).

38. Dr. Robert Charnas, ZYTIGA®'s global regulatory leader, suggested that because abiraterone and prednisone were tested in combination, their individual anti-cancer effects could not be determined. (2T323:25-324:8).

39. The COU-AA-003 ("003 trial") trial was another study that evaluated 1000 mg/day or abiraterone acetate in post-chemotherapy mCRPC patients. (DTX 1185). The patients in the COU-AA-003 study were allowed to be on steroids. Eighteen of forty-seven patients (38%) were on a low dose of steroids. (DTX 1185.4). PSA declines were seen in thirty-two of the forty-seven patients (68%). The results of this trial were published. Reid, et al., *Significant and Sustained Antitumor Activity in Post-Docetaxel, Castration-Resistant Prostate Cancer with the CYP17 Inhibitor Abiraterone Acetate*, 20 J. of Clinical Oncology 1 (2010). (DTX 1185).

40. The COU-AA-004 Phase II trial ("004 trial") used the combination of abiraterone and prednisone in post-docetaxel mCRPC patients. (2T272:7-19; 3T614:6-15). The median time to PSA progression reported in the COU-AA-003 trial and the COU-AA-004 trial was the same, approximately 5.6 months. (4T954:22-956:11). The results of the 004 trial were also published. Daniel

Danila et al., *Phase II Multicenter Study of Abiraterone Plus Prednisone Therapy in Patients with Docetaxel-Treated Castrate-Resistant Prostate Cancer*, 28 J. of Clinical Oncology 1496, 1497 (2010). (JTX 8090).

41. The COU-AA-301 clinical trial ("301 trial") was the registration study that compared the combination of abiraterone plus prednisone to a control arm of prednisone plus a placebo. (2T276:19-277:3). The 301 trial was considered the pivotal trial showing efficacy and safety for the NDA application. (2T283:5-6).

42. Like previous trials, the coadministration arm of the 301 trial involved 1000 milligrams of abiraterone and 10 milligrams of prednisone, administered daily. (2T277:6-8).

43. Positive effects were seen in the patients receiving abiraterone plus prednisone. The Independent Data Monitoring Committee, an outside committee that evaluates patient safety throughout a clinical trial, therefore recommended that the placebo control arm of the trial be discontinued for ethical reasons. (2T277:12-278:6). All the participants were then given prednisone plus abiraterone, as opposed to a placebo. (2T277:12-17).

44. The 301 trial demonstrated that abiraterone and prednisone in combination were efficacious. (3T372:5-8). The results of the 301 trial demonstrated a four month increase in median overall survival. (2T278:9-13; 2T376:23-25).

45. The results from the 001, 002, 003, 004 and 301 trials were submitted to the FDA for review as part of the original NDA application. (2T284:9-13). No single study compared abiraterone monotherapy to abiraterone plus prednisone combination therapy. (2T293:5-7). Such a comparison by the FDA would necessarily be less direct, based on a comparison of data from different studies. (2T374:12-22).

46. The final clinical trial was the COU-AA-302 clinical trial ("302 trial"). (2T278:16). The 302 trial was the basis for a change to the indications on the ZYTIGA® label in 2018. (2T308:7-8). In the 302 trial, abiraterone plus prednisone was compared to prednisone plus a placebo. The study subjects

were patients whose disease had not progressed to the point where chemotherapy was required. (2T278:18-23). The same dosages, 1000 milligrams of abiraterone and 10 milligrams of prednisone, were administered. (2T279:1-3).

47. In the 302 trial protocol, it was noted that administration of a corticosteroid "improved symptoms of fatigue and tolerability of abiraterone acetate, including symptoms of mineralocorticosteroid excess. The improved tolerability of abiraterone acetate after concomitant administration of low-dose corticosteroids was associated with suppression of ACTH and upstream adrenal steroids[.]" (DTX 1358, at 20).

48. The comparative control arm of this study, as in the 301 study, was discontinued for ethical reasons, to allow all the patients to take abiraterone plus prednisone. (2T279:8-12). The combination of abiraterone and prednisone in the 302 trial showed a sixty percent reduction in the risk of progression or death, and an overall median survival improvement of about four months. (2T279:23-280:2).

**F. Prior Art**

49. The priority date is August 2006. (DFF at 64, ¶249; PFF at 154, ¶764).

50. Before 2006, there was a significant divergence of opinion within the scientific community as to whether prostate cancer was androgen dependent or independent. (1T116:9-18). However, the prevailing belief was that, once the cancer resumed growing after ADT, the cancer became androgen independent. (1T116:16-18).

51. Prior to the invention described in the '438 patent, there were treatment options for prostate cancer that stopped responding to ADT, but the invention was not among them. (8T1848:18-24; *see* DTX 1135).

52. The relevant prior art consists of the following:

a) Glenn Gerber et al., *Prostate Specific Antigen for Assessing Response to Ketoconazole and Prednisone in Patients with Hormone Refractory Metastatic Prostate Cancer*, 144 J. of Urology 1177 (1990) (DTX 1059) (hereinafter "Gerber 1990");

b) S.E. Barrie et al., *Pharmacology of Novel Steroidal Inhibitors of Cytochrome* $P450_{17\alpha}$ *(17a-Hydroxylase/C17-20 Lyase)*, 50 J. Steroid Biochem. Molec. Biol. 267 (1994) (DTX 1062) (hereinafter "Barrie 1994");

c) Gerald Potter et al., Novel Steroidal Inhibitors of Human Cytochrome $P450_{17\alpha}$ (17a-Hydroxylase-$C_{17,20}$-lyase): Potential Agents for the Treatment of Prostatic Cancer, 38 J. Med. Chem. 2463 (1995) (JTX 8037) (hereinafter "Potter 1995");

d) Ian F. Tannock et al., *Chemotherapy with Mitoxantrone Plus Prednisone or Prednisone Alone for Symptomatic Hormone-Resistant Prostate Cancer: A Canadian Randomized Trial with Palliative End Points*, 14 J. Clin. Oncol. 1756 (1996) (DTX 1076) (hereinafter "Tannock 1996");

e) Oliver Sartor, et al., *Effect of Prednisone on Prostate-Specific Antigen in Patients with Hormone-Refractory Prostate Cancer*, 52(2) UROLOGY 252 (1998) (DTX 1087) (hereinafter "Sartor 1998");

f) Michael Jarman et al., *The 16,17-Double Bond Is Needed for Irreversible Inhibition of Human Cytochrome* $P450_{17\alpha}$ *by Abiraterone (17-(3-Pyridyl)androsta-5,16-dien-3β-ol) and Related Steroidal Inhibitors*, 41 J. Med. Chem. 5375 (1998) (DTX 1085) (hereinafter "Jarman 1998");

g) F.D. Fossa et al., *Flutamide Versus Prednisone in Patients with Prostate Cancer Symptomatically Progressing After Androgen-Ablative Therapy: A Phase III Study of the European Organization for Research and Treatment of Cancer Genitourinary Group*, 19 J. Clin. Oncol. 62 (2001) (JTX 8048) (hereinafter "Fossa 2001");

h) Marwan Fakih et al., *Glucocorticoids and Treatment of Prostate Cancer: A Preclinical and Clinical Review*, 60 Urology 553 (2002) (DTX 1104) (hereinafter "Fakih 2002");

i) Katherine Harris et al., *Low Dose Ketoconazole with Replacement Doses of Hydrocortisone in Patients with Progressive Androgen Independent Prostate Cancer*, 168 J. Urology 542 (2002) (JTX 8053) (hereinafter "Harris 2002");

j) A. O'Donnell et al., *Hormonal Impact of the 17a-Hydroxylase/*$C_{17,20}$*-lyase Inhibitor Abiraterone Acetate (CB7630) in Patients with Prostate Cancer*, 90 British J. Can. 2317 (2004) (DTX 1129) (hereinafter "O'Donnell 2004");

k) L. Vidal et al., *Reversing Resistance to Targeted Therapy*, 16 J. Chemo. 7 (2004) (DTX 1135) (hereinafter "Vidal 2004");

l) Gerhardt Attard et al., *Selective Blockade of Androgenic Steroid Synthesis By Novel Lyase Inhibitors As A Therapeutic Strategy For*

*Treating Metastatic Prostate Cancer*, Urological Oncology (2005) (JTX 8072) (hereinafter "Attard 2005");

m) Oliver Sartor, *The Continuing Challenge of Hormone-Refractory Prostate Cancer*, Clinical Genitourinary Cancer (2006) (PTX 108) (hereinafter "Sartor 2006"); and

n) Marc B. Garnick & Camille Motta, *Androgen Deprivation Therapy, the Future*, Prostate Cancer Principles and Practice (2006) (DTX 1157) (hereinafter "Garnick 2006").

53. The prior art is further summarized and discussed at Section II.A.2, *infra*.

**G. FDA Approval**

54. The FDA will approve a new medication if there is substantial evidence of safety and effectiveness. (2T388:21-22). In order to obtain approval to market a new drug, a company is required to submit a New Drug Application ("NDA") to the FDA. (2T282:4-10, 387:19-388:4). An NDA application contains proposed labeling, prescribing information, animal and human studies, including phase I, II, and III clinical trials, and toxicity data. (2T282:14-283:2, 388:5-12).

55. ZYTIGA® is sold in the United States pursuant to approved NDA No. 202379. (Civ No. 15-5909, DE 502, at 90, ¶53). The NDA application for ZYTIGA® was submitted in December of 2010 for the use of ZYTIGA® in combination with prednisone for the treatment of men with mCRPC. (2T283:19-20, 284:18-21, 370:9-10). The NDA was specifically submitted for ZYTIGA®, and prednisone was considered a concomitant therapy. (2T411:3-5). The application received priority review as requested.[12] (2T284:22-286:13).

56. On November 9, 2010, the FDA and Cougar Biotechnology had a "pre-NDA" meeting. (2T334:3-23, 335:9; DTX 1331). The purpose of a pre-NDA meeting is for the sponsor of a drug and the FDA to discuss the NDA; for the

[12] The standard timeline for review of an NDA was approximately ten months. Priority review expedites that process, resulting in completion in about six months. (2T285:1-6).

sponsor to inform the FDA about the NDA; and for the FDA to provide initial feedback that would aid in the NDA review process. (2T334:15-23).

57. The scientific rationale for developing abiraterone was addressed in the briefing package that was submitted to the FDA for this pre-NDA meeting. (2T336:5-7; DTX 1331, at 11-14). That scientific rationale was described as follows:

> Based on our understanding of abiraterone acetate's mechanism of action and as predicted by the syndrome of congenital deficiency of CYP17, we anticipated that a state of mineralocorticoid excess mediated by increased deoxycorticosteron could occur after pharmacologic inhibition of CYP17, resulting in hypertension, hypokalemia and fluid retention. Indeed, these mechanism-based toxicities were observed in Phase 1 and 2 studies. Accordingly, the Phase 1 studies were designed to allow administration of low dose corticosteroids for disease progression or for palliation of symptoms. The improved tolerability of abiraterone acetate after concomitant administration of low-dose corticosteroids was associated with suppression of ACTH and upstream adrenal steroids, including mineralocorticoids, suggesting that the combination may be better tolerated and safer regimen in this older prostate cancer patient population.
>
> Thus, the regimen of low-dose prednisone 5 mg twice a day and abiraterone acetate 1 g daily was advanced into Phase 2 and 3 testing. Prednisone was selected over other corticosteroids because it is commonly used as standard of care in combination with chemotherapy and often maintained as palliative treatment after chemotherapy is discontinued in patients with advanced metastatic prostate cancer. When abiraterone acetate was administered in a combination with oral prednisone 5 mg twice daily there appeared to be a decreased incidence and severity of mineralocorticoid based side effects, including hypertension, fluid retention and hypokalemia (Danila et al., JCO). Anti-tumor activity was observed across all patient studies as declines in prostate specific antigen levels, and in objective radiographic responses in the subset of men who had measureable disease.

(DTX 1331, at 12).

58. The NDA as submitted included a "summary of clinical efficacy," *i.e.*, a summary of the clinical trials discussed above that established ZYTIGA®'s efficacy. (2T352:16-353:6; JTX 8187). In comparing the various clinical trials

and addressing efficacy, the report noted that "[t]he totality of data from Phase 1/2 studies, Phase 2 studies, and pivotal Study COU-AA-301 consistently demonstrates the benefit of abiraterone acetate and prednisone treatment for patients with mCRPC." (JTX 8187, at 52; 2T375:8-17).

59. The summary of clinical efficacy explained the specific dosing recommendations of 1000mg/day of abiraterone and 10 mg/day of prednisone. (JTX 8187, at 54). In addressing prednisone, the recommendation provided that "concurrent treatment with prednisone" was "administered to ameliorate mineralocorticoid-related toxicity that was observed with abiraterone acetate in early Phase 1/2 studies." (*Id.*). It noted that when abiraterone was administered alone, "[h]ypertension, hypokalemia, and peripheral edema were observed frequently, and were managed with the mineralocorticoid receptor antagonist eplerenone or with low-dose glucocorticosteroids." (*Id.*).

60. On April 26, 2011, the FDA completed its medical review, which is the FDA's analysis and interpretation of the data presented in the clinical section of the NDA. (2T342:17-343:2; DTX 1333). In addressing the potential for overdose, drug abuse and withdrawal, the medical review included the following comment: "Abiraterone acetate is given concurrently with 10mg of prednisone once daily in order to attenuate mineralocorticoid excess resulting from reduced feedback inhibition of ACTH." (DTX 1333, at 107; 2T344:8-12).

61. The FDA approved the NDA on April 28, 2011. (2T286:19). Specifically, the FDA approved ZYTIGA® in combination with prednisone for the treatment of mCRPC. (2T393:12-17).

62. The FDA publishes Approved Drug Products with Therapeutic Equivalence Evaluations in the "Orange Book." (DE 502, at 97, ¶90). The FDA requires NDA holders to identify in the Orange Book "each patent that claims the drug or a method of using the drug that is the subject of the NDA ... and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner of the patent engaged in the manufacture, use, or sale of the drug product." (*Id.* at ¶91).

63. The '438 patent is listed in the Orange Book in connection with NDA No. 202379. (*Id.* at ¶92). Each defendant had knowledge of the '438 patent and its listing in the Orange Book when each respective defendant filed its Paragraph IV certification for its ANDA. (*Id.* at 98, ¶¶93-94).

**H. ZYTIGA Labeling**

64. A medication's product label is an FDA-approved document. (2T390:2). The label contains information that the FDA believes is necessary in order for the physician to prescribe a medication properly. (2T390:2-8). The label also reflects the FDA's views about the medication and how it should be used. (2T391:14-17).

65. Physicians look to the Indications and Usage section of a label to determine why a particular therapy is being used. (3T543:8-9). The Warnings and Precautions section of a label provides information about adverse reactions that may occur when using the drug product. (2T420:4-7; PDX 406, at 4). The Dosing and Administration section of a label provides the recommended dose for each indication and subpopulation. (2T412:1-5; 3T543:18-22).

66. On April 28, 2011, the FDA approved NDA 202379, with FDA-approved labeling. (DE 502, at 90, ¶55). The Indications and Usage section provided that, "ZYTIGA is a CYP17 inhibitor indicated for use in combination with prednisone for the treatment of patients with metastatic castration-resistant prostate cancer who have received prior chemotherapy containing docetaxel." (*Id.* at 90, ¶55).

67. On December 12, 2012, the FDA again approved NDA 202379, with FDA-approved labeling stating in the Indications and Usage section that "ZYTIGA is a CYP17 inhibitor indicated in combination with prednisone for the treatment of patients with metastatic castration-resistant prostate cancer." (DE 502, at 90, ¶56).

68. On February 7, 2018, the FDA approved NDA 202379, with FDA-approved labeling stating in the Indications and Usage section that:

> ZYTIGA is indicated in combination with prednisone for the treatment of patients with

- Metastatic castration-*resistant* prostate cancer (CRPC)
- Metastatic high-risk castration-*sensitive* prostate cancer (CSPC)

(PTX 406; emphasis added). This Indications and Usage Section is representative of the Indications and Usage section on the current ZYTIGA® label. (PPF. at 14, ¶68). The Indications and Usage section of the label does not identify any other disease or condition, other than mCRPC and metastatic high-risk CSPC. (4T845:15-17).

69. The approved "Dosage and Administration" section of the 2018 ZYTIGA® label reads, in part:

> **2.1 Recommended Dose for metastatic CRPC**
> The recommended dose of ZYTIGA is 1,000 mg (two 500 mg tablets or four 250 mg tablets) administered orally once daily in combination with prednisone 5 mg administered orally **twice** daily.
>
> **2.2 Recommended Dose for metastatic high-risk CSPC**
> The recommended dose of ZYTIGA is 1,000 mg (two 500 mg tablets or four 250 mg tablets) orally once daily with prednisone 5 mg administered orally **once** daily.

(PTX 406). These are the doses that the FDA has approved for the treatment of these diseases. (2T412:1-2).

70. Section 5 of the ZYTIGA® label, "Warnings and Precautions," warns that it may cause hypertension, hypokalemia, and fluid retention due to mineralocorticoid excess. (PDX 406, at 4). In the 2018 label, the FDA removed the following warning: "[c]o-administration of a corticosteroid suppresses adrenocorticotropic hormone (ACTH) drive, resulting in the reduction in the incidence and severity of these adverse reactions." (2T421:13-19).

71. Section 14 of the label highlights some of the clinical studies that were completed and demonstrated efficacy. (2T415:20-22). This section specifies that "[t]he efficacy and safety of ZYTIGA with prednisone was established in three randomized, placebo-controlled, international clinical studies." (PDX 406, at 21; 2T418:1-4).

**I. Defendants' Labels**

72. Each defendant has filed an ANDA seeking approval to market a generic form of ZYTIGA®, *i.e.*, abiraterone acetate tablets. (DE 502, at 91, ¶65). The FDA requires that a drug manufacturer, when filing for such an application, to prepare a side-by-side comparison of its proposed labels to the brand name labels. (2T398:10-13). Typically, a proposed generic's drug label is substantively the same as the approved branded drug's label. (3T393:10-13).

73. Defendants' proposed ANDA product labels recite the same mCRPC indication as the ZYTIGA® label, except that defendants' labels substitute "abiraterone acetate" for "ZYTIGA." (2T396:18-21, 407:22-24; 3T541:2-24; JTX 8011 (Amerigen's proposed label); PTX 359 (Amneal proposed label); PTX 367 (DRL); PTX 372 (Mylan); PTX 383 (Teva); PTX 393 (West-Ward/Hikman); PTX 397 (Wockhardt)).

74. The proposed Indications and Usage sections of defendants' labels entail that they wish to market abiraterone plus prednisone for the treatment of mCRPC only. (2T408:3-5). The defendants' proposed labels do not contain the mCSPC indication that was added to the ZYTIGA® label in its 2018 version. (2T396:22-397:1).

75. The Dosage and Administration sections of defendants' labels all recommend administering 1000mg/day of abiraterone acetate, and 10mg/day of prednisone. (DE 502, at 94, ¶ 73).

76. Amerigen's, Mylan's, and West-Ward/Hikman's Dosing and Administration sections are identical to the ZYTIGA® pre-2018 labels insofar as they state that the "recommended dosage" is 1,000 milligrams of abiraterone acetate tablets administered orally once daily in combination with 10 milligrams of prednisone administered orally twice daily. (2T413:18-23; JTX 8011; PDX 393).

77. Amneal's, DRL's, Teva's, and Wockhardt's proposed Dosage and Administration sections, like the ZYTIGA® 2018 label, state the same

1000mg/10mg "recommended dosage," while adding the words "for mCRPC." (2T413:23-414:3).

78. The defendants' labels that are based on the ZYTIGA® 2015 label still contain the warning, dropped from the ZYTIGA® 2018 label, that "[c]o-administration of a corticosteroid suppresses adrenocorticotropic hormone (ACTH) drive, resulting in the reduction in the incidence and severity of these adverse reactions." (2T422:16-23). The FDA has already instructed Teva to remove this language from its label. (2T424:20-21).

**J. ZYTIGA Marketing**

79. The FDA requires pharmaceutical companies to submit marketing materials. (2T483:8-10). The materials do not have to be approved in advance, but they cannot mischaracterize a drug's indication. (2T483:23-484:1). Several of ZYTIGA®'s marketing documents discuss the role of prednisone.

80. In a marketing document related to the 2011 indication (*i.e.*, prior to the removal of the warning language related to the "[c]o-administration of a corticosteroid") the role of prednisone was described as reducing "the incidence and severity of mineralocorticoid-related adverse reactions" with ZYTIGA®. (DTX 1260; 2T484:7-23).

81. A ZYTIGA® brochure dedicated to explaining the role of prednisone also notes that prednisone "reduces the incidence and severity of mineralocorticoid-related adverse reactions associated with ZYTIGA." (DTX 1276; 2T488:8-22).

82. A third marketing document explaining the role of prednisone explains that prednisone lessens the system's response to a net cortisol deficit due to abiraterone. (2T489:7-12; DTX 1276).

83. Other ZYTIGA® marketing materials, however, promote ZYTIGA® in combination with prednisone solely as a means to treat prostate cancer. (PDX 424 (stating that "ZYTIGA plus prednisone achieved a statistically significant median overall survival difference"); PDT 447 (stating that "ZYTIGA plus

prednisone significantly increased median radiographic progression for survival")).

## II. CONCLUSIONS OF LAW

The Hatch-Waxman Act strikes a balance between two competing policy interests: "(1) inducing pioneering research and development of new drugs and (2) enabling competitors to bring low-cost, generic copies of those drugs to market." *Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368, 1370-71 (Fed. Cir. 2002). A brand name drug manufacturer seeking FDA approval must submit an NDA that includes, among other things, a statement of the drug's components, proposed labeling describing the uses for which the drug may be marketed, and scientific data showing that the drug is safe and effective. 21 U.S.C. § 355(b)(1); *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 404, 132 S. Ct. 1670, 1676 (2012).

The Hatch-Waxman Act streamlines the FDA approval process for generic manufacturers, who can "bring their products to market without submitting all of the extensive drug and clinical data ordinarily required of an NDA under 21 U.S.C. § 355(b)(1)." *Takeda Pharm. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 629 (Fed. Cir. 2015). A generic drug applicant seeking approval to market may file either an ANDA or "505(b)(2) application." 21 U.S.C. §§ 355(b)(2), (j). An ANDA allows generic drug applicants seeking approval "to rely on the safety and efficacy information for an approved drug listed in the Approved Drug Products with Therapeutic Equivalence Evaluations, or the 'Orange Book.'" *Takeda*, 785 F.3d at 629.

After consulting the Orange Book, a generic company filing an ANDA is required to assure "the FDA that its proposed generic drug will not infringe the brand's patents." *Caraco Pharm. Labs.*, 566 U.S. at 406. To achieve this, a generic manufacturer can file a "paragraph IV certification," which states that a listed patent "is invalid or will not be infringed by the manufacture, use, or sale of the [generic] drug." 21 U.S.C. § 355(j)(2)(A)(vii)(IV). The Act treats such a filing as an act of infringement, providing the brand with a right to sue

immediately. *See* 35 U.S.C. § 271(e)(2)(A). Assuming the brand does so, the FDA may not approve the ANDA until thirty months pass, or until the court finds the patent invalid or not infringed. *See* 21 U.S.C. § 355(j)(5)(B)(iii).

Once invalidity is asserted in a paragraph IV certification, the ANDA applicant takes on the burden of establishing it. *In re Cyclobenzeprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1078 (Fed. Cir. 2012). A patent and each of its claims are presumed to be valid, even where those claims may be dependent upon other invalid claims in the patent. 35 U.S.C. § 282(a). A party may rebut this presumption of validity only by clear and convincing evidence. *Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1260 (Fed. Cir. 2012) (citing 35 U.S.C. § 282; *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 131 S. Ct. 2238, 2245 (2011)).

Once non-infringement is asserted in a paragraph IV certification, the patentee takes on the burden of establishing infringement by a preponderance of the evidence. *See SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988); *Kegel Co., Inc. v. AMF Bowling, Inc.*, 127 F.3d 1420, 1425 (Fed. Cir. 1997). To prove infringement, the patentee must show that it is more likely than not that the proposed ANDA product would, if commercially marketed, meet the claim limitations of the patent-in-suit. *See Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1287 (Fed. Cir. 2010); *Abbott Labs. v. TorPharm, Inc.*, 300 F.3d 1367, 1373 (Fed. Cir. 2002).

Plaintiffs allege two kinds of infringement: "induced" and "contributory." *See* 35 U.S.C. § 271(b), (c). Defendants assert the defense of patent invalidity, based on lack of a sufficient written description and obviousness.

I discuss the validity issues first, in section II.A. In subsection II.A.1, I conclude that the '438 patent contains an adequate description. In subsection II.A.2, I hold that the '438 patent is invalid for obviousness. In section II.B, I consider in the alternative whether, if the patent were valid, defendants' activities would infringe. In subsection II.B.1, I hold that the defendants' labels

would result in induced infringement. In subsection II.B.2, I hold that there would be contributory infringement.

### A. Validity

As a defense to infringement, defendants assert that the '438 patent is invalid for lack of a written description and for obviousness. Although asserted as a defense, the issue of patent validity is most profitably discussed in advance of the infringement contentions. The defendants prevailed on those invalidity contentions in three inter partes review proceedings ("IPR") before the PTAB. The parties state that the PTAB decisions, dated January 17, 2018, are subject to a pending motion for reconsideration. (DTX 1562 (Mylan decision); *see also* DE 393 (Amerigen and Wockhardt decisions).)[13]

---

13 Defendants do not seek to estop the plaintiffs' litigation of the validity issues that they lost before the PTAB. Rather, the plaintiffs seek to estop defendants from asserting the invalidity of the patent, an issue on which the defendants *prevailed* before the PTAB. That argument was raised *in limine* and previously rejected by this Court. (1T25:24-28:12). I consider (a) the purpose of the statute and (b) the meaning of the term "final."

The relevant estoppel provision, 35 U.S.C. § 315(e)(2), concededly may be read in the manner that plaintiffs propose. The manifest statutory intent, however, is to prevent abuse of inter partes proceedings, for example through the withholding of grounds and presentation of serial challenges. As I stated on the record, § 315(e)(2) is "designed to prevent parties from using multiple, possibly inconsistent and wasteful means of attacking a patent . . . . I get it that a party to an IPR has to assert all of its invalidity contentions or risk losing the opportunity to do so."

I do not accept, however, that Congress intended to require a party to stand mute in court because it previously prevailed on the same issue before the PTAB. The result would be a decision reached without consideration of legally relevant facts and issues. And if these Court proceedings overtook review of the PTAB decision, this Court could find itself in the position of being required to enter an injunction against infringement based on a patent already found invalid. *See* 1T25:5–8 ("THE COURT: . . . . Let's just say hypothetically that there was prior art squarely on point. . . . You're saying that having lost in an inter partes proceeding, you could come here and prevail? MR. TRELA: We could prevail until the inter partes proceeding runs its course.")

The case law contains no deep analysis of the issue, but it appears to reflect the

[fn. 13 cont'd on following page]

[fn. 13 continued]

concept that only unsuccessful or unsubmitted arguments are subsequently barred. *See Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 271 F. Supp. 3d 990, 1027 (E.D. Wis. 2017) (Section 315(e)(2) prohibits an *unsuccessful* IPR petitioner from asserting in the district court "that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during that inter partes review.")(emphasis added); *Depomed Inc. v. Purdue Pharma LP*, 2014 WL 3729349, at *5 (D.N.J. July 25, 2014) (Bongiovanni, M.J.). On October 30, 2018, I expanded on this discussion on the record in connection with plaintiff's motion for a stay pending appeal.

In connection with the plaintiff's motion for a stay pending appeal, I further discussed on the record the issue of finality. For convenience, I summarize my reasoning here. The issue is whether the PTAB's decision, which is subject to a pending motion for reconsideration, is "final" for purposes of § 315(e). I conclude that it is not, and for this reason, too, my consideration of validity issues is not estopped. I think finality, for these purposes, should track the concept as it is used in the closely related context of exhaustion and appealability. "The parties to an appeal to the Board may not appeal to the U.S. Court of Appeals for the Federal Circuit under § 1.983 of this title [Appeal to the United States Court of Appeals for the Federal Circuit in inter partes reexamination] until all parties' rights to request rehearing have been exhausted, at which time the decision of the Board is ***final*** and appealable by any party to the appeal to the Board." 37 C.F.R. § 41.81 (emphasis added). *See* 37 C.F.R. 90.3(b)(1) (deadline to appeal runs from PTAB's action on request for rehearing).

A contrary view of finality would lead to the same conundrum identified above—*i.e.*, the possibility of issuance of a mandatory injunction based on a PTAB decision treated by the plaintiff as "final," but only for purposes of § 315(e) estoppel (because the plaintiff itself sought reconsideration).

I observe that these are issues which will tend to arise in the interim when the PTAB and court proceedings are not synchronized. All matters in dispute are likely to converge before the Federal Circuit when my decision is appealed and the PTAB IPR decision becomes ripe for review. In the meantime, my goal has been to hear all claims and compile the fullest possible record on the matters submitted to me for decision.

### 1. Written Description

Defendants allege that the asserted claims in the '438 patent do not meet the written-description requirement of 35 U.S.C. § 112. I disagree.

In pertinent part, 35 U.S.C. § 112 provides:

> The specification shall contain a written description of the invention and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his [or her] invention.

"The purpose of this provision is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the [invention] as described in the patent specification." *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2010); *see also AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1298 (Fed. Cir. 2014). "[T]he test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art. Based on that inquiry, the specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010).

To begin with, the '438 patent clearly sets forth the metes and bounds of the invention. It teaches the administration of a specified dosage of two specified drugs for the treatment of a specified condition in a specified, narrow class of patients, *i.e.*, those suffering from mCRPC. Not even minimal adjustment or experimentation is suggested; a skilled practitioner (assuming regulatory approval) would need little if any additional instruction to practice the method.

In defendants' view, however, the specification is inadequate because it fails to disclose test results showing that prednisone itself provides an anti-cancer benefit. Nor, they say, does it provide sufficient information to permit a POSA to understand that *both* agents, abiraterone and prednisone, "treat" prostate cancer. (DBr. at 68; Def. Response at 38). These challenges fit only awkwardly within a contention that the method is not described so that a practitioner could practice it. Nevertheless, I address them.

First, I find that the specification in the '438 patent sufficiently identifies prednisone as an anti-cancer agent for purposes of the 35 U.S.C. § 122 written-description requirement. As stated in my *Markman* opinion, that is what "treatment," as used here, means. The specification is directed to the administration of abiraterone acetate with "at least one additional therapeutic agent, such as an anti-cancer agent or a steroid." (JTX 8000). The specification defines "anti-cancer agent" as "any therapeutic agent that directly or indirectly kills cancer cells or directly or indirectly prohibits, stops or reduces the proliferation of cancer cells." (*Id.* at 4). The '438 patent provides a list of anti-cancer agents, including mitoxantrone, paclitaxel, docetaxel, leuprolide, goserelin, triptorelin, seocalcitol, bicalutamide, and flutamide. (*Id.* at 3). It further identities additional "anti-cancer" agents as "hormone ablation agents, anti-androgen agents, differentiating agents, . . . antibiotic agents . . . and anti-androgens." (*Id.* at 7). Thus, an antibiotic agent is defined as an anti-cancer agent, and prednisone is explicitly identified as an antibiotic agent. (*Id.* at 9).

Second, the specification provides a list of steroids, including hydrocortisone, prednisone, and dexamethasone. (*Id.* at 3, 10). In discussing the administration of steroids, the specification provides that the "amount of the steroid administered to a mammal having cancer is an amount that is sufficient to treat the cancer whether administered alone or in combination with a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor." (*Id.* at 10). Thus, whether identified as either an "anti-cancer agent" or a "steroid," prednisone is sufficiently identified in the specification as an agent that "treats" cancer.

To this extent, the patent drafter is privileged to act as his or her own lexicographer. "The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Novartis Corp. v. Teva Pharms. USA, Inc.*, 565 F.Supp.2d 595, 604 (D.N.J. 2008) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

Taking the patent's own definitions of terms as my guide, I find that the written description is adequate.

**2. Obviousness**

Defendants allege that the combination therapy claimed in the '438 patent would already have been obvious to a person of ordinary skill in the art ("POSA") under 35 U.S.C. § 103. The burden here, as in other validity challenges, is proof by clear and convincing evidence. *See* p. 26, *supra*, and cases cited. The parties agree that August 25, 2006 is the priority date for the prior art analysis. Defendants assert that, as of that date, a POSA familiar with the prior art would have been motivated to combine abiraterone acetate with prednisone for three reasons: (1) for its anti-cancer effects; (2) to mitigate abiraterone's side effects; or (3) for prednisone's palliative properties. (DBr. at 33).

A patent claim is invalid as "obvious" where the "differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103. "[O]bviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007) (citing *In re Corkill*, 771 F.2d 1496, 1500 (Fed. Cir. 1985) ("Although [the inventor] declared that it cannot be predicted how any candidate will work in a detergent composition, but that it must be tested, this does not overcome [the prior art's] teaching that hydrated zeolites will work.")).

Four factors guide the obviousness inquiry under § 103: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the field of the invention; and (4) objective considerations such as commercial success, long felt need, and the failure of others to develop the invention. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406, 127 S. Ct. 1727 (2007) (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 17-18, 86 S. Ct. 684 (1966)). The evidence at trial focused on factors 1, 2, and 4, the prior-art and objective-considerations factors.[14]

---

[14] The parties make short work of factor 3, the level of skill possessed by a POSA. Under either side's analysis, that level of skill is quite high. A POSA would be a physician specializing in medical oncology or urology with significant practical experience and with access to individuals with expertise in endocrinology, biochemistry, pharmacology, or other related fields of science.

In determining the level of ordinary skill in the art, the following factors may be considered: "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Envtl. Designs, Inc. v. Union Oil Co.*, 713 F.2d 693, 696 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co., Inc. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1382 (Fed. Cir. 1983)), *cert. denied*, 464 U.S. 1043, 104 S. Ct. 709, 79 L. Ed. 2d 173 (1984).

Defendants offered the following definition of a POSA:

> Physician specializing in medical oncology or urology, having an M.D. and/or Ph.D. in pharmacology, biochemistry, or related discipline. Significant practical experience (e.g., 5-6 years' worth) in medical oncology or urology could substitute for an advanced degree. It is understood that the POSA would have access to individuals having expertise in pharmacology, biochemistry, endocrinology, enzymology, and/or molecular biology, and would collaborate with them as necessary.

(DTX 2400). Plaintiffs offered the following definition of a POSA:

> A person of ordinary skill would be a physician specializing in urology or medical oncology who has significant practical experience in the treatment of patients with prostate cancer. Such a person would've worked in a team or setting that includes access to one or more individuals who have expertise in endocrinology, biochemistry, pharmacology and/or molecular biology, or related field of science, and who has experience in prostate cancer treatments or androgen synthesis and action.

(3T537:4-12).

Principles specifically governing the application of those factors to a combination patent, especially a combination-therapy patent, are as follows.

The novelty of a combination therapy in relation to prior art may consist in the idea of putting two known elements together. The POSA's motivation to combine prior art teachings to achieve the "claimed invention does not have to be found explicitly in the prior art references sought to be combined, but rather may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself." *Pfizer*, 480 F.3d at 1362 (internal quotation and citation omitted). *Accord Dystar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1361 (Fed. Cir. 2006) (stating that motivation to modify prior art to arrive at claimed invention "may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself.") Thus the mix of information available to a POSA must be considered.

Relevance, however, has its limits. There must be "a nexus between the claimed invention and the [objective indicia]." *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)). The evidence, moreover, "must be reasonably commensurate with the scope of the claims." *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011). To determine whether the necessary nexus exists, "[o]ur cases require consideration of whether 'the marketed product embodies the claimed features.'" *ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1222 (Fed. Cir. 2016) (quoting *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000)); *see also Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1573 (Fed. Cir. 1996) (noting that whether requisite nexus exists is a question of fact).

In reviewing all these factors, courts use an approach that is not formulaic, but "expansive," "flexible," or "functional." *KSR*, 550 U.S. at 415; *see*

---

The two sides' experts agreed that the discrepancies between their definitions would not affect their opinions.

*also Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1291 (2006) ("There is flexibility in our obviousness jurisprudence because a motivation may be found implicitly in the prior art. We do not have a rigid test that requires an actual teaching to combine."). In describing this flexible approach, the Supreme Court noted that, although "[a] factfinder should be aware, of course, of the distortion caused by hindsight bias" in evaluating obviousness, the proper approach must allow for "recourse to common sense." *KSR*, 550 U.S. at 421 (citing *Graham*, 383 U.S. at 36 (warning against "temptation to read into the prior art the teachings of the invention in issue" and instructing courts to "guard against slipping into use of hindsight")).

The crux of defendants' argument is that the prior art would have motivated a POSA to combine abiraterone with prednisone with a reasonable expectation of success. One component of the defendants' obviousness argument is that the anti-cancer role of prednisone in actual "treatment" of mCRPC could have been anticipated. A second component of the defendants' argument, however, is that the role of prednisone in palliation or reducing side effects would also have motivated a POSA to combine it with abiraterone. Implicit in that second component is the idea that the *motivation* to combine therapies need not have been entirely congruent with the patented *idea* as conceived by the inventor. *See KSR*, 550 U.S. at 420 (stating that it is error to look "only to the problem the patentee was trying to solve"); *In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006) ("[T]he skilled artisan need not be motivated to combine [the prior art] for the same reason contemplated by [the inventor]" (quoting *In re Beattie*, 974 F.2d 1309, 1312 (Fed. Cir. 1992) ("[T]he law does not require that the references be combined for the reasons contemplated by the inventor.")). Thus defendants rely in part on these other effects of prednisone because those effects lent a separate impetus to the administration of abiraterone and prednisone in combination.

The argument can be pushed too far; the proverbial blind pig must at least have been searching for an acorn. The case law does not suggest that

obviousness must be found because an inventor, ignorant of the relevant science and considering an entirely different problem, could have stumbled on the patented method. This case, however, is close to the other end of the spectrum.

The combination therapy, it is true, is patented as a "treatment." But even prednisone's effects as a palliative and a side-effect minimizer would furnish a powerful motivation to combine it with abiraterone. And the idea for such a combination, even if initially motivated only by those two effects, would have gotten the POSA to the same place. That road led straight to the practice of the patented method: the target condition would be prostate cancer; the target population would be the subset of patients who had mCRPC; the dosage would be 1000mg of abiraterone and 10mg of prednisone daily; the object would be to slow the spread of the disease by hormone deprivation; the clinical results would be the same, and would be measured by prolongation of life (or, in the interim, by proxy metrics such as reduction of PSA levels). In short, the anticipated combination therapy—irrespective of what was in the POSA's mind as to the exact mechanism—would have looked precisely the same. So understood, this begins to look less like serendipity and more like inevitability.

I first review the prior art evidence as to abiraterone, prednisone, and combination therapy (subsections a, b, & c). I then review the secondary considerations evidence (subsection d). Finally, I state my overall conclusions as to obviousness (subsection e).

**a. *Prior art: abiraterone***

Barrie 1994,[15] a published study involving mice, disclosed that ketoconazole is a non-selective inhibitor that was used as a treatment for hormone-dependent prostate cancer. As a result, efforts were then being undertaken to discover a more potent and selective inhibitor. (DTX 1062, at 1). In that regard, Barrie 1994 concluded that abiraterone was "worthy of further

15 Full citations and abbreviations for the prior art are at Section I.F, *supra.*

study" as a potential agent "for the treatment of hormone-dependent prostate cancer." (7T1563:7-9; DTX 1062, at 5).

Potter 1995 explained that abiraterone is a "strong candidate for further development as a potential drug for the treatment of prostatic carcinoma in humans." (JTX 8037, at 7; 7T1563:10-13). Abiraterone was also noted as an inhibitor of both the hydroxylase and the lyase function of the CYP17 enzyme. (JTX 8037, at 6; 6T1316:6-16; *see* PDX 7.5, chart attached to opinion). A few years later, Jarman 1998 indicated that abiraterone had been selected for clinical evaluation based on animal testing: "its marked reduction of circulating testosterone levels in the male rat and mouse and of androgen-dependent organ weights in the mouse." (DTX 1085, at 5375).

The first human trial of abiraterone, reported in O'Donnell 2004, began in 1997. (1T109:12-110:1, 209:11-13; DTX 1129). The Institute of Cancer Research tested abiraterone in a Phase I clinical trial. (1T205:24-206:6). No patient was given a glucocorticoid during testing. O'Donnell did, however, discuss co-administration of a glucocorticoid with abiraterone. (1T214:9; DTX 1129; *see infra* at 43).

The O'Donnell 2004 trial comprised of multiple parts. (1T211:3-5). In the first portion of the trial, a population of castrate male patients received a single dose of abiraterone, at varying dosage levels, and were monitored for the following ten days. (1T211:15-20; DTX 1129, at 2319). All patients in this portion of the study experienced a reduction in testosterone levels below castrate levels. (1T214:14-16). The second portion of the trial administered a single dose of abiraterone, at various dosages, in non-castrate males. (1T212:5-7; DTX 1129, at 2319). Testosterone levels were reduced there as well, but not to below-castrate levels. (1T215:4-5). In the third and final portion of the study, non-castrate males were given a single dose of 500 milligrams of abiraterone every day for twelve days. (1T212:8-18, -21). Testosterone suppression was not sustained in that non-castrate portion of the study. (1T214:20-21).

The O'Donnell 2004 trial determined that abiraterone was safe. (1T214:11). But because of the failure to attain sustained testosterone

suppression in non-castrate patients, the results suggested that abiraterone was suitable as a second-line (*i.e.*, post-castration) treatment. (1T216:12-19; DTX 1129, at 2317 ("The enhanced testosterone suppression achieved in castrate men merits further clinical study as a second-line hormonal treatment for prostate cancer.")). Specifically, O'Donnell 2004 found that testosterone levels would be suppressed below castrate levels by a daily dose of abiraterone in the amount of 800 milligrams. (DTX 1129, at 2317; *see also* Garnick 2006 (DTX 1157, at 919-20 (recognizing that abiraterone "shows potential in the treatment of cancer," and "has demonstrated [an] ability to selectively inhibit the target enzyme, resulting in inhibition of testosterone production in both the adrenals and the testes"))). After a series of rejections, the O'Donnell results were eventually published in the British Journal of Cancer, four years after the close of the underlying study. (1T208:2, 222:6-227:17, 239:19-240:1).

O'Donnell 2004 specifically compares ketoconazole to abiraterone. (DTX 1129, at 2318). O'Donnell notes that "[i]n addition to ketoconazole, aminoglutethimide and abiraterone, other compounds designed to inhibit general androgen production have been developed and show promise." (DTX 1129, at 2321). In addressing ketoconazole, O'Donnell 2004 observes that it is an "unselective" inhibitor, that it has an antitumor effect (measured by clinical benefit as well as reduction in PSA), and that a more "selective" (*i.e.*, CYP-17) inhibitor, abiraterone, could be used as a second-line agent. (DTX 1129, at 2318).

**b. *Prior art: prednisone***

Tannock 1996 was a palliation study involving patients having refractory prostate cancer with pain. They received mitoxantrone, a chemotherapy drug (not a CYP17 inhibitor) with prednisone, or else prednisone alone. (7T1609:2-12; DTX 1076, at 1756; 8T1742:14-18). Tannock 1996 disclosed that prednisone, dosed at 10 milligrams per day, would provide palliation to hormone-resistant prostate cancer patients, when used with mitoxantrone. (7T1609:1-15; DTX 1076, at 1756). Defendants' expert testified that prednisone

was administered to alleviate the "known effects of mitoxantrone" including nausea, vomiting, hair loss, low blood counts, and neuropathy. (8T1743:2-8).

Sartor 1998 evaluated the effects of prednisone on PSA levels in patients with hormone-refractory prostate cancer. (DTX 1087, at 252). Twenty-nine patients were given ten milligrams of prednisone daily. (*Id.*; 7T1575:5-11). Of those twenty-nine patients, fourteen (48%) achieved a PSA decline of at least 25%, ten (34%) achieved a PSA decline of at least 50%, and four (14%) achieved a PSA decline of at least 75%, measured from baseline. (DTX 1087, at 254). Sartor 1998 reported that four patients (14%) had a duration of response greater than six months. (*Id.* at 254; 7T1575:17-1576:2).

Thus, Sartor 1998 concluded that prednisone could decrease PSA levels. (DTX 1087, at 255; DE 393-3 ("Sartor reasonably stands for the proposition that administration of prednisone is tolerated and effective in a subset of patients, and at the time it was published, indicated some measure of efficacy for certain mCRPC patients."). Sartor 1998 hypothesized that "PSA declines of greater than 50% may be useful in predicting a relatively prolonged survival." (*Id.* at 256).

Fossa 2001 evaluated 201 patients, all of whom had metastatic disease that had progressed after castration. (JTX 8048, at 63). Of those patients, 101 received prednisone and 100 received flutamide, an antiandrogen. (*Id.* at 62). Of the 101 patients treated with twenty milligrams of prednisone per day, twenty-one (20.8%) had a PSA decline of greater than 50%. (7T1578:8-10; JTX 8048, at 63, 67). There was no difference in median overall survival between the two groups of patients, however. (JTX 8048, at 70). Fossa 2001 concluded that "[m]onotherapy with low-cost prednisone should be considered as first-line, standard hormonal manipulation of HRPC, but the combination with tolerable cytotoxic treatment should be explored further." (JTX 8048, at 70).

Fakih 2002, a clinical review article that evaluated "the mechanisms underlying glucocorticoid antitumor effects in prostate cancer," concluded that "[g]lucocorticoids may exert an antitumor effect on androgen-independent prostate cancer by suppression of adrenal androgens. Low-dose glucocorticoids

produce negative feedback on the pituitary gland, leading to a decrease in both testicular and adrenal androgens." (DTX 1104, at 553).

Harris 2002 was a prospective phase II study conducted on twenty-eight men with androgen-independent cancer. It evaluated the efficacy and safety of administering 200 milligrams of ketoconazole, three times a day, with replacement doses of hydrocortisone. (JXT 8053, at 542). Harris 2002 noted that "[g]lucocorticoids alone may have antitumor effects mediated either by direct interaction with androgen receptors or by feedback inhibition of the hypothalamic-pituitary-adrenal axis." (*Id.* at 544).

**c. *Prior art: combination therapy***

The study published in Gerber 1990 evaluated PSA level changes in fifteen men with hormone refractory metastatic prostate cancer that were treated with a combination of ketoconazole and prednisone. (DTX 1059, at 1177). The action of ketoconazole is not as focused as that of abiraterone. Abiraterone acetate is a selective drug that inhibits CYP17, one enzyme with two functions: 17 alpha-hydroxylase and 17,20-lyase. (1T123:13-20; JTX 8072, at 3). Ketoconazole is a non-specific inhibitor; it acts on the CYP17 enzyme, but also on other points in the pathways of adrenal steroid synthesis. (1T105:2; 6T1262:10-17, 1326:4-19). Ketoconazole inhibits adrenal steroid synthesis and causes adrenal insufficiency. (6T1276:3-6).

The patients in the Gerber 1990 study were treated with 600 to 900 milligrams of ketoconazole daily and five milligrams of prednisone twice per day. (DTX 1059, at 1177-78). Of the fifteen patients, twelve (80%) had a decrease in PSA levels with a median duration of response of three months. (DTX 1059, at 1177). The other three patients had a prolonged response, greater than eight months, of decreased PSA levels and improvement in bone pain. (DTX 1059, at 1177). Ultimately, Gerber 1990 concluded that "there appears to be a small subgroup of patients with progressive prostate cancer despite androgen ablation who will benefit from ketoconazole and glucocorticoid treatment." (DTX 1059, at 1177).

O'Donnell 2004, discussed in the preceding section, reported promising results for abiraterone. It also indicated, however, that the treated patients experienced a reduced adrenal reserve. (*Id.*; *see also* Attard 2005 (JTX 8072) (noting that all six patients in O'Donnell 2004 "had a reduced cortisol response to ACTH stimulation on the 11th day after dosing, suggesting reduced adrenocortical reserve."). Researchers speculated that such a deficiency could be addressed with a dose of a steroid, either concomitantly or during times of stress. (1T220:24, 221:7-22, 244:12-19, 249:5-9; DTX 1129, at 2317 ("Adrenocortical suppression may necessitate concomitant administration of replacement glucocorticoid.")). In considering the use of a glucocorticoid, O'Donnell 2004 noted that it was "common practice" to administer supplementary hydrocortisone with aminoglutethimide and ketoconazole. (DTX 1129, at 2323).

O'Donnell 2004 suggested that "further studies with abiraterone acetate will be required to ascertain if concomitant therapy with glucocorticoid is required on a continuous basis, at times of physiological stress, if patients become symptomatic or indeed at all." (*Id.*; *see also* Attard 2005 (JTX 8072, at 1245) (concluding that safety and efficacy of abiraterone should be undertaken where abiraterone was administered daily "to castrate men with advanced prostate cancer" and that patients should "be monitored for the development of glucocorticoid insufficiency"); Garnick 2006 (DTX 1157, at 919-20) (noting that abiraterone was under development "as a second-line hormonal therapy for prostate cancer for patients who are refractory;" and that administration of 800 mg/day resulted in "hypersecretion of luteinizing hormone," which "may necessitate concomitant treatment with replacement glucorticoid").

In 2004, Dr. de Bono,[16] along with Lara Vidal, published a review article titled "Reversing Resistance to Targeted Therapy." Its subject matter was

[16] Defendants now request that the Court disregard parts of Dr. de Bono's testimony, which they say was not properly disclosed before trial. In particular, defendants argue that Dr. de Bono offered surprise expert testimony regarding the import of the prior art and clinical trials. Defendants did not raise this particular

methods of fighting resistance to cancer treatment and thereby maximizing the treatment's anti-tumor effect. (1T113:9-225; DTX 1135). It noted that hormone therapy was the "mainstay" of treating metastatic prostate cancer. (DTX 1135, at 17). Vidal 2004 further observed that circulating low levels of adrenal androgens (*i.e.*, those produced by the adrenal glands rather than the testes) can result in failure to respond to hormone therapy. It further stated, however, that adrenal androgen synthesis can be inhibited by low doses of steroids, or through inhibition of key enzymes using either abiraterone or ketoconazole. (DTX1135, at 7-8).

The authors noted generally that combining drugs could improve outcomes. (1T122:3-4). For example, chemotherapy drugs had been combined to treat lymphoma. (1T122:5-6). Vidal 2004 noted that combination therapies entail "major logistical challenge[s]" since they require "more than one industry partner"; as a result, researchers were pursuing "less selective agents that can hit multiple targets." (DTX 1135, at 11).

Finally, Sartor 2006 noted that "[s]econdary hormonal manipulations (i.e, ketoconazole, estrogens, glucocorticoids, antiandrogens, and antiandrogen withdrawal) have long been used in [hormone refractory prostate cancer], but because no study with these agents has demonstrated a survival advantage, their potential role is not agreed upon by all." (PTX 108, at 238).

**d. *Objective considerations***

As to factor 4, objective considerations, plaintiffs raise several arguments related to ZYTIGA®'s commercial success, failure of others, skepticism, long-

---

objection during trial, but I nevertheless consider it. (*See* DBr. at 66 (citing 1T98:12-107:7, 113:9-124:16, 130:2-132:12, 136:23-137:7, 142:4-143:15)). The objected-to portions of Dr. de Bono's testimony, while technical, did not exceed the bounds of his personal observations and involvement in the development of the clinical trials. Such testimony is helpful to the court's understanding of the trials and was properly admitted under Rule 701. Fed. R. Evid. 701. *See generally Asplundh Mfg. Div., a Div. of Asplundh Tree Expert Co. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1193 (3d Cir. 1995) (Under Rule 701, even non-experts who possess helpful specialized knowledge may be permitted "to testify about technical matters that might have been thought to lie within the exclusive province of experts.").

felt need, professional approval and industry praise, and unexpected results. My assessment of these is mixed at best, and I give them correspondingly less weight.

As of today, ZYTIGA® has achieved substantial sales and marketplace success. From April 2011 to the end of 2017, plaintiffs estimate, ZYTIGA® generated over $5.7 billion in net sales. (8T1790:17-20). Plaintiffs presented evidence that approximately 85% to 95% of ZYTIGA® prescriptions were being filled in proximity to a fill of prednisone. (8T1803:14-18).

During most of that period of ZYTIGA®'s market success there was a blocking patent in place. Prior to the '438 combination-therapy patent was the patent on abiraterone itself. That patent, U.S. Patent No. 5,604,213 ("the '213 patent"), titled "17-Substituted Steroids Useful in Cancer Treatment," was issued February 18, 1997, and expired in December 2016. (PPF at 208). The '213 patent discusses seventeen steroids and their use in the treatment of androgen-dependent and estrogen-dependent disorders. (JTX 8042). The '213 patent specifically discloses abiraterone and suggests a method of using abiraterone acetate for the treatment of prostate cancer. (*Id.*). The '213 patent compares the inhibition levels of abiraterone with those of ketoconazole, and reports that abiraterone achieves a superior reduction of testosterone levels. (*Id.*). It was under the '213 patent that BTG granted Cougar Biotechnology an exclusive license to develop abiraterone in 2004. (9T2044:21-25).

Plaintiffs point out that two other CYP17 inhibitors had failed to treat advanced prostate cancer (9T1969:24-25); that various pharmaceutical companies declined to pursue abiraterone after 1999 (1T229:10-230:17); and that the O'Donnell 2004 authors had difficulty getting their results published. The anti-cancer effect of abiraterone plus prednisone, then, was unexpected in plaintiffs' opinion. In countering that the argument that ZYTIGA® met a long-felt need, Defendants note that other treatments, in particular Taxotere and Jevtana, had similar survival benefits.

#### e. ***Obviousness: Discussion and analysis***

By the priority date of August 25, 2006, abiraterone had been identified in the art as a treatment for prostate cancer. It was understood that abiraterone selectively inhibited the CYP17 enzyme. This was seen as an improvement on ketoconazole, a less selective agent that inhibited CYP17, but also interfered with other metabolic steps. (*See* O'Donnell 2004; Barrier 1994).

Ketoconazole and aminoglutethimide were known treatments. (6T1260:22-24, 1276:3-6, 1325:13-14, 1327:8-15). Both ketoconazole and abiraterone were steroid inhibitors, and both inhibited the CYP17 enzyme (although, as stated, ketoconazole inhibited others steps as well). (6T1262:7-17, 1325:13-1326:19). Barrie 1994 and O'Donnell 2004 both used ketoconazole as a starting point for their discussions regarding abiraterone and its potential to be a more selective inhibitor.[17] (7T1563:7-9; DTX 1062, at 5; DTX 1129, at 2318). Barrie 1994, comparing the inhibition levels of hormone production by abiraterone with ketoconazole, concludes that abiraterone was more effective than ketoconazole in decreasing testosterone levels. (DTX 1062, at 270; *see also* Jarman 1998 (noting that abiraterone caused "marked reduction of circulating testosterone" warranting further clinical evaluations (DTX 1085, at 5375)). O'Donnell 2004 specifically notes that abiraterone's ability to sustain testosterone suppression in castrate males, when given in 500 to 800 milligram doses, suggested that it could be used as a second-line treatment.[18] (DTX 1129, at 2317).

---

17 The '213 patent likewise used ketoconazole as a starting point and relevant comparison in its discussion of abiraterone. (JTX 8042).

18 It is undisputed that publication of the study underlying O'Donnell 2004 was delayed, and that companies did not pursue the marketing of abiraterone immediately after that publication. I do not give weight, however, to the plaintiffs' speculation that those events resulted from skepticism about abiraterone therapy, a conclusion unsupported by any first-hand testimony. (PBr. at 34, 39). Because there are many reasons that a company decided not to pursue a particular drug or publish a study, I cannot assume plaintiffs' speculative explanation is the true one.

From all of this, I conclude that abiraterone had been identified in the prior art as a second-line prostate cancer treatment. I also conclude that it was regarded as a superior swap for ketoconazole, in that it performed a parallel function in a more targeted manner.

As for prednisone itself, Tannock 1996 suggested that corticosteroids provide some level of palliation to cancer patients. Sartor 1998 goes farther, and suggests that prednisone can cause reduced PSA levels, a marker of anti-cancer effect. It further teaches the administration of 20 mg/day of prednisone as a monotherapy in patients with mCRPC. Plaintiffs may be correct that Sartor 1998 was flawed, in that it was not a prospective study but a retrospective analysis of data, and that it carried a risk of sample bias. A reference, however, "is prior art for all that it discloses, and there is no requirement that a teaching in the prior art be scientifically tested . . . or even guarantee success . . . before providing a reason to combine." (internal citations omitted); *Duramed Pharm., Inc. v. Watson Labs., Inc.*, 413 F. App'x 289, 294 (Fed. Cir. 2011).

Sartor 1998 teaches that prednisone monotherapy worked to reduce PSA levels in some mCRPC patients, and a POSA would have known that. Whether firm or shaky, the Sartor results disclosed to a POSA that prednisone can have an anti-cancer effect. That conclusion is supported by three other prior art references: Fossa 2001, Fakih 2002, and Harris 2002.[19]

Reduced PSA levels, to be sure, do not necessarily correspond to a survival benefit. Still, PSA levels are an accepted measure of progression of prostate cancer. I am not convinced that PSA levels are so meaningless that researchers would have been dissuaded from pursuing prednisone in combination therapy.

---

19 The extent to which the biochemical basis for such an effect was understood is less clear, however, and hindsight is not the appropriate test. *See* Findings of Fact ¶ 34, *supra* (post-priority-date citations).

Based on the foregoing, and some additional references (especially O'Donnell 2004), I find that there was more than sufficient motivation for a POSA to combine abiraterone with prednisone.

Gerber 1990 suggests that a patient whose PSA levels are increasing can be treated with a combination of ketoconazole and a glucocorticoid, which can result in a decrease in PSA levels. Gerber 1990 also teaches that the combination of ketoconazole and five milligrams a day of prednisone, twice daily, is safe and effective for treating hormone-refractory advance prostate cancer.

O'Donnell 2004 corroborates that in the clinical use of ketoconazole, it was "common practice" to administer supplementary hydrocortisone. It states cautiously that "further studies with abiraterone acetate will be required to ascertain if concomitant therapy with glucocorticoid is required on a continuous basis, at times of physiological stress, if patients become symptomatic or indeed at all." (DTX 1129, at 2323). The prior art went so far as to identify specific dosages: between ten and twenty milligrams per day of prednisone (Gerber 1990; Tannock 1996; Sartor 1998; Fossa 2001); and 800 milligrams of abiraterone. (Gerber 1990; O'Donnell 2004; Garnick 2006).

A POSA would have interpreted ketoconazole's clinical use as a basis to take the next investigative steps with abiraterone. It made sense to replace ketoconazole with abiraterone, as it became clear that abiraterone was a superior, more selective inhibitor. Co-administration of 10mg per day of prednisone would naturally carry over from the ketoconazole combination therapy to the abiraterone combination therapy.

I believe a POSA would have been concerned about the potential reduction in cortisol as a side effect of abiraterone's inhibition of CYP17. Specifically, a POSA would have seen the potential for resulting excess mineralocorticoid (aldosterone) and adrenal insufficiency. Plaintiffs'

reservations about the Synacthen test for adrenal insufficiency[20] are, I believe, well-taken. They do not, however, outweigh the clear import of O'Donnell 2004. O'Donnell 2004 states that "[s]ome impact on adrenal reserve was predictable from the steroid synthesis pathway." That conclusion is consistent with defendants' expert's testimony and with the literature relied upon by defendants' expert. (6T1287:3-1292:8; DTX 1096). O'Donnell 2004 suggests that a practitioner could address those side effects through coadministration of a glucocorticoid. To be sure, the paper appears to be agnostic about whether coadministration would (or would always) be necessary. It falls far short, however, of concluding that such coadministration is unnecessary or should be avoided. *See Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009) (prior art does not teach away "if it merely expresses a general preference for an alternative invention but does not criticize, discredit, or otherwise discourage investigation into the invention claimed."). I therefore do not agree, as plaintiffs suggest, that prior art "taught away" from the combination therapy. Plaintiffs further suggest that there were other options and theories on how to treat mCRPC, and that there were other anti-cancer agents, perhaps even more promising ones. Nevertheless, the prior art clearly pointed to coadministration of abiraterone with a glucocorticoid. *See, e.g., In re Fulton*, 391 F.3d 1195, 1200 (Fed. Cir. 2004) ("a finding that the prior art as a whole suggests the desirability of a particular combination need not be supported by a finding that the prior art suggests that the combination claimed by the patent applicant is the preferred, or most desirable, combination."); *In re Gurley*, 27 F.3d 551, 552-53 (Fed. Cir. 1994) (upholding obviousness finding where patent was directed to one of two alternative resins disclosed in prior art reference, even though reference described claimed resin as "inferior.").

---

20 The Synacthen test evaluates adrenal insufficiency based on the measurement of serum cortisol before and after an injection of synthetic ACTH. (DTX 1096).

Nor do I agree that prednisone's own side effects would have discouraged its use. The prior art establishes that, despite side effects, glucocorticoids were reasonably well-tolerated. The mere existence of other treatments does not suggest that a POSA would employ these alternatives to the exclusion of prednisone.

In short, to the POSA, the prior art would suggest that abiraterone could be combined with prednisone with a reasonable probability of success.

The factor 4 objective considerations presented by plaintiffs do not alter my conclusion. *See generally Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 719 (Fed. Cir. 1991) (holding that district court did not err when it determined that secondary considerations did not carry sufficient weight to override obviousness determination based on primary considerations).

As to the commercial success factor, there can be no dispute that ZYTIGA® has yielded billions of dollars in sales.[21] "Commercial success is relevant because the law presumes an idea would successfully have been brought to market sooner, in response to market forces, had the idea been obvious to persons skilled in the art." *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1376 (Fed. Cir. 2005). "Evidence of commercial success . . . is only significant if there is a nexus between the claimed invention and the commercial success." *Ormco*, 463 F.3d at 1311-12. "When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the

---

[21] The net sales figures offered by plaintiffs, totaling $5.7 billion for 2011–17, are for ZYTIGA® abiraterone acetate tablets alone. They do not correspond precisely to the patented invention, *i.e.*, ZYTIGA® plus prednisone. *See Merck Sharp & Dohme Corp. v. Sandoz Inc.*, 2015 U.S. Dist. LEXIS 113710, at *118 (D.N.J. Aug. 27, 2015) (Commercial success is measured by sales of a "commercial embodiment of the claimed compound"); *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008) (noting that "failure to link that commercial success to the features of [the] invention that were not disclosed in [the prior art] undermines the probative force of the evidence."). On that score, plaintiffs offer suggestive though not conclusive evidence that approximately 85% to 95% of ZYTIGA® prescriptions were being filled at a pharmacy in temporal proximity to a fill of prednisone.

patented invention." *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997). However, "if the feature that creates the commercial success was known in the prior art, the success is not pertinent." *Ormco*, 463 F.3d at 1311-12; *see also J.T. Eaton*, 106 F.3d at 1571 ("[T]he asserted commercial success of the product must be due to the merits of the claimed invention beyond what was readily available in the prior art"); *see Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011) (noting that if "commercial success is due to an element in the prior art, no nexus exists.").

Specifically, "where 'market entry by others was precluded [due to blocking patents], the inference of non-obviousness of [the asserted claims], from evidence of commercial success, is weak.'" *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 740 (Fed. Cir. 2013) (quoting *Merck*, 395 F.3d at 1377). "A 'blocking patent' is an earlier patent that must be licensed in order to practice a later patent. This often occurs, for instance, between a pioneer patent and an improvement patent." *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1379 n.2 (Fed. Cir. 2000). "The existence of such a blocking patent may deter non-owners and non-licensees from investing the resources needed to make, develop, and market such a later, 'blocked' invention, because of the risk of infringement liability and associated monetary or injunctive remedies." *Acorda Therapeutics Inc. v. Apotex Inc.*, 2011 U.S. Dist. LEXIS 102875, at *61 (D.N.J. Sep. 6, 2011), *aff'd*, 476 F. App'x 746 (Fed. Cir. 2012); *see also id.* at *66 ("if all other variables are held constant, a blocking patent diminishes possible rewards from a non-owner's or non-licensee's investment activity aimed at an invention whose commercial exploitation would be infringing, therefore reducing incentives for innovations in the blocked space by non-owners and non-licensees of the blocking patent.").

To explain the commercial success of the patented ZYTIGA® combination therapy, despite its alleged obviousness, defendants point to the exclusionary effect of the earlier '213 "blocking patent." Abiraterone was previously known in

the art, and indeed was taught by the '213 patent. From 1997 through 2016, that patent granted its holder the exclusive right to market abiraterone. *See Galderma Labs.*, 737 F.3d at 740 (holding that any inference of non-obviousness gleaned from evidence of commercial success is undermined when blocking patent precludes others from entering market).

Janssen contends that the effect of the blocking patent is overstated, because they were willing to license the '213 patent rights at any time from 2000 until 2004, when Cougar Biotechnology was granted its exclusive license. To be sure, licensing opportunities can "dilute the power of the blocking patent" in evaluating commercial success. *Accord Therapeutics*, 2018 U.S. App. LEXIS 25536, at *70. But such licensing efforts appear to have been lackluster. Dr. Ian Judson testified that he met with three drug companies on one occasion in an effort to partner and license abiraterone. (1T229:23-230:3). Dr. Judson pointed to no further attempts to find a licensing partner. (1T229:12-14). And starting in 2004, of course, both the blocking patent and the Cougar license (which was exclusive) prevented non-owners or licensees from entering the market. Between 2004 and 2006, Cougar Biotechnology was the exclusive licensee for abiraterone. So although the commercial possibilities might otherwise have attracted entrants, Cougar's exclusive status surely would have stifled such interest.

The existence of a blocking patent 1997 through 2006 (indeed, through 2016), despite some desultory licensing efforts, would have discouraged entry at the very time when the obviousness of combination therapy was manifesting itself. *See generally Media Techs. Licensing, LLC v. Upper Deck Co.*, 596 F.3d 1334, 1339 (Fed. Cir.) ("Even if Media Tech could establish the required nexus, a highly successful product alone would not overcome the strong showing of obviousness."), *cert. denied*, 562 U.S. 894, 131 S. Ct. 305 (2010). And the sales of ZYTIGA may not be wholly attributable to the patented combination therapy. These are powerful offsetting factors. All in all, however, I must recognize that this abiraterone product has enjoyed commercial success.

I find the market-skepticism factor to be neutral. "Evidence of industry skepticism weighs in favor of non-obviousness. If industry participants or skilled artisans are skeptical about whether or how a problem could be solved or the workability of the claimed solution, it favors non-obviousness." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1335 (Fed. Cir. 2016). Plaintiff advances arguments related to the delayed publication of the study results underlying O'Donnell 2004, a negative comment received in response to those results, the failure to obtain a licensing partner after 1999 and before 2004, the uncertainty of Dr. de Bono's colleagues in proceeding with the extension study, and an article from 1999 that discounted hormonal therapies. Much of that skepticism seems to be directed to abiraterone itself, rather than the claimed combination. And the context is important: as noted above, prior art suggested the combination of abiraterone and glucocorticoids to treat prostate-cancer, and by 1997 industry researchers had patented abiraterone itself. By then, multiple experts had concluded that it was worth pursuing abiraterone as a treatment for prostate cancer. *See* Section II.A.2.a, *supra*. This skepticism factor does not point strongly either way.

I next address the plaintiffs' claims that the patented invention addressed a long-felt need and had unexpected results. "[L]ong-felt need is analyzed as of the date of an articulated identified problem and evidence of efforts to solve that problem." *Tex. Instruments, Inc. v. U.S. ITC*, 988 F.2d 1165, 1178 (Fed. Cir. 1993). In practical terms, courts "look to the filing date of the challenged invention to assess the presence of a long-felt and unmet need." *P&G v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 998 (Fed. Cir. 2009). "Evidence of 'unexpected results' allows a patent-holder to rebut a *prima facie* case of obviousness by showing that the 'claimed invention exhibits some superior property or advantage that a person of ordinary skill in the relevant art would have found surprising or unexpected.'" *Daiichi Sankyo Co., Ltd. v. Mylan Pharm. Inc.*, 670 F. Supp. 2d 359, 382 (D.N.J. 2009) (quoting *In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995), *aff'd*, 619 F.3d 1346 (Fed. Cir. 2010)). To establish this

factor, "the claimed properties or results must be different in 'kind and not merely in degree' from the results of the prior art." *Id.* (quoting *In re Huang*, 100 F.3d 135, 139 (Fed. Cir. 1996)). That is, in order for the results to be "unexpected," they must be proven to be surprising in relation to the closest prior art. *Id.* (citing *In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991)).

Plaintiffs state that the claimed invention was an advance on the prior art in that it had less toxicity, was better tolerated, and improved overall survival. Defendants point to existing contemporaneous alternatives: Jevtana was approved by the FDA in 2010, a year before ZYTIGA® was approved; Xtandi was approved in 2012. (7T1626:13-18). Those drugs were FDA-approved and available for the treatment of prostate cancer patients. *Cf. Pfizer Inc. v. Teva Pharm. United States, Inc.*, 460 F. Supp. 2d 659, 662 (D.N.J. 2006) (noting that failure to obtain FDA approval is "appropriate benchmark in evaluating failure of others"). Taxotere (a chemotherapy drug) and Jevtana were found to extend overall survival of mCRPC patients by 2.5 months, whereas ZYTIGA®-based therapy extended survival by about four months. (7T1622:17-24). That represents a real improvement, but an incremental one. In the context of prostate cancer patients with dire prognoses, it cannot be discounted. Still, it does not suggest that all other efforts had failed, or that the abiraterone/prednisone combination therapy was unexpected "in kind and not merely in degree." *Daichi, supra.* So, although there is evidence supporting the unmet-need or failure-of-others factors, I do not find it to be powerful.

As for the professional-approval factor, plaintiff points to the 301 and 302 studies, as well as the post-priority-date Attard 2008 and 2009 references. "Appreciation by contemporaries skilled in the field of the invention is a useful indicator of whether the invention would have been obvious to such persons at the time it was made." *Vulcan Eng'g Co. v. FATA Aluminium, Inc.*, 278 F.3d 1366, 1373 (Fed. Cir.), *cert. denied*, 537 U.S. 814, 123 S. Ct. 81 (2002). A court may look to "contemporaneous recognition of the achievements of the

[patented] system, including articles in trade journals" and testimony by those skilled in the art that prior to the appearance of the patented technology, it was generally believed the system could not be created. *Id.* This factor weighs somewhat in plaintiffs' favor.

All in all, however, I conclude that the patented combination here was well foreshadowed in peer-reviewed articles. That factor outweighs the others. Balancing all of the prior art and the other indicia, I find that the evidence favors a conclusion of obviousness. *Tokai Corp. v. Easton Enters.*, 632 F.3d 1358, 1370 (Fed. Cir. 2011) ("However, even assuming the existence of a nexus, we see no error in the district court's determination that Tokai failed to establish 'that any of these secondary factors are significant,' . . . in light of the strong showing of prima facie obviousness.").

Defendants' burden of proof to rebut the presumption of validity by clear and convincing evidence is met. The '438 patent is declared invalid for obviousness.

**B. Infringement**

In this section, I assume *arguendo* that the '438 patent is valid and consider whether, if valid, it would have been infringed. Plaintiffs assert both induced and contributory infringement. Both, I find, would be supported by a preponderance of the evidence.

**1. Induced infringement**

The gist of the induced infringement claim here is that the ANDA label, which specifies indications and proper use of the abiraterone/prednisone combination therapy, would induce physicians' direct infringement of the method claimed in the '438 patent. The label by definition embodies the range of uses and indications that are approved by the FDA. Defendants argue that because the allegedly infringing use would fall outside the scope of the FDA-approved use, the ANDA label does not induce infringement.

It's a subtle argument. Both the patent and the label indications, followed faithfully, would lead to the same actions, undertaken in the same manner and for the same reason: the administration of abiraterone and

prednisone, in combination, to treat a class of patients who suffer from mCRPC, with the goal of slowing the progression of the disease. The defendants, however, argue that the '438 patent claims that *each* component (abiraterone, prednisone) has an anti-cancer effect. The FDA, in contrast, allegedly approved administration of the prednisone component of the combination only for its palliative effect, or to address side effects. Therefore, the argument runs, the administration of the combination therapy in accordance with the FDA-approved label would not infringe.

Defendants ask, in effect, that the court look behind the Indications and Usage section of the label, which provides for combination therapy and does not segregate the contribution of each component. That would require the Court to reanalyze the clinical data as if it were a regulatory body, and posit a revised Indication which, in defendants' estimation, would better fit the underlying science. I do not sit to reconstruct a theoretical ruling by an ideal FDA; in assessing the scope of the FDA approval, I am confined to the actual ruling of the actual FDA. In short, this is not an appeal of the FDA's decision, but only an attempt to define its scope.

"Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b); *see Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003). Thus infringement liability falls upon parties who, while not directly infringing a patent themselves, induce others to infringe. *See Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1926 (2015).

"A person induces infringement under § 271(b) by actively and knowingly aiding and abetting another's direct infringement." *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 675 (Fed. Cir. 1990) (emphasis omitted). To succeed on an induced infringement claim, a plaintiff must prove that the defendants' "actions induced infringing acts and that [they] knew or should have known [their] actions would induce actual infringement." *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990). However, it is insufficient that defendants merely have "knowledge of the acts

alleged to constitute infringement." *Id.* "[P]roof of actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement." *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469 (Fed. Cir. 1990); *see ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007). "While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice." *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988).

**a. FDA approval**

The '438 patented method, say defendants, requires that *each* component (abiraterone and prednisone) have an anti-cancer effect. The FDA however, allegedly approved the prednisone component for its palliative effects only, and the proposed ANDA labels reflect that. Thus, according to defendants, their ANDAs do not meet the claim limitation of a "therapeutically effective amount of prednisone," *i.e.*, an amount of prednisone that is, in itself, therapeutically effective *against prostate cancer.*

How do we know that the FDA did not approve a therapy in which prednisone, viewed separately, has an anti-cancer effect? Primarily, defendants say, because (1) the underlying clinical trials and data provided to the FDA would not permit such a conclusion. Relatedly, defendants cite the following evidence: (2) the ZYTIGA® label is vague in its Indications and Usage section as to the role of prednisone; (3) plaintiffs' NDA submissions focused on the efficacy of abiraterone, not prednisone, in treating cancer; (4) the FDA approval package does not suggest that prednisone was approved for its combination effect with abiraterone; and (5) the FDA-approved marketing materials promote prednisone as relieving abiraterone's side effects.

"The FDA-approved label for an approved drug indicates whether the FDA has approved a particular method of use for that drug." *Bayer Schering Pharma AG & Bayer HealthCare Pharm., Inc. v. Lupin, Ltd.*, 676 F.3d 1316, 1322 (Fed. Cir. 2012). Under the Food, Drug, and Cosmetics Act ("FDCA"), new pharmaceutical drugs cannot be marketed or sold unless the sponsor of the

drug demonstrates to the satisfaction of the FDA that the drug is "safe for use under the conditions prescribed, recommended or suggested" on the drug's label. 21 U.S.C. § 355(d). A drug receives FDA approval only for treatment of specified conditions, referred to as "indications." 21 U.S.C. §§ 352, 355(d).

FDA regulations provide guidance on how to interpret a label. The "Indications and Usage" section of the label must set forth indications that are supported by "substantial evidence of effectiveness based on adequate and well-controlled studies." 21 C.F.R. § 201.57(c)(2)(iv). The Indications and Usage section "must state that the drug is indicated for the treatment, prevention, mitigation, cure, or diagnosis of a recognized disease or condition, or of a manifestation of a recognized disease or condition, or for the relief of symptoms associated with a recognized disease or condition." 21 C.F.R. § 201.57(c)(2). "Indications or uses must not be implied or suggested in other sections of the labeling," *i.e.*, sections other than the Indications and Usage section. 21 C.F.R. § 201.57(c)(2)(iv); *cf. Warner-Lambert*, 316 F.3d at 1356 ("The FDA does not grant across-the-board approval to market a drug. Rather, it grants approval to make, use, and sell a drug *for a specific purpose* for which that drug has been demonstrated to be safe and efficacious." (emphasis added)).

The three cases cited by the defendants, *Bayer Schering, supra, Warner-Lambert, supra,* and *Allergan, Inc. v. Alcon Labs., Inc.*, 324 F.3d 1322, 1324-25 (Fed. Cir. 2003), are not precisely on point. To begin with, they involve multiple effects of a single drug, rather than a dispute over the allocation of multiple effects as between two drugs. I take my lead, however, from those cases' shared reluctance to adopt the mode of analysis of the FDA approval that is employed by the defendants here.

Because *Bayer Schering* is the most pertinent of the three, I give it the most extended discussion. There, the defendants sought to market a generic form of Yasmin, a branded oral contraceptive. The FDA had granted plaintiffs' NDA seeking approval of Yasmin "for oral contraception." 676 F.3d at 1319. The defendants' ANDAs sought FDA approval to market generic forms of

Yasmin for the same approved use, "oral contraception." *Id.* Defendants filed paragraph IV certifications, and the plaintiffs filed suit against the ANDA applicants, alleging infringement of a method-of-use patent. That patent's claims recited that the drug "achieves three effects simultaneously: a contraceptive (or gestagenic) effect, an anti-androgenic effect . . . and an anti-aldosterone effect." *Id.* at 1320. Defendants filed a motion for judgment in their favor on the pleadings; they would not infringe, they said, because they sought to market the generic form of Yasmin "only for oral contraception and not for the combination of uses claimed in the [] patent." *Id.* The district court agreed. *Id.*

On appeal, the plaintiffs acknowledged that both the FDA-approved label and the proposed generic labels stated in their Indications and Usage sections that the drug was to be used as an "oral contraceptive." *Id.* at 1320. The "Clinical Pharmacology" section of the label, however, referred to the other two effects, *i.e.*, the anti-androgenic and anti-aldosterone effects. Based on that language, the plaintiffs argued that the FDA had approved "the use of Yasmin to induce those effects" in addition to the contraceptive effect. *Id.* at 1322, 1324.

The Federal Circuit held that, as to this issue, it is the Usages and Indications section that does the real work. The court expressly rejected the notion that an indication could be implied from another section of the label, an approach that would not make regulatory sense. A particular use or indication for a drug is FDA-approved only when the safety and efficacy of that use has been established. The inclusion of such a use in the label's Indications and Usage section constitutes the necessary "[a]cknowledgement of the safety and efficacy of that specific method of use." *Id.* at 1324.

Mention in the Clinical Pharmacology section, the court held, is not the same thing at all:

> The reference in the Clinical Pharmacology section of the label to the anti-mineralocorticoid and anti-androgenic activity of drospirenone is certainly not a direct indication of an appropriate

> use for Yasmin, and even if it could be considered an "implied or suggested" indication of an appropriate use, the regulation expressly states that such implied or suggested uses do not constitute approved uses.

*Id.* at 1323.

The Federal Circuit in *Bayer Schering* discussed extrinsic evidence submitted by the plaintiffs, including physicians' declarations and marketing materials. *Id.* at 1324. These documents, said the plaintiffs, established a context that suggested FDA approval of Yasmin as safe and effective not just for contraception, but for the claimed combination of three effects. *Id.* The Federal Circuit demurred. This evidence, the Court held, demonstrated that the FDA was *aware* that Yasmin could cause the other two effects, not that the FDA had *approved* the safety and efficacy of the medication for the claimed combination of effects. *Id.* Accordingly, the Court held that the FDA had approved Yasmin for use only as an oral contraceptive, and that defendants did not commit infringement. The defendants sought to market their drug solely for that approved use as a contraceptive, while the patent claimed the trio of uses in combination. *Id.* at 1326.

Following the lead of *Bayer,* I will not read an indication into the ZYTIGA® label or ANDA labels that is not there. The Indications and Usage section is clear that abiraterone and prednisone are to be used in combination for the treatment of mCRPC. That indication signifies that these agents are FDA-approved in combination to treat cancer. (2T400:16-24).

Defendants' FDA expert, Dr. Akhilesh Nagaich, testified persuasively that prednisone would not have been identified in the Indications and Usage section if its sole approved purpose were the treatment of side effects, and I agree. (4T861:21-862:2). I also credit Dr. O'Shea's testimony, which is consistent with the FDA regulations, that if prednisone were approved solely to treat side effects of abiraterone, it would probably not appear in the Indications section, but only in the label's dosage and administration section, or the warnings and precautions section. (2T401:19-402:1, 405:1-6). It is also likely that if

prednisone had been approved only to alleviate side effects, the label would simply have said so. (2T402:2-3).

An item's inclusion in the Indications and Usage section cannot be brushed aside; to place it there is a critical regulatory decision. Indeed, as noted above, it's essentially that or nothing; indications *not* listed in the Indications and Usage section cannot be derived by implication from other sections of the labeling. 21 C.F.R. § 201.57(c)(2)(iv) ("Indications or uses must not be implied or suggested in other sections of the labeling"); *see also Bayer Schering*, 676 F.3d at 1323–24; *Warner-Lambert*, 316 F.3d at 13; *Shire LLC v. Amneal Pharm., LLC*, 2014 U.S. Dist. LEXIS 85369, at *18 (D.N.J. June 23, 2014) (rejecting argument that drug was FDA-approved to treat amphetamine abuse based on studies section of label, where the Indications section clearly stated that the drug was "indicated for the treatment of Attention Deficit Hyperactivity Disorder"), *aff'd and reversed on other grounds*, 802 F.3d 1301 (Fed. Cir. 2015).[22]

---

22 I consider with care certain other cases in which courts were considering, *inter alia,* the related but distinct issue of specific *intent* to induce infringement. *See* Section II.C, *infra*. With that caveat, I have given some weight to cases that that have rejected invitations to infer a drug's use from sections of the label other than indications and usage.

Thus, in *United Therapeutics Corp. v. Sandoz, Inc.*, No. 12cv1617, 2014 U.S. Dist. LEXIS 121573, at *49 (D.N.J. Aug. 29, 2014) Judge Sheridan of this court persuasively rejected a plaintiff's argument that an infringing use could be predicated on a label warning, as opposed to an indication. The court noted that there is a "rather significant difference between a warning and an instruction." *Id.* A "warning provides information regarding a potential risk," but stops short of prescribing a specific "course of action." *Id.* An instruction, on the other hand, specifically directs that a particular action, or series of actions be taken. *Id.* at 49-50 (rejecting inducement claim if patentee must engage in "scholarly scavenger hunt" through the label to identify statements that may potentially, but not inevitably, impact a prescribing physician's actions).

To similar effect is *Otsuka Pharm. Co., Ltd. v. Torrent Pharm. Ltd., Inc.*, 99 F. Supp. 3d 461, 476, 490-93 (D.N.J. 2015) (Simandle, C.J.) (finding that warning and safety information is insufficient to establish inducement of claimed method). *See also Sanofi v. Glenmark Pharm. Inc.*, 204 F. Supp. 3d 665, 674 (D. Del. 2016) (finding that physician would look to indications and usage section, but that the indications and usage section explicitly referred physicians to the clinical studies section, which a physician would therefore consider as well), *aff'd*, 875 F.3d 636 (Fed. Cir. 2017).

Also implicit in *Bayer* is my refusal to give controlling weight to the other evidence introduced by defendants. To be sure, there are indications in the record that the FDA was aware of prednisone's palliative benefits. To be sure, underlying NDA submissions emphasize the anti-cancer effect of abiraterone rather than that of prednisone. And there there are marketing materials that tout the palliative effects of prednisone without mentioning its anti-cancer effect. Giving these proofs due latitude, I nevertheless conclude that they do not negate what the FDA actually did in its approval of the label's Indications and Uses. *See Bayer Schering*, 676 F.3d at 1323-24 (refusing to imply indication from marketing materials, clinical pharmacology section of label at issue, and from physician's declarations). I cannot find that prednisone was approved as part of ZYTIGA®'s indication solely for its benefits with respect to palliation and side effects.

Concededly, this Court, like the parties, must wrestle with an irreducible level of ambiguity in a combination-therapy approval. As defendants say, the Indications and Uses do not, for example, attribute a percentage of efficacy to each component; the most that can be said is that the FDA has approved the combination as safe and effective. Similarly, defendants attack plaintiffs' cited combination-study clinical trials which, in defendants' view, are confounded and fail to establish the independent contribution of prednisone to the efficacy of the combination.

Again, the fact remains that the FDA did approve the combination-based treatment of mCRPC based on a combination study. Perhaps the studies could have been better designed. Perhaps the researchers could have found an ethical means of definitively isolating the contribution of each component.[23]

---

For similar reasons, I do not give weight to the warning that was omitted from the 2018 version of the ZYTIGA® label ("Co-administration of a corticosteroid suppresses adrenocorticotropic hormone (ACTH) drive, resulting in the reduction in the incidence and severity of these adverse reactions." (2T421:13-19)).

[23] Placebo control studies, for example, were discontinued when the combination therapy began to show therapeutic benefit. *See* Section I.E., *supra*.

But from arguments that the FDA *should* not have approved an indication, I cannot leap to the conclusion that it *did* not. That, to me, is an important methodological lesson to be drawn from the approach of *Bayer*.

I treat defendants' other two cited cases more briefly. In *Warner-Lambert*, the branded manufacturer held a patent for a method of "treating neurodegenerative diseases" using a drug known as gabapentin. 316 F.3d at 1351. Its NDA, however, led to approval of gabapentin for use in "adjunctive therapy in the treatment of partial seizure with and without secondary generalization in adults with epilepsy." *Id.* at 1352. Defendant Apotex's ANDA sought to market generic gabapentin for the same indication, *i.e.*, partial seizure. *Id.* The Federal Court affirmed the grant of summary judgment to Apotex because the two indications were distinct; partial seizure is not a neurodegenerative disease. *Id.* at 1353.

Finally, in *Allergan, Inc. v. Alcon Labs., Inc.*, 324 F.3d 1322, 1324-25 (Fed. Cir. 2003), the Federal Circuit held that an ANDA applicant's labeled indication for reducing intraocular pressure would not induce infringement of patented methods of "protecting the optic nerve and retina" and "providing neural protection." Because the patent-claimed uses were not approved by the FDA, the ANDA applicant could not be held liable for infringement even if the proposed drug in fact had those additional protective effects in patients who took the drug for the approved purpose. *Id.* at 1324.

These three cited cases, *Bayer* in particular, eschewed the kind of searching review of the FDA record and regulatory "do-over" that defendants propose. The common feature of these three cases is that, to decide the induced-infringement issue, those courts compared the wording of the label to the patent claims.[24]

---

24 What may be occurring here is a kind of category mistake. This is not an appeal seeking affirmance or reversal of an FDA decision. In this context, what is significant about an FDA approval is its existence and scope.

Following that approach, I find that the combination therapy embodied in the label meets the claim limitations of the patent. The Indication on the ZYTIGA® label is clear: "ZYTIGA is indicated in combination with prednisone for the treatment of patients with Metastatic castration-resistant prostate cancer (CRPC)." (PTX 406). That language aligns with the language of Claim 1 of the patent: "A method for the treatment of a prostate cancer in a human comprising administering to said human a therapeutically effective amount of abiraterone acetate . . . and a therapeutically effective amount of prednisone." (JTX 8000).

Although the Indications and Usage section is paramount, I observe that the dosing section and the clinical studies section corroborate the reasoning above. The 301 study established that the combination of the two drugs has an anti-cancer effect. Section 14 of the label, which highlights the clinical studies that were completed, states that "[t]he efficacy and safety of *ZYTIGA with prednisone* was established in three randomized, placebo-controlled, international clinical studies." (PDX 406 at 21 (emphasis added); 2T418:1-4). The effectiveness seen in the studies is attributed to abiraterone plus prednisone, not simply abiraterone. (2T418:6-7; 3T588:5-7). The dosing section recommends that both drugs be administered in specific doses for the purpose of treating mCRPC. In short, it is the combination, and not one drug to the exclusion of the other, that was found safe and effective as a treatment for mCRPC. The FDA meant what it said when it listed the combination in the approved Indications and Uses.

The ZYTIGA® Indications and Usage section encompasses an FDA-approved method, the administration of abiraterone plus prednisone for the treatment of mCRPC. That being the patented method, I find that the labels encompass infringement.

**b. Intent to induce infringement**

The next, interrelated question is whether the ANDA defendants' proposed abiraterone labels evince a specific intent to encourage physicians to

infringe the '438 patent. To summarize, the '438 patent claims the administration of a "therapeutically effective amount of abiraterone acetate" and a "therapeutically effective amount of prednisone," which is defined in dependent claims as 1000mg/day of abiraterone and 10 mg/day of prednisone, to a mCRPC patient. I find that the labels embody an intent to induce a physician to do just that.

Inducement can be established "where there is '[e]vidence of active steps taken to encourage direct infringement,' which can in turn be found in 'advertising an infringing use or instructing how to engage in an infringing use.'" *Takeda*, 785 F.3d at 630–31 (quoting *Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936, 125 S. Ct. 2764, 162 L.Ed.2d 781 (2005)). "[T]he sale of a product specifically labeled for use in a patented method constitutes inducement to infringe that patent, and usually is also contributory infringement." *Eli Lilly & Co. v. Actavis Elizabeth LLC*, 435 F. App'x 917, 926 (Fed. Cir. 2011) (citing *Astrazeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2010) (finding intent to induce infringement based on product label authorizing patented use, which "would inevitably lead some consumers to practice the claimed method"); *DSU Med. Corp. v. JMS Co. Ltd.*, 471 F.3d 1293, 1305-06 (Fed. Cir. 2006) (*en banc* in relevant part) (finding liability for induced infringement when company "offers a product with the object of promoting its use to infringe, as shown by clear expression or other affirmative steps taken to foster infringement")). If relying on instructions, those instructions must evince an "intent to encourage infringement." *Vita–Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1329 (Fed. Cir. 2009). It is not enough that the instructions happen to encompass an infringing mode; rather, they must "teach an infringing use . . . such that we are willing to infer from those instructions an affirmative intent to infringe the patent." *Vita-Mix*, 581 F.3d at 1329 n.2; *see Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1365 (Fed. Cir. 2012). When proof of intent to encourage depends on the label, "[t]he label must encourage, recommend, or promote infringement." *Takeda*, 785 F.3d at 631 (citations omitted).

Mind-reading, however, is not required to establish the necessary intent. The sale of a product specifically labeled for use *via* a patented method constitutes inducement to infringe that patent. *Astrazeneca*, 633 F.3d at 1060 (finding intent to induce infringement based on the product label authorizing patented use, which "would inevitably lead some consumers to practice the claimed method.").

With this framework in mind, the Court analyzes whether the ANDA labels bespeak an intent to induce infringement by doctors. Defendants' proposed product labels, recall, are substantively identical to the approved ZYTIGA® label, except that the chemical name "abiraterone acetate" is substituted for the trademark "ZYTIGA®."

Defendants' Indications are as follows:

- Amerigen's Indication provides "Abiraterone acetate tablets are a CYP17 inhibitor indicated in combination with prednisone for the treatment of patients with metastatic castration-resistant prostate cancer[.]" (JTX 8011);
- Amneal's Indication provides "Abiraterone acetate tablets are a CYP17 inhibitor indicated in combination with prednisone for the treatment of patients with . . . metastatic castration-resistant prostate cancer (CRPC)." (PTX 359);
- DRL's Indication provides "Abiraterone acetate is a CYP17 inhibitor indicated in combination with prednisone for the treatment of patients with . . . metastatic castration-resistant prostate cancer (CRPC)." (PTX 367);
- Mylan's Indication provides "Abiraterone acetate tablets are a CYP17 inhibitor indicated in combination with prednisone for the treatment of patients with . . . metastatic castration-resistant prostate cancer (CRPC)." (PTX 372);
- Teva's Indication provides "Abiraterone acetate tablets are a CYP17 inhibitor indicated in combination with prednisone for the treatment of patients with . . . metastatic castration-resistant prostate cancer (CRPC)." (PTX 383);
- West-Ward/Hikman's Indication provides "Abiraterone acetate tablets, USP are a CYP17 inhibitor indicated in combination with prednisone for the treatment of patients with . . . metastatic castration-resistant prostate cancer (CRPC)." (PTX 393); and

- Wockhardt's Indication provides "Abiraterone acetate tablets, USP are a CYP17 inhibitor indicated in combination with prednisone for the treatment of patients with . . . metastatic castration-resistant prostate cancer (CRPC)." (PTX 397).

The Indications and Usage section of defendants' labels, no less than that of the ZYTIGA® label itself, clearly express an intent that physicians be authorized to prescribe abiraterone plus prednisone for the treatment of mCRPC. (2T408:3-5).

Again, the Indications and Usage section is paramount, but I find corroboration elsewhere. The approved "Dosage and Administration" section of the 2018 ZYTIGA® label reads, in part: "Recommended Dose for metastatic CRPC . . . The recommended dose of ZYTIGA is 1,000 mg (two 500 mg tablets or four 250 mg tablets) administered orally once daily in combination with prednisone 5 mg administered orally twice daily." (PTX 406).

Defendants' labels all contain Dosage sections that recommend administering 1000mg/day of abiraterone acetate, and 10mg/day of prednisone. (DE 502, at 94 ¶73). Amneal's, DRL's, Teva's, and Wockhardt's proposed Dosage sections track the wording of ZYTIGA®'s 2018 label. (2T413:23-3). They state the recommended "recommended dosage *for mCRPC.*" (2T413:25-414:3 (emphasis added)) The other defendants' labels track the pre-2018 ZYTIGA® label in that they state the "recommended dosage" but omit the words "for mCRPC." I do not regard the distinction as significant; everyone agrees that the relevant target group for the ANDA consists of mCRPC patients.[25]

The similarities between plaintiffs' and defendants' Indications and Dosing sections are manifest. Defendants nonetheless contend that this, in

---

25 The 2018 ZYTIGA® label, recall, added an indication for mCSPC (*i.e.*, the castration-sensitive, as opposed to castration-resistant, form of the disease). Presumably the "for mCRPC" language was felt to be necessary for clarity, since the label now had more than one indication. I do not believe it alters the substance of the label. At any rate, the ANDA parties do not seek to market the drug combination for that additional mCSPC indication.

itself, is not sufficient to establish inducement because the labels do not direct doctors to use prednisone to fight cancer, as opposed to addressing abiraterone's side effects. (DBr. at 27). In a similar vein, defendants argue that they do not "know" that prednisone has anti-cancer effects. Lacking such knowledge, defendants say, they cannot be regarded as intentionally promoting such use. (DBr. at 29).

The intent required here is not the kind of specific intent required by the criminal law. In the context of patent infringement litigation involving pharmaceuticals, "the sale of a product specifically labeled for use in a patented method constitutes inducement to infringe that patent." *Eli Lilly*, 435 F. App'x at 926; *see also Astrazeneca*, 633 F.3d at 1060 (product label authorizing patented use sufficient to establish intent, because it "would inevitably lead some consumers to practice the claimed method"); *GlaxoSmithKline LLC v. Glenmark Generics Inc., USA*, 2015 U.S. Dist. LEXIS 52525, at *18 (D. Del. Apr. 22, 2015) ("there is no question that statements 'in a package insert that encourage infringing use of a drug product are alone sufficient to establish intent to encourage direct infringement' for purposes of an induced infringement claim." (citation omitted)).

The key question is whether the label teaches performance of an infringing use. These cases make clear that the instructions in the label itself are sufficient for finding the requisite specific intent. *See In re Depomed Patent Litig.*, 2016 U.S. Dist. LEXIS 166077, at *181-82 (finding defendants possessed specific intent based on "the instructions in the label itself" and that "[i]nformation outside the label (e.g., a physician's knowledge) is not sufficient to meet the standard." (citation omitted)); *see also Sanofi v. Watson Laboratories Inc.*, 875 F.3d 636, 644-46 (Fed. Cir. 2017) (affirming verdict of inducing infringement where label encouraged patient to use drug in manner that infringed claims, relying on data of actual usage of drug product as further evidence that labeling encouraged infringement, and rejecting contention that

because drug had substantial noninfringing uses there could not be inducing infringement).

Here, the content of the ANDA labels virtually compels an inference of specific intent to encourage the infringing use, and I do draw that inference. Claim 1 of the '438 patent, the only independent claim, is a method of treating prostate cancer by the administration of abiraterone and prednisone. (JTX 8000). Dependent claims 2–20 of the '438 patent describe additional limitations of the method, including the amount of abiraterone acetate (1000mg/day) and the amount of prednisone (10mg/day) used, and the type of prostate cancer being treated (mCRPC). (*Id.*). All of the defendants' label Indications promote that exact use. *See Bone Care Int'l, L.L.C. v. Roxane Labs., Inc.*, 2012 U.S. Dist. LEXIS 80450, at *33 (D. Del. June 11, 2012) (finding induced infringement where defendants' proposed labels did not differ from plaintiff's labels "in any relevant way.").

Defendants cite cases in which intent was not inferred from the label's content, but in those cases the infringing use was no more than an option. In none of those cases did the generic defendant successfully interpose an ostrich defense to Indication and Dosing sections that directly instructed infringing use, as they do here.

In *Shire*, for example, the patent claimed a method of administering a certain drug orally, with food. 2014 U.S. Dist. LEXIS 85369 at *15. In contrast, defendants' ANDA labels stated that the drug could be taken with or without food. *Id.* Consistent with the label, physicians could, at their option, infringe or not infringe. The court held accordingly:

> The problem is that the statement that the medication may be taken with or without food cannot be reasonably understood to be an instruction to engage in an infringing use. As Defendants contend, it is indifferent to which option is selected. At most, it may be understood to permit an infringing use, but permission is different from encouragement. . . . [T]he proposed label does not contain any instruction to take the medication with food. Plaintiffs have failed to raise a material factual dispute over whether the

> proposed label encourages infringement of method claims requiring administration with food.

*Id.* at *16.

Similarly, in *Acorda*, the patent taught that a drug be taken with food. 2011 U.S. Dist. LEXIS 102875, at *2. The proposed label directed physicians to "the pharmacokinetics section of the label for information on the differences between the fed and fasted states with capsules and tablets," and stated that physicians should be "thoroughly familiar with the complex effects of food" on the drug. *Id.* at *17. Finding that the labels did not infringe, the court explained that none of the label's statements "direct any action on the part of any physician, but merely call attention to the pharmacokinetics section." *Id.* In addition, the label did not state "a preference of one over the other or a direction to use the capsule form in the fed state." *Id.* Here, too, the options were "with food" or "without food," and the label did not promote one over the other.

The ANDA defendants' abiraterone labels are a far cry from that. The *only* way to follow these labels is to administer abiraterone, together with prednisone, in specified doses, to a mCRPC patient.[26]

I am also unpersuaded by defendants' argument that doctors will prescribe prednisone only for the unpatented purposes of palliation or minimizing side effects. First, this hypothetical possibility is contrary to the labels' explicit Indication, *i.e.*, abiraterone plus prednisone for the treatment of mCRPC. Second, this argument is best considered as a substantial non-infringing use under § 271(c), not as a rebuttal of intent under § 271(b). *See Sanofi*, 875 F.3d at 646 ("a person can be liable for inducing an infringing use of a product even if the product has substantial noninfringing uses") (citing *Grokster*, 545 U.S. at 934-37). Third, courts have found induced infringement

---

26 Nor is there persuasive evidence that the defendants took affirmative steps to avoid infringing uses, as in *Otsuka Pharm.*, 99 F. Supp. 3d at 485 ("The fact that . . . Defendants actively and voluntarily removed any reference to the allegedly infringing indication, in turn, belies any suggestion that these Defendants acted with the specific intention to encourage infringement.")

even in situations where a label did not track the patent's description of an underlying medical condition, but instead sought to treat a symptom. Infringement was found because the use of the product would entail the patented treatment of the underlying condition. *See, e.g., L.A. Biomedical Research Inst. at Harbor-UCLA Med. Ctr. v. Eli Lilly & Co.*, 2014 U.S. Dist. LEXIS 185431, at *13-14 (C.D. Cal. May 12, 2014) (noting that "a once daily dosage of [drug] to treat [symptom] in these patients results directly in treatment of the underlying [condition] and the performance of the patented method.").

Proposed labeling that instructs infringing uses is generally sufficient to support a finding of intentional inducement. The defendants' proposed labels here would infringe each element of the asserted claim. They teach the reader to perform every element of the patented method. With respect to the specific intent element, I conclude that the plaintiffs have sufficiently shown that the defendants "knew or should have known [their] actions would induce actual infringements." *See DSU Med. Corp.*, 471 F.3d at 1306. All defendants filed ANDAs seeking approval to market abiraterone under a label which instructs physicians and medical professionals to administer abiraterone plus prednisone in accordance with the patented method. This indication is the same use set forth in the patent-in-suit, and the labels of the defendants' proposed products are the same as the ZYTIGA® labels. *See* 21 C.F.R. § 314.94(a)(1)(8)(iv).

Accordingly, I find that plaintiffs have proven that, assuming the '438 patent is valid, the defendants would intentionally induce infringement if permitted to market their ANDA products under the proposed labels.

**2. Contributory infringement**

Plaintiffs also claim that abiraterone is a material part of a claimed invention, and that defendants are thus liable for contributory infringement (again, assuming that the '438 patent is valid). The parties give this claim very little attention in their briefing, and my finding of induced infringement renders it redundant. I therefore address it in abbreviated fashion.

Contributory infringement is prohibited by 35 U.S.C. § 271(c):

> Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

Stated simply, "[a] party is liable for contributory infringement if that party sells, or offers to sell, a material or apparatus for use in practicing a patented process." *i4i Ltd. P;ship v. Microsoft Corp.*, 598 F.3d 831, 850-51 (Fed. Cir. 2010). To establish contributory infringement under this subsection, a patent owner must prove the following: "1) that there is direct infringement, 2) that the accused infringer had knowledge of the patent, 3) that the component has no substantial noninfringing uses, and 4) that the component is a material part of the invention." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326, 96 U.S.P.Q.2d 1742 (Fed. Cir. 2010).

Defendants concede, at least *arguendo*, elements 1, 2, and 4. The dispute focuses on the third element. Prednisone, say defendants, has a substantial non-infringing use as a glucocorticoid replacement. (DBr. at 32). "[D]istribution of a component of a patented device will not violate the patent if it is suitable for use in other ways." *Grokster*, 545 U.S. at 932. "[T]he doctrine absolves the equivocal conduct of selling an item with substantial lawful as well as unlawful uses." *Id.* A non-infringing use is substantial if it is "not unusual, far-fetched, illusory, impractical, 'occasional, aberrant, or experimental." *Vita-Mix Corp.*, 581 F.3d at 1327.

I find defendants' argument unpersuasive for several reasons. First, every administration of prednisone as a glucocorticoid replacement to treat mCRPC would factually duplicate the patented method. The noninfringing "use," then, is not so easily separated from the infringing one. This is not like using a patented anvil to moor a boat. The distinction between infringement

and noninfringement seems to turn, not on any external fact, but on the subjective mental processes of the prescribing physician.

Defendants' reliance on *Warner-Lambert* is therefore misplaced; that case involved an off-label use to treat a separate condition. As noted above, the patented method of treating neurodegenerative diseases was distinct from the FDA approval of the drug for "treatment of partial seizure" (which is not itself a neurogenerative disease). 316 F.3d at 1352. The court explained that "it defies common sense to expect that Apotex will actively promote the sale of its approved gabapentin, in contravention of FDA regulations, for a use that (a) might infringe Warner-Lambert's patent and (b) constitutes such a small fraction of total sales." *Id.* at 1365.

There, gabapentin was not approved by the FDA for the patented use in relation to a particular medical condition. Here, by contrast, the label-indicated use *is* the patented combination use. The prednisone does not know why it was administered, and its pharmacological effect when administered to a mCRPC patient with abiraterone will be the same, irrespective of any mental reservation by the physician. *Cf. L.A. Biomedical Research Inst.*, 2014 U.S. Dist. LEXIS 185431, at *13-14 (noting that "a once daily dosage of [drug] to treat [a symptom] in these patients results directly in treatment of the underlying [condition] and the performance of the patented method.").

Defendants argue in the alternative that Section 5.2 of their ANDA labels, the Warnings and Precautions Section, encourages abiraterone monotherapy. (DPF. at 63, ¶244). I look to the Indications. Abiraterone monotherapy is an off-label use, and there is no evidence in the record that this proposed off-label use is or would be "substantial." *Cf. Acorda Therapeutics*, 2011 WL 4074116 at **14, 19 (finding substantial non-infringing use where evidence showed that 75% of the sales of the product were for non-infringing use). If anything, the Warning section discourages such off-label use by suggests that withdrawing the use of prednisone from the combination therapy can have detrimental effects on a patient.

I therefore find that contributory infringement is present here as well.

## III. CONCLUSION

The '438 patent is invalid for obviousness, but contains an adequate written description. The plaintiffs have established by a preponderance of the evidence that if the patent were valid, defendants' activities would constitute induced infringement and contributory infringement.

Dated: As amended October 31, 2018

KEVIN MCNULTY
United States District Judge


Abiraterone Acetate – Selective Inhibition
ACTIVITY
glucocorticoid
mineralocorticoid
androgen
precursors, intermediates, & final steroids
enzymes
Cholesterol
Cholesterol side chain cleavage enzyme (desmolase)
Pregnenolone
Progesterone
Deoxycorticosterone
Corticosterone
18OH-corticosterone
Aldosterone
CYP17 17α-hydroxylase
11β-hydroxylase
17OH-pregnenolone
17OH-progesterone
11-deoxycortisol
Cortisol
CYP17 17,20-lyase
Dehydroepiandrosterone
Androstenedione
Testosterone
Dihydrotestosterone
PDX7.5

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **BTG INTERNATIONAL LIMITED, et al.,**<br>Plaintiffs,<br>**v.**<br>**AMNEAL PHARMACEUTICALS LLC, et al.**<br>Defendants. | Civ. No. 15-cv-5909 (KM)(JBC) |
| **BTG INTERNATIONAL LIMITED, et al.,**<br>Plaintiffs,<br>**v.**<br>**AMERIGEN PHARMACEUTICALS, INC., and AMERIGEN PHARMACEUTICALS LTD.,**<br>Defendants. | Civ. No. 16-cv-2449 (KM)(JBC) |
| **BTG INTERNATIONAL LIMITED, et al.,**<br>Plaintiffs,<br>**v.**<br>**TEVA PHARMACEUTICALS USA, INC.,**<br>Defendant. | Civ. No. 17-cv-6435 (KM)(JBC)<br><br>**CONSOLIDATED ORDER** |

**KEVIN MCNULTY, U.S.D.J.:**

The Court in this patent infringement action of United States Patent No. 8,822,438 ("the '438 patent") having held a bench trial beginning on July 23, 2018 and concluding on August 2, 2018, and the Court having considered the parties' post-trial submissions (DE 533, 534, 535, 536, 549, 552, and 553), the evidence and testimony presented at trial, and the arguments of the parties; and

the Court having filed simultaneously herewith an Opinion setting forth its reasoning; and good cause appearing therefor;

**IT IS** this 26th day of October, 2018,

**ORDERED and ADJUDGED**, for the reasons expressed in the accompanying Opinion, that the '438 patent is invalid for obviousness and that the plaintiffs take nothing on their claims of infringement; and

**IT IS FURTHER ORDERED** in the alternative that if the patent were valid, defendants' activities would constitute induced infringement and contributory infringement; and

**IT IS FURTHER ORDERED** pursuant to the Court's equitable powers and Rule 62, that the status quo be maintained through Tuesday, October 30, 2018, and that no generic launch shall occur before October 31, 2018.[1] By close of business on October 29, 2018, the parties shall submit briefs, not to exceed 15 pages, on the effect of Fed. R. Civ. P. 62 and the appropriateness or not of a stay pending appeal. Assuming there is no agreement among the parties, I will hear oral argument on the stay application on Tuesday, October 30, 2018, at 3 p.m.

KEVIN MCNULTY
United States District Judge

[1] The Hatch-Waxman 30-month stay is scheduled to expire on Sunday, October 28, 2018. I find preliminarily that the merits of this case present a potentially appealable issue; that the harm to the plaintiffs and the balance of harms between the parties favors this very brief delay; that this temporary stay does no more than preserve the status quo; that a generic launch, if temporary, would create both financial and medical disruption; and that the public interest favors a brief delay to permit the orderly litigation of a stay pending appeal.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BTG INTERNATIONAL LIMITED, et al.,<br>Plaintiffs,<br>v.<br>AMNEAL PHARMACEUTICALS LLC, et al.,<br>Defendants. | Hon. Kevin McNulty, U.S.D.J<br>Civil Action No.:<br>2:15-cv-05909-KM-JBC |
| BTG INTERNATIONAL LIMITED, et al.,<br>Plaintiffs,<br>v.<br>AMERIGEN PHARMACEUTICALS, INC., et al.,<br>Defendants. | Hon. Kevin McNulty<br>Civil Action No.:<br>2:16-cv-02449-KM-JBC |
| BTG INTERNATIONAL LIMITED, et al.,<br>Plaintiffs,<br>v.<br>TEVA PHARMACEUTICALS USA, INC.,<br>Defendant. | Hon. Kevin McNulty<br>Civil Action No.:<br>2:17-cv-06435-KM-JBC |

**[~~PROPOSED~~] FINAL JUDGMENT UNDER RULE 54(b)**

This matter was raised to the Court by way of Plaintiffs'[1] unopposed letter motion requesting entry of judgment pursuant to Federal Rule of Civil Procedure 54(b) ("Motion").

From July 23 to August 2, 2018, the Court held a bench trial in the above-captioned matters. On October 26, 2018, the Court issued its Opinion and Order (Dkt. 560, 561) determining that the asserted claims (4, 8, 11, 19, and 20) of Plaintiffs' U.S. Patent No. 8,882,438 ("the '438 patent") are invalid for obviousness, but are supported by an adequate written description. The Court also determined that if the asserted '438 patent claims were valid,

[1] "Plaintiffs" refers to Janssen Biotech, Inc. ("Janssen Biotech"), Janssen Oncology, Inc. ("Janssen Oncology"), Janssen Research & Development, LLC ("Janssen R&D") (collectively, "Janssen"), and BTG International Limited ("BTG").

the Participating Defendants'[2] activities upon approval of their ANDAs would constitute induced and contributory infringement, and thus the filing of each of Defendants' ANDAs would have been an act of infringement under 35 U.S.C. § 271(e)(2)(A). The '438 patent is the only patent asserted in these actions.

To facilitate an appeal of the Court's Opinion* and Order, Plaintiffs request entry of judgment under Rule 54(b) consistent with the Opinion* and Order as to their claims for infringement of the '438 patent against the Participating Defendants, as well as the Participating Defendants' counterclaims for declaratory judgments of non-infringement and invalidity of the '438 patent in the -5909 and -2449 actions. In addition, Plaintiffs request entry of judgment under Rule 54(b) consistent with the Opinion* and Order as to their claims for infringement against Teva under the '438 patent and Teva's counterclaim for declaratory judgment of non-infringement and invalidity in the -6435 action pursuant to Plaintiffs' and Teva's stipulation that the Court's judgment as to Teva in the -5909 action would apply to the -6435 action as well. Dkt. No. 381 at 5.

Accordingly, it is ORDERED, ADJUDGED and DECREED:

1. The balance of the equities and interests of judicial administration favor entry of final judgment under Rule 54(b) as requested by Plaintiffs' Motion.

2. There is no just reason for delaying entry of final judgment under Rule 54(b) as requested by Plaintiffs' Motion.

3. For the reasons stated in the Court's October 26, 2018 Opinion,* the asserted claims (4, 8, 11, 19, and 20) of the '438 patent are invalid for obviousness.

4. For the reasons stated in the Court's October 26, 2018 Opinion,* the asserted claims of the '438 patent satisfy the written description requirement of 35 U.S.C. § 112.

5. In the alternative, if the '438 patent were valid, for the reasons stated in the Court's October 26, 2018 Opinion,* each of the Participating Defendants would engage in induced and contributory infringement of the asserted '438 patent claims if its ANDA were approved, and therefore the filing of each of the ANDAs constituted an act of infringement of the asserted claims of the '438 patent under 35 U.S.C. § 271(e)(2):

- For Amerigen, ANDA No. 208027;
- For Amneal, ANDA No. 208327;

---

[2] "Participating Defendants" refers to Amerigen Pharmaceuticals Limited, Amerigen Pharmaceuticals, Inc. ("Amerigen"); Amneal Pharmaceuticals LLC, Amneal Pharmaceuticals of New York, LLC ("Amneal"); Dr. Reddy's Laboratories, Inc., Dr. Reddy's Laboratories Ltd. ("DRL"); Mylan Pharmaceuticals Inc., Mylan Inc. ("Mylan"); Teva Pharmaceuticals USA, Inc. ("Teva"); West-Ward Pharmaceuticals Corp. (n/k/a Hikma Pharmaceuticals USA Inc.) and Hikma Pharmaceuticals, LLC ("West-Ward"), Wockhardt Bio AG, Wockhardt USA, LLC, and Wockhardt Ltd. ("Wockhardt").

- For DRL, ANDA No. 208416;
- For Mylan, ANDA No. 208446;
- For Teva, ANDA Nos. 208432 and 210726;
- For West-Ward, ANDA No. 208339; and
- For Wockhardt, ANDA No. 208380.

6. For the reasons stated in the Court's October 26, 2018 Opinion,* FINAL JUDGMENT is hereby entered under Rule 54(b) of the Federal Rules of Civil Procedure in favor of Amneal, DRL, Mylan, Teva, West-Ward, and Wockhardt as to Plaintiffs' claims for infringement of the '438 patent, and the counterclaims of Amneal, DRL, Mylan, Teva, West-Ward, and Wockhardt for declaratory judgment of invalidity of the '438 patent, in the -5909 action.

7. In the alternative, if the '438 patent were valid, for the reasons stated in the Court's October 26, 2018 Opinion,* FINAL JUDGMENT is hereby entered under Rule 54(b) of the Federal Rules of Civil Procedure in favor of Plaintiffs as to the counterclaims of Amneal, DRL, Mylan, Teva, West-Ward, and Wockhardt for declaratory judgment of non-infringement of the '438 patent, in the -5909 action.

8. For the reasons stated in the Court's October 26, 2018 Opinion,* FINAL JUDGMENT is hereby entered under Rule 54(b) of the Federal Rules of Civil Procedure in favor of Amerigen as to Plaintiffs' claims for infringement of the '438 patent, and the counterclaim of Amerigen for declaratory judgment of invalidity of the '438 patent, in the -2449 action.

9. In the alternative, if the '438 patent were valid, for the reasons stated in the Court's October 26, 2018 Opinion,* FINAL JUDGMENT is hereby entered under Rule 54(b) of the Federal Rules of Civil Procedure in favor of Plaintiffs as to the counterclaim of Amerigen for declaratory judgment of non-infringement of the '438 patent, in the -2449 action.

10. For the reasons stated in the Court's October 26, 2018 Opinion,* FINAL JUDGMENT is hereby entered under Rule 54(b) of the Federal Rules of Civil Procedure in favor of Teva as to Plaintiffs' claim for infringement of the '438 patent, and the counterclaim of Teva for declaratory judgment of invalidity of the '438 patent, in the -6435 action.

11. In the alternative, if the '438 patent were valid, for the reasons stated in the Court's October 26, 2018 Opinion,* FINAL JUDGMENT is hereby entered under Rule 54(b) of the Federal Rules of Civil Procedure in favor of Plaintiffs as to the counterclaim of Teva for declaratory judgment of non-infringement of the '438 patent, in the -6435 action.

* Amended October 31, 2018. (Dkt. 571 in 2:15-cv-5909 and Dkt. 43 in 2:16-cv-2449)

DATED: 10/31/2018

Kevin McNulty

Honorable Kevin McNulty
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BTG INTERNATIONAL LIMITED, et al.,<br><br>Plaintiffs,<br><br>v.<br>AMNEAL PHARMACEUTICALS LLC, et al.,<br><br>Defendants. | Hon. Kevin McNulty, U.S.D.J<br><br>Civil Action No.:<br>2:15-cv-05909-KM-JBC |
| BTG INTERNATIONAL LIMITED, et al.,<br><br>Plaintiffs,<br><br>v.<br>AMERIGEN PHARMACEUTICALS, INC., et al.,<br>Defendants. | Hon. Kevin McNulty<br>Civil Action No.:<br>2:16-cv-02449-KM-JBC |
| BTG INTERNATIONAL LIMITED, et al.,<br><br>Plaintiffs,<br>v.<br>TEVA PHARMACEUTICALS USA, INC.,<br><br>Defendant. | Hon. Kevin McNulty<br><br>Civil Action No.:<br>2:17-cv-06435-KM-JBC |

**[~~PROPOSED~~] ORDER GRANTING PLAINTIFFS' MOTION PURSUANT TO FED. R. CIV. P. 62(c) FOR INJUNCTION PENDING APPEAL**

The Court having concluded that the commercial marketing and sale of Defendants'[1] generic versions of Janssen's ZYTIGA® drug product will cause Plaintiffs irreparable harm, and that Plaintiffs' showing as to likelihood of success on appeal, the balance of hardships, and the public interest are sufficient to merit temporary equitable relief,

IT IS HEREBY ORDERED THAT:

1. Defendants, their officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with the foregoing, including but not limited to all U.S. distribution partners for Defendants' generic version of Janssen's ZYTIGA drug product, are enjoined from the commercial marketing and sale of any and all generic copies of ZYTIGA for 14 days, until midnight, Nov. 9, 2018, or until

[ ] until exhaustion of all appeals from this Court's October 26, 2018 Opinion and Order (Dkt. 560, 561) in the above-captioned case, or until further order of this Court. If Plaintiffs prevail on appeal, the injunction will continue until further order of this Court to allow Plaintiffs an opportunity to seek permanent relief.

[ ] pending the resolution of Plaintiffs' Fed. R. App. P. 8(a) motion for an injunction pending appeal to the U.S. Court of Appeals for the Federal Circuit. This injunction shall remain in full force and effect until resolution of Plaintiffs' Fed. R. App. P. 8(a) motion, or until further order of this Court.

the Federal Circuit renders a decision on a stay pending appeal, whichever is sooner.

[1] Defendants are Amerigen Pharmaceuticals, Ltd., Amerigen Pharmaceuticals, Inc., Amneal Pharmaceuticals LLC, Amneal Pharmaceuticals of New York, LLC, Dr. Reddy's Laboratories, Inc., Dr. Reddy's Laboratories Ltd., Mylan Pharmaceuticals Inc., Mylan Inc., Teva Pharmaceuticals USA, Inc., West-Ward Pharmaceuticals Corp., Hikma Pharmaceuticals, LLC, Wockhardt Bio AG, Wockhardt USA, LLC, and Wockhardt Ltd.

Plaintiff shall not enter into any binding offer for an authorized generic while this order is in effect.

SO ORDERED:

Dated: Oct 30, 2018

Kevin McNulty

Hon. Kevin McNulty, U.S.D.J.

Trials@uspto.gov
571-272-7822

Paper 14
Entered: May 31, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

AMERIGEN PHARMACEUTICALS LIMITED,
Petitioner,

v.

JANSSEN ONCOLOGY, INC.,
Patent Owner.

IPR2016-00286
Patent 8,822,438 B2

Before LORA M. GREEN, RAMA G. ELLURU, and
KRISTINA M. KALAN, *Administrative Patent Judges.*

KALAN, *Administrative Patent Judge.*

# DECISION
## Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

# I. INTRODUCTION

Amerigen Pharmaceuticals Limited ("Petitioner") filed a Petition (Paper 1, "Pet.") to institute an *inter partes* review of claims 1–20 of U.S. Patent No. 8,822,438 B2 (Ex. 1001, "the '438 patent") pursuant to 35 U.S.C. §§ 311–319. Janssen Oncology, Inc. ("Patent Owner") filed a Preliminary Response (Paper 12, "Prelim. Resp."). Applying the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim, we institute an *inter partes* review as to claims 1–20 as discussed below.

Our findings of fact and conclusions of law, including those relating to the broadest reasonable construction of the patent claim terms, are based on the record developed thus far, prior to Patent Owner's Response. This is not a final decision as to the patentability of any challenged claim. Our final decision will be based on the full record developed during trial.

# II. BACKGROUND

## *A. Related Matters*

The parties indicate that the '438 patent is being asserted in a number of District Court proceedings, some of which have been terminated. Pet. 1–2; Paper 6, 2–3. Patent Owner represents that the following proceedings have not been terminated: *BTG Int'l Ltd., et al. v. Actavis Labs. FL, Inc., et al.,* C.A. No. 2:15-cv-05909-KM-JBC (D. N.J.); and *Janssen Biotech, Inc., et al. v. Mylan Pharm. Inc., et al.,* C.A. No. 1:15-cv-00130-IMK (N.D. W. Va.). Paper 13, 2–3. Patent Owner also states that the '438 patent is "the subject of *ex parte* reexamination request No. 90/020,096, which has been assigned to an Office examiner for determination." *Id.* at 2.

*B. The '438 Patent*

The '438 patent, titled "Methods and Compositions for Treating Cancer," describes methods that comprise "administering a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor, such as abiraterone acetate (i.e., 3β-acetoxy-17-(3-pyridyl)androsta-5,16-diene), in combination with at least one additional therapeutic agent such as an anti-cancer agent or a steroid." Ex. 1001, Title, Abstract. As described in the '438 patent, it is believed that testosterone and dihydrotestosterone promote the growth of prostate cancer. *Id.* at 1:49–51. Hormone therapy can be used to suppress the production or block the effects of hormones such as testosterone. *Id.* at 1:43–51. The enzyme 17α-hydroxylase/$C_{17,20}$-lyase ("CYP17") is involved in testosterone synthesis. *Id.* at 3:66–4:1. CYP17 inhibitors have been shown to be useful in the treatment of cancer, specifically, androgen-dependent disorders like prostate cancer. *Id.* at 5:23–27. Abiraterone acetate, a prodrug of abiraterone, is a CYP17 inhibitor. *Id.* at 2:10–12. The '438 patent describes administration of an effective amount of a CYP17 inhibitor, such as abiraterone acetate, with a steroid such as prednisone or dexamethasone. *Id.* at 2:9–3:20.

*C. Claims*

Claim 1 of the '438 patent is reproduced below:

> 1. A method for the treatment of a prostate cancer in a human comprising administering to said human a therapeutically effective amount of abiraterone acetate or a pharmaceutically acceptable salt thereof and a therapeutically effective amount of prednisone.

Ex. 1001, 16:16–20. Dependent claims 2–20 of the '438 patent describe additional limitations of the method, including the amount of abiraterone

acetate and the amount of prednisone used, and the type of prostate cancer being treated. *Id.* at 16:21–17:14.

*D. The Prior Art*

Petitioner relies on the following prior art:

1. O'Donnell, A. et al., *Hormonal impact of the 17α-hydroxylase/ $C_{17,20}$-lyase inhibitor abiraterone acetate (CB7630) in patients with prostate cancer*, British Journal of Cancer 90:2317–2325 (2004) ("O'Donnell") (Ex. 1003);
2. Gerber, G.S. & Chodak, G.W., *Prostate specific antigen for assessing response to ketoconazole and prednisone in patients with hormone refractory metastatic cancer*, J. Urol. 144:1177–79 (1990) ("Gerber") (Ex. 1004); and
3. U.S. Patent No. 5,604,213 to Barrie, issued February 18, 1997 ("Barrie") (Ex. 1005).

Petitioner also relies on the declarations of Scott R. Serels, M.D. (Ex. 1002, the "Serels Declaration") and DeForest McDuff, Ph.D. (Ex. 1017, the "McDuff Declaration") in support of its arguments.

*E. The Asserted Grounds*

Petitioner challenges claims 1–20 of the '438 patent on the following grounds:

| **References** | **Basis** | **Claims Challenged** |
|---|---|---|
| O'Donnell and Gerber | § 103 | 1–20 |
| Barrie and Gerber | § 103 | 1–4 and 6–11 |

## III. ANALYSIS

We turn now to Petitioner's asserted grounds of unpatentability, Patent Owner's arguments in the Preliminary Response, and the supporting evidence

to determine whether Petitioner has met the threshold standard of 35 U.S.C. § 314(a).

*A. Claim Interpretation*

The Board interprets claims in an unexpired patent using the "broadest reasonable construction in light of the specification of the patent in which [they] appear[]." 37 C.F.R. § 42.100(b); *see In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1275–79 (Fed. Cir. 2015), *cert. granted sub nom. Cuozzo Speed Techs. LLC v. Lee*, 136 S. Ct. 890 (mem.) (2016). Under the broadest reasonable interpretation standard, claim terms are given their ordinary and customary meaning in view of the specification, as would be understood by one of ordinary skill in the art at the time of the invention. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

Petitioner proposes that we construe the claim terms "treat," "treating," "treatment," "anti-cancer agent," and "refractory cancer." Pet. 17–19. Patent Owner accepts Petitioner's definitions of those terms. Prelim. Resp. 18. These claim terms are discussed and defined explicitly in the specification of the '438 patent, as noted by Petitioner. Pet. 18. Accordingly, we construe those terms as set forth in the specification and below:

| **Claim term(s)** | **Construction** |
|---|---|
| "treat," "treating," and "treatment | include the eradication, removal, modification, management or control of a tumor or primary, regional, or metastatic cancer cells or tissue and the minimization or delay of the spread of cancer<br>Ex. 1001, 3:46–50 |
| "anti-cancer agent" | any therapeutic agent that directly or indirectly kills cancer cells or directly or |

| | |
|---|---|
| | indirectly prohibits, stops or reduces the proliferation of cancer cells<br>Ex. 1001, 4:8–16 |
| "refractory cancer" | cancer that is not responding to an anti-cancer treatment or cancer that is not responding sufficiently to an anti-cancer treatment<br>Ex. 1001, 4:23–27. |

Patent Owner proposes that we construe the phrase "therapeutically effective amount of prednisone" to mean "an amount of prednisone effective for treating cancer." Prelim. Resp. 19. In support of its proposed construction, Patent Owner points to the definition in the specification, which provides: "As used herein, and unless otherwise defined, the phrase 'therapeutically effective amount' when used in connection with a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor or therapeutic agent means *an amount of the 17α-hydroxylase/ $C_{17,20}$-lyase inhibitor* or *therapeutic agent effective for treating a disease or disorder disclosed herein, such as cancer*." *Id.* at 18–19 (quoting Ex. 1001, 4:17–22) (emphasis by Patent Owner). The specification's definition of "therapeutically effective amount," applies to a therapeutic agent. Ex. 1001, 4:17–22. The specification provides examples of a "therapeutic agent" such as "an anti-cancer agent or a steroid, e.g., a corticosteroid or, more specifically, a glucocorticoid." *Id.* at 1:14–16. Thus, the definition of "therapeutically effective amount" in the specification would apply to prednisone, a glucocorticoid. *Id.* at 3:10–11. Furthermore, claim 1 is directed to "A method for the treatment of a prostate cancer in a human." Ex. 1001, 16:16–17. Based on the definition and discussion the specification, and the manner in which the term is used in the claims, we construe

"therapeutically effective amount of prednisone" as "an amount of prednisone effective for treating prostate cancer."

*B. Grounds Asserted by Petitioner*

*1. Ground Based on O'Donnell and Gerber*

Petitioner challenges claims 1–20 as obvious under 35 U.S.C. § 103 over O'Donnell and Gerber. Pet. 36–48. Patent Owner disputes Petitioner's contentions. Prelim. Resp. 32–44.

O'Donnell, which is titled "Hormonal impact of the 17α-hydroxylase/C17-20-lyase inhibitor abiraterone acetate (CB7630) in patients with prostate cancer," discloses that treatment of prostate cancer with abiraterone acetate, at a dose of 500–800 mg, can successfully suppress testosterone levels. Ex. 1003, Abstract. O'Donnell also discloses that ketoconazole, another CYP17 inhibitor, has been evaluated as a possible agent with which to achieve decreased production of adrenal steroids, but that abiraterone acetate was developed as a more selective inhibitor. *Id.* at 2318. O'Donnell further discloses that adrenocortical suppression may require administration of replacement glucocorticoid. *Id.* at Abstract, 2323. O'Donnell states that "some impact on adrenal reserve was predictable from the steroid synthesis pathway." *Id.* at 2323. Regarding administration of ketoconazole, O'Donnell states that "it is common practice to administer supplementary hydrocortisone" and that this may prove necessary with abiraterone acetate. *Id.* On the basis of the clinical evidence, O'Donnell reports that the need for concomitant therapy of abiraterone acetate with a glucocorticoid needs to be further investigated. *Id.*

Gerber, which is titled "Prostate Specific Antigen for Assessing Response to Ketoconazole and Prednisone in Patients with Hormone

Refractory Metastatic Prostate Cancer," discloses use of ketoconazole, a known CYP17 enzyme inhibitor and inhibitor of gonadal and adrenocortical steroid synthesis, with prednisone to treat patients with progressive prostate cancer. Ex. 1004, 1177. Gerber provides that patients exhibiting progressively increasing prostate specific antigen ("PSA") levels, when treated with ketoconazole and prednisone, experienced a decrease in PSA levels. *Id.* at 1178–79.

Regarding claim 1, Petitioner argues that although O'Donnell does not disclose administration of abiraterone acetate with prednisone, "O'Donnell teaches that concomitant hormone replacement therapy with a glucocorticoid may be needed for continuous use of abiraterone acetate in treating a prostate cancer in a human patient." Pet. 38. Gerber, Petitioner argues, teaches that "the combination of ketoconazole and prednisone is safe and effective in treating human patients with hormone-refractory advanced prostate cancer." *Id.* Thus, Petitioner reasons, the "motivation to add prednisone to a method of treating prostate cancer in a human patient that includes abiraterone acetate is clearly seen in Gerber," which "teaches that the administration of ketoconazole, a CYP17 inhibitor, in combination with 5 mg prednisone twice daily, is safe and effective in treating human patients with hormone-refractory prostate cancer." *Id.* Regarding dependent claims 2–20, Petitioner argues that the additional limitations found in the dependent claims also are obvious over O'Donnell and Gerber. *Id.* at 40. Patent Owner does not separately address Petitioner's arguments directed to the dependent claims.

On this record, we are persuaded by Petitioner's arguments and presentation of the evidence. O'Donnell suggests that co-administration of a glucocorticoid, of which prednisone is one, may be needed in connection

with use of abiraterone acetate. Ex. 1003, 2323. Gerber discloses co-administration of a glucocorticoid, prednisone, with ketoconazole for the safe and effective treatment of prostate cancer. Ex. 1004, 1179. Ketoconazole and abiraterone acetate are both characterized as CYP17 inhibitors. Ex. 1003, 2318; Ex. 1002 ¶¶ 36, 45; *see also* Prelim. Resp. 42, Figs. 1, 2. We are persuaded, on this record, that the relative success of administration of ketoconazole together with prednisone to treat prostate cancer would lead one of ordinary skill in the art to expect that the "addition of 10 mg of prednisone daily according to Gerber to the treatment regimen of O'Donnell would be safe and effective in treating a prostate cancer, including prostate cancer refractory to anticancer therapy, including hormone and anti-androgen therapy." Pet. 39.

Patent Owner argues that Petitioner's challenges to the claims based on O'Donnell and Gerber fail for a number of reasons. First, Patent Owner argues that the prior art does not teach the problem of mineralocorticoid excess. Prelim. Resp. 32. Patent Owner also challenges Petitioner's and Dr. Serels's assertion that administration of abiraterone acetate or ketoconazole causes mineralocorticoid excess. *Id.* at 32–33. Dr. Serels's opinion that one of ordinary skill in the art would have expected that CYP17 inhibition would result in mineralocorticoid excess, according to Patent Owner, is erroneously based on "the experience of individuals with specific and rare forms of complete congenital CYP17 deficiency." *Id.* at 34.

Notwithstanding Patent Owner's arguments that Dr. Serels's reasoning is flawed, we are not persuaded that Dr. Serels's analysis and reliance on certain resources is in error. We can accord appropriate weight to an expert's testimony, taking into account the expert's understanding of the level of skill

in the art at the time of the invention, and the references relied upon in support thereof. *See, e.g.*, *Yorkey v. Diab*, 601 F.3d 1279, 1284 (Fed. Cir. 2010) (holding the Board has discretion to give more weight to one item of evidence over another "unless no reasonable trier of fact could have done so"). Our review of Dr. Serels's declaration and supporting evidence leads us to credit his testimony that "one of skill in the art would have expected that the co-administration of prednisone with abiraterone would improve the safety and tolerability of administering abiraterone by reducing the potential for side effects associated with the administration of a CYP17 inhibitor." Pet. 27–28 (citing Ex. 1002 ¶ 34).

Next, Patent Owner argues that Petitioner fails to establish a motivation to combine the references, because both abiraterone acetate and ketoconazole can be safely administered alone. *Id.* at 37. Only with hindsight, Patent Owner argues, could Petitioner argue that prednisone should be administered with abiraterone acetate. *Id.* at 39. Patent Owner also argues that the prior art teaches away from concomitant administration of abiraterone acetate and prednisone. *Id.* at 44. As discussed above, we are persuaded that Petitioner has articulated a reason to combine the references that, on this record, demonstrates a reasonable likelihood that Petitioner would prevail on its arguments in this regard. We are unpersuaded, on this record, that Petitioner's reasoning demonstrates impermissible hindsight; Petitioner's reasoning incorporates and relies on the knowledge of those of ordinary skill in the art at the time of the invention. *See, e.g.*, *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971) ("Any judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was

within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper."). Nor are we persuaded that that the teachings of the references rise to the level of teaching away from Petitioner's proposed combination – they do not criticize, discredit, or otherwise discourage the solution claimed, but rather, as Petitioner argues, encourage exploration of such a combination. *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) (explaining "[t]he prior art's mere disclosure of more than one alternative does not constitute a teaching away from any of these alternatives because such disclosure does not criticize, discredit, or otherwise discourage the solution claimed"). We are persuaded on the record thus far that Petitioner has demonstrated a reasonable likelihood of prevailing on its obviousness challenge to claim 1.

Claims 2–20 each depend directly or indirectly from claim 1. Petitioner contends these claims are also unpatentable under 35 U.S.C. § 103 based on O'Donnell and Gerber. Pet. 40–48. Concerning these claims, we determine that the supporting evidence demonstrates a reasonable likelihood that Petitioner would prevail in its showing, the substance of which has not been addressed specifically by Patent Owner. In view of the Petition, the Preliminary Response, and the evidence before us, we are persuaded that Petitioner has demonstrated a reasonable likelihood of prevailing on its assertion that claims 1–20 are obvious over O'Donnell and Gerber.

*2. Ground Based on Barrie and Gerber*

Petitioner challenges claims 1–4 and 6–11 as obvious under 35 U.S.C. § 103 over Barrie and Gerber. Pet. 36–45. Patent Owner disputes Petitioner's contentions. Prelim. Resp. 44–46.

Barrie, which is titled "17-Substituted Steroids Useful in Cancer Treatment," is directed to a class of 17-substituted steroids and their use in the treatment of androgen-dependent and estrogen-dependent disorders. Ex. 1005, 1:11–14. Specifically, Barrie discloses abiraterone, acid addition salts and 3-esters of abiraterone, and abiraterone acetate. *Id.* at 5:21–26, 7:23–26, 11:39–55. Barrie discloses that abiraterone acetate may be administered in a method of treating disorders, including prostate cancer, as a pharmaceutical composition comprising a therapeutically effective amount of abiraterone acetate. *Id.* at 10:27–57. Barrie compares the inhibition levels of hormone production by abiraterone acetate with ketoconazole, concluding that the decrease in testosterone levels resulting from administration of abiraterone acetate was much more marked than for ketoconazole. *Id.* at 26:32–38.

Regarding claim 1, Petitioner argues that although Barrie does not disclose co-administering abiraterone acetate with prednisone, it teaches "that abiraterone acetate is a CYP17 inhibitor that is more effective in suppressing testosterone levels in a mammal in vivo than ketoconazole, a CYP17 inhibitor known in the art." Pet. 39. Gerber, Petitioner argues, teaches that "the combination of ketoconazole and prednisone is safe and effective in treating human patients with hormone-refractory advanced prostate cancer." *Id.* Thus, Petitioner reasons, the "motivation to add prednisone to the method of treating prostate cancer of [Barrie] is clearly seen in Gerber," which "teaches that the administration of ketoconazole, a CYP17 inhibitor, in

combination with 5 mg prednisone twice daily, is safe and effective in treating human patients with hormone-refractory prostate cancer." *Id.* Regarding dependent claims 2–4 and 6–11, Petitioner argues that the additional limitations found in the dependent claims also are obvious over Barrie and Gerber. *Id.* at 40–46. Patent Owner does not separately address Petitioner's arguments directed to the dependent claims.

We are persuaded, at this stage of the proceeding, by Petitioner's arguments and presentation of the evidence. Barrie discloses use of abiraterone acetate for the treatment of prostate cancer. Ex. 1005, 1:11–13. Barrie contrasts the performance of ketoconazole with the performance of its disclosed compounds, including abiraterone acetate, in determining the relative activity of the tested compounds. *Id.* at 25:13–26:39, Table 3. Gerber discloses co-administration of a glucocorticoid, prednisone, with ketoconazole for the safe and effective treatment of prostate cancer. Ex. 1004, 1179. Ketoconazole and abiraterone acetate are both characterized as CYP17 inhibitors. Ex. 1002 ¶¶ 36, 45; *see also* Prelim. Resp. 42, Figs. 1, 2. We are persuaded, on this record, that the relative success of administration of ketoconazole together with prednisone to treat prostate cancer would lead one of ordinary skill in the art to expect that the "addition of 5 mg twice daily prednisone to the treatment regimen of [Barrie] also would be safe and effective in treating a prostate cancer, including prostate cancer refractory to anti-cancer therapy, including hormone and anti-androgen therapy." Pet. 39. Notwithstanding Patent Owner's arguments that Dr. Serels's reasoning is flawed, our review of Dr. Serels's declaration and supporting evidence leads us to credit his testimony that "one of skill in the art would have expected that the co-administration of prednisone with abiraterone would improve the

safety and tolerability of administering abiraterone by reducing the potential for side effects associated with the administration of a CYP17 inhibitor." Pet. 27–28 (citing Ex. 1002 ¶ 34).

Patent Owner argues that Petitioner's challenges to the claims based on Barrie and Gerber fail for "all of the same reasons discussed above with respect to the combination of" O'Donnell and Gerber. Prelim. Resp. 44. For the reasons articulated with respect to the combination of O'Donnell and Gerber, above, we are not persuaded by Patent Owner's arguments. Patent Owner also argues that Barrie states that abiraterone acetate did not inhibit corticosterone biosynthesis in rodents, leading one of skill in the art to understand "that abiraterone acetate did not inhibit glucocorticoid production." *Id.* at 45 (citing Ex. 1005, 25:45–48). Patent Owner also states that Barrie does not include clinical trial results, does not mention glucocorticoid replacement, and does not teach that abiraterone acetate could give rise to any side effects, let alone mineralocorticoid excess. *Id.* at 45–46.

The portion of Barrie on which Patent Owner relies states that the compounds of the invention had no significant effect on adrenal weight, "suggesting that they did not inhibit corticosterone biosynthesis." Ex, 1005, 25:45–48. Although this suggestion is present in Barrie, it is insufficiently conclusive to unseat Petitioner's arguments at this stage of the proceeding. The additional alleged shortcomings of Barrie noted by Patent Owner similarly do not unseat Petitioner's arguments, which rely on sources other than Barrie, such as Gerber and the Serels Declaration, to demonstrate the presence of those elements. We are persuaded on the record thus far that Petitioner has demonstrated a reasonable likelihood of prevailing on its obviousness challenge to claim 1.

Claims 2–4 and 6–11 each depend directly or indirectly from claim 1. Petitioner contends these claims are also unpatentable under 35 U.S.C. § 103 based on Barrie and Gerber. Pet. 40–45. Concerning these claims, we determine that the supporting evidence demonstrates a reasonable likelihood that Petitioner would prevail in its showing, the substance of which has not been addressed specifically by Patent Owner. In view of the Petition, the Preliminary Response, and the evidence before us, we are persuaded that Petitioner has demonstrated a reasonable likelihood of prevailing on its assertion that claims 1–4 and 6–11 are obvious over Barrie and Gerber.

*3. Objective Indicia of Non-Obviousness*

Petitioner contends that the Patent Owner may try to rely on secondary considerations of non-obviousness. Pet. 48–59. Patent Owner presents arguments directed to objective indicia of nonobviousness. Prelim. Resp. 46–52. Specifically, Petitioner pre-emptively raises arguments and evidence relating to commercial success, unexpected benefits, long-felt need, the existence of a blocking patent, and copying. Pet. 48–59. Patent Owner presents arguments related to unexpected results, long-felt need, and commercial success. Prelim. Resp. 46–52.

The issue of secondary considerations is highly fact-specific. At this stage of the proceeding, the record regarding such secondary considerations is incomplete. Based on the record before us, we determine that Patent Owner's evidence of secondary considerations is insufficient to preclude trial. Such evidence of secondary considerations should be more fully evaluated in the context of a trial when the ultimate determination of obviousness is made. We conclude that the information presented in the

Petition establishes a reasonable likelihood that the Petitioner will prevail in challenges to claims 1–20 of the ’438 patent.

*4. Patent Owner’s Additional Arguments*

Patent Owner makes several additional arguments in its Preliminary Response, namely: (A) Petitioner fails to meet the requirements of 35 U.S.C. § 311(b), which requires that an IPR challenge can be brought “only on the basis of prior art consisting of patents and printed publications,”; (B) Petitioner’s obviousness arguments are redundant; (C) the Petition should be rejected under 35 U.S.C. § 325(d), which allows the Board to take into account whether the same or substantially the same prior art or arguments previously were presented to the Office; and (D) the Petition is an improper use of the IPR proceeding and/or an abuse of process under 35 U.S.C. §§ 316(a)(6) & 316(b), in that Petitioner is seeking to short circuit the Hatch Waxman process and deprive companies who have complied with ANDA procedure from obtaining the 180 day exclusivity period to which they will be entitled if their court challenges are successful. Prelim. Resp. 52–55. We address these arguments in turn.

*(A) 35 U.S.C. § 311(b)*

A conference call was held to discuss a similar issue on February 16, 2016, and a subsequent Order issued on February 22, 2016. Paper 11. Patent Owner sought to file a motion to exclude the declaration of Petitioner’s expert and related arguments addressing commercial success. *Id.* As we stated in the Order of February 22, 2016: “There is no authority for excluding Petitioner’s arguments and evidence addressing commercial success at the petition stage. Moreover, as Petitioner notes, the petition is the

first and last chance for a petitioner to present its case." *Id.* at 3. We maintain the position articulated in the Order for purposes of this Decision.

*(B) Redundancy*

Our governing statute requires the Director of the Patent and Trademark Office to "prescribe regulations . . . setting forth the standards for the showing of sufficient grounds to institute a review under section 314(a)," and requires the Director to "consider the effect of any such regulation on the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings instituted under this chapter." 35 U.S.C. § 316(a)(2), (b). In view of the considerations listed in 35 U.S.C. § 316(b), the Director prescribed 37 C.F.R. § 42.108, which provides: (1) "the Board may authorize the review to proceed on all or some of the challenged claims and on all or some of the grounds of unpatentability asserted for each claim," and (2) "the Board may deny some or all grounds of unpatentability for some or all of the challenged claims." 37 C.F.R. § 42.108(a), (b). Based on our analysis of the information before us at this point, we decline to exercise our discretion to deny institution based on redundancy.

*(C) 35 U.S.C. § 325(d)*

Patent Owner requests that the Board exercise its discretion under 35 U.S.C. § 325(d) and decline to initiate *inter partes* review of the '438 patent because substantially the same prior art and arguments were before the Examiner during prosecution of the '438 patent. Prelim. Resp. 54–55. Specifically, Patent Owner contends: "Obviousness based on the teachings of O'Donnell (2004) was one of the primary grounds that the Examiner relied on during the prosecution of the '438 Patent" and the argument now

advanced by Petitioner in the context of Gerber "was specifically considered by the Examiner in the context of O'Donnell (2004)." *Id.* at 54.

The permissive language of § 325(d) does not prohibit instituting *inter partes* review based on arguments previously presented to the Office. *See* 35 U.S.C. § 325(d) ("In determining whether to institute or order a proceeding under this chapter, chapter 30, or chapter 31, the Director *may take into account* whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office.") (emphasis added). We are mindful of the burden on Patent Owner and the Office to rehear the same or substantially the same prior art or arguments that were considered previously by the Office. For the reasons discussed herein, however, we are persuaded that Petitioner's arguments with respect to the combinations of O'Donnell and Gerber, and Barrie and Gerber, are supported by the evidence of record at this stage of the proceeding. Therefore, we do not exercise our authority to decline an *inter partes* review of the '438 patent under 35 U.S.C. § 325(d).

*(D) 35 U.S.C. § 316(a)(6) and § 316(b)*

Regarding Patent Owner's argument that the Petition is an improper use of the IPR proceeding and/or an abuse of process, we are mindful of the policy argument advanced by Patent Owner. Notwithstanding its citations to portions of our statute concerning abuse of process and the Director's considerations in prescribing regulations (35 U.S.C. § 316(a)(6) and § 316(b)), however, Patent Owner has demonstrated no statutory basis for a Hatch-Waxman carve-out in the arguments presented. Absent such authority, we decline to find abuse of process in Petitioner's filing of its Petition in this case.

*C. Conclusion*

We conclude that Petitioner has demonstrated a reasonable likelihood of prevailing with respect to its challenge of claims 1–20 of the ’438 patent. We have not made, however, a final determination under 35 U.S.C. § 318(a) with respect to the patentability of the challenged claims.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that *inter partes* review is instituted on the following grounds of unpatentability asserted in the Petition:

Claims 1–20 as obvious under 35 U.S.C. § 103 over O’Donnell and Gerber;

Claims 1–4 and 6–11 as obvious under 35 U.S.C. § 103 over Barrie and Gerber; and

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(a), *inter partes* review of the ’438 patent is hereby instituted commencing on the entry date of this decision, and pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial; and

FURTHER ORDERED that the trial is limited to the grounds identified above, and no other ground set forth in the Petition as to any challenged claim is authorized.

FOR PETITIONER:

William Hare
Gabriela Materassi
McNEELEY HARE & WAR LLP
bill@miplaw.com
materassi@miplaw.com

FOR PATENT OWNER:

Dianne B Elderkin
Barbara L. Mullin
Ruben H. Munoz
AKIN GUMP STRAUSS HAUER & FELD LLP
delderkin@akingump.com
bmullin@akingump.com
rmunoz@akingump.com

Trials@uspto.gov
571-272-7822

Paper 23
Entered: July 21, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

AMERIGEN PHARMACEUTICALS LIMITED,
Petitioner,

v.

JANSSEN ONCOLOGY, INC.,
Patent Owner.

Case IPR2016-00286
Patent 8,822,438 B2

Before LORA M. GREEN, RAMA G. ELLURU, and
KRISTINA M. KALAN, *Administrative Patent Judges.*

KALAN, *Administrative Patent Judge.*

# DECISION
Patent Owner's Request for Rehearing
*37 C.F.R. § 42.71*

# I. INTRODUCTION

Patent Owner Janssen Oncology, Inc. ("Patent Owner") filed a Request for Rehearing (Paper 16, "Req."). In rendering the Decision to Institute (Paper 14, "Dec."), we instituted an *inter partes* review as to claims 1–20 of U.S. Patent No. 8,822,438 B2 (Ex. 1001, "the '438 patent"). In its Request for Rehearing, Patent Owner contends that the Board should grant rehearing and decline to institute *inter partes* review of claims 1–20 of the '438 patent. Req. 1.

For the reasons set forth below, Patent Owner's request for rehearing is *denied*.

# II. ANALYSIS

A request for rehearing must identify specifically all matters the party believes the Board misapprehended or overlooked, and the place where each matter was addressed previously in a motion, an opposition, or a reply. 37 C.F.R. § 42.71(d). The Board applies an abuse of discretion standard in reviewing institution decisions. 37 C.F.R. § 42.71(c).

In its Request for Rehearing, Patent Owner contends that (1) the Decision to Institute ignores Petitioner's admissions that the prior art does not teach or suggest the claim element "a therapeutically effective amount of prednisone" (Req. 5–10); and (2) the Board fails to credit the Patent Office's prior determination of commercial success and Petitioner's admission of unexpected results (*id.* at 10–13). We disagree.

We instituted *inter partes* review on two obviousness grounds asserted by Petitioner in the Petition. Dec. 19. In doing so, we determined that Petitioner had demonstrated a reasonable likelihood of prevailing with respect to its challenge of claims 1–20 of the '438 patent. *Id.* In our

Decision to Institute, we construed the terms "treat," "treating," and "treatment" to "include the eradication, removal, modification, management or control of a tumor or primary, regional, or metastatic cancer cells or tissue and the minimization or delay of the spread of cancer." *Id.* at 5. We construed the phrase "therapeutically effective amount of prednisone" to mean "an amount of prednisone effective for treating prostate cancer." *Id.* at 7.

With respect to its first contention, Patent Owner argues that "every challenged claim requires administering "a therapeutically effective amount of prednisone." Req. 5. Patent Owner argues, therefore, that

> in keeping with its claim construction, in order to conclude that petitioner had demonstrated a reasonable likelihood of prevailing in its obviousness challenge under 35 U.S.C. § 314(a), the Board was required to determine if petitioner is likely to show at trial that the prior art patents and publications relied upon teach or suggest the claimed co-administration including a "therapeutically effective amount of abiraterone acetate," and, separately, "an amount of prednisone effective for treating [*i.e.*, having an *anti-cancer effect on*] prostate cancer.

*Id.* at 6. Patent Owner's related arguments expound on Petitioner's failure to demonstrate that prednisone must have a "therapeutic anti-cancer effect." *Id.* at 7–10.

Although Patent Owner does not advocate for a new claim construction in its Request for Rehearing, its arguments are based on a construction that we have not adopted, namely, that "treating" must mean "having an anti-cancer effect on." *Id.* A Request for Rehearing is not an opportunity to present a new argument about claim construction, notwithstanding its framing as a matter that we addressed in our Decision to Institute. We are

not persuaded by Patent Owner's argument that we should revisit, on rehearing, our determination about the constructions of any terms in view of the arguments presented in the Request for Rehearing. In view of our claim constructions in the Decision to Institute, we considered both Petitioner's and Patent Owner's arguments and determined that Petitioner had demonstrated a reasonable likelihood of prevailing on its assertions. We are unpersuaded that this constitutes an abuse of discretion.

With respect to Patent Owner's second contention, we stated in our Decision to Institute:

> The issue of secondary considerations is highly fact-specific. At this stage of the proceeding, the record regarding such secondary considerations is incomplete. Based on the record before us, we determine that Patent Owner's evidence of secondary considerations is insufficient to preclude trial. Such evidence of secondary considerations should be more fully evaluated in the context of a trial when the ultimate determination of obviousness is made.

Dec. 15.

Patent Owner argues that "the PTO previously determined that the invention of the '438 patent was commercially successful" and that "the preexisting record establishing commercial success is complete." Req. 10–11. We disagree. In an *inter partes* review proceeding, we are not bound by an Examiner's determinations in the prosecution of a patent. To the extent Patent Owner presented evidence that the Examiner had reasons for allowing the claims based on secondary considerations, we have considered that evidence in rendering our Decision to Institute.

In reaching our determination in the Decision to Institute, we acknowledged Patent Owner's arguments regarding secondary

considerations. Dec. 15. Accordingly, we did not overlook these arguments. Nor did we misapprehend Patent Owner's secondary considerations arguments. Our review of secondary considerations took into account pre-emptive arguments raised by the Petitioner as well as Patent Owner's arguments related to unexpected results, long-felt need, and commercial success. *Id.* We found, nevertheless, that Patent Owner's evidence was insufficient to preclude trial, and that Petitioner had established a reasonable likelihood of prevailing on its challenges. *Id.* at 15–16. It is a matter of discretion to proceed or not to proceed with any ground, and Patent Owner has not demonstrated that we abused that discretion.

For the forgoing reasons, Patent Owner has not shown that the Board misapprehended or overlooked any matter in instituting trial in this proceeding.

## III. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Patent Owner's request for rehearing is *denied*.

FOR PETITIONER:

William Hare
Gabriela Materassi
MCNEELEY HARE & WAR LLP
bill@miplaw.com
materassi@miplaw.com

FOR PATENT OWNER:

Dianne B. Elderkin
Barbara L. Mullin
Ruben H. Munoz
AKIN GUMP STRAUSS HAUER & FELD LLP
delderkin@akingump.com
bmullin@akingump.com
rmunoz@akingump.com

Trials@uspto.gov
Tel: 571-272-7822

Paper 86
Entered: January 17, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

AMERIGEN PHARMACEUTICALS LIMITED and
ARGENTUM PHARMACEUTICALS LLC,
Petitioner,

v.

JANSSEN ONCOLOGY, INC.,
Patent Owner.

Case IPR2016-00286[1]
Patent 8,822,438 B2

Before LORA M. GREEN, RAMA G. ELLURU, and
KRISTINA M. KALAN, *Administrative Patent Judges*.

KALAN, *Administrative Patent Judge.*

# FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

[1] Case IPR2016-01317 has been joined with this proceeding.

## I. INTRODUCTION

Amerigen Pharmaceuticals Limited ("Amerigen") filed a Petition (Paper 1, "Pet.") to institute an *inter partes* review of claims 1–20 of U.S. Patent No. 8,822,438 B2 (Ex. 1001, "the '438 patent") pursuant to 35 U.S.C. §§ 311–319. Janssen Oncology, Inc. ("Patent Owner") filed a Preliminary Response (Paper 12, "Prelim. Resp."). We instituted an *inter partes* review of claims 1–20 on certain grounds of unpatentability alleged in the Petition (Paper 14, "Dec.").

Argentum Pharmaceuticals LLC ("Argentum") filed a Petition for *inter partes* review of claims 1–20 of the '438 patent. Case IPR2016-01317, Paper 2. Together with its Petition, Argentum filed a Motion for Joinder to join the case with the previously instituted proceeding in IPR2016-00286. *Id.*, Paper 3. We instituted trial in IPR2016-01317 and joined Argentum as a Petitioner in IPR2016-00286. *Id.*, Paper 9.

After institution of trial, Patent Owner filed a Patent Owner Response (Paper 33, "PO Resp."). Amerigen and Argentum (collectively, "Petitioner") filed a Reply (Paper 60, "Reply"). Pursuant to a Board Order (Paper 68), Patent Owner filed an Identification of New Arguments and Evidence in Petitioner's Reply (Paper 74), to which Petitioner filed a Reply (Paper 78). An oral hearing was held on February 16, 2017. A transcript of the hearing has been entered into the record. Paper 85 ("Tr.").

The Board has jurisdiction under 35 U.S.C. § 6. In this Final Written Decision, issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73, we determine that Petitioner has shown by a preponderance of the evidence that all claims of the '438 patent for which trial was instituted, namely, claims 1–20, are unpatentable.

## II. BACKGROUND

### *A. Related Matters*

The parties indicate that the ’438 patent is being asserted in a number of district court proceedings, some of which have been terminated. Pet. 1–2; Paper 6, 2–3. Patent Owner represents that the following proceedings have not been terminated: *BTG Int’l Ltd. v. Actavis Labs. FL, Inc.,* C.A. No. 2:15-cv-05909-KM-JBC (D.N.J.), *Janssen Biotech, Inc. v. Mylan Pharms. Inc.,* C.A. No. 1:15-cv-00130-IMK (N.D. W. Va.), *BTG Int’l Ltd. v. Amerigen Pharms., Inc.,* C.A. No. 2:16-cv-02449-KM-JBC (D.N.J.), and *BTG Int’l Ltd. v. Glenmark Pharms. Inc., USA*, C.A. No. 2:16-cv-03743-KM-JBC (D.N.J). Paper 57, 2–3.

Patent Owner also states that the ’438 patent was the subject of *ex parte* reexamination request No. 90/020,096, but “will not be granted a filing date for failure to comply with the requirements of 37 C.F.R. § 1.501(a).” Paper 18, 2.

### *B. The ’438 Patent*

The ’438 patent, titled “Methods and Compositions for Treating Cancer,” describes methods that comprise “administering a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor, such as abiraterone acetate (i.e., 3β-acetoxy-17-(3-pyridyl)androsta-5,16-diene), in combination with at least one additional therapeutic agent such as an anti-cancer agent or a steroid.” Ex. 1001, at [54], [57]. As described in the ’438 patent, it is believed that testosterone and dihydrotestosterone promote the growth of prostate cancer. *Id.* at 1:49–51. Hormone therapy can be used to suppress the production or block the effects of hormones such as testosterone. *Id.* at 1:43–51.

The enzyme 17α-hydroxylase/$C_{17, 20}$-lyase ("CYP17") is involved in testosterone synthesis. *Id.* at 3:66–4:1. CYP17 inhibitors have been shown to be useful in the treatment of cancer, specifically, androgen-dependent disorders like prostate cancer. *Id.* at 5:23–27. Abiraterone acetate, a prodrug of abiraterone, is a CYP17 inhibitor. *Id.* at 2:10–12.

The '438 patent describes administration of a therapeutically effective amount of a CYP17 inhibitor, such as abiraterone acetate, with a therapeutically effective amount of at least one additional therapeutic agent including, but not limited to, an anti-cancer agent, such as mitoxantrone, paclitaxel, docetaxel, leuprolide, goserelin, triptorelin, seocalcitol, bicalutamide, or flutamide, or a steroid, such as hydrocortisone, prednisone, or dexamethasone. *Id.* at 2:9–3:20.

*C. Challenged Claims*

Claim 1 of the '438 patent is reproduced below:

> 1. A method for the treatment of a prostate cancer in a human comprising administering to said human a therapeutically effective amount of abiraterone acetate or a pharmaceutically acceptable salt thereof and a therapeutically effective amount of prednisone.

Ex. 1001, 16:16–20. Dependent claims 2–20 of the '438 patent describe additional limitations of the method, including the amount of abiraterone acetate and the amount of prednisone used and the type of prostate cancer being treated. *Id.* at 16:21–17:14.

*D. Prior Art References Relied Upon by Petitioner*

Petitioner relies on the following prior art:

1. O'Donnell, A. et al., *Hormonal impact of the 17α-hydroxylase/ $C_{17, 20}$-lyase inhibitor abiraterone acetate (CB7630) in patients with prostate cancer*, 90 British Journal of Cancer 2317–25 (2004) ("O'Donnell") (Ex. 1003);

2. Gerber, G.S. & Chodak, G.W., *Prostate specific antigen for assessing response to ketoconazole and prednisone in patients with hormone refractory metastatic prostate cancer*, 144 J. Urol. 1177–79 (1990) ("Gerber") (Ex. 1004); and
3. U.S. Patent No. 5,604,213 to Barrie, issued February 18, 1997 ("Barrie") (Ex. 1005).

*E. Instituted Grounds of Unpatentability*

We instituted *inter partes* review of claims 1–20 of the '438 patent on the following grounds:

| **References** | **Basis** | **Claims Challenged** |
|---|---|---|
| O'Donnell and Gerber | § 103 | 1–20 |
| Barrie and Gerber | § 103 | 1–4 and 6–11 |

In support of its challenges, Petitioner relies on the declarations of Scott R. Serels, M.D. (Ex. 1002; Ex. 1095), DeForest McDuff, Ph.D. (Ex. 1017; Ex. 1096), Mark J. Ratain, M.D. (Ex. 1091), and Richard Dorin, M.D. (Ex. 1093). Patent Owner relies on the declarations of Matthew Rettig, M.D. (Ex. 2038), Richard Auchus, M.D., Ph.D. (Ex. 2040), Gerald Walter Chodak, M.D. (Ex. 2042), and Christopher A. Vellturo, Ph.D. (Ex. 2044).

## III. ANALYSIS

*A. Claim Interpretation*

The Board interprets claim terms in an unexpired patent according to the broadest reasonable construction in light of the specification of the patent in which they appear. *See Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation standard); 37 C.F.R. § 42.100(b). Under that standard, and absent any special definitions, we give claim terms their ordinary and customary meaning as

would be understood by one of ordinary skill in the art at the time of the invention. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definitions for claim terms must be set forth with reasonable clarity, deliberateness, and precision. *See In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Only those terms which are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Ltd.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'") (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

With respect to claim interpretation, "[u]sually [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1149 (Fed. Cir. 2012) (citations omitted). "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Thorner v. Sony Computer Entm't Am. LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012) (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)).

Petitioner proposes that we construe the claim terms "treat," "treating," "treatment," "anti-cancer agent," and "refractory cancer." Pet. 17–19. Those claim terms are discussed and defined explicitly in the specification of the '438 patent, as noted by Petitioner. *Id.* at 18; Ex. 1001, 3:31–5:5. In our Decision on Institution, we construed those terms, as well as the term "therapeutically effective amount of prednisone" as follows:

| **Claim term(s)** | **Construction** |
|---|---|
| "treat," "treating," and "treatment" | include the eradication, removal, modification, management or control of a tumor or primary, regional, or metastatic cancer cells or tissue and the minimization or delay of the spread of cancer<br>Ex. 1001, 3:46–50 |
| "anti-cancer agent" | any therapeutic agent that directly or indirectly kills cancer cells or directly or indirectly prohibits, stops or reduces the proliferation of cancer cells<br>Ex. 1001, 4:8–16 |
| "refractory cancer" | cancer that is not responding to an anti-cancer treatment or cancer that is not responding sufficiently to an anti-cancer treatment<br>Ex. 1001, 4:23–27. |
| "therapeutically effective amount of prednisone" | an amount of prednisone effective for treating prostate cancer |

Patent Owner, in its Response, states that our Decision on Institution properly construed "a therapeutically effective amount of prednisone" and the terms "treat," "treating," and "treatment." PO Resp. 8.

Patent Owner also submitted a claim construction of the terms "treatment" and "treating" by the district court in a companion litigation. Ex. 2122. The district court, after a lengthy analysis, construed the disputed terms as follows: "*Treatment/treating* means the eradication, removal, modification, management or control of a tumor or primary, regional, or metastatic cancer cells or tissue and the minimization or delay of the spread of cancer." *Id.* at 30. The district court read out of the definition the term "includes." *Id.* Although we are not bound by the district court's reasoning

and claim constructions in related proceedings, we do not disregard the determinations of a court interpreting the same claim term in a related patent in a concurrent proceeding. *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1326–27 (Fed. Cir. 2015) ("The fact that the board is not generally bound by a previous judicial interpretation of a disputed claim term does not mean, however, that it has no obligation to acknowledge that interpretation or to assess whether it is consistent with the broadest reasonable construction of the term."). Thus, although we acknowledge and have considered the district court's interpretation, we retain our broadest reasonable construction of the terms "treat," "treatment," and "treating."

We see no reason to modify our claim construction positions in light of the record developed at trial, and we maintain our claim constructions from the Decision on Institution for the purposes of this Decision. No other claim terms have been presented to us for construction following institution of trial, and we determine that no other claim terms require express construction.

*B. Principles of Law*

A claim is unpatentable under 35 U.S.C. § 103[2] if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying

[2] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. § 103. Because the '438 patent has an effective filing date before the effective date of the applicable AIA amendments, throughout this Decision we refer to the pre-AIA versions of 35 U.S.C. § 103.

factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). A decision on the ground of obviousness must include "articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006). The obviousness analysis "should be made explicit" and it "can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *KSR*, 550 U.S. at 418. We analyze the asserted grounds of unpatentability in accordance with the above-stated principles.

*C. Level of Skill in the Art*

We adopt Petitioner's contention that a person of ordinary skill in the art

> would be a physician specializing in urology or oncology, or holding a Ph.D. in pharmacology, biochemistry or a related discipline. Additional experience could substitute for the advanced degree. To the extent necessary, one of skill in the art may collaborate with one or more other persons of skill in the art for one or more aspects with which the other person may have expertise, experience and/or knowledge that was obtained through his or her education, industrial or academic experiences. For example, one of skill may consult with an enzymologist and/or molecular biologist and thus may rely on the opinions of such specialists in evaluating the claims.

Pet. 7 (citations omitted). Patent Owner does not appear to dispute Petitioner's definition in its Patent Owner Response. *See generally* PO Resp. The level of ordinary skill in the art in this case is further demonstrated by

the prior art asserted in the Petition. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

*D. Overview of the Prior Art*

*1. O'Donnell*

O'Donnell, which is titled "Hormonal impact of the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor abiraterone acetate (CB7630) in patients with prostate cancer," discloses that treatment of prostate cancer with abiraterone acetate, at a dose of 500–800 mg, can successfully suppress testosterone levels. Ex. 1003, Abstract. O'Donnell also discloses that ketoconazole, another CYP17 inhibitor, has been evaluated as a possible agent with which to achieve decreased production of adrenal steroids, but that abiraterone acetate was developed as a more selective inhibitor. *Id.* at 2318. O'Donnell further discloses that adrenocortical suppression may require administration of replacement glucocorticoid. *Id.* at Abstract, 2323. O'Donnell states that "[s]ome impact on adrenal reserve was predictable from the steroid synthesis pathway." *Id.* at 2323. Regarding administration of ketoconazole, O'Donnell states that "it is common practice to administer supplementary hydrocortisone" and that this may prove necessary with abiraterone acetate. *Id.* On the basis of the clinical evidence, O'Donnell reports that the need for concomitant therapy of abiraterone acetate with a glucocorticoid needs to be further investigated. *Id.*

*2. Gerber*

Gerber, which is titled "Prostate Specific Antigen for Assessing Response to Ketoconazole and Prednisone in Patients with Hormone Refractory Metastatic Prostate Cancer," discloses use of ketoconazole, a known CYP17 enzyme inhibitor and inhibitor of gonadal and adrenocortical

steroid synthesis, with prednisone to treat patients with progressive prostate cancer. Ex. 1004, 1177. Gerber provides that patients exhibiting progressively increasing prostate specific antigen ("PSA") levels, when treated with ketoconazole and prednisone, experienced a decrease in PSA levels. *Id.* at 1178–79. Based on its study, Gerber concludes that "there appears to be a small subgroup of patients with progressive prostate cancer despite hormonal therapy who will derive significant benefit from the combination of ketoconazole and glucocorticoid replacement therapy." *Id.* at 1179.

*3. Barrie*

Barrie, which is titled "17-Substituted Steroids Useful in Cancer Treatment," is directed to a class of 17-substituted steroids and their use in the treatment of androgen-dependent and estrogen-dependent disorders. Ex. 1005, 1:11–14. Specifically, Barrie discloses abiraterone, acid addition salts and 3-esters of abiraterone, and abiraterone acetate. *Id.* at 5:21–26, 7:23–26, 11:39–55. Barrie discloses that abiraterone acetate may be administered in a method of treating disorders, including prostate cancer, as a pharmaceutical composition comprising a therapeutically effective amount of abiraterone acetate. *Id.* at 10:27–57. Barrie compares the inhibition levels of hormone production by abiraterone acetate with ketoconazole, concluding that the decrease in testosterone levels resulting from administration of abiraterone acetate was much more marked than for ketoconazole. *Id.* at 26:32–38.

*E. Obviousness Analysis*

*1. Petitioner's Arguments*

Petitioner argues, generally, that it was "known that in using a CYP17 inhibitor to reduce testosterone synthesis, the CYP17 inhibitor also undesirably suppressed the production of cortisol, a glucocorticoid." Pet. 6 (citing Ex. 1002 ¶¶ 32, 34, 48). Cortisol is "necessary for other biochemical cycles in the body and its reduced production caused adverse effects, including hypertension, hypokalemia (decrease in circulating potassium levels), and fluid retention." *Id.* Administration of a CYP17 inhibitor to suppress androgen synthesis results in the "undesired side effect" that "cortisol production is compromised (*e.g.,* reduced), which interferes with the negative feedback mechanism that usually maintains cortisol levels within the normal physiological range." *Id.* at 26. Petitioner also argues that it was "known that CYP17 inhibition of cortisol increased ACTH drive (*i.e.*, increased ACTH production), which resulted in a corresponding increase in mineralocorticoids," leading to mineralocorticoid excess. *Id.* (citing Ex. 1002 ¶ 31). It was general knowledge in the art, Petitioner argues, "to administer a glucocorticoid, such as prednisone or hydrocortisone, to a patient with ACTH drive, such as a patient administered a CYP17 inhibitor, to reduce ACTH drive, and consequently, reduce mineralocorticoid excess." *Id.* (citing Ex. 1002 ¶ 32).

*a. Ground Based on O'Donnell and Gerber*

Petitioner challenges claims 1–20 as obvious under 35 U.S.C. § 103 over O'Donnell and Gerber. Pet. 36–48.

Regarding claim 1, Petitioner argues that O'Donnell teaches "that abiraterone acetate is a selective CYP17 inhibitor that is more effective in

suppressing testosterone levels in a mammal *in vivo* than ketoconazole, a CYP17 inhibitor known in the art." Pet. 37 (citing Ex. 1003, 2138, 2322, 2323, 2325). Petitioner further argues that, although O'Donnell does not disclose administration of abiraterone acetate with prednisone, "O'Donnell teaches that concomitant hormone replacement therapy with a glucocorticoid may be needed for continuous use of abiraterone acetate in treating a prostate cancer in a human patient." *Id.* at 38 (citing Ex. 1003, Abstract, 2323). Gerber, Petitioner argues, teaches that "the combination of ketoconazole and prednisone is safe and effective in treating human patients with hormone-refractory advanced prostate cancer." *Id.* at 38–39 (citing Ex. 1004, Abstract, 1177–79).

Regarding motivation to combine, Petitioner reasons that the "motivation to add prednisone to a method of treating prostate cancer in a human patient that includes abiraterone acetate is clearly seen in Gerber," which "teaches that the administration of ketoconazole, a CYP17 inhibitor, in combination with 5 mg prednisone twice daily, is safe and effective in treating human patients with hormone-refractory prostate cancer." *Id.* at 38. One of ordinary skill in the art, Petitioner argues, would have combined abiraterone acetate and prednisone "with a reasonable expectation of success because the prior art taught abiraterone acetate as a more effective CYP17 inhibitor than ketoconazole and the combination of ketoconazole and prednisone as safe and effective to treat patients with hormone refractory metastatic prostate cancer." *Id.* at 7 (citing Ex. 1002 ¶¶ 45–49).

Claims 2–20 each depend directly or indirectly from claim 1. Petitioner contends these claims are also unpatentable under 35 U.S.C. § 103 based on O'Donnell and Gerber. *Id.* at 40–48.

*b. Ground Based on Barrie and Gerber*

Petitioner challenges claims 1–4 and 6–11 as obvious under 35 U.S.C. § 103 over Barrie and Gerber. Pet. 36–45.

Regarding claim 1, Petitioner argues that Barrie teaches "that abiraterone acetate is a selective CYP17 inhibitor that is more effective in suppressing testosterone levels in a mammal in vivo than ketoconazole, a CYP17 inhibitor known in the art." Pet. 37, 39 (citing Ex. 1005, 25:13–26:63). Gerber, Petitioner argues, teaches that "the combination of ketoconazole and prednisone is safe and effective in treating human patients with hormone-refractory advanced prostate cancer." *Id.* at 39 (citing Ex. 1004, Abstract, 1177–79).

Petitioner reasons that the "motivation to add prednisone to the method of treating prostate cancer of [Barrie] is clearly seen in Gerber," which "teaches that the administration of ketoconazole, a CYP17 inhibitor, in combination with 5 mg prednisone twice daily, is safe and effective in treating human patients with hormone-refractory prostate cancer." *Id.* (citing Ex. 1004, Abstract, 1177–79). Thus, one of ordinary skill in the art would have combined abiraterone acetate and prednisone "with a reasonable expectation of success because the prior art taught abiraterone acetate as a more effective CYP17 inhibitor than ketoconazole and the combination of ketoconazole and prednisone as safe and effective to treat patients with hormone refractory metastatic prostate cancer." *Id.* at 7 (citing Ex. 1002 ¶¶ 45–49).

Claims 2–4 and 6–11 each depend directly or indirectly from claim 1. Petitioner contends these claims are also unpatentable under 35 U.S.C. § 103 based on Barrie and Gerber. *Id.* at 40–45.

*2. Patent Owner's Non-Obviousness Arguments*

Patent Owner presents a series of arguments directed to the art relied upon in both of Petitioner's grounds, arguments directed to the reasons to combine the prior art, and arguments related to objective indicia of non-obviousness. PO Resp. 12–65. We address each in turn.

*a. Patent Owner's First Argument*

Patent Owner argues, first, that the "central premise of Petitioner's flawed arguments is that abiraterone acetate and ketoconazole act in the same manner and would have been assumed to have the same hormonal side effects." PO Resp. 13. Rather, Patent Owner argues, "ketoconazole and abiraterone acetate have very different mechanisms of action and do not act in the same way," and these differences "mean that a POSA would not have translated the clinical experience with ketoconazole to abiraterone acetate." *Id.* (citing Ex. 2038 ¶¶ 103, 122–23; Ex. 2090, 2413–14, Ex. 2018, 90; Ex. 1020, 544). Because "abiraterone acetate was understood *not* to suppress production of *all* adrenal steroids" and because "abiraterone acetate was not a 'potent inhibitor' of glucocorticoids," one of ordinary skill in the art "would not have found it appropriate to simply apply the clinical experience with ketoconazole, including its side effects, and methods of managing those side effects, to abiraterone acetate." *Id.* at 15–17 (citing Ex. 2038 ¶¶ 103–04).

Patent Owner argues next that O'Donnell confirms that abiraterone acetate allows cortisol to be made in normal levels in patients, unlike ketoconazole. *Id.* at 17. In view of the data in O'Donnell, Patent Owner argues, a person of ordinary skill in the art would have understood "that there was no need for glucocorticoid replacement therapy" and that the decision to give glucocorticoid replacement would not have been made lightly. *Id.*

at 18–19 (citing Ex. 1003, 2322–23; Ex. 2038 ¶¶ 107–15; Ex. 2040 ¶¶ 13–15, 30–35, 59–62). Regarding the Synacthen test administered in O'Donnell, Patent Owner argues that these results "lack any significance" because, *inter alia,* the Synacthen test "only measures a patient's cortisol levels in response to stress." *Id.* at 20–21 (citing Ex. 2040 ¶¶ 27–29, 31–34).

Patent Owner argues, finally, that Barrie confirms that abiraterone acetate acts differently from ketoconazole. *Id.* at 22. Barrie reports that administration of ketoconazole to mice caused an increase in adrenal weight, whereas administration of abiraterone acetate resulted in no significant effect in adrenal weight, indicating that "abiraterone acetate acts differently from ketoconazole and its mechanism of action was much more selective." *Id.* at 22–23 (citing Ex. 2040 ¶ 45; Ex. 1005, 25:46–48).

Petitioner agrees that the prior art "including Barrie and O'Donnell, disclose that (1) the CYP 17 enzyme has two separate activities in the adrenal androgen synthesis pathway, a 17α-hydroxylase and a C 17,20 lyase activity, and (2) [abiraterone acetate] is a more selective and potent inhibitor of both CYP 17 activities than ketoconazole." Reply 2–3. Petitioner, nevertheless, replies that one of ordinary skill in the art "would have expected that cortisol deficiency from administration of [abiraterone acetate] to treat prostate cancer would diminish adrenal reserve and potentially cause adrenal insufficiency (AI), particularly during times of physiological stress." *Id.* at 3–4 (citing Ex. 1003, 2323; Ex. 1093 ¶¶ 20–24).

Petitioner further replies that O'Donnell "expressly states that the administration of AA to treat a patient with prostate cancer may require co-administration of a glucocorticoid as replacement therapy based on abnormal cortisol responses in *all* patients in Study C." *Id.* at 5 (citing Ex. 1003, 2321,

2323). Petitioner challenges Patent Owner's "attempts to argue that [O'Donnell's] clear statements do not actually mean what they say" and Patent Owner's arguments that a person of ordinary skill in the art would have "disregarded [O'Donnell's] unequivocal teachings, performed their own analysis of the underlying data, and reached a contrary conclusion." *Id.*

Based on the information presented during trial, we understand that ketoconazole and abiraterone acetate do not have identical mechanisms. *See, e.g.,* Ex. 1003, 2318, Figure 1. As noted by both Petitioner and Patent Owner, however, abiraterone acetate and ketoconazole are both CYP17 inhibitors. PO Resp. 5; Reply 2. Both parties appear to agree that, based on their respective mechanisms of action, administration of ketoconazole would inhibit production of cortisol, and administration of abiraterone acetate inhibits one of the pathways of cortisol production. Pet. 29; Tr. 28:19–24; Ex. 1003, 2318. Patent Owner agrees that abiraterone acetate "inhibits cortisol to an extent." Tr. 29:10–14. Although Patent Owner urges us to focus on the differences in the mechanisms of operation of ketoconazole and abiraterone acetate (PO Resp. 13–17), we look not only at the differences, but also at the similarities.

The evidence demonstrates that one of ordinary skill would have been aware of the differences and the similarities in the mechanisms and, nevertheless, would have compared and analogized between the two. *See, e.g.,* Tr. 14:20–15:5; Ex. 1003, 2318, Figure 1; Ex. 1188, 168:22–169:23. Both O'Donnell and Barrie refer to ketoconazole in their discussions of abiraterone acetate, indicating that teachings regarding ketoconazole administration were a starting point for exploration of abiraterone acetate administration. Ex. 1003, 2318; Ex. 1005, Table 1. For example, O'Donnell,

after evaluating ketoconazole as an agent, turns to an evaluation of abiraterone acetate as a more selective CYP17 inhibitor, i.e., as an improvement on ketoconazole. Ex. 1003, 2318. After presenting the results from its studies, O'Donnell discusses that, in the clinical use of ketoconazole, "it is common practice to administer supplementary hydrocortisone" and that, therefore, "further studies with abiraterone acetate will be required to ascertain if concomitant therapy with glucocorticoid is required on a continuous basis, at times of physiological stress, if patients become symptomatic or indeed at all." *Id.* at 2323. This statement represents the proposition that one of ordinary skill in the art would use the example of ketoconazole's clinical use to take the next investigative steps with abiraterone acetate. We have not been presented with evidence that dissuades us from taking this statement at face value. Patent Owner's expert testified that ketoconazole, as "an inhibitor of steroid biosynthesis that had been used at that point," was a basis for comparison: "When you write scientific papers, you always like to make comparisons with what is known and explain why your results are different or the same or what the caveats are. And I think that's setting up . . . to understand what comes next, why they did this experiment." Ex. 1188, 169:15–23. Thus, we are persuaded that one of ordinary skill in the art would understand that both ketoconazole and abiraterone are CYP17 inhibitors, albeit with different mechanisms. With this knowledge, and given the teachings of the prior art on administration of ketoconazole and administration of abiraterone acetate, we find that one of ordinary skill in the art would look to the administration of ketoconazole for guidance on how to administer abiraterone acetate.

Regarding the interpretation of O'Donnell's Synacthen test, we do not agree with Patent Owner that the results "lack any significance." *See* PO Resp. 20. We are persuaded that one of ordinary skill in the art would understand the results of this test to be an indicator that something was amiss with the O'Donnell Study C patients' cortisol levels following administration of abiraterone acetate. Results of the Synacthen test led O'Donnell to conclude that further studies were needed to determine whether glucocorticoid replacement would be necessary. Ex. 1003, 2323. We understand Patent Owner's position that the "Synacthen test results in O'Donnell do not give a complete picture of a patient's glucocorticoid production." PO Resp. 21. We, however, do not perceive that a complete picture of a patient's glucocorticoid production is required for one of ordinary skill in the art to be motivated to explore whether glucocorticoid replacement therapy was necessary. Petitioner's experts opine that O'Donnell's results for the Study C patients were "unquestionably abnormal" and implied that abiraterone acetate could result in chronic cortisol deficiency "for which glucocorticoid replacement therapy could be required." Reply 6–7 (citing Ex. 1093, 22, 68; Ex. 1023, 1245). We credit this testimony as supporting Petitioner's argument that one of ordinary skill in the art, upon reviewing O'Donnell's Synacthen test results and statement regarding impact on adrenal reserve, would not conclude that they lack any significance; rather, they would conclude that they are significant enough to merit further investigation of administration of abiraterone acetate with glucocorticoids.

*b. Patent Owner's Second Argument*

Patent Owner argues that there is no prior art evidence that ketoconazole causes mineralocorticoid excess. PO Resp. 23. Gerber does

not mention mineralocorticoid excess, Patent Owner argues, nor do any of the prior art references relied upon by Petitioner's expert, Dr. Serels. *Id.* at 24–25. Rather, Patent Owner argues, one of ordinary skill in the art would expect that ketoconazole's suppression of "all adrenal steroid synthetic pathways" would lead to a mineralocorticoid reduction. *Id.* at 26 (citing Ex. 2040 ¶¶ 36, 38; Ex. 2067, 585). Patent Owner also argues that there is no prior art evidence that abiraterone acetate would cause mineralocorticoid excess. *Id.* at 26. Neither Barrie nor O'Donnell, Patent Owner notes, measures mineralocorticoid excess. *Id.*

Patent Owner argues, finally, that even if mineralocorticoid excess was a problem, it would not be treated with prednisone. *Id.* at 28. Rather, contends Patent Owner, it would be treated with other readily available drugs, such as eplerenone, anti-hypertensives, diuretics, and potassium supplements. *Id.* at 28–29 (citing Ex. 2038 ¶ 155–56; Ex. 2040 ¶¶ 61–62; Ex. 2066, 84–85; Ex. 2037, 211:8–20).

Petitioner replies that mineralocorticoid excess is predictable from abiraterone acetate's mechanism of action. Reply 4, 7, 10. Petitioner argues that one of ordinary skill in the art would have expected that abiraterone acetate suppression of steroid synthesis "downstream of CYP 17 would increase adrenal steroids upstream of CYP17, including mineralocorticoids such as DOC and weak glucocorticoids such as corticosterone." *Id.* at 4 (citing Ex. 2040 ¶ 33; Ex. 1188, 126:10–129:4; Ex. 1093 ¶ 25). Petitioner further argues that a person of ordinary skill in the art "would have considered, by analogy, the clinical presentation of patients with combined congenital CYP 17 deficiency for guidance with respect to the anticipated clinical symptoms and appropriate options for managing such symptoms in

patients administered AA to treat mCRPC" as Patent Owner's expert, "Dr. Auchus, has opined outside of this proceeding." *Id.* (citing Ex. 1085, 508; Ex. 1188, 126:10–129, 4; Ex. 1023, 1243–45, Fig. 1; Ex. 1002 ¶¶ 31–32; Ex. 1093 ¶¶ 24–25). Analogizing in this manner to congenital CYP17 deficiency (*id.*), Petitioner replies that low-dose glucocorticoid replacement therapy was the "cornerstone of therapeutic management of symptoms" in patients with combined congenital CYP17 deficiency. *Id.* at 11. Petitioner also disputes that the readily available drugs identified by Patent Owner would address the underlying cortisol deficiency, criticizing eplerenone as "new" and "inadvisable" and mineralocorticoid antagonists as "counterproductive and dangerous." *Id.* at 11–12.

On the record before us, Petitioner has reasonably established that one of ordinary skill in the art would have looked at mineralocorticoid production in the CYP17 inhibition scheme to assess the possibility of mineralocorticoid imbalance in the administration of abiraterone acetate. *See* Ex. 1002 ¶¶ 31–32; Ex. 1093 ¶¶ 25. In addition, Petitioner has reasonably established that one of ordinary skill in the art would have analogized to congenital CYP17 deficiency to assess the possibility of mineralocorticoid excess in patients administered abiraterone acetate. *See* Ex. 1002 ¶ 31–32; Ex. 1085, 508; Reply 4. Even though the analogy is not necessarily perfect or complete, an analogy to the problems arising from a congenital CYP17 deficiency likely would shed light on CYP17 inhibition in other, non-congenital situations. *Id.* We are not persuaded that the lack of explicit discussion of mineralocorticoid excess in Barrie, Gerber, or O'Donnell would discourage the analogy.

Patent Owner argues that Dr. Serels's conclusion that ketoconazole would cause mineralocorticoid excess was incorrect. PO Resp. 24.

However, we do not understand Petitioner's argument for motivation to combine to be premised on this assertion alone. *See* Pet. 6, 26, 37–39. Dr. Serels's response that he now fully appreciates that "mineralocorticoid excess would not occur with ketoconazole" does not change his opinion that "cortisol deficiency would have been expected to have significant negative clinical impact in mCRPC patients treated with abiraterone" or that one of ordinary skill in the art "would have been motivated to co-administer a glucocorticoid, and in particular prednisone, as a first choice to suppress predicted ACTH drive in patients administered abiraterone acetate to treat mCRPC." Ex. 1095 ¶ 10. Additionally, the existence of alternative treatments for mineralocorticoid excess, as discussed by Patent Owner, does not persuade us that one of ordinary skill in the art would employ these alternatives to the exclusion of prednisone. Rather, we are persuaded by Petitioner's argument that the better option for a typically high-risk, elderly population would have been co-administration of glucocorticoid replacement therapy. Reply 12 (citing Ex. 1093 ¶¶ 20–24, 26–27, 34–35).

*c. Patent Owner's Third Argument*

Patent Owner argues that the prior art "discouraged the use of glucocorticoids in prostate cancer therapy unless they were clinically needed" and that a person of ordinary skill in the art "would have avoided prescribing them unless there was a clear and compelling clinical need warranting their use." PO Resp. 29–30. First, Patent Owner argues, use of glucocorticoids such as prednisone was avoided due to their many negative side effects, such

as osteoporosis, immunosuppression, and hypertension, which are particularly detrimental to patients with mCRPC. *Id.* at 30 (citing Ex. 2038 ¶ 124; Ex. 2040 ¶ 60; Ex. 2068, 239, 242; Ex. 2069, 139). Second, Patent Owner argues that the prior art taught that prednisone could fuel the prostate cancer by indiscriminately binding to and activating the androgen receptor. *Id.* at 32 (citing Ex. 2038 ¶ 132; Ex. 2024, Abstract).

Petitioner replies that Patent Owner's expert, outside of this proceeding, has opined that "low-dose prednisone with [abiraterone acetate] is not associated with the adverse safety profile sometimes seen when treating other malignancies and autoimmune disorders with therapeutic glucocorticoid doses." Reply 10 (citing Ex. 1086, Abstract, 1235; Ex. 1188, 153:22–154:10). Moreover, Petitioner replies, the concern with side effects from long-term administration of glucocorticoids would not have been a factor "because of the short survival prospects for patients with mCRPC (less than two years) and the enhanced risk of immediate and potentially fatal consequences if glucocorticoid replacement therapy was not co-administered." *Id.* (citing Ex. 1091 ¶ 40; Ex. 1093 ¶¶ 23, 28, 29). Petitioner also argues that Patent Owner's proposed alternative options, such as another mineralocorticoid antagonist, spironolactone, potassium canrenoate, or eplerenone, were unstudied and/or dangerous. *Id.* at 11–12. Thus, "the prudent option to manage the predictable impact on adrenal reserve would have been co-administration of glucocorticoid replacement therapy." *Id.* at 12 (citing Ex. 1093 ¶¶ 20–24, 26–27, 34–35).

We find that the prior art does not discourage or teach away from administration of prednisone to mCRPC patients. The teachings of the references do not rise to the level of teaching away from Petitioner's

proposed combination—they do not criticize, discredit, or otherwise discourage the solution claimed, but rather, as Petitioner argues, encourage exploration of such a combination. *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) (explaining "[t]he prior art's mere disclosure of more than one alternative does not constitute a teaching away from any of these alternatives because such disclosure does not criticize, discredit, or otherwise discourage the solution claimed"). Although glucocorticoids have certain risks, we are not persuaded that those risks outweigh the positive effects in seriously ill patients with limited life expectancy, such that a person of ordinary skill in the art would have been dissuaded from administering glucocorticoids to a mCRPC patient. We have sufficient evidence before us that the risks of glucocorticoid therapy were known, that the longevity of mCRPC patients was short, that glucocorticoid therapy was reasonably well tolerated in the short term, and that any long-term side effects would have been viewed by one of ordinary skill in the art in light of the same. Thus, we are persuaded that one of ordinary skill in the art would not have been dissuaded from administering abiraterone acetate with prednisone, but rather, would have been motivated to co-administer prednisone with abiraterone acetate.

*d. Patent Owner's Fourth Argument*

Patent Owner argues that Petitioners "misled the Panel" regarding the prior art's teachings about the use of ketoconazole and prednisone, in that Gerber does not teach any "relative success of administration of ketoconazole together with prednisone." PO Resp. 33–34. First, Patent Owner argues that Gerber did not establish that co-administration of ketoconazole and prednisone is a safe and effective treatment for prostate cancer. *Id.* at 34. Patent Owner criticizes Gerber as not being akin to a clinical trial and as

providing "minimal, if any, guidance with respect to efficacy in the treatment of prostate cancer." *Id.* at 35. Second, Patent Owner argues that the intervening prior art between 1990 and 2006 taught that ketoconazole and prednisone therapy was not a safe and effective treatment for prostate cancer. *Id.* at 37. In the early 2000s, Patent Owner argues, Phase II and III studies had failed to show any survival benefit in mCRPC, and in 2006, ketoconazole was considered a "last resort" therapy for patients who had failed to meet all other available options. *Id.*

Petitioner maintains that Gerber and other teachings in the art demonstrate that co-administration of ketoconazole and prednisone is safe and effective to treat prostate cancer. Reply 1, 9. Petitioner replies that Gerber teaches that "ketoconazole 'as a single agent has limited use'" but a subgroup of mCRPC patients may "derive significant benefit" from the "combination of ketoconazole and physiological glucocorticoid replacement therapy." *Id.* at 9 (quoting Ex. 1004, 1179).

We disagree that Petitioner's arguments and evidence are misleading. Gerber, despite the fact that it was not a Phase III trial, nevertheless is a peer-reviewed article published in a reputable journal, indicating that treatment with ketoconazole and prednisone demonstrated some degree of success in a group of patients. Tr. 9:10–14. O'Donnell (2004), which is later in time than Gerber (1990), corroborates that in the clinical use of ketoconazole, it is "common practice" to administer supplementary hydrocortisone. Ex. 1003, 2323. Patent Owner's argument that ketoconazole was a "last resort" does not undercut the teachings of Gerber, or Gerber's demonstration that the combination of ketoconazole and prednisone worked for some patients, in which it was reasonably well tolerated, considering the circumstances.

Ex. 1002 ¶¶ 33–35; Ex. 1004, 1079. Gerber reasonably stands for the proposition that administration of ketoconazole and prednisone is tolerated and effective in a subset of patients, and at the time it was published, indicated some measure of efficacy for certain mCRPC patients. The prior art demonstrating use of ketoconazole with a glucocorticoid for advanced prostate cancer would have informed one of ordinary skill in the art that this was a possible approach to treatment.

*2. Patent Owner's Arguments as to Petitioner's Failure to Meet Its Burden*

*a. Motivation to Combine*

Patent Owner argues that (1) O'Donnell does not provide a motivation to use prednisone with abiraterone acetate to treat prostate cancer; (2) Barrie does not provide a motivation to use prednisone with abiraterone acetate to treat prostate cancer; and (3) Gerber does not provide a motivation to use prednisone with abiraterone acetate to treat prostate cancer. PO Resp. 39–43. Regarding O'Donnell, Patent Owner argues that, given the differences in the mechanism of action between ketoconazole and abiraterone acetate, one of ordinary skill in the art "would not have translated the clinical experience with ketoconazole to abiraterone acetate." *Id.* at 40. Regarding Barrie, Patent Owner argues that Barrie "says nothing about glucocorticoid replacement or prednisone with any of the many compounds disclosed." *Id.* at 42. Regarding Gerber, Patent Owner argues that Petitioner's "flawed syllogism is scientifically inaccurate" and "misrepresents the state of the art at the time of the invention." *Id.* at 43. Additionally, Patent Owner argues

that the prior art taught, as a whole, that for the clinical use of abiraterone acetate, glucocorticoid replacement was not required. *Id.*

In both its grounds, Petitioner states that the "motivation to add prednisone to a method of treating prostate cancer in a human patient that includes abiraterone acetate is clearly seen in Gerber," which "teaches that the administration of ketoconazole, a CYP17 inhibitor, in combination with 5 mg prednisone twice daily, is safe and effective in treating human patients with hormone-refractory prostate cancer." Pet. 38. Thus, the absence of alleged motivation in Barrie does not change the analysis of whether Gerber provides motivation to combine. For the first ground based on O'Donnell, Petitioner further states that "concomitant hormone replacement therapy with a glucocorticoid may be needed for continuous use of abiraterone acetate in treating a prostate cancer in a human patient." *Id.* Regarding O'Donnell, we are persuaded, as we have discussed above, that one of ordinary skill in the art would have translated the clinical experience with ketoconazole to abiraterone acetate. Regarding Gerber, we are persuaded, as we have discussed above, that Petitioner has neither presented a scientifically inaccurate syllogism, nor misrepresented the state of the art at the time of the invention. Thus, we are persuaded that Petitioner has met its burden to demonstrate motivation to combine.

*b. Reasonable Expectation of Success*

Patent Owner argues that, based on the prior art, one of ordinary skill in the art "had no reasonable expectation of success in arriving at the '438 patented invention." PO Resp. 45. More particularly, Patent Owner argues that Petitioner has not met its burden to establish that the prior art "provides a reasonable expectation that prednisone could be used for 'the eradication,

removal, modification, management or control of a tumor or primary, regional, or metastatic cancer cells or tissue and the minimization or delay of the spread of cancer.'" *Id.* at 46. In making this argument, Patent Owner does not contest, but does discuss, our claim constructions of "therapeutically effective amount of prednisone," as well as "treat," "treating," and "treatment." PO Resp. 45–46. Our construction of "treat," "treating," and "treatment" comes directly from the specification: these terms "include the eradication, removal, modification, management or control of a tumor or primary, regional, or metastatic cancer cells or tissue and the minimization or delay of the spread of cancer." We construed "therapeutically effective amount of prednisone" as "an amount of prednisone effective for treating prostate cancer," which invokes the term "treating."

The specification is directed to the administration of abiraterone acetate with "at least one additional therapeutic agent, *such an as anti-cancer agent or a steroid*." Ex. 1001, 1:10–12 (emphasis added). Therefore, the specification identifies, as therapeutic agents, both anti-cancer agents and steroids (the specification does not explicitly define "therapeutic agent"). The specification explicitly defines "anti-cancer agent" as "any therapeutic agent that directly or indirectly kills cancer cells or directly or indirectly prohibits, stops or reduces the proliferation of cancer cells." *Id.* at 4:8–16; *see also supra* (construing "anti-cancer agent"). The specification lists many examples of anti-cancer agents. *See, e.g.,* Ex. 1001, 3:17–18 (listing mitoxantrone, paclitaxel, docetaxel, leuprolide, goserelin, triptorelin, seocalcitol, bicalutamide, and flutamide), 7:43–51 (listing hormone ablation agents, anti-androgen agents, differentiating agents, anti-neoplastic agents, kinase inhibitors, anti-metabolite agents, alkylating agents, *antibiotic agents,*

immunological agents, interferon-type agents, intercalating agents, growth factor inhibitors, cell cycle inhibitors, enzymes, topoisomerase inhibitors, biological response modifiers, mitotic inhibitors, matrix metalloprotease inhibitors, genetic therapeutics, and anti-androgens) (emphasis added), 9:53–10:11. Thus, as set forth by the specification, antibiotic agents are one example of anti-cancer agents. *Id.* at 7:46. The specification lists examples of antibiotic agents, and includes in this list dexamethasone, corticosteroids such as hydrocortisone, *prednisone*, and prednisolone. *Id.* at 9:30–46. Therefore, prednisone, as an antibiotic agent, is an anti-cancer agent, according to the specification.

The specification does not explicitly define "steroid." The specification lists a few examples of steroids, namely, "corticosteroids or glucocorticoids" (*id.* at 10:16–17), "hydrocortisone, *prednisone*, or dexamethasone" (*id.* at 3:19–20, 10:20–21 (emphasis added)), and "prednisolone" (*id.* at 10:35). In discussing administration of steroids, the specification provides that the "amount of the steroid administered to a mammal having cancer is an amount that is sufficient to *treat* the cancer whether administered *alone* or in combination with a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor." *Id.* at 10:21–24 (emphasis added).

The specification, therefore, appears to make a distinction between anti-cancer agents, on the one hand, and steroids, on the other hand. They are treated in the specification as two different categories of therapeutic agents. *See id.* at 3:15–20 ("a therapeutically effective amount of at least one additional anti-cancer agent, such as, but not limited to, mitoxantrone, paclitaxel, docetaxel, leuprolide, goserelin, triptorelin, seocalcitol,

bicalutamide, flutamide, or a steroid including, but not limited to, hydrocortisone, prednisone, or dexamethasone.”).

The anti-cancer agent exemplars in the specification have an anti-cancer effect, as that term is defined. The four steroid examples given (dexamethasone, hydrocortisone, prednisone, and prednisolone), which are identified as antibiotic agents and therefore anti-cancer agents, presumably have an anti-cancer effect. However, because steroids are discussed separately from anti-cancer agents in the specification, they are treated differently than anti-cancer agents: the identified steroids are anti-cancer agents, but they also are treated by the specification as a different category of therapeutic agents. Although steroids may have anti-cancer effects, as suggested by the evidence we have before us in the specification, the specification does not foreclose that they may also have other therapeutic effects. It would make little sense for the specification to identify the four steroid examples given as anti-cancer agents, and then to address them again as steroids, if these four steroid examples did not have an effect apart from an anti-cancer effect.

Treatment, according to the ’438 specification, therefore, can include eradication of a tumor, as would be expected of an anti-cancer agent. Treatment, however, need not exclude other effects that may be provided by steroids. Treatment by steroids can also refer to the other treatments that are “included” in the construction of “treat,” “treating,” and “treatment,” such as management or control of a tumor, cancer cells or tissue, and minimization or delay of the spread of cancer. “As a patent law term of art, ‘includes’ means ‘comprising.’” *SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1284 (Fed. Cir. 2005) (citations omitted). The terms “management” and

"control" in the definition also do not foreclose that the terms "treat," "treatment," or "treating" may refer to different effects derived from administration of steroids, apart from anti-cancer effects, such as palliative effects.

We construed "therapeutically effective amount of prednisone" as "an amount of prednisone effective for treating prostate cancer." Thus, because "treating" can "include" a number of actions, prednisone may be used to "treat" prostate cancer, perhaps by an anti-cancer effect, or perhaps by some other mechanism. Thus, we determine that Petitioner has met its burden that the prior art provides a reasonable expectation that prednisone could be used as a therapeutic agent in the treatment of prostate cancer.

*c. Unpredictability of Drug Combination Therapy*

Patent Owner argues that the unpredictability of drug combination therapy "precludes a finding that a reasonable expectation of success with abiraterone acetate and prednisone can be gleaned from the prior art Gerber disclosure of ketoconazole and prednisone." PO Resp. 49.

Claim 1, which is directed to the administration of abiraterone acetate and prednisone, does not require a particular result. It does require a "therapeutically effective amount" of each component, but as we have discussed above, the claim language does not require any unexpectedly synergistic anti-cancer results. Moreover, although ketoconazole and prednisone do not meet Patent Owner's measure of "success," Gerber and other art nevertheless disclose its effective administration to a subset of patients. Therefore, Patent Owner's reasonable expectation of success argument, viewed in light of the language of the challenged claims and the evidence of record, does not convince us that the Petitioner has not

established by a preponderance of the evidence a reasonable expectation of achieving the method for treatment of a prostate cancer in a human recited by the challenged claims.

*d. Hindsight*

Finally, Patent Owner argues that Petitioner's attempt to "narrow the problem to be solved at the time of the invention by focusing on the use of abiraterone acetate to treat prostate cancer" is a "legally improper use of hindsight." PO Resp. 52. Patent Owner characterizes the field of treatment strategies for prostate cancer as much broader, and focused on docetaxel-based chemotherapy regimens. *Id.* at 51–52.

We are unpersuaded, based on the evidence before us on the full record, that Petitioner's reasoning demonstrates impermissible hindsight. *See, e.g., In re McLaughlin,* 443 F.2d 1392, 1395 (CCPA 1971) ("Any judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper."). Although the thrust of the research in the relevant area at the relevant time may have focused on different approaches to prostate cancer, the art cited by Petitioner discloses that some research focused on use of a CYP17 inhibitor with glucocorticoids to treat prostate cancer. This persuades us that Petitioner's reasoning incorporates and relies on the knowledge of those of ordinary skill in the art at the time of the invention, notwithstanding Patent Owner's arguments that this research was overshadowed by a different line of investigation.

*3. Objective Indicia of Non-Obviousness*

In its Petition, Petitioner contends that the Patent Owner may try to rely on secondary considerations of non-obviousness. Pet. 48–59. Specifically, the Petition raises arguments related to commercial success, unexpected results, long-felt need, the existence of a blocking patent, and copying. *Id.*

In its Response, Patent Owner presents arguments directed to objective indicia of nonobviousness. PO Resp. 53–60. Patent Owner argues that the objective indicia of non-obviousness demonstrate: 1) skepticism and the failure of others; 2) unexpected results; 3) the claimed invention has met a long-felt need; and 4) the claimed invention has achieved significant commercial success. *Id.* at 53–65.

In its Reply, Petitioner presents arguments related to commercial success and unexpected results. Reply 12–23.

Factual inquiries for an obviousness determination include secondary considerations based on evaluation and crediting of objective evidence of nonobviousness. *Graham*, 383 U.S. at 17. Secondary considerations may include any of the following: long-felt but unsolved needs, failure of others, unexpected results, commercial success, copying, licensing, and praise. *Id.* The totality of the evidence submitted may show that the challenged claims would not have been obvious to one of ordinary skill in the art. *In re Piasecki*, 745 F.2d 1468, 1471–72 (Fed. Cir. 1984). Before we make our final obviousness determination, we must consider the evidence of obviousness anew in light of any evidence of secondary considerations of nonobviousness presented by Patent Owner. *See Graham*, 383 U.S. at 17–18 ("Such secondary considerations as commercial success, long felt but

unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."); *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012) ("This objective evidence must be 'considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art.'" (quoting *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39 (Fed. Cir. 1983))).

All types of objective evidence of nonobviousness must be shown to have a nexus to the claimed invention. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) (nexus generally); *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996) (commercial success); *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (unexpected results); *Rambus Inc. v. Rea*, 731 F.3d 1248, 1256 (Fed. Cir. 2013) (long-felt need). The stronger the showing of nexus, the greater the weight accorded the objective evidence of nonobviousness. *See Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 306 (Fed. Cir. 1985).

*a. Skepticism and the Failure of Others*

Patent Owner describes the history of abiraterone acetate development as a series of starts and stops. PO Resp. 53–54. The sponsor of the research described in O'Donnell, according to Patent Owner, lost interest and shuttered the development program by 1999. *Id.* No clinical data concerning abiraterone acetate was published until O'Donnell in 2004. *Id.* at 54. During this time, other potential therapeutic agents and regimens for prostate cancer were investigated without success. *Id.* at 54–55. Petitioners do not present

any arguments directed to skepticism and the failure of others. *See* Petition *passim;* Reply *passim.*

"Evidence of industry skepticism weighs in favor of non-obviousness. If industry participants or skilled artisans are skeptical about whether or how a problem could be solved or the workability of the claimed solution, it favors non-obviousness." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1335 (Fed. Cir. 2016).

Based on Patent Owner's evidence, it does appear that abiraterone acetate was viewed with some skepticism until the application for the '438 patent was filed in 2006. However, abiraterone acetate was also previously patented in 1997 (Barrie), and therefore at least some in the industry had overcome their skepticism sufficiently to undertake research on and to seek a patent on the invention of abiraterone acetate alone. Moreover, the claims at issue are directed to the combination of abiraterone acetate with prednisone, whereas Patent Owner's arguments are directed to the purported skepticism of the industry toward abiraterone acetate alone, which falls short of establishing a nexus between skepticism of the industry and the challenged claims. Finally, the "failure of others" argument as it relates to the combination of abiraterone acetate with prednisone may have come about as a result of other factors, such as a blocking patent (Barrie), as we discuss more fully below. Thus, we determine that these factors do not weigh in favor of patentability of the challenged claims.

*b. Unexpected Results*

Patent Owner asserts that unexpected results are demonstrated by the Phase I/II study in which abiraterone acetate was administered as a monotherapy and also together with dexamethasone, a glucocorticoid. PO

Resp. 55–56 (citing Ex. 2015). In this study, "unexpectedly, when a glucocorticoid was added to the treatment regimen after a patient stopped responding to abiraterone acetate monotherapy, many of the patients started responding again, regardless of whether that patient's disease had worsened while on glucocorticoids in the past." *Id.* at 56. Patent Owner presents a table comparing abiraterone acetate monotherapy to abiraterone acetate administered with dexamethasone (in clinical trial COU-AA-001, from Ex. 2015) and to abiraterone acetate administered with prednisone (in clinical trial COU-AA-002, from Ex. 2017) to argue that patients given abiraterone acetate with prednisone responded for more than twice as long on average as those given abiraterone acetate alone. *Id.* at 58–59. Patent Owner concludes that it was "extraordinarily unexpected" that, in Phase III trials, "the combination further demonstrated an unexpected survival benefit in patients with advanced prostate cancer." *Id.* at 59.

In the Petition, Petitioner argues that the prednisone administered in the approved indication for Zytiga (the trademark for abiraterone acetate) is intended as hormone replacement therapy, not as an anti-cancer therapy, and therefore, one of ordinary skill in the art would not expect the combination of prednisone and abiraterone acetate to yield "any additionally clinically significant anti-cancer benefit." Pet. 53. To the extent that co-administration of prednisone with abiraterone acetate "made treatment of prostate cancer with abiraterone safer and/or more tolerable, this greater safety and/or tolerability was expected." *Id.* at 56. In the Reply, Petitioner argues that the Response (1) does not compare the closest prior art (O'Donnell and/or Barrie); (2) draws conclusions from irrelevant data and makes improper comparisons; (3) ignores its own data that shows the combination of

abiraterone acetate and prednisone is not better; and (4) ignores the data that prednisone may contribute to drug resistance to abiraterone acetate. Reply 12–19.

Regarding Patent Owner's comparison of abiraterone acetate monotherapy with abiraterone acetate/dexamethasone therapy, we agree with Petitioner that from those studies Patent Owner is "drawing the conclusion that there is an unexpected result of abiraterone acetate with prednisone. But the claims are to prednisone. Not to dexamethasone." Tr. 22:10–13. Although dexamethasone and prednisone are both glucocorticoids (Tr. 45:14–16), Patent Owner does not point us to any evidence as to why the ordinary artisan would consider dexamethasone and prednisone to be interchangeable for the purpose of comparing results. Because the claims cover prednisone, and not any other glucocorticoid, the results of the combination of dexamethasone with abiraterone acetate are of limited use, as we are not informed of the similarities or differences of the mechanism of action of those glucocorticoids or how the mechanism leads to the asserted unexpected results.

Moreover, to the extent the table purportedly compares the abiraterone acetate monotherapy to abiraterone acetate administered with prednisone, the table compares the abiraterone acetate monotherapy administered in clinical trial COU-AA-001 with the abiraterone acetate administered with prednisone in clinical trial COU-AA-002, without explaining or accounting for the differences between the two trials. *Cf.* Tr. 42:15–43:3.

We determine that there is insufficient evidence that the alleged unpredictable and unexpected results of abiraterone acetate and prednisone are objective indicia of nonobviousness of the challenged claims. Patent

Owner does not sufficiently tie the allegedly unpredictable and unexpected result to the administration of abiraterone acetate and prednisone as claimed. Thus, we determine this consideration does not weigh in favor of the patentability of the challenged claims.

*c. Long-Felt Need*

According to Patent Owner, prior to the invention claimed in the ’438 patent, “mCRPC was considered incurable and the prognosis for men with the disease was dismal,” and thus, “there was an urgent need for new agents that would improve survival.” PO Resp. 59–60.

In the Petition, Petitioner argues that “the combination of abiraterone acetate and prednisone satisfied no long-felt need beyond what abiraterone may have done,” because (1) “any success of Zytiga® that is not a result of the claimed invention is irrelevant to secondary considerations”; (2) “the combination of abiraterone acetate and prednisone does not produce unexpected results in anti-cancer benefit”; and (3) “the perception among clinicians is that the requirement to coadminister prednisone with Zytiga is a drawback to its use to treat prostate cancer.” Pet. 56–57 (citing Ex. 1017 ¶¶ 31–35; Ex. 1002 ¶¶ 74, 80, 83, 85).

We determine that, although drugs that contribute to increasing cancer patient survival rates nearly always satisfy a long-felt need, Patent Owner has not presented sufficient evidence that a specific long-felt need existed for the method of administering abiraterone acetate and prednisone claimed in the ’438 patent. Abiraterone acetate’s availability (and underutilization) for approximately a decade prior to issuance of the ’438 patent undermines Patent Owner’s argument that a long-felt need existed for any regimen based on abiraterone acetate. The record also indicates that, although there were

drawbacks to the existing drugs, there were other drugs on the market that were available to prostate cancer patients. Ex. 1017 ¶ 33; Ex. 2038 ¶ 196. We are not satisfied that long-felt need is necessarily objective indicia of nonobviousness of the challenged claims. Thus, we determine this consideration is neutral regarding the patentability of the challenged claims.

*d. Commercial Success*

Patent Owner argues that "ZYTIGA® therapy has been an outstanding commercial success, with U.S. sales reaching $1.07 billion in 2015 alone." PO Resp. 60. Patent Owner criticizes Dr. McDuff's declaration, which "contends that ZYTIGA®'s commercial success is of limited 'economic relevance' due to other factors" as a "mischaracterization of the evidence regarding commercial success of ZYTIGA®." *Id.* To support its argument, Patent Owner presents evidence of market share. Tr. 55:19–23 (citing Ex. 2044 ¶¶ 39–43). Patent Owner also presents evidence that abiraterone acetate is administered together with prednisone at least 89% of the time. *Id.* (citing Ex. 2044 ¶ 47; Ex. 2095).

In its Petition, discussing the prosecution history, Petitioner argues that the information presented to the Examiner "fails to show any nexus between the claimed combination and the commercial performance of Zytiga®." Pet. 50. Petitioner also argues that (1) applicants "adduced no evidence that a market consisting only of 'post chemo' mCRPC patients is the appropriate relevant market;" (2) "recent market data demonstrate a steep and continuous decline in Zytiga's market share post-Xtandi launch;" and (3) "any commercial success of Zytiga® is likely due to the effectiveness of abiraterone acetate in treating prostate cancer." *Id.* at 50–51. Petitioner further argues that the existence of a blocking patent (here, Barrie) limits the

applicability of any evidence of commercial success to overcome a prima facie case of obviousness. *Id.* at 57 (citing *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1376–77 (Fed. Cir. 2005)). In its Reply, Petitioner reiterates (1) the significance of the Barrie patent as a blocking patent and (2) that Petitioner fails to establish any causal nexus to the '438 claims. Reply 20–22. Petitioner also argues that the market performance of Zytiga heavily derives from factors other than the subject matter of the '438 patent, such as patient convenience. *Id.* at 22–23; Tr. 20:6–11. Petitioner does not materially dispute the $1.07 billion annually in sales figure.

"When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention." *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997); *WBIP,* 829 F.3d at 1329. That presumption of nexus, however, is rebuttable, as "a patent challenger may respond by presenting evidence that shows the proffered objective evidence was 'due to extraneous factors other than the patented invention.'" *WBIP*, 829 F.3d at 1329 (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387, 1393 (Fed. Cir. 1988)).

There is no real dispute that Zytiga is commercially successful in terms of dollar figures. PO Resp. 60. However, as discussed herein, abiraterone acetate was previously known and patented. Ex. 1005. "Where 'market entry by others was precluded [due to blocking patents], the inference of non-obviousness of [the asserted claims], from evidence of commercial success, is weak.'" *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 740 (Fed. Cir. 2013) (quoting *Merck & Co.*, 395 F.3d at 1377). Even if the Barrie patent

were "available for licensing and was actively shopped around to other companies" between 2000 (after which a previous license expired) and 2004 (when the predecessor of Patent Owner took a license), the record evidence does not indicate that those efforts in this span of time remove the deterrent effect of the blocking patent. PO Resp. 64 (citing Ex. 2044 ¶ 36; Ex. 2005 ¶ 8); Tr. 47:1–7. Thus, although the revenues generated by Zytiga are substantial, the commercial success of Zytiga is mitigated by the existence of a blocking patent. We are persuaded, rather, by Petitioner's argument that the blocking patent would have deterred others from exploring the commercial potential of abiraterone acetate, and thus, that blocking patent to abiraterone acetate limits the applicability of other evidence of commercial success.

We also note Petitioner's argument that there is no nexus between the commercial success and the claimed invention, in that the record evidence attributes Zytiga's commercial success to abiraterone acetate, rather than to the combination of abiraterone acetate and prednisone. Reply 21–23. In this case, if the feature that created the commercial success was known in the prior art, i.e., abiraterone acetate, the success is not pertinent to the issue of obviousness. *Galderma Labs.*, 737 F.3d at 740. As the Zytiga prescribing information indicates, the stated purpose of co-administration of prednisone or "a corticosteroid" is reducing the incidence of adverse reactions due to CYP17 inhibition. Ex. 1018, 3–6 ("[c]o-administration of a corticosteroid" suppresses ACTH drive, resulting in a reduction in the incidence and severity of adverse reactions such as hypertension, hypokalemia, and fluid retention as a consequence of increased mineralocorticoid levels resulting from CYP17 inhibition); Ex. 1019, 2–3 (co-administration of a corticosteroid suppresses

the ACTH drive, reducing the incidence and severity of mineralocorticoid adverse reactions). Also, this literature's discussion of a corticosteroid generally contradicts the specific anti-cancer role of prednisone argued by Patent Owner. As discussed in the prescribing literature, and as supported by Petitioner's expert testimony here, Zytiga's anti-cancer effects come from abiraterone acetate. Ex. 1002 ¶¶ 68–70, 74–78. We are unpersuaded that there is a nexus between the commercial method, namely, the administration of abiraterone acetate and prednisone, and any novel features of the claimed method. Petitioner has demonstrated that both abiraterone acetate and prednisone were known in the prior art. Patent Owner's assertions that the combination of these features drove Patent Owner's increased sales do not demonstrate a nexus between any commercial success and the claimed invention of the '438 patent.

Thus, on this record, it is not clear whether the sales of Zytiga are due to the method recited in the '438 patent, or the known and patented abiraterone acetate itself. Consequently, we cannot conclude from the evidence before us that the commercial success of Zytiga was due to the merits of the invention recited in the claims of the '438 patent. Accordingly, we determine that Petitioner presents sufficient evidence to rebut the presumption of nexus between the commercial success of Zytiga and the claimed method. We, therefore, are not persuaded that Patent Owner's evidence of commercial success supports the nonobviousness of the challenged claims.

*4. Summary*

As detailed above, the secondary considerations of nonobviousness raised by Patent Owner are neutral or not in favor of the patentability of the

challenged claims, and do not outweigh the other *Graham* factors in our obviousness analysis. We determine, therefore, that Petitioner has demonstrated that the preponderance of the evidence of record supports that it would have been obvious to the ordinary artisan at the time of invention to combine Gerber with either O'Donnell or Barrie, with a reasonable expectation of success of achieving the method of challenged claim 1. We also have considered Petitioner's arguments and evidence as to dependent claims 2–20, which reasoning we adopt as our own. We are persuaded, based on those arguments, that Petitioner has demonstrated by a preponderance of the evidence that those claims would have been obvious based on the combination of Gerber and O'Donnell (for claims 2–20) and Gerber and Barrie (for claims 2–4 and 6–11). *See* Pet. 40–48; Ex. 1002 ¶¶ 50–66.

*F. Motion to Exclude*

Patent Owner filed a Motion to Exclude (Paper 70), to which Petitioner responded (Paper 76) and to which Patent Owner filed a Reply (Paper 79). The party moving to exclude evidence bears the burden of proof to establish that it is entitled to the relief requested, e.g., that the material sought to be excluded is inadmissible under the Federal Rules of Evidence. *See* 37 C.F.R. §§ 42.20(c), 42.62(a).

Patent Owner seeks to exclude Exhibits 1017, 1017 [B-1 and B-2], 1032, 1040–67, 1088, 1091 ¶¶ 23–29, 32–34, 42, 44–46 and 72–74, 1092, 1093 ¶ 13, 1094, 1097–1156, 1160–63, 1165–73, and 1175–90. Paper 70, 14. Patent Owner seeks to exclude these exhibits as (a) expert declarations and exhibits that Patent Owner alleges are outside of the scope of the prior art permitted by 35 U.S.C. § 311(b); (b) exhibits that Petitioner belatedly filed in connection with the Reply and declarations; (c) sections of Petitioner's Reply

declarations that are not cited in the briefs, and therefore irrelevant and prejudicial; and (d) exhibits that lack authenticity or violate the hearsay rule. *Id.* at 1.

Petitioner responds that (a) Exhibits 1017 and 1096 (currently 1152) and related exhibits cited therein are proper reply evidence; (b) Exhibits to the Reply Brief filed and served after midnight should not be stricken; (c) Patent Owner has cited no authority for its position that an uncited paragraph should be stricken; and (d) Exhibits 1040, 1041, 1048, 1049, 1051–53, 1055–57, 1088, 1128, 1130, 1140, and 1166, as well as 1017 [B-1 and B-2], 1032, 1042–44, 1058–63, 1067, and 1140, have been authenticated, and Exhibits 1042–44, 1055, 1056, 1058–63, and 1067 are not hearsay under FRE 803. Paper 76, 1–9.

Because we do not expressly rely upon Exhibits 1017 [B-1 and B-2], 1032, 1040–67, 1088, 1092, 1094, 1097–1151, 1153–56, 1160–63, 1165–73, and 1175–87, 1189, and 1190 in this Decision, Patent Owner's Motion to Exclude need not be decided as to these exhibits. Accordingly, Patent Owner's Motion to Exclude is dismissed as moot as to these Exhibits. Below, we address concerns regarding Exhibits 1017, 1096 (1152), 1091, 1093, and 1188.

We disagree that Exhibit 1017 (Dr. McDuff's first declaration) should be excluded. We do not construe Petitioner's preliminary arguments concerning secondary considerations to be a ground on which this proceeding is based. 35 U.S.C. § 311(b). We further credit Petitioner's argument that "the Patent Owner itself attempted to claim commercial success as an objective indicia of non-obviousness in Patent Owner's Response." Paper 76, 2. We also disagree that Exhibit 1092 (Dr. McDuff's second

declaration, in fact Exhibit 1152) is inadmissible pursuant to 37 C.F.R. § 42.123(b), or that it is improper reply evidence. Petitioner may submit evidence with its Reply in support of Petitioner's properly responsive arguments. *Belden Inc. v. Berk-Tek LLC,* 805 F.3d 1064, 1078 (Fed. Cir. 2015). In particular, Petitioner also notes that the second McDuff Declaration, now labeled as Exhibit 1152, was cited to as Exhibit 1096 in the Reply and, thus, was in fact cited to in the Reply. Paper 76, 3. The most recent Exhibit List filed by Petitioner indicates that Exhibit 1096 is "Reserved" and Exhibit 1152 is in fact the second declaration of Dr. McDuff. Paper 75, 18. We find that Exhibits 1017 and 1096 (1152) are properly part of the record.

Regarding Exhibit 1188, a late action will be excused either on a showing of good cause or upon a Board decision that consideration on the merits would be in the interests of justice. 37 C.F.R. § 42.5(c)(3). This rule must be construed to secure the just, speedy, and inexpensive resolution of every proceeding. 37 C.F.R. § 42.1(b). Weighing the prejudice to Petitioner of the delay in filing Exhibit 1188 against the prejudice to Petitioner of not considering Exhibit 1188, we determine that it would be in the interests of justice to excuse Petitioner's late action. We note that there is no statutory bar in this instance, and that Petitioner filed the Reply and certain primary supporting documents in a timely manner, and sought to obtain Patent Owner's leave to retroactively extend the deadline for filing the reply by one day, which Patent Owner declined. Paper 76, 4–5.

Regarding the portions of Exhibits 1091 and 1093 that were not specifically cited in Petitioner's reply, we disagree with Patent Owner that we should exclude these portions. In our proceedings, "[e]vidence consists of

affidavits, transcripts of depositions, documents, and things. All evidence must be filed in the form of an exhibit." 37 C.F.R. § 42.63(a). An exhibit "must be filed with the first document in which it is cited." 37 C.F.R. § 42.6(c). The Reply, as filed, references Exhibits 1091 and 1093 in its List of Exhibits. Paper 62, 10. Exhibits 1091 and 1093 were filed along with the Reply. We find the reference to the Declaration adequate to support the "cited" requirement in 37 C.F.R. § 42.6(c). We are unaware of any legal basis for striking uncited paragraphs of an expert declaration. Thus, the portions of Exhibits 1091 and 1093 sought to be excluded are not inadmissible, and we shall not exclude them as such.

Accordingly, Patent Owner's Motion to Exclude is *denied* as to Exhibits 1017, 1096 (1152), 1091 ¶¶ 23–29, 32–34, 42, 44–46 and 72–74, 1093 ¶ 13, and 1188 and *dismissed* as to Exhibits 1017 [B-1 and B-2], 1032, 1040–67, 1088, 1092, 1094, 1097–1151, 1153–56, 1160–63, 1165–73, and 1175–87, 1189, and 1190.

*G. Motion to Seal*

Patent Owner filed a number of documents in this proceeding as "Parties and Board Only." *See, e.g.,* Exhibits 2038, 2044, 2092–94, 2118. Patent Owner also filed a Protective Order (Exhibit 2113) and a Red-line of Protective Order (Exhibit 2114). Neither party, it appears, filed a motion to seal.

A party intending for a document to be sealed must file a motion to seal with a proposed protective order. *See* 37 C.F.R. §§ 42.14, 42.54(a). If such a motion were to be granted, the Board would consider entry of the modified protective order, which would govern the treatment of confidential information in the proceeding. If Patent Owner seeks to seal the documents

filed as "Parties and Board Only," Patent Owner shall file a motion to seal within ten (10) business days of the entry of this Decision. *See* 35 U.S.C. § 316(a)(1); 37 C.F.R. §§ 42.14, 42.54(a); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,770 (Aug. 14, 2012).

*H. Conclusion*

Having considered the parties' arguments and evidence, we evaluate all of the evidence together to make a final determination of obviousness. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1075 (Fed. Cir. 2012) (stating that a fact finder must consider all evidence relating to obviousness before finding patent claims invalid). In so doing, we conclude that Petitioner has satisfied its burden of demonstrating, by a preponderance of the evidence, that the subject matter of claims 1–20 would have been obvious over the combination of Gerber and O'Donnell and that claims 1–4 and 6–11 would have been obvious over the combination of Gerber and Barrie.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–20 are held *unpatentable*;

FURTHER ORDERED that Patent Owner's Motion to Exclude is *denied* as to Exhibits 1017, 1096 (1152), 1091 ¶¶ 23–29, 32–34, 42, 44–46 and 72–74, 1093 ¶ 13, and 1188 and *dismissed* as to Exhibits 1017 [B-1 and B-2], 1032, 1040–67, 1088, 1092, 1094, 1097–1151, 1153–56, 1160–63, 1165–73, and 1175–87, 1189, and 1190; and

FURTHER ORDERED, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

William Hare
Gabriela Materassi
MCNEELY HARE & WAR LLP
bill@miplaw.com
materassi@miplaw.com

Teresa Rea
Shannon Lentz
CROWELL & MORING LLP
trea@crowell.com
slentz@crowell.com

FOR PATENT OWNER:

Dianne B. Elderkin
Barbara L. Mullin
Ruben H. Munoz
AKIN GUMP STRAUSS HAUER & FELD LLP
delderkin@akingump.com
bmullin@akingump.com
rmunoz@akingump.com

Trials@uspto.gov
571-272-7822

Paper 92
Entered: December 3, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

AMERIGEN PHARMACEUTICALS LIMITED and
ARGENTUM PHARMACEUTICALS LLC,
Petitioner,

v.

JANSSEN ONCOLOGY, INC.,
Patent Owner.

---

Case IPR2016-00286[1]
Patent 8,822,438 B2

---

Before JEFFREY N. FREDMAN, KRISTINA M. KALAN and JACQUELINE T. HARLOW, *Administrative Patent Judges*.[2]

KALAN, *Administrative Patent Judge*.

DECISION
Denying Patent Owner's Request for Rehearing
*37 C.F.R. § 42.71(d)*

---

[1] Case IPR2016-01317 has been joined with this proceeding.
[2] A Panel Change Order issued on September 28, 2018, indicating that the judges named herein now constitute the panel. Paper 91.

# I. INTRODUCTION

Janssen Oncology, Inc. ("Patent Owner") filed a Request for Rehearing (Paper 90, "Request" or "Req.") of our Final Written Decision (Paper 86, "Final Written Decision" or "Dec.") in which claims 1–20 of U.S. Patent No. 8,822,438 B2 (Ex. 1001, "the '438 patent") are unpatentable. For the reasons that follow, Patent Owner's Request for Rehearing is denied.

# II. THE REQUEST FOR REHEARING

In pertinent part, 37 C.F.R. § 42.71(d) states:

> The burden of showing a decision should be modified lies with the party challenging the decision. The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, an opposition, or a reply.

Thus, a request for rehearing is not an opportunity merely to disagree with the Board's assessment of the arguments or weighing of the evidence, or to present new arguments or evidence.

Patent Owner requests rehearing to address four issues with our Final Written Decision: first, whether the Board misapprehended evidence regarding Petitioner's reasoning for administration of prednisone with abiraterone acetate; second, whether the Board overlooked or misapprehended Petitioner's evidence concerning patients with congenital CYP17 deficiency; third, whether the Board overlooked or misapprehended evidence regarding abiraterone acetate and adrenal insufficiency; and fourth, whether the Board misapprehended Petitioner's assertions as to the 1000 mg dose of abiraterone acetate in claims 4, 11, 19, and 20. Req. 1–3.

We have reviewed Patent Owner's Request and carefully considered all the arguments presented. For the following reasons, we are not persuaded that the Board misapprehended or overlooked arguments or evidence with respect to the contentions asserted by Patent Owner.

## III. DISCUSSION

*(A) Patent Owner's First Argument*

Patent Owner argues that the Board "overlooked or misapprehended the consequences of the now undisputed fact that ketoconazole does not cause mineralocorticoid excess." Req. 7. Patent Owner argued, in its Response, that ketoconazole did not cause mineralocorticoid excess, and pointed to Dr. Serels's testimony that it asserts supported its argument. *Id.* at 5 (citing PO Resp. 23–26, Ex. 1095 ¶ 10).

We considered this evidence and argument in our Final Written Decision, and, as we stated, we did "not understand Petitioner's argument for motivation to combine to be premised on this assertion alone." Dec. 21–22 (citing Pet. 6, 26, 37–39). We noted that Dr. Serels appreciated that "mineralocorticoid excess does not occur with ketoconazole," yet this did not change his opinion that "cortisol deficiency would have been expected to have significant negative clinical impact in mCRPC patients treated with abiraterone" and that one of ordinary skill in the art "would have been motivated to co-administer a glucocorticoid, and in particular prednisone, as a first choice to suppress predicted ACTH drive in patients administered abiraterone acetate to treat CRPC." *Id.* at 22 (citing Ex. 1095 ¶ 10). Accordingly, we determined that Petitioner reasonably and with properly presented arguments established that one of ordinary skill in the art would have looked to the prior art's co-administration of ketoconazole and a

glucocorticoid to assess the possibility of administering a glucocorticoid with abiraterone acetate. We expressly addressed Dr. Serels's testimony on this issue, and did not overlook Dr. Serels's testimony or other testimony regarding the relationship between ketoconazole and mineralocorticoid excess. *Id.* Nor are we persuaded, given our consideration and analysis of Dr. Serels's testimony and the other evidence we considered, that we misapprehended the import of this testimony and evidence, or Petitioner's reliance on the same to support Petitioner's arguments for motivation to combine the relied-upon references. *Id.*

*(B) Patent Owner's Second Argument*

Patent Owner argues that the Board considered new arguments regarding congenital CYP17 deficiency that were allegedly improperly presented on Reply. Req. 9. Patent Owner argues that that the Board accepted and relied upon Petitioner's claims regarding congenital CYP17 deficiency despite Patent Owner's advising the Board that these were new arguments. *Id.* at 9–10.

We considered Patent Owner's Identification of New Arguments and Evidence in Petitioner's Reply (Paper 74) in rendering our Final Written Decision, as well Petitioner's reply to the same (Paper 78) and the arguments presented by both parties on this issue. Dec. 2, 21. We have been cautioned that reply arguments should not be parsed "with too fine a filter." *Ericsson Inc. v. Intellectual Ventures I LLC*, 901 F.3d 1374, 1380 (Fed. Cir. 2018). Accordingly, we evaluated the evidence and arguments in the Petition and those in the Reply we considered to be properly responsive, and stated that "Petitioner has reasonably established that one of ordinary skill in the art would have looked at mineralocorticoid production in the CYP17 inhibition

scheme to assess the possibility of mineralocorticoid imbalance in the administration of abiraterone acetate." Dec. 21 (citing Ex. 1002 ¶¶ 31–32 (Dr. Serels's Declaration, submitted with the Petition, discussing CYP17 inhibition); Ex. 1093 ¶¶ 25 (Dr. Serels's Declaration, submitted with the Reply, discussing CYP17 inhibition)). We also found that, on the record before us, Petitioner reasonably established that one of ordinary skill in the art "would have analogized to congenital CYP17 deficiency to assess the possibility of mineralocorticoid excess in patients administered abiraterone acetate." *Id.* (citing Ex. 1002 ¶¶ 31–32; Ex. 1085, 508; Reply 4). We acknowledged that "the analogy is not necessarily perfect or complete," but concluded that "an analogy to the problems arising from a congenital CYP17 deficiency likely would shed light on CYP17 inhibition in other, non-congenital situations." *Id.* Accordingly, we did not simply accept Petitioner's argument regarding congenital CYP17 deficiency on its face, but rather, we determined that Petitioner reasonably and with properly presented arguments established that one of ordinary skill in the art would have looked at the CYP17 inhibition scheme in general to assess the possibility of mineralocorticoid imbalance. Thus, we are not persuaded that we overlooked or misapprehended this argument.

*(C) Patent Owner's Third Argument*

Patent Owner argues that the Board overlooked evidence that abiraterone acetate does not cause adrenal insufficiency. Req. 12 (citing Dec. 16). Patent Owner argues that "adrenal insufficiency" and "diminished adrenal reserve" are both distinct from "mineralocorticoid excess," as demonstrated by opposite side effects—for example, hypertension for mineralocorticoid excess, and hypotension for adrenal insufficiency (i.e.,

cortisol deficiency). *Id.* Patent Owner also faults the Board for overlooking or misapprehending the Synacthen test results and the follow-on abiraterone acetate monotherapy study. *Id.* at 13.

As noted above, we considered Patent Owner's Identification of New Arguments (Paper 74) in rendering our Final Written Decision, as well as Petitioner's Reply (Paper 78) and the arguments presented by both parties on this issue. Dec. 2, 15–19; *see also Ericsson Inc.*, 901 F.3d at 1380. The arguments and evidence identified in Patent Owner's third argument here are part of a broader argument concerning cortisol deficiency as a result of abiraterone acetate and/or ketoconazole activity. We stated in the Final Written Decision that "we understand that ketoconazole and abiraterone acetate do not have identical mechanisms," but noted that the parties "appear to agree that, based on their respective mechanisms of action, administration of ketoconazole would inhibit production of cortisol, and administration of abiraterone acetate inhibits one of the pathways of cortisol production." *Id.* at 17–18 (citing Pet. 29; Tr. 28:19–24; Ex. 1003, 2318). We also noted that Patent Owner agreed that abiraterone acetate "inhibits cortisol to an extent." *Id.* (citing Tr. 29:10–14). We also considered and discussed the results of the Synacthen test. Dec. 19. Patent Owner's disagreement with our conclusions is not a proper basis for a rehearing request. Regarding the argument based on abiraterone acetate monotherapy (Req. 13–14), Patent Owner does not point us to where these argument were raised previously. 37 C.F.R. § 42.71(d).

Thus, our Final Written Decision, as part of a broader inquiry, looked not only at the differences, but also at the similarities, of the mechanisms of ketoconazole and abiraterone, and to the comparative discussions of both in

the prior art, to determine that one of ordinary skill would have been aware of the differences and the similarities in the mechanisms. Dec. 17 (citing Tr. 14:20–15:5; Ex. 1003, 2318, Figure 1; Ex. 1188, 168:22–169:23). We are not persuaded that this constitutes overlooking or misapprehending aspects of Patent Owner's argument concerning cortisol deficiency.

*(D) Patent Owner's Fourth Argument*

Patent Owner argues that the Board misapprehended that the prior art does not teach or suggest a 1000 mg abiraterone acetate dose. Req. 14. More particularly, Patent Owner faults the Board for adopting Petitioners' assertions made in support of its arguments that a skilled person would have been motivated to increase the dose of abiraterone acetate disclosed in the prior art references. *Id.; see also* Dec. 43 ("We also have considered Petitioner's arguments and evidence as to dependent claims 2–20, which reasoning we adopt as our own.").

Patent Owner now presents a new argument that we misapprehended the teachings of the prior art with respect to claims 4, 11, 19, and 20. Req. 14–15. Patent Owner, however, does not point out where this matter was previously raised. Because Patent Owner has not previously raised any of its arguments presented in the Request, we are not permitted to consider its arguments now. 37 C.F.R. § 42.71(d). Moreover, we did not overlook Patent Owner's arguments regarding these claims; rather, we considered and adopted Petitioner's arguments regarding these claims. Dec. 43; *cf. Cutsforth, Inc. v. Motive Power, Inc.*, 636 F. App'x 575 (Fed. Cir. 2016) (nonprecedential). Patent Owner's failure to argue specifically against these claims during trial does not permit Patent Owner to now present arguments in this regard.

## IV. CONCLUSION

We have reviewed and considered the arguments in Patent Owner's Request and conclude that Patent Owner has not carried its burden of demonstrating that the Board misapprehended or overlooked any matters in rendering the Final Written Decision. 37 C.F.R. § 42.71(d). Rather, Patent Owner uses its Request as an opportunity to argue positions with which we disagreed in our Final Written Decision. Merely disagreeing with our analysis or conclusions does not serve as a proper basis for a request for rehearing. Patent Owner also uses its Request to raise matters without adequately demonstrating where those matters previously were raised. Thus, Patent Owner's challenge does not meet the standard set forth for a request for rehearing.

The Request for Rehearing is *denied*.

FOR PETITIONER:

William Hare
Gabriela Materassi
Christopher Casieri
Renita Rathinam
MCNEELY HARE & WAR LLP.
bill@miplaw.com
materassi@miplaw.com
chris@miplaw.com
rathinam@miplaw.com

Teresa Stanek Rea
Shannon Lentz
CROWELL & MORING LLP
TRea@Crowell.com
SLentz@Crowell.com

FOR PATENT OWNER:

Dianne B. Elderkin
Barbara L. Mullin
Ruben H. Munoz
AKIN GUMP STRAUSS HAUER & FELD LLP.
delderkin@akingump.com
bmullin@akingump.com
rmunoz@akingump.com

trials@uspto.gov
571.272.7822

Paper 21
Entered: January 10, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MYLAN PHARMACEUTICALS INC.,
Petitioner,

v.

JANSSEN ONCOLOGY, INC.,
Patent Owner.

---

Case IPR2016-01332
Patent 8,822,438 B2

---

Before LORA M. GREEN, RAMA G. ELLURU, and
KRISTINA M. KALAN, *Administrative Patent Judges*.

KALAN, *Administrative Patent Judge*.

# DECISION
## Institution of *Inter Partes* Review and Denial of Motion for Joinder
*37 C.F.R. § 42.108*
*37 C.F R § 42.122(b)*

Mylan Pharmaceuticals Inc. ("Mylan") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1–20 (the "challenged claims") of U.S. Patent No. 8,822,438 B2 (Ex. 1001, "the '438 patent") pursuant to 35 U.S.C. §§ 311–319. Concurrently with its Petition, Mylan filed a Motion for Joinder (Paper 3, "Mot."), seeking to join this case, under 35 U.S.C. § 315(c), with the *inter partes* review in *Amerigen Pharmaceuticals, Ltd. v. Janssen Oncology, Inc.*, Case IPR2016-00286 ("the Amerigen IPR" and Petitioner "Amerigen"), which was instituted on May 31, 2016. *See* Case IPR2016-00286, slip op. at 19 (PTAB May 31, 2016) (Paper 14) (decision instituting review of claims 1–20 of the '438 patent). Patent Owner, Janssen Oncology, Inc. ("Janssen"), filed an Opposition to the Motion for Joinder (Paper 9, "Opp.") and Mylan filed a Reply to Janssen's Opposition (Paper 10, "Reply"). Janssen also filed a Preliminary Response to the Petition (Paper 14, "Prelim. Resp.").

For the reasons set forth below, we conclude that Mylan has shown that its Petition warrants institution of *inter partes* review of claims 1–20 of the '438 patent. This conclusion is consistent with our institution decision in the Amerigen IPR. *See* IPR2016-00286, Paper 14, 19. Thus, we institute an *inter partes* review. We, however, do not grant Mylan's Motion for Joinder.

## I. PETITION FOR *INTER PARTES* REVIEW

The parties indicate that the '438 patent is being asserted in a number of district court proceedings. Pet. 1–2; Paper 7, 2–3. In addition, the '438 patent is the subject of pending *inter partes* review proceedings, including the Amerigen IPR, as noted above, which has been instituted; IPR2016-01317 (*Argentum Pharmaceuticals LLC v. Janssen Oncology, Inc.*), which was joined with the Amerigen IPR on September 19, 2016 (IPR2016-01317,

Paper 9); and IPR2016-01582, which is pending. Janssen also states that the ’438 patent “was the subject of *ex parte* reexamination request No. 90/020,096,” but “will not be granted a filing date for failure to comply with the requirements of 37 C.F.R. § 1.501(a).” Paper 7, 2.

In the Amerigen IPR, we instituted *inter partes* review of claims 1–20 of the ’438 patent on the same grounds of unpatentability asserted in the present Petition:

| **References** | **Basis** | **Claims Challenged** |
|---|---|---|
| O’Donnell[1] and Gerber[2] | § 103 | 1–20 |
| Barrie[3] and Gerber | § 103 | 1–4 and 6–11 |

Pet 3; Mot. 2; IPR2016-00286, Paper 14, 19.

Mylan supports its assertions in its Petition with substantially the same art and arguments proffered by Amerigen in the Amerigen IPR. Pet. 4–61. Mylan states that “the proposed grounds for instituting *inter partes* review in the Mylan IPR are identical to the ones on which the Amerigen IPR was instituted.” Mot. 6. The exceptions to the similarities between the present Petition and the petition in the Amerigen IPR are: the declaration of Mylan’s declarant, Marc B. Garnick, M.D. (Ex. 1002), the declaration of

---

[1] O’Donnell, A. et al., *Hormonal impact of the 17α-hydroxylase/ $C_{17,20}$-lyase inhibitor abiraterone acetate (CB7630) in patients with prostate cancer*, British Journal of Cancer 90:2317–2325 (2004) (“O’Donnell”) (Ex. 1003).

[2] Gerber, G.S. & Chodak, G.W., *Prostate specific antigen for assessing response to ketoconazole and prednisone in patients with hormone refractory metastatic cancer*, J. Urol. 144:1177–79 (1990) (“Gerber”) (Ex. 1004).

[3] U.S. Patent No. 5,604,213 to Barrie, issued February 18, 1997 (“Barrie”) (Ex. 1005).

Mylan's declarant Ivan T. Hoffman (Ex. 1017);[4] and the inclusion of Exhibits 1068–1080.[5]

Additionally, Mylan notes that it would not be time-barred from filing the present Petition without a corresponding motion for joinder. Mot. 6; 35 U.S.C. § 315(b).

Janssen responds that, because "Mylan's petition is merely a repetition of Amerigen's first petition and Argentum's second petition, it does nothing more than drain the Board's resources with no added value." Prelim Resp. 2. Janssen requests that the Board exercise its discretion and deny institution pursuant to 35 U.S.C. § 325(d). *Id.*

We have discretion under 35 U.S.C. § 325(d) to reject a petition when the same or substantially the same prior art or arguments were presented previously to the Office. The relevant portions of that statute are reproduced below:

> In determining whether to institute or order a proceeding under this chapter, chapter 30, or chapter 31, the Director may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office.

35 U.S.C. § 325(d). In exercising our discretion under § 325(d), we take into account numerous factors, including the facts of each case, and the

---

[4] Amerigen relied on the declarations of Dr. Scott R. Serels, M.D. (IPR2016-00286, Ex. 1002) and DeForest McDuff, Ph.D. (IPR2016-00286, Ex. 1017) in support of its assertions and arguments.

[5] Janssen also notes in its Opposition that "Mylan appears to withdraw, and does not appear to rely, on original Exhibits 1002, 1017, 1037, 1038, 1042–44, 1052, 1056, 1058–1063, and 1067 that were submitted in the Amerigen IPR." Opp. 6 n.3.

burden on the parties and the Board. *See Conopco, Inc. v. Proctor & Gamble Co.*, Case IPR2014-00506, slip op. at 4, 6 (PTAB Dec. 10, 2014) (Paper 25) (Informative), slip op. at 6 (PTAB July 7, 2014) (Paper 17), *cited in NVIDIA Corp. v. Samsung Elec. Co.*, Case IPR2016-00134, slip op. at 6–7 (PTAB May 4, 2016) (Paper 9); *see also* Amendments to the Rules of Practice for Trials Before the Patent Trial and Appeal Board, 77 Fed. Reg. 18750, 18759 (Apr. 1, 2016) ("[T]he current rules provide sufficient flexibility to address the unique factual scenarios presented to handle efficiently and fairly related proceedings before the Office on a case-by-case basis, and that the Office will continue to take into account the interests of justice and fairness to both petitioners and patent owners where multiple proceedings involving the same patent claims are before the Office.").

Having reviewed the Petition and Janssen's Preliminary Response, we incorporate our analysis from our institution decision in the Amerigen IPR. IPR2016-00286, Paper 14, 4–15. For the same reasons given in the institution decision in the Amerigen IPR, we determine that Mylan has demonstrated a reasonable likelihood that it would prevail with respect to its challenge to claims 1–20 of the '438 patent on the asserted grounds.

Although we have discretion to reject a petition when the same or substantially the same prior art or arguments previously were presented to the Office (35 U.S.C. § 325(d)), we decline to exercise that discretion here. Mylan brings the same challenges brought by Amerigen and Argentum, but supports them with additional evidence and with two different declarations from two different declarants. The depositions of those declarants, as well as the additional evidence presented by Mylan, may affect the course of this trial relative to the course of the trial in IPR2016-00286. For example,

Janssen states that Mylan's "new testimony would force Janssen to engage in discovery and briefing not currently contemplated" in the Amerigen IPR. Opp. 6–7.

Moreover, it appears that this case will involve arguments concerning objective indicia of non-obviousness, which involves a fact-specific analysis that often turns on evidence presented during trial. Pet. 51–61. A patent owner generally presents arguments based on objective indicia in response to a petitioner's allegations of obviousness. Here, Mylan preemptively presented arguments directed to objective indicia. *Id.* Janssen presented arguments directed to objective indicia in its Preliminary Response in the Amerigen IPR (IPR2016-00286, Paper 12, 46–52), but has not presented the same arguments in the Preliminary Response in this case. As such, the objective indicia arguments possibly differ between the Amerigen IPR and the present case. Because evidence directed to objective indicia typically develops during trial, we cannot assume, at this stage, that the arguments to be made during the course of the trial are the same or similar to those made in IPR2016-00286.

Other than these differences, however, both the instant Petition and the petition in the Amerigen IPR assert substantially the same two challenges to patentability. Thus, given this substantial similarity in proceedings, we do not perceive that either Janssen or the Board will be overwhelmed with an unreasonable number of challenges to patentability.

While we recognize Janssen's concern with respect to the need to defend its patent in multiple *inter partes* review proceedings, the present Petition was timely filed within the one year time set by Congress in 35

U.S.C. § 315(b).[6] The time elapsed between the filing of Amerigen's petition in IPR2016-00286 and the filing of Mylan's Petition in this case was approximately six months, which is not excessive for purposes of institution.

Unlike other cases in which we have exercised our discretion under § 325(d) to deny institution of a follow-on petition, based on the particular facts of this case, we are not presented with a second bite at the apple by an identical petitioner. In addition, Mylan does not seek to cure any problems of the petition in IPR2016-00286 with the filing of the present Petition. Also, we have not decided the outcome in IPR2016-00286.

In view of the challenges in the Petition, and having considered Janssen's arguments in the Patent Owner Preliminary Response, we institute an *inter partes* review in this proceeding on the same grounds as those on which we instituted trial in IPR2016-00286. We do not institute an *inter partes* review on any other grounds. We decline to exercise our discretion under 35 U.S.C. § 325(d) to reject the Petition.

## II. MOTION FOR JOINDER

In the Motion for Joinder, Mylan seeks joinder "of the above-captioned *inter partes* review (hereinafter 'Mylan IPR') with the pending *inter partes* review concerning the same patent and the same grounds of invalidity in" the Amerigen IPR. Mot. 1. Mylan filed the present Motion on June 30, 2016, within one month of our decision instituting *inter partes* review in IPR2016-00286, which issued on May 31, 2016. *See* IPR2016-

[6] 35 U.S.C. § 315(b) states, in part, that "[a]n inter partes review may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner . . . is served with a complaint alleging infringement of the patent."

00286, Paper 14; Mot. Therefore, the Motion is timely under 37 C.F.R. § 42.122(b). *See* 37 C.F.R. § 42.122(b) ("Any request for joinder must be filed, as a motion under § 42.22, no later than one month after the institution date of any inter partes review for which joinder is requested.").

The Board, acting on behalf of the Director, has the discretion to join a party to a pending *inter partes* review where the conditions of 35 U.S.C. § 315(c) are met. *See* 35 U.S.C. § 315(c); *see also* 37 C.F.R. § 42.4(a) ("The Board institutes the trial on behalf of the Director."). Specifically, 35 U.S.C. § 315(c) provides:

> If the Director institutes an inter partes review, the Director, in his or her discretion, may join as a party to that inter partes review any person who properly files a petition under section 311 that the Director, after receiving a preliminary response under section 313 or the expiration of the time for filing such a response, determines warrants the institution of an inter partes review under section 314.

Joinder may be authorized when warranted, but the decision to grant joinder is discretionary. 35 U.S.C. § 315(c); 37 C.F.R. § 42.122(b).

As the moving party, Mylan bears the burden of proving that it is entitled to the requested relief. 37 C.F.R. § 42.20(c). A motion for joinder should (1) set forth reasons why joinder is appropriate; (2) identify any new grounds of unpatentability asserted in the petition; and (3) explain what impact (if any) joinder would have on the trial schedule for the existing review. *See* Frequently Asked Question H5, https://www.uspto.gov/patents-application-process/patent-trial-and-appeal-board/ptab-e2e-frequently-asked-questions (last visited January 3, 2017). Patent trial regulations, including the rules for joinder, must be construed to secure the just, speedy, and inexpensive resolution of every proceeding. 37 C.F.R. § 42.1(b).

As noted above, we have instituted *inter partes* review of claims 1–20 of the ’438 patent in the Amerigen IPR. *See generally* IPR2016–00286, Paper 14. In addition, we determine above that Mylan has filed a Petition that warrants institution of *inter partes* review of the same claims. Accordingly, the conditions of 35 U.S.C. § 315(c) are satisfied, and we must consider whether to exercise our discretion to join Mylan as a Petitioner to the Amerigen IPR.

In its Motion for Joinder, Mylan asserts that joinder is appropriate “because it will promote efficient and consistent resolution of the validity of a single patent and will not prejudice any of the parties to the Amerigen IPR.” Mot. 1. Mylan represents that joinder with the Amerigen IPR is appropriate because the grounds proposed in the present Petition are “the same grounds of invalidity on which the Board instituted the Amerigen IPR.” Mot. 3. Mylan further argues that (a) joinder will not impact the Board’s ability to complete the review in a timely manner; (b) joinder will promote efficiency by consolidating issues, avoiding duplicate efforts, and preventing inconsistencies; (3) joinder will not prejudice Janssen or Amerigen. Mot. 4–6.

Janssen filed an Opposition to Mylan’s Motion for Joinder, stating that “the Board should deny Mylan’s motion because it introduces new exhibits, including two new expert declarations” and because “Mylan also fails to specify how its petition differs from Amerigen’s petition and it cites no Board decisions to support what it seeks to do here.” Opp. 1. Specifically, Janssen argues that (a) Mylan’s Petition introduces new evidence and testimony that would prejudice Janssen by unduly complicating the Amerigen IPR if joinder is allowed; (b) Mylan’s Motion

for Joinder fails to specify how its Petition differs from Amerigen's petition and how briefing and discovery may be simplified; and (c) Mylan cites no Board decision granting joinder where a petitioner requesting joinder sought to rely on expert testimony from a different expert. Opp. 6–11.

In its Reply, Mylan asserts that the Board should grant joinder, because its new exhibits, apart from the two expert declarations, "simply complete the record." Reply 3. Regarding its expert declarations, Mylan argues that "taking a single deposition" does not present the type of prejudicial burden that counsels in favor of denying joinder.[7] *Id.* at 2. Mylan relies on *Torrent Pharms. Ltd. v. Novartis AG*, Case IPR2014-00784, in support of its assertion that related discovery would not be an undue burden. *Id.* at 3–4.

In view of the circumstances of this case, we are not persuaded that Mylan has established sufficiently that joinder to the Amerigen IPR is warranted. Granting joinder in view of Mylan's two different declarations and new evidence would add an additional dimension to the substantive issues in the Amerigen IPR, and thus would be more significant than Mylan suggests. Although the parties have conferred and cooperated on certain matters in this proceeding, their inability to agree on several critical issues in connection with facilitating joinder further differentiates this case from other

---

[7] Janssen states that Mylan "has represented to Janssen off the record that it is willing to withdraw the Hofmann Declaration to rely solely on the McDuff Declaration," but that "Mylan is not willing to withdraw the Garnick Declaration to rely solely on the Serels Declaration." Opp. 3 n.2. Off-the-record representations notwithstanding, we have before us in this case two declarations from two different declarants on Mylan's behalf.

cases in which the parties have cooperated and in which we have granted joinder.

Additionally, granting joinder would add significant procedural complications and delay to the progress of the Amerigen IPR. In the Amerigen IPR, Janssen has filed its Response, and the date for the oral hearing is only a few weeks away. Granting joinder would require adjusting the schedule to allow Janssen discovery regarding the different declarants' testimony and the additional evidence associated with the present Petition. Mylan's Motion for Joinder does not offer a practical way to accommodate the additional discovery without inconveniencing all involved or delaying the due dates in the Amerigen IPR.

In view of the facts and circumstances of this case, Mylan, as movant, has not met its burden to show why joinder is appropriate, consistent with the goal of securing the just, speedy, and inexpensive resolution of every proceeding. Based on the record before us, and for the reasons given above, we institute an *inter partes* review in IPR2016-01332. However, we decline to exercise our discretion to join Mylan as a Petitioner to the Amerigen IPR. In view of the timeline of the Amerigen IPR, and in view of the number of common issues between the cases, we implement a condensed schedule in the present case to allow for resolution of these two cases involving the '438 patent in relative proximity to each other.

## IV. ORDER

Accordingly, it is

ORDERED that trial is instituted in IPR2016-01332 as to claims 1–20 of the '438 patent on the following grounds only:

Claims 1–20 as obvious under 35 U.S.C. § 103 over O'Donnell and Gerber;

Claims 1–4 and 6–11 as obvious under 35 U.S.C. § 103 over Barrie and Gerber;

FURTHER ORDERED that no grounds other than the ones specifically granted above are authorized for *inter partes* review as to the claims of the '438 patent;

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is given of the institution of a trial commencing on the entry date of this Decision; and

FURTHER ORDERED that Mylan's Motion for Joinder is *denied*.

FOR PETITIONER:
Brandon M. White
bmwhite@perkinscoie.com
Crystal Canterbury
ccanterbury@perkinscoie.com

FOR PATENT OWNER:
Dianne Elderkin
delderkin@akingump.com
Barbara Mullin
bmullin@akingump.com
Ruben Munoz
rmunoz@akingump.com

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MYLAN PHARMACEUTICALS INC., ACTAVIS LABORATORIES FL, INC., AMNEAL PHARMACEUTICALS LLC, AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, DR. REDDY'S LABORATORIES, INC., DR. REDDY'S LABORATORIES, LTD., SUN PHARMACEUTICALS INDUSTRIES, LTD., SUN PHARMACEUTICALS INDUSTRIES, INC., TEVA PHARMACEUTICALS USA, INC., WEST-WARD PHARMACEUTICAL CORP., and HIKMA PHARMACEUTICALS, LLC,
Petitioner,

v.

JANSSEN ONCOLOGY, INC.,
Patent Owner.

---

Case IPR2016-01332[1]
Patent 8,822,438 B2

---

Before LORA M. GREEN, RAMA G. ELLURU, and KRISTINA M. KALAN, *Administrative Patent Judges*.

KALAN, *Administrative Patent Judge.*

# FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

---

[1] Case IPR2017-00853 has been joined with this proceeding.

## I. INTRODUCTION

Mylan Pharmaceuticals Inc. ("Mylan") filed a Petition (Paper 1, "Pet.") to institute an *inter partes* review of claims 1–20 of U.S. Patent No. 8,822,438 B2 (Ex. 1001, "the '438 patent") pursuant to 35 U.S.C. §§ 311–319. Janssen Oncology, Inc. ("Patent Owner") filed a Preliminary Response (Paper 14, "Prelim. Resp."). We instituted an *inter partes* review of claims 1–20 on certain grounds of unpatentability alleged in the Petition (Paper 21, "Dec.").

Actavis Laboratories FL, Inc., Amneal Pharmaceuticals LLC, Amneal Pharmaceuticals of New York, LLC, Dr. Reddy's Laboratories, Inc., Dr. Reddy's Laboratories, Ltd., Sun Pharmaceuticals Industries, Ltd., Sun Pharmaceuticals Industries, Inc., Teva Pharmaceuticals USA, Inc., West-Ward Pharmaceutical Corp., and Hikma Pharmaceuticals, LLC (collectively, the "Actavis Petitioners") filed a Petition for *inter partes* review of claims 1–20 of the '438 patent. Case IPR2017-00853, Paper 8. Together with its Petition, the Actavis Petitioners filed a Motion for Joinder to join the case with the previously instituted proceeding in IPR2016-01332. *Id.*, Paper 9. We instituted trial in IPR2017-00853 and joined the Actavis Petitioners as a Petitioner in IPR2016-01332. *Id.,* Paper 19.

After institution of trial, Patent Owner filed a Patent Owner Response (Paper 35, "PO Resp."). Mylan and the Actavis Petitioners (collectively, "Petitioner") filed a Reply (Paper 55, "Reply"). Pursuant to a Board Order (Paper 64), Patent Owner filed an Identification of New Arguments and Evidence in Petitioner's Reply (Paper 65), to which Petitioner filed a Reply

(Paper 74). An oral hearing was held on May 24, 2017. A transcript of the hearing has been entered into the record. Paper 82 ("Tr.").

The Board has jurisdiction under 35 U.S.C. § 6. In this Final Written Decision, issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73, we determine that Petitioner has shown by a preponderance of the evidence that all claims of the '438 patent for which trial was instituted, namely, claims 1–20, are unpatentable.

## II. BACKGROUND

### *A. Related Matters*

The parties indicate that the '438 patent is being asserted in a number of district court proceedings, some of which have been terminated. Pet. 1–2; Paper 7, 3. Patent Owner represents that the following proceedings have not been terminated: *BTG Int'l Ltd. v. Actavis Labs. FL, Inc.,* C.A. No. 2:15-cv-05909-KM-JBC (D.N.J.); and *Janssen Biotech, Inc. v. Mylan Pharms. Inc.,* C.A. No. 1:15-cv-00130-IMK (N.D. W. Va.), *BTG Int'l Ltd. v. Amerigen Pharms., Inc.,* C.A. No. 2:16-cv-02449-KM-JBC (D.N.J.); and *BTG Int'l Ltd. v. Glenmark Pharms. Inc., USA*, C.A. No. 2:16-cv-5909 (D.N.J). Paper 27, 3.

Patent Owner also states that the '438 patent was the subject of *ex parte* reexamination request No. 90/020,096, but "will not be granted a filing date for failure to comply with the requirements of 37 C.F.R. § 1.501(a)." Paper 7, 2.

### *B. The '438 Patent*

The '438 patent, titled "Methods and Compositions for Treating Cancer," describes methods that comprise "administering a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor, such as abiraterone acetate (i.e., 3β-

acetoxy-17-(3-pyridyl)androsta-5,16-diene), in combination with at least one additional therapeutic agent such as an anti-cancer agent or a steroid."
Ex. 1001, at [54], [57]. As described in the '438 patent, it is believed that testosterone and dihydrotestosterone promote the growth of prostate cancer. *Id.* at 1:49–51. Hormone therapy can be used to suppress the production or block the effects of hormones such as testosterone. *Id.* at 1:43–51.

The enzyme 17α-hydroxylase/$C_{17,20}$-lyase ("CYP17") is involved in testosterone synthesis. *Id.* at 3:66–4:1. CYP17 inhibitors have been shown to be useful in the treatment of cancer, specifically, androgen-dependent disorders like prostate cancer. *Id.* at 5:23–27. Abiraterone acetate, a prodrug of abiraterone, is a CYP17 inhibitor. *Id.* at 2:10–12.

The '438 patent describes administration of a therapeutically effective amount of a CYP17 inhibitor, such as abiraterone acetate, with a therapeutically effective amount of at least one additional therapeutic agent including, but not limited to, an anti-cancer agent, such as mitoxantrone, paclitaxel, docetaxel, leuprolide, goserelin, triptorelin, seocalcitol, bicalutamide, or flutamide, or a steroid, such as hydrocortisone, prednisone, or dexamethasone. *Id.* at 2:9–3:20.

*C. Challenged Claims*

Claim 1 of the '438 patent is reproduced below:

> 1. A method for the treatment of a prostate cancer in a human comprising administering to said human a therapeutically effective amount of abiraterone acetate or a pharmaceutically acceptable salt thereof and a therapeutically effective amount of prednisone.

Ex. 1001, 16:16–20. Dependent claims 2–20 of the '438 patent describe additional limitations of the method, including the amount of abiraterone

acetate and the amount of prednisone used and the type of prostate cancer being treated. *Id.* at 16:21–17:14.

*D. Prior Art References Relied Upon by Petitioner*

Petitioner relies on the following prior art:

1. O'Donnell, A. et al., *Hormonal impact of the 17α-hydroxylase/ $C_{17, 20}$-lyase inhibitor abiraterone acetate (CB7630) in patients with prostate cancer*, 90 British Journal of Cancer 2317–25 (2004) ("O'Donnell") (Ex. 1003);
2. Gerber, G.S. & Chodak, G.W., *Prostate specific antigen for assessing response to ketoconazole and prednisone in patients with hormone refractory metastatic prostate cancer*, 144 J. Urol. 1177–79 (1990) ("Gerber") (Ex. 1004); and
3. U.S. Patent No. 5,604,213 to Barrie, issued February 18, 1997 ("Barrie") (Ex. 1005).

*E. Instituted Grounds of Unpatentability*

We instituted *inter partes* review of claims 1–20 of the '438 patent on the following grounds:

| **References** | **Basis** | **Claims Challenged** |
|---|---|---|
| O'Donnell and Gerber | § 103 | 1–20 |
| Barrie and Gerber | § 103 | 1–4 and 6–11 |

In support of its challenges, Petitioner relies on the declarations of Marc B. Garnick, M.D. (Ex. 1002; Ex. 1104, 1153), Ivan T. Hoffman (Ex. 1017; Ex. 1134, 1146, 1151, 1154), Ian McKeague, Ph.D. (Ex. 1091), John Bantle, M.D. (Ex. 1097) and Bryan D. Beel (Ex. 1152). Patent Owner relies on the declarations of Ian Judson, M.D. (Ex. 2028), Matthew Rettig, M.D. (Ex. 2038), Richard Auchus, M.D., Ph.D. (Ex. 2040), Christopher A. Vellturo, Ph.D. (Ex. 2044), and Johann S. De Bono (Ex. 2118).

## III. ANALYSIS

### *A. Claim Interpretation*

The Board interprets claim terms in an unexpired patent according to the broadest reasonable construction in light of the specification of the patent in which they appear. *See Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation standard); 37 C.F.R. § 42.100(b). Under that standard, and absent any special definitions, we give claim terms their ordinary and customary meaning as would be understood by one of ordinary skill in the art at the time of the invention. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definitions for claim terms must be set forth with reasonable clarity, deliberateness, and precision. *See In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Only those terms which are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Ltd.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'") (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

With respect to claim interpretation, "[u]sually [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1149 (Fed. Cir. 2012) (citations omitted). "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Thorner v. Sony Computer Entm't Am. LLC,* 669 F.3d 1362, 1365

(Fed. Cir. 2012) (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)).

Petitioner proposes that we construe the claim terms "treat," "treating," "treatment," "anti-cancer agent," and "refractory cancer." Pet. 17–19. We adopted constructions for these claim terms in the Decision on Institution in IPR2016-00286.[2] Pet. 18 (citing IPR2016-00286, Paper 14). In our Decision on Institution in IPR2016-00286, we construed those terms, as well as the term "therapeutically effective amount of prednisone" as follows:

| Claim term(s) | Construction |
|---|---|
| "treat," "treating," and "treatment" | include the eradication, removal, modification, management or control of a tumor or primary, regional, or metastatic cancer cells or tissue and the minimization or delay of the spread of cancer<br>Ex. 1001, 3:46–50 |
| "anti-cancer agent" | any therapeutic agent that directly or indirectly kills cancer cells or directly or indirectly prohibits, stops or reduces the proliferation of cancer cells<br>Ex. 1001, 4:8–16 |
| "refractory cancer" | cancer that is not responding to an anti-cancer treatment or cancer that is not responding sufficiently to an anti-cancer treatment<br>Ex. 1001, 4:23–27. |
| "therapeutically effective amount of prednisone" | an amount of prednisone effective for treating prostate cancer |

[2] IPR2016-00286 is an earlier-filed case involving the '438 patent, the same grounds, and the same Patent Owner. Petitioner filed a motion for joinder of this case with IPR2016-00286 (Paper 3), which we denied (Paper 21).

Patent Owner, in its Response, states: "The Panel's construction of 'treat,' 'treating' and 'treatment' is consistent with the disclosure of the '438 patent and should be maintained." PO Resp. 6. Patent Owner also states that it "understands the Panel's construction to mean that administration of prednisone with abiraterone acetate, must *at least* cause an anti-cancer effect, regardless of whether it has any other non-anti-cancer effects." *Id.* at 5. Petitioner replies that "the Board clearly held that 'treatment' does not require an antitumor or anticancer effect." Reply 18 (citing IPR2016-00286, Decision on Institution (Paper 14) at 5; IPR2016-00286, Decision Denying Request for Rehearing (Paper 23) at 3 (rejecting Janssen's request for rehearing and noting that the Board's construction of "treating" does not require "having an anti-cancer effect on").)

Patent Owner also submitted a claim construction of the terms "treatment" and "treating" by the district court in a companion litigation. Ex. 2004. The district court, after a lengthy analysis, construed the disputed terms as follows: "*Treatment/treating* means the eradication, removal, modification, management or control of a tumor or primary, regional, or metastatic cancer cells or tissue and the minimization or delay of the spread of cancer." *Id.* at 30. The district court read out of the definition the term "includes." *Id.* Although we are not bound by the district court's reasoning and claim constructions in related proceedings, we do not disregard the determinations of a court interpreting the same claim term in a related patent in a concurrent proceeding. *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1326–27 (Fed. Cir. 2015) ("The fact that the board is not generally bound by a previous judicial interpretation of a disputed claim term does not mean, however, that it has no obligation to acknowledge that interpretation or to

assess whether it is consistent with the broadest reasonable construction of the term."). Thus, although we acknowledge and have considered the district court's interpretation, we retain our broadest reasonable construction of the terms "treat," "treatment," and "treating."

We see no reason to modify our claim construction positions in light of the record developed at trial, and we maintain our claim constructions from the Decision on Institution for the purposes of this Decision. No other claim terms have been presented to us for construction following institution of trial, and we determine that no other claim terms require express construction.

*B. Principles of Law*

A claim is unpatentable under 35 U.S.C. § 103[3] if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). A decision on the ground of obviousness must include "articulated reasoning with some rational underpinning to support the legal conclusion of

[3] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. § 103. Because the '438 patent has an effective filing date before the effective date of the applicable AIA amendments, throughout this Decision we refer to the pre-AIA versions of 35 U.S.C. § 103.

obviousness." *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006). The obviousness analysis "should be made explicit" and it "can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *KSR*, 550 U.S. at 418. We analyze the asserted grounds of unpatentability in accordance with the above-stated principles.

*C. Level of Skill in the Art*

We adopt Petitioner's contention that a person of ordinary skill in the art

> would be a physician specializing in urology, endocrinology, or oncology, or a person holding a Ph.D. in pharmacology, biochemistry or a related discipline, such as pharmaceutical science. Additional experience could substitute for the advanced degree. To the extent necessary, one of skill in the art may collaborate with one or more other persons of skill in the art for one or more aspects with which the other person may have expertise, experience and/or knowledge that was obtained through his or her education, industrial or academic experiences. For example, one of skill may consult with an endocrinologist, oncologist, or medical biochemist and thus may rely on the opinions of such specialists in evaluating the claims.

Pet. 7 (citations omitted). Patent Owner does not appear to dispute Petitioner's definition in its Patent Owner Response. *See generally* PO Resp. The level of ordinary skill in the art in this case is further demonstrated by the prior art asserted in the Petition. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

*D. Overview of the Prior Art*

*1. O'Donnell*

O'Donnell, which is titled "Hormonal impact of the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor abiraterone acetate (CB7630) in patients with prostate cancer," discloses that treatment of prostate cancer with abiraterone acetate, at a dose of 500–800 mg, can successfully suppress testosterone levels. Ex. 1003, Abstract. O'Donnell also discloses that ketoconazole, another CYP17 inhibitor, has been evaluated as a possible agent with which to achieve decreased production of adrenal steroids, but that abiraterone acetate was developed as a more selective inhibitor. *Id.* at 2318. O'Donnell further discloses that adrenocortical suppression may require administration of replacement glucocorticoid. *Id.* at Abstract, 2323. O'Donnell states that "[s]ome impact on adrenal reserve was predictable from the steroid synthesis pathway." *Id.* at 2323. Regarding administration of ketoconazole, O'Donnell states that "it is common practice to administer supplementary hydrocortisone" and that this may prove necessary with abiraterone acetate. *Id.* On the basis of the clinical evidence, O'Donnell reports that the need for concomitant therapy of abiraterone acetate with a glucocorticoid needs to be further investigated. *Id.*

*2. Gerber*

Gerber, which is titled "Prostate Specific Antigen for Assessing Response to Ketoconazole and Prednisone in Patients with Hormone Refractory Metastatic Prostate Cancer," discloses use of ketoconazole, a known CYP17 enzyme inhibitor and inhibitor of gonadal and adrenocortical steroid synthesis, with prednisone to treat patients with progressive prostate cancer. Ex. 1004, 1177. Gerber provides that patients exhibiting

progressively increasing prostate specific antigen ("PSA") levels, when treated with ketoconazole and prednisone, experienced a decrease in PSA levels. *Id.* at 1178–79. Based on its study, Gerber concludes that "there appears to be a small subgroup of patients with progressive prostate cancer despite hormonal therapy who will derive significant benefit from the combination of ketoconazole and glucocorticoid replacement therapy." *Id.* at 1179.

### *3. Barrie*

Barrie, which is titled "17-Substituted Steroids Useful in Cancer Treatment," is directed to a class of 17-substituted steroids and their use in the treatment of androgen-dependent and estrogen-dependent disorders. Ex. 1005, 1:11–14. Specifically, Barrie discloses abiraterone, acid addition salts and 3-esters of abiraterone, and abiraterone acetate. *Id.* at 5:21–26, 7:23–26, 11:39–55. Barrie discloses that abiraterone acetate may be administered in a method of treating disorders, including prostate cancer, as a pharmaceutical composition comprising a therapeutically effective amount of abiraterone acetate. *Id.* at 10:27–57. Barrie compares the inhibition levels of hormone production by abiraterone acetate with ketoconazole, concluding that the decrease in testosterone levels resulting from administration of abiraterone acetate was much more marked than for ketoconazole. *Id.* at 26:32–38.

## *E. Obviousness Analysis*

### *1. Petitioner's Arguments*

Petitioner argues, generally, that it was "known that in using a CYP17 inhibitor to reduce testosterone synthesis, the CYP17 inhibitor also undesirably suppressed the production of cortisol, a glucocorticoid, which is

necessary for other biochemical cycles in the body." Pet. 5. In particular, reduced production of cortisol "caused adverse effects, including hypertension, hypokalemia (decrease in circulating potassium levels), and fluid retention." *Id.* (citing Ex. 1002 ¶¶ 42, 44, 58). Administration of a CYP17 inhibitor to suppress androgen synthesis results in the "undesired side effect" that "cortisol production is compromised (*e.g.,* reduced), which interferes with the negative feedback mechanism that usually maintains cortisol levels within the normal physiological range." *Id.* at 26. Petitioner also argues that it was "known that CYP17 inhibition of cortisol increased ACTH drive (*i.e.*, increased ACTH production), which resulted in a corresponding increase in mineralocorticoids," leading to mineralocorticoid excess. *Id.* at 27 (citing Ex. 1002 ¶ 41). It was general knowledge in the art, Petitioner argues, "to administer a glucocorticoid, such as prednisone or hydrocortisone, to a patient with ACTH drive, such as a patient administered a CYP17 inhibitor, to reduce ACTH drive, and consequently, reduce mineralocorticoid excess." *Id.* (citing Ex. 1002 ¶ 42).

*a. Ground Based on O'Donnell and Gerber*

Petitioner challenges claims 1–20 as obvious under 35 U.S.C. § 103 over O'Donnell and Gerber. Pet. 38–50.

Regarding claim 1, Petitioner argues that O'Donnell teaches "that abiraterone acetate is a selective CYP17 inhibitor that is more effective than ketoconazole, a CYP17 inhibitor known in the art, in suppressing testosterone levels in a mammal *in vivo*." Pet. 38 (citing Ex. 1003, 2138, 2322, 2323, 2325). Petitioner further argues that, although O'Donnell does not disclose administration of abiraterone acetate with prednisone, "O'Donnell taught that concomitant hormone replacement therapy with a glucocorticoid may be

needed when using abiraterone acetate to treat a prostate cancer in a human patient." *Id.* at 39 (citing Ex. 1003, 2323). Gerber, Petitioner argues, teaches that "the combination of ketoconazole and prednisone (a glucocorticoid) is safe and effective in treating human patients with hormone-refractory advanced prostate cancer." *Id.* at 39–40 (citing Ex. 1005 [sic], 1177–79).

Regarding motivation to combine, Petitioner reasons that one of skill in the art "would have been motivated to add prednisone to a method of using abiraterone acetate (a CYP17 inhibitor)" to treat prostate cancer in a human patient "by Gerber's teaching that administering 5 mg prednisone twice daily with ketoconazole, also a CYP17 inhibitor, is a safe and effective treatment in human patients with hormone-refractory prostate cancer." *Id.* at 40. Petitioner also argues that one of ordinary skill in the art would have been "motivated by suggestions in the prior art that prednisone could have some amount of anti-cancer activity." *Id.* (citing Ex. 1002 ¶¶ 33, 89–90). Overall, Petitioner argues, one of ordinary skill in the art would have combined abiraterone acetate and prednisone "with a reasonable expectation of success" because the "prior art taught that abiraterone acetate was a more effective CYP17 inhibitor than ketoconazole and that the combination of ketoconazole and prednisone was safe and effective to treat patients with hormone refractory metastatic prostate cancer, which would have motivated the combination." *Id.* at 6 (citing Ex. 1002 ¶¶ 55–59).

Claims 2–20 each depend directly or indirectly from claim 1. Petitioner contends these claims are also unpatentable under 35 U.S.C. § 103 based on O'Donnell and Gerber. Pet. 42–50.

*b. Ground Based on Barrie and Gerber*

Petitioner challenges claims 1–4 and 6–11 as obvious under 35 U.S.C. § 103 over Barrie and Gerber. Pet. 38–47.

Regarding claim 1, Petitioner argues that Barrie teaches "that abiraterone acetate is a selective CYP17 inhibitor that is more effective than ketoconazole, a CYP17 inhibitor known in the art, in suppressing testosterone levels in a mammal *in vivo*." Pet. 38 (citing Ex. 1005, 25:13–26:63). Gerber, Petitioner argues, teaches that "the combination of ketoconazole and prednisone (a glucocorticoid) is safe and effective in treating human patients with hormone-refractory advanced prostate cancer." *Id.* at 39–40 (citing Ex. 1005 [sic], 1177–79).

Regarding motivation to combine, Petitioner reasons that one of skill in the art "would have been motivated to add prednisone to a method of using abiraterone acetate (a CYP17 inhibitor)" to treat prostate cancer in a human patient "by Gerber's teaching that administering 5 mg prednisone twice daily with ketoconazole, also a CYP17 inhibitor, is a safe and effective treatment in human patients with hormone-refractory prostate cancer." *Id.* at 40. Petitioner also argues that one of ordinary skill in the art would have been "motivated by suggestions in the prior art that prednisone could have some amount of anti-cancer activity." *Id.* (citing Ex. 1002 ¶¶ 33, 89–90). Overall, Petitioner argues, one of ordinary skill in the art would have combined abiraterone acetate and prednisone "with a reasonable expectation of success" because the "prior art taught that abiraterone acetate was a more effective CYP17 inhibitor than ketoconazole and that the combination of ketoconazole and prednisone was safe and effective to treat patients with

hormone refractory metastatic prostate cancer, which would have motivated the combination." *Id.* at 6 (citing Ex. 1002 ¶¶ 55–59).

Claims 2–4 and 6–11 each depend directly or indirectly from claim 1. Petitioner contends these claims are also unpatentable under 35 U.S.C. § 103 based on Barrie and Gerber. Pet. 42–47.s

*2. Patent Owner's Non-Obviousness Arguments*

Patent Owner presents a series of arguments directed to the art relied upon in both of Petitioner's grounds, arguments directed to the reasons to combine the prior art, and arguments related to objective indicia of non-obviousness. PO Resp. 10–64. We address each in turn.

*a. Patent Owner's First Argument*

Patent Owner argues, first, that Petitioner's "obviousness theory is anchored on its assertion that, because abiraterone acetate and ketoconazole are both 'CYP17 inhibitors,' they will cause the same side effects." PO Resp. 13. Rather, Patent Owner argues, abiraterone acetate and ketoconazole cause very different effects on steroid biosynthesis. *Id.* (citing Ex. 2126, 29:5–17; 8:5–21). Patent Owner emphasizes that ketoconazole "is considered a *non-selective* steroid synthesis inhibitor" whereas abiraterone acetate "is a *selective* CYP17 inhibitor" that targets only CYP17. *Id.* at 13–15, Figs. 1, 2 (citing Ex. 2038 ¶¶ 19–20, 25–39, 97, 103). Patent Owner faults Petitioner's expert for omitting "any mention of these fundamental differences in the effects of ketoconazole and abiraterone acetate on the various steroid synthesis pathways, particularly those that might implicate a need for glucocorticoid replacement therapy." *Id.* at 17.

Patent Owner argues, next, that Petitioner incorrectly contends that ketoconazole and abiraterone acetate cause the same side effects. *Id.* Rather,

Patent Owner argues, there is no prior art evidence that ketoconazole causes mineralocorticoid excess. *Id.* at 18. According to Patent Owner, "mineralocorticoid production was *reduced* in patients administered ketoconazole." *Id.* (citing Ex. 2040 ¶ 38; Ex. 2067, 585). Patent Owner further argues that there was no evidence in 2006 that abiraterone acetate would cause mineralocorticoid excess. *Id.* at 19 (citing Ex. 2038 ¶¶ 154–60, 162; Ex. 2040 ¶¶ 49–66). Neither Barrie nor O'Donnell, Patent Owner notes, measures mineralocorticoid excess. *Id.* at 19–20.

Petitioner replies that ketoconazole and aminoglutethimide, known treatments for prostate cancer, inhibited production of testosterone and numerous other steroids such as cortisol, resulting in conditions such as mineralocorticoid excess and adrenal insufficiency and symptoms such as hypertension, hypokalemia, fluid retention, fatigue, nausea and vomiting, weight loss, and hypotension. Reply 4–5 (citing Ex. 1097 ¶¶ 32–33, 37–39, 41; Ex. 1104 ¶¶ 16–23). Abiraterone acetate, as a "next generation steroid synthesis inhibitor," is in the same class of treatment agents as ketoconazole and aminoglutethimide, argues Petitioner, and therefore, "a skilled artisan would have been concerned that abiraterone acetate would induce similar side effects as other steroid synthesis inhibitors." *Id.* at 5–6 (citing Ex. 1104 ¶¶ 14–31, Ex. 1097 ¶¶ 44–49). Thus, "in light of steroid synthesis inhibitors' known effects on the adrenal pathways, a skilled artisan would have been motivated to administer glucocorticoids with abiraterone acetate to counteract expected endocrine disruptions." *Id.* at 7 (citing Ex. 1097 ¶¶ 21–66, Ex. 1104

¶¶ 20–22, 40–79). Petitioner also argues that O'Donnell's test results were consistent with mineralocorticoid excess. *Id.* at 15.

Based on the information presented during trial, we understand that ketoconazole and abiraterone acetate do not have identical mechanisms. *See, e.g.,* Ex. 2038 ¶¶ 25–39, Figs. 4, 5). As noted by both Petitioner and Patent Owner, however, abiraterone acetate and ketoconazole are both steroid synthesis inhibitors, particularly, CYP17 inhibitors. Pet. 26; PO Resp. 13–15; Reply 2, 5, 9. Both parties appear to agree that, based on their respective mechanisms of action, administration of ketoconazole would inhibit production of cortisol, and administration of abiraterone acetate inhibits one of the pathways of cortisol production. Pet. 5, 26; Tr. 12:18–19; PO Resp. 14, Figs. 1, 2; Ex. 1003, 2318; Ex. 1023, 3, Fig. 1. Patent Owner takes the position that abiraterone acetate "allows some cortisol to be made." Tr. 31:27–29. Although Patent Owner urges us to focus on the differences in the mechanisms of ketoconazole and abiraterone acetate, we look not only at the differences, but also at the similarities. The evidence demonstrates that one of ordinary skill would have been aware of the differences and the similarities in the mechanisms and, nevertheless, would have compared and analogized between the two. *See, e.g.*, Ex. 1003, 2318, Figure 1; Reply 6 (citing Ex. 1104 ¶¶ 14–31; Ex. 1097 ¶¶ 44–49). Both O'Donnell and Barrie refer to ketoconazole in their discussions of abiraterone acetate, indicating that teachings regarding ketoconazole administration were a starting point for exploration of abiraterone acetate administration. Ex. 1003, 2318; Ex. 1005, Table 1. O'Donnell, after evaluating ketoconazole as an agent, turns to an evaluation of abiraterone acetate as a more selective CYP17 inhibitor, i.e., as an improvement on ketoconazole. Ex. 1003, 2318. After presenting the

results from its studies, O'Donnell discusses that, in the clinical use of ketoconazole, "it is common practice to administer supplementary hydrocortisone" and that, therefore, "further studies with abiraterone acetate will be required to ascertain if concomitant therapy with glucocorticoid is required on a continuous basis, at times of physiological stress, if patients become symptomatic or indeed at all." *Id.* at 2323. This statement represents the proposition that one of ordinary skill in the art would use the example of ketoconazole's clinical use to take the next investigative steps with abiraterone acetate. We have not been presented with evidence that dissuades us from taking this statement at face value.

Thus, we are persuaded that one of ordinary skill in the art would understand that both ketoconazole and abiraterone are CYP17 inhibitors, albeit with different mechanisms. With this knowledge, and given the teachings of the prior art on administration of ketoconazole and administration of abiraterone acetate, we find that one of ordinary skill in the art would look to the administration of ketoconazole for guidance on how to administer abiraterone acetate.

*b. Patent Owner's Second Argument*

Patent Owner argues that O'Donnell establishes no need for glucocorticoid replacement with abiraterone acetate. PO Resp. 20. First, Patent Owner argues, O'Donnell reports no side effects of abiraterone acetate warranting glucocorticoid replacement. *Id.* (citing Ex. 2038 ¶¶ 109–16; Ex. 2040 ¶¶ 26, 30–35). According to Patent Owner, "based on the clinical evidence within O'Donnell itself, a skilled person would not have concluded that abiraterone acetate suppresses cortisol production to a degree that would necessitate concomitant glucocorticoid replacement therapy." *Id.* at 21.

Next, Patent Owner argues that O'Donnell's Synacthen test results did not establish a need for glucocorticoid replacement with abiraterone acetate. *Id.* at 24. Rather, Patent Owner argues, the Synacthen test results reported in O'Donnell "do not allow any meaningful conclusions to be drawn and would have been unhelpful in determining if a patient had a diagnosable adrenal disorder." *Id.* (citing Ex. 2040 ¶¶ 12–17, 27–29, 32–33; Ex. 2038 ¶¶ 115–18; Ex. 2051, 195; Ex. 2052, 927).

Petitioner replies that skilled artisans would have had concerns generally about the potential reduction in cortisol based on abiraterone acetate's inhibition of CYP17, and specifically, about adrenal insufficiency with abiraterone acetate. Reply 9–10. According to Petitioner, the prior art contained "independent data finding that abiraterone acetate may induce adrenal insufficiency." *Id.* at 10 (citing Ex. 1097 ¶¶ 48, 50–55, Ex. 1104 ¶¶ 40–48). Petitioner points to O'Donnell's Synacthen test and the abnormal test results by day 11, as well as O'Donnell's statement that "[s]ome impact on adrenal reserve was predictable from the steroid synthesis pathway," to support its argument that one of ordinary skill would have been motivated to administer glucocorticoid therapy with abiraterone acetate "to prevent potentially deadly adrenal insufficiency and low adrenal reserve." *Id.* at 10–11, 13.

We agree with Petitioner's plain reading of O'Donnell as indicating further investigation of the necessity of co-administration of a glucocorticoid with abiraterone acetate. O'Donnell clearly states that adrenocortical suppression may require administration of replacement glucocorticoid. Ex. 1003, Abstract, 2323. O'Donnell also states that "[s]ome impact on adrenal reserve was predictable from the steroid synthesis pathway." *Id.*

at 2323. Regarding administration of ketoconazole, O'Donnell states that "it is common practice to administer supplementary hydrocortisone" and that this may prove necessary with abiraterone acetate. *Id.* On the basis of the clinical evidence, O'Donnell reports that the need for concomitant therapy of abiraterone acetate with a glucocorticoid needs to be further investigated. *Id.* We disagree with Patent Owner that O'Donnell establishes that there is *no need* for glucocorticoid replacement with abiraterone acetate. Based on a plain reading, O'Donnell evaluates the evidence and expresses concerns based on the evidence regarding co-administration of a glucocorticoid with abiraterone acetate; it does not teach away from such co-administration, nor does it conclude that such co-administration is unnecessary.

Regarding the interpretation of O'Donnell's Synacthen test, we do not agree that the results "do not allow any meaningful conclusions to be drawn." PO Resp. 24. We are persuaded that one of ordinary skill in the art would understand the results of this test to be an indicator that something was amiss with the O'Donnell Study C patients' cortisol levels following administration of abiraterone acetate. Results of the Synacthen test led O'Donnell to conclude that further studies were needed to determine whether glucocorticoid replacement would be necessary. Ex. 1003, 2323. We understand Patent Owner's position that the "Synacthen test results in O'Donnell measure only cortisol, and do not account for the total glucocorticoid levels in the body" (PO Resp. 25), but do not perceive that a complete picture of a patient's glucocorticoid production is required for one of ordinary skill in the art to be motivated to explore whether glucocorticoid replacement therapy was necessary. Petitioner's experts opine that O'Donnell's Synacthen test was the standard diagnostic for adrenal

insufficiency and ideal for identifying early adrenal insufficiency. Reply 10–11 (citing Ex. 1097 ¶¶ 34–35, 48, 50; Ex. 1104 ¶¶ 40–48). Petitioner's experts also opine that low adrenal reserve, which is closely related to adrenal insufficiency and can be fatal, is likely when abnormal Synacthen results and otherwise normal cortisol levels and few symptoms are present. *Id.* at 11–12 (citing Ex. 1097 ¶¶ 38, 52–54, 71). We credit this testimony as supporting Petitioner's argument that one of ordinary skill in the art, upon reviewing O'Donnell's Synacthen test results and statement regarding impact on adrenal reserve, would not conclude that they lack any significance; rather, they would conclude that they are significant enough to merit further investigation of administration of abiraterone acetate with glucocorticoids.

*c. Patent Owner's Third Argument*

Patent Owner argues that ketoconazole with prednisone was not known to be "safe and effective" for prostate cancer in 2006. PO Resp. 27. First, Patent Owner argues, Gerber did not establish that ketoconazole with prednisone was safe and effective for prostate cancer. *Id.* (citing Ex. 2038 ¶¶ 167–87). Patent Owner disagrees that one of ordinary skill in the art would have read Gerber as Petitioner suggests, but rather, would have recognized that "Gerber advanced a scientifically unsupportable premise – that any decline in PSA in a treated patient was a 'response' to the combination treatment." *Id.* at 28. Second, Patent Owner argues that other prior art taught that ketoconazole with prednisone was not a safe and effective treatment of prostate cancer, but rather a "last resort" therapy for patients who had failed other options. *Id.* at 29. Patent Owner points to clinical test results showing that "ketoconazole in combination with a

glucocorticoid, such as hydrocortisone or prednisone, failed to provide any survival benefit in mCRPC in Phase II and Phase III studies." *Id.*

Petitioner replies that these arguments are "meritless" because, "even if true, *abiraterone acetate* was established as an effective prostate cancer treatment in 2006" and the claims recite abiraterone acetate, not ketoconazole. Reply 20–21. Petitioner also challenges Patent Owner's argument that ketoconazole and prednisone is not "safe and effective" because it is not FDA-approved. *Id.* at 21. Petitioner further argues that prior art use of glucocorticoids with steroid synthesis inhibitors is relevant because it would have suggested the combination to skilled artisans, pointing to ketoconazole's off-label prescription with prednisone or hydrocortisone to treat advanced prostate cancer. *Id.* (citing Ex. 1104 ¶¶ 16, 30, 34; Ex. 1003, 7; Ex. 1107).

We disagree that Petitioner's arguments and evidence regarding the administration of ketoconazole with prednisone are lacking. Gerber, despite the fact that it was not a Phase III trial, nevertheless is a peer-reviewed article published in a reputable journal, indicating that treatment with ketoconazole and prednisone demonstrated some degree of success in a group of patients. Ex. 1004. O'Donnell (2004), which is later in time than Gerber (1990), corroborates that in the clinical use of ketoconazole, it is "common practice" to administer supplementary hydrocortisone. Ex. 1003, 2323. Patent Owner's argument that ketoconazole was a "last resort" does not undercut the teachings of Gerber, or Gerber's demonstration that the combination of ketoconazole and prednisone worked for some patients, in which it was reasonably well tolerated, considering the circumstances. Ex. 1002 ¶¶ 33–35; Ex. 1004, 1079. Gerber reasonably stands for the proposition that

administration of ketoconazole and prednisone is tolerated and effective in a subset of patients, and at the time it was published, indicated some measure of efficacy for certain mCRPC patients. The prior art demonstrating use of ketoconazole with a glucocorticoid for advanced prostate cancer would have informed one of ordinary skill in the art that this was a possible approach to treatment.

*d. Patent Owner's Fourth Argument*

Patent Owner argues that prednisone's severe side effects would have dissuaded persons from using it without a clear clinical benefit. PO Resp. 30. First, Patent Owner argues, use of glucocorticoids was discouraged because of adverse side effects, particularly in prostate cancer patients. *Id.* Second, Patent Owner argues that the prior art taught that prednisone could fuel the prostate cancer. *Id.* at 32. Third, Patent Owner argues that, if symptoms of mineralocorticoid excess occurred, a skilled person would have addressed them with other available drugs, such as eplerenone, anti-hypertensives, diuretics, and potassium supplements. *Id.* at 35.

Petitioner replies that nothing about prednisone's side effects would have dissuaded skilled artisans from co-administering it with abiraterone acetate to advanced prostate cancer patients. Reply 19. First, Petitioner argues that prednisone's side effects were minimal and greatly outweighed by its prevention of potentially deadly side effects. *Id.* Second, Petitioner argues that the prior art did not teach that prednisone fueled prostate cancer. *Id.* at 20.

Although glucocorticoids have certain risks, we are not persuaded that those risks outweigh the positive effects in seriously ill patients with limited life expectancy, such that a person of ordinary skill in the art would have

been dissuaded from administering glucocorticoids to a mCRPC patient. We have sufficient evidence before us that the risks of glucocorticoid therapy were known, that the longevity of mCRPC patients was short, that glucocorticoid therapy was reasonably well tolerated in the short term, and that any long-term side effects would have been viewed by one of ordinary skill in the art in light of the same. Reply 19–20. Thus, we are persuaded that one of ordinary skill in the art would not have been dissuaded from administering abiraterone acetate with prednisone, but rather, would have been motivated to co-administer prednisone with abiraterone acetate.

Additionally, the existence of alternative treatments for mineralocorticoid excess, as discussed by Patent Owner, does not persuade us that one of ordinary skill in the art would employ these alternatives to the exclusion of prednisone. Rather, we are persuaded by Petitioner's argument that the better option for a typically high-risk, elderly population would have been co-administration of glucocorticoid replacement therapy. Reply 19 (citing Ex. 1104 ¶¶ 68–69; Ex. 1097 ¶ 97).

*e. Patent Owner's Fifth Argument*

Patent Owner argues that, in 2006, prednisone was not known to have anti-cancer effects. PO Resp. 35. More particularly, Patent Owner argues that a skilled person would not have considered prednisone to be an effective anti-cancer agent alone, and would have no expectation that co-administration of prednisone with abiraterone acetate would result in an enhanced anti-cancer effect. *Id.* at 35–36.

Petitioner replies that Patent Owner's position "merely compounds" Patent Owner's claim construction error. Reply 17. During the IPR2016-00286 proceeding, Petitioner notes, "the Board clearly held that 'treatment'

does not require an antitumor or anticancer effect." Reply 18 (citing IPR2016-00286, Decision on Institution (Paper 14) at 5; IPR2016-00286, Decision Denying Request for Rehearing (Paper 23) at 3 (rejecting Janssen's request for rehearing and noting that the Board's construction of "treating" does not require "having an anti-cancer effect on").

In making this argument, Patent Owner does not contest, but does discuss, our claim constructions of "therapeutically effective amount of prednisone," as well as "treat," "treating," and "treatment." PO Resp. 35–36. Our construction of "treat," "treating," and "treatment" comes directly from the specification: these terms "include the eradication, removal, modification, management or control of a tumor or primary, regional, or metastatic cancer cells or tissue and the minimization or delay of the spread of cancer." We construed "therapeutically effective amount of prednisone" as "an amount of prednisone effective for treating prostate cancer," which invokes the term "treating."

The specification is directed to the administration of abiraterone acetate with "at least one additional therapeutic agent, *such an as anti-cancer agent or a steroid*." Ex. 1001, 1:10–12 (emphasis added). Therefore, the specification identifies, as therapeutic agents, both anti-cancer agents and steroids (the specification does not explicitly define "therapeutic agent").

The specification explicitly defines "anti-cancer agent" as "any therapeutic agent that directly or indirectly kills cancer cells or directly or indirectly prohibits, stops or reduces the proliferation of cancer cells." *Id.* at 4:8–16; *see also supra* (construing "anti-cancer agent"). The specification lists many examples of anti-cancer agents. *See, e.g.,* Ex. 1001, 3:17–18 (listing mitoxantrone, paclitaxel, docetaxel, leuprolide, goserelin, triptorelin,

seocalcitol, bicalutamide, and flutamide), 7:43–51 (listing hormone ablation agents, anti-androgen agents, differentiating agents, anti-neoplastic agents, kinase inhibitors, anti-metabolite agents, alkylating agents, *antibiotic agents,* immunological agents, interferon-type agents, intercalating agents, growth factor inhibitors, cell cycle inhibitors, enzymes, topoisomerase inhibitors, biological response modifiers, mitotic inhibitors, matrix metalloprotease inhibitors, genetic therapeutics, and anti-androgens) (emphasis added), 9:53–10:11. Thus, as set forth by the specification, antibiotic agents are one example of anti-cancer agents. *Id.* at 7:46. The specification lists examples of antibiotic agents, and includes in this list dexamethasone, corticosteroids such as hydrocortisone, *prednisone*, and prednisolone. *Id.* at 9:30–46. Therefore, prednisone, as an antibiotic agent, is an anti-cancer agent, according to the specification.

The specification does not explicitly define "steroid." The specification lists a few examples of steroids, namely, "corticosteroids or glucocorticoids" (*id.* at 10: 16–17), "hydrocortisone, *prednisone*, or dexamethasone" (*id.* at 3:19–20, 10:20–21 (emphasis added)), and "prednisolone" (*id.* at 10:35). In discussing administration of steroids, the specification provides that the "amount of the steroid administered to a mammal having cancer is an amount that is sufficient to *treat* the cancer whether administered *alone* or in combination with a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor." *Id.* at 10:21–24 (emphasis added).

The specification, therefore, appears to make a distinction between anti-cancer agents, on the one hand, and steroids, on the other hand. They are treated in the specification as two different categories of therapeutic agents. *See id.* at 3:15–20 ("a therapeutically effective amount of at least one

additional anti-cancer agent, such as, but not limited to, mitoxantrone, paclitaxel, docetaxel, leuprolide, goserelin, triptorelin, seocalcitol, bicalutamide, flutamide, or a steroid including, but not limited to, hydrocortisone, prednisone, or dexamethasone.”).

The anti-cancer agent exemplars in the specification have an anti-cancer effect, as that term is defined. The four steroid examples given (dexamethasone, hydrocortisone, prednisone, and prednisolone), which are identified as antibiotic agents and therefore anti-cancer agents, presumably have an anti-cancer effect. However, because steroids are discussed separately from anti-cancer agents in the specification, they are treated differently than anti-cancer agents: the identified steroids are anti-cancer agents, but they also are treated by the specification as a different category of therapeutic agents. Although steroids may have anti-cancer effects, as suggested by the evidence we have before us in the specification, the specification does not foreclose that they may also have other therapeutic effects. It would make little sense for the specification to identify the four steroid examples given as anti-cancer agents, and then to address them again as steroids, if these four steroid examples did not have an effect apart from an anti-cancer effect.

Treatment, according to the ’438 specification, therefore, can include eradication of a tumor, as would be expected of an anti-cancer agent. Treatment, however, need not exclude other effects that may be provided by steroids. Treatment by steroids can also refer to the other treatments that are “included” in the construction of “treat,” “treating,” and “treatment,” such as management or control of a tumor, cancer cells or tissue, and minimization or delay of the spread of cancer. “As a patent law term of art, ‘includes’ means

'comprising.'" *SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1284 (Fed. Cir. 2005) (citations omitted). The terms "management" and "control" in the definition also do not foreclose that the terms "treat," "treatment," or "treating" may refer to different effects derived from administration of steroids, apart from anti-cancer effects, such as palliative effects.

We construed "therapeutically effective amount of prednisone" as "an amount of prednisone effective for treating prostate cancer." Thus, because "treating" can "include" a number of actions, prednisone may be used to "treat" prostate cancer, perhaps by an anti-cancer effect, or perhaps by some other mechanism. Thus, we determine that Petitioner has met its burden that the prior art provides a reasonable expectation that prednisone could be used as a therapeutic agent in the treatment of prostate cancer.

*f. Patent Owner's Sixth Argument*

Patent Owner argues that a skilled person would not have had a reasonable expectation of success in achieving the '438 patented invention. PO Resp. 37. More particularly, Patent Owner argues that the prior art provided no basis for a skilled person to expect prednisone would provide anti-prostate cancer effects. *Id.* Additionally, Patent Owner argues that the unpredictability of drug combination therapy for prostate cancer precludes obviousness. *Id.* at 40.

Because this argument is premised on the same claim construction principles as Patent Owner's fifth argument, we refer to and incorporate our analysis regarding the same, *supra*, to address this argument. Regarding Patent Owner's unpredictability argument, we note that Claim 1, which is directed to the administration of abiraterone acetate and prednisone, does not

require a particular result. It does require a "therapeutically effective amount" of each component, but as we have discussed above, the claim language does not require any unexpectedly synergistic anti-cancer results. Moreover, although ketoconazole and prednisone do not meet Patent Owner's measure of "success," Gerber and other art nevertheless disclose its effective administration to a subset of patients. Therefore, Patent Owner's unpredictability argument, viewed in light of the language of the challenged claims and the evidence of record, does not convince us that the Petitioner has not established by a preponderance of the evidence a reasonable expectation of achieving the method for treatment of a prostate cancer in a human recited by the challenged claims.

*g. Patent Owner's Seventh Argument*

Patent Owner argues that Petitioner's obviousness grounds rely on hindsight. PO Resp. 41. More particularly, Patent Owner argues that Petitioner ignores the "unpredictable landscape facing the skilled person in 2006 and instead frames the questions as whether there is any conceivable reason for using prednisone with abiraterone acetate in the treatment of prostate cancer." *Id.* at 42.

Petitioner challenges this argument, asserting that despite Patent Owner's allegations of "hindsight bias," Patent Owner "never disputes that abiraterone acetate was known to be effective for treating prostate cancer, in part based on past successes with ketoconazole and aminoglutethimide." Reply 6 n.2.

We are unpersuaded, based on the evidence before us on the full record, that Petitioner's reasoning demonstrates impermissible hindsight. *See, e.g., In re McLaughlin,* 443 F.2d 1392, 1395 (CCPA 1971) ("Any

judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper."). Although the thrust of the research in the relevant area at the relevant time may have focused on different approaches to prostate cancer, the art cited by Petitioner discloses that some research focused on use of a CYP17 inhibitor with glucocorticoids to treat prostate cancer. This persuades us that Petitioner's reasoning incorporates and relies on the knowledge of those of ordinary skill in the art at the time of the invention, notwithstanding Patent Owner's arguments that this research was overshadowed by a different line of investigation.

*h. Patent Owner's Eighth Argument*

Patent Owner argues that Petitioner has failed to meet its burden of demonstrating obviousness of the claimed invention, pointing particularly to its arguments regarding motivation to combine. PO Resp. 43. Patent Owner argues that (1) O'Donnell and Gerber do not provide a reason to use prednisone with abiraterone acetate to treat prostate cancer; (2) Barrie and Gerber do not provide a reason to use prednisone with abiraterone acetate to treat prostate cancer; and (3) the prior art taught away from using prednisone in prostate cancer patients. *Id.* at 43–47. Regarding the combination of O'Donnell and Gerber, Patent Owner argues that they provide no "safety and tolerability" reasons to administer prednisone with abiraterone acetate, and that a person of ordinary skill would have been dissuaded from administering prednisone to a prostate cancer patient without a demonstrated clinical need. *Id.* at 45. Regarding Barrie and Gerber, Patent Owner argues that Barrie

"says nothing about glucocorticoid replacement or prednisone with any of the many compounds disclosed" and, thus, the combination provides no logical reason for a skilled person to treat a prostate cancer patient with prednisone and abiraterone acetate. *Id.* at 46. Regarding teaching away, Patent Owner argues that the prior art demonstrates that "a skilled person would have found substantial reasons not to co-administer prednisone with abiraterone acetate to treat prostate cancer patients." *Id.* at 47.

In both its grounds, Petitioner states that the motivation to add prednisone to the method of treating prostate cancer of either O'Donnell or Barrie is seen in Gerber, which teaches that the administration of ketoconazole, a CYP17 inhibitor, in combination with 5 mg prednisone twice daily, is safe and effective in treating human patients with hormone-refractory prostate cancer. Pet. 40–41. Thus, the absence of mention of glucocorticoid replacement or prednisone in Barrie does not change the analysis of whether Gerber provides motivation to combine. For the first ground based on O'Donnell, Petitioner further states that "concomitant hormone replacement therapy with a glucocorticoid may be needed when using abiraterone acetate to treat prostate cancer in a human patient." *Id.* at 39. Regarding O'Donnell, we are persuaded, as we have discussed above, that one of ordinary skill in the art would have translated the clinical experience with ketoconazole to abiraterone acetate.

The teachings of the references do not rise to the level of teaching away from Petitioner's proposed combination—they do not criticize, discredit, or otherwise discourage the solution claimed. *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) (explaining "[t]he prior art's mere disclosure of more than one alternative does not constitute a teaching away

from any of these alternatives because such disclosure does not criticize, discredit, or otherwise discourage the solution claimed"). Rather, as Petitioner argues, the prior art encourages exploration of such a combination. Pet. 38–42. Thus, we find that the prior art does not teach away from administration of prednisone to mCRPC patients.

3. *Objective Indicia of Non-Obviousness*

In its Petition, Petitioner contends that the Patent Owner may try to rely on secondary considerations of non-obviousness. Pet. 51–61. Specifically, the Petition raises arguments related to commercial success, unexpected results, long-felt need, the existence of a blocking patent, and copying. *Id.*

In its Response, Patent Owner presents arguments directed to objective indicia of nonobviousness. PO Resp. 48–64. Patent Owner argues that the objective indicia of non-obviousness demonstrate: 1) unexpected results; 2) skepticism and the failure of others; 3) the claimed invention has met a long-felt need; and 4) the claimed invention has significant commercial success. *Id.*

In its Reply, Petitioner presents arguments related to unexpected results, skepticism and failure of others, long-felt but unmet need, and commercial success. Reply 22–27.

Factual inquiries for an obviousness determination include secondary considerations based on evaluation and crediting of objective evidence of nonobviousness. *Graham*, 383 U.S. at 17. Secondary considerations may include any of the following: long-felt but unsolved needs, failure of others, unexpected results, commercial success, copying, licensing, and praise. *Id.* The totality of the evidence submitted may show that the challenged claims

would not have been obvious to one of ordinary skill in the art. *In re Piasecki*, 745 F.2d 1468, 1471–72 (Fed. Cir. 1984). Before we make our final obviousness determination, we must consider the evidence of obviousness anew in light of any evidence of secondary considerations of nonobviousness presented by Patent Owner. *See Graham*, 383 U.S. at 17–18 ("Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."); *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012) ("This objective evidence must be 'considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art.'" (quoting *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39 (Fed. Cir. 1983))).

All types of objective evidence of nonobviousness must be shown to have a nexus to the claimed invention. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) (nexus generally); *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996) (commercial success); *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (unexpected results); *Rambus Inc. v. Rea*, 731 F.3d 1248, 1256 (Fed. Cir. 2013) (long-felt need). The stronger the showing of nexus, the greater the weight accorded the objective evidence of nonobviousness. *See Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 306 (Fed. Cir. 1985).

*a. Unexpected Results*

Patent Owner asserts that unexpected results are demonstrated by groundbreaking clinical studies showing that the addition of a glucocorticoid

unexpectedly enhanced the response to abiraterone acetate. PO Resp. 48. According to Patent Owner, a first clinical study involved abiraterone acetate monotherapy and an "extension study" in which dexamethasone was co-administered to patients. *Id.* (citing Ex. 2014, Abstract; Ex. 2133). In this study, "when a glucocorticoid was added to the treatment regimen after a patient stopped responding to abiraterone acetate monotherapy, many patients started responding again, regardless of whether that patient's disease had worsened while on glucocorticoids in the past." *Id.* at 49–50. Patent Owner presents a table comparing abiraterone acetate monotherapy to abiraterone acetate administered with dexamethasone (in clinical trial COU-AA-001, from Ex. 2015) and to abiraterone acetate administered with prednisone (in clinical trial COU-AA-002, from Ex. 2017) to argue that patients given abiraterone acetate with prednisone responded for more than twice as long on average as those given abiraterone acetate alone. *Id.* at 53–54. Patent Owner concludes that the "combination therapy provided patients with advanced prostate cancer an overall survival benefit, which is exceedingly uncommon in prostate cancer drug development." *Id.* at 54.

In the Petition, Petitioner argues that the prednisone administered in the approved indication for Zytiga (the trademark for abiraterone acetate) is intended as hormone replacement therapy, not as an anti-cancer therapy, and therefore, one of ordinary skill in the art would not expect the combination of prednisone and abiraterone acetate to yield "any additional clinically significant anti-cancer benefit." Pet. 54–55. To the extent that co-administration of prednisone with abiraterone acetate "made treatment of prostate cancer with abiraterone safer and/or more tolerable, this greater safety and/or tolerability was expected." *Id.* at 58. In the Reply, Petitioner

argues that the Response (1) did not show a statistically significant difference between any of the time to PSA progression ("TTPP") estimates it compared; (2) omitted contradictory data from its other clinical trials; (3) ignores that the patients in the study producing longer TTPP were healthier at the start of the study; and (4) has not shown that the claimed combination produces any survival advantage over abiraterone acetate alone, which could be attributed to the use of prednisone. Reply 22–23. Petitioner further argues that the challenged claims do not claim treating patients with abiraterone acetate and dexamethasone, but rather, treating patients with abiraterone acetate and prednisone. *Id.* at 23–24.

Regarding Patent Owner's comparison of abiraterone acetate monotherapy with abiraterone acetate/dexamethasone therapy, we agree with Petitioner that this evidence "tells you something about the combination of abiraterone with dexamethasone. It tells you nothing about the combination we have here, abiraterone plus prednisone." Tr. 18:8–10. Although dexamethasone and prednisone are both glucocorticoids, Petitioner points to evidence indicating that dexamethasone and prednisone had different activities. Tr. 38:13–16 (citing Ex. 1104 ¶¶ 104–06). Because the claims cover prednisone, and not any other glucocorticoid, the results of the combination of dexamethasone with abiraterone acetate are of limited use, as we are not informed of the similarities or differences of the mechanism of action of those glucocorticoids or how the mechanism leads to the asserted unexpected results.

Moreover, to the extent the table purportedly compares the abiraterone acetate monotherapy to abiraterone acetate administered with prednisone, the table compares the abiraterone acetate monotherapy administered in clinical

trial COU-AA-001 with the abiraterone acetate administered with prednisone in clinical trial COU-AA-002, without explaining or accounting for the differences between the two trials. PO Resp. 51–54.

We determine that there is insufficient evidence that the alleged unpredictable and unexpected results of abiraterone acetate and prednisone are objective indicia of nonobviousness of the challenged claims. Patent Owner does not sufficiently tie the allegedly unpredictable and unexpected result to the administration of abiraterone acetate and prednisone as claimed. Thus, we determine this consideration does not weigh in favor of the patentability of the challenged claims.

*b. Skepticism and the Failure of Others*

Patent Owner describes the history of abiraterone acetate development as a series of starts and stops. PO Resp. 55–57. The sponsor of the research described in O'Donnell, according to Patent Owner, lost interest and terminated the development program in 1999. *Id.* No clinical data concerning abiraterone acetate was published until O'Donnell in 2004. *Id.* at 54. During this time, other potential therapeutic agents and regimens for prostate cancer were investigated without success. *Id.* at 56–57.

Petitioner argues that the testimony of Patent Owner's declarant, Dr. Judson, refutes Patent Owner's arguments. *See* Reply 24–25. Petitioner also argues that Patent Owner's failure of others evidence is irrelevant as it is not directed to others' attempts to improve abiraterone acetate's side effects, or even to abiraterone acetate at all. *Id.* at 25.

"Evidence of industry skepticism weighs in favor of non-obviousness. If industry participants or skilled artisans are skeptical about whether or how a problem could be solved or the workability of the claimed solution, it

favors non-obviousness." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1335 (Fed. Cir. 2016).

Based on Patent Owner's evidence, it does appear that abiraterone acetate was viewed with some skepticism until the application for the '438 patent was filed in 2006. However, abiraterone acetate was also previously patented in 1997 (Barrie), and therefore at least some in the industry had overcome their skepticism sufficiently to undertake research on and to seek a patent on the invention of abiraterone acetate alone. Moreover, the claims at issue are directed to the combination of abiraterone acetate with prednisone, whereas Patent Owner's arguments are directed to the purported skepticism of the industry toward abiraterone acetate alone, which falls short of establishing a nexus between skepticism of the industry and the challenged claims. Finally, the "failure of others" argument as it relates to the combination of abiraterone acetate with prednisone may have come about as a result of other factors, such as a blocking patent (Barrie), as we discuss more fully below. Thus, we determine that these factors do not weigh in favor of patentability of the challenged claims.

*c. Long-Felt Need*

According to Patent Owner, before to the invention claimed in the '438 patent, "the prognosis for men with mCRPC was dismal," and thus, "there was an urgent need for new agents that would improve survival." PO Resp. 57.

In the Petition, Petitioner argues that "any success of Zytiga® that is not a result of the alleged novel features of the claimed invention is irrelevant to secondary considerations" because the combination of abiraterone acetate and prednisone does not produce unexpected results in anti-cancer benefit,

and “the perception among clinicians is that the requirement to coadminister prednisone with Zytiga is a drawback to its use to treat prostate cancer.” Pet. 59 (citing Ex. 1017 ¶¶ 23, 29–34; Ex. 1002 ¶¶ 84, 90, 93–96). Petitioner also argues that any need for a clinically efficacious treatment was satisfied by abiraterone acetate itself, or by Xtandi, a competing drug claimed in patents filed more than a year before the earliest priority date of the ’438 patent. Reply 25.

We determine that, although drugs that contribute to increasing cancer patient survival rates nearly always satisfy a long-felt need, Patent Owner has not presented sufficient evidence that a specific long-felt need existed for the method of administering abiraterone acetate and prednisone claimed in the ’438 patent. Abiraterone acetate’s availability (and underutilization) for approximately a decade prior to issuance of the ’438 patent undermines Patent Owner’s argument that a long-felt need existed for any regimen based on abiraterone acetate. The record also indicates that, although there were drawbacks to the existing drugs, there were other drugs on the market that were available to prostate cancer patients. Ex. 1002 ¶¶ 96; Ex. 1104 ¶¶ 112–13. We are not satisfied that long-felt need is necessarily objective indicia of nonobviousness of the challenged claims. Thus, we determine this consideration is neutral regarding the patentability of the challenged claims.

*d. Commercial Success*

Patent Owner argues that “ZYTIGA® therapy has been an outstanding commercial success, with U.S. sales reaching $1.07 billion in 2015 and $1.09 billion in 2016.” PO Resp. 58. Patent Owner criticizes Mr. Hoffman’s analysis of Zytiga’s market share, arguing that under any metric, Zytiga has achieved substantial market share. *Id.* at 60–61. To support its argument,

Patent Owner presents evidence of market share. *Id.* at 59–61 (citing Ex. 1012, 6–8; Ex. 2044 ¶¶ 8–9, 64–68, Appendix C, C-1, D). Patent Owner also presents evidence that there is a nexus between the '438 patent claims and the commercial success of Zytiga. *Id.* at 61 (citing Ex. 2038 ¶¶ 214–19; Ex. 2044 ¶¶ 54–61).

In its Petition, discussing the prosecution history, Petitioner argues that the information presented to the Examiner "fails to show any nexus between the claimed combination and the commercial performance of Zytiga." Pet. 52–53. Petitioner also argues that applicants made no effort during prosecution to suggest that the claimed invention, rather than the prior art abiraterone acetate, was responsible for the commercial success of Zytiga. *Id.* at 53. More particularly, Petitioner argues that Zytiga is a commercial embodiment of Barrie, rather than the '438 patent. *Id.* at 53–54. Petitioner further argues that the existence of a blocking patent (here, Barrie) limits the applicability of any evidence of commercial success to overcome a prima facie case of obviousness. *Id.* at 59–60 (citing *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1376–77 (Fed. Cir. 2005)). In its Reply, Petitioner reiterates (1) the significance of the Barrie patent as a blocking patent; (2) that Petitioner fails to establish any nexus to the '438 claims; and (3) that the commercial success evidence submitted to the examiner was insufficient to demonstrate commercial success. Reply 25–27. Petitioner does not materially dispute the $1.07 billion or $1.09 billion annually in sales figures.

"When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention." *J.T. Eaton & Co. v.*

*Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997); *WBIP*, 829 F.3d at 1329. That presumption of nexus, however, is rebuttable, as "a patent challenger may respond by presenting evidence that shows the proffered objective evidence was 'due to extraneous factors other than the patented invention.'" *WBIP*, 829 F.3d at 1329 (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1393 (Fed. Cir. 1988)).

There is no real dispute that Zytiga is commercially successful in terms of dollar figures. PO Resp. 58. However, as discussed herein, abiraterone acetate was previously known and patented. Ex. 1005. "Where 'market entry by others was precluded [due to blocking patents], the inference of non-obviousness of [the asserted claims], from evidence of commercial success, is weak.'" *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 740 (Fed. Cir. 2013) (quoting *Merck & Co.*, 395 F.3d at 1377). Even if the Barrie patent were "available for licensing and was actively shopped around to other companies" between 2000 (after which a previous license expired) and 2004 (when the predecessor of Patent Owner took a license), the record evidence does not indicate that those efforts in this span of time remove the deterrent effect of the blocking patent. PO Resp. 63 (citing Ex. 2044 ¶¶ 26, 29–33); Reply 25 (citing Ex. 1134 ¶¶ 8–17). Thus, although the revenues generated by Zytiga are substantial, the commercial success of Zytiga is mitigated by the existence of a blocking patent. We are persuaded, rather, by Petitioner's argument that the blocking patent would have deterred others from exploring the commercial potential of abiraterone acetate, and thus, that blocking patent to abiraterone acetate limits the applicability of other evidence of commercial success.

We also note Petitioner's argument that there is no nexus between the commercial success and the claimed invention, in that the record evidence attributes Zytiga's commercial success to abiraterone acetate, rather than to the combination of abiraterone acetate and prednisone. Reply 21–23. In this case, if the feature that created the commercial success was known in the prior art, i.e., abiraterone acetate, the success is not pertinent to the issue of obviousness. *Galderma Labs.*, 737 F.3d at 740. As the Zytiga prescribing information indicates, the stated purpose of co-administration of prednisone or "a corticosteroid" is reducing the incidence of adverse reactions due to CYP17 inhibition. Ex. 1018, 3–6 ("[c]o-administration of a corticosteroid" suppresses ACTH drive, resulting in a reduction in the incidence and severity of adverse reactions such as hypertension, hypokalemia, and fluid retention as a consequence of increased mineralocorticoid levels resulting from CYP17 inhibition); Ex. 1019, 2–3 (co-administration of a corticosteroid suppresses the ACTH drive, reducing the incidence and severity of mineralocorticoid adverse reactions). Also, this literature's discussion of a corticosteroid generally contradicts the specific anti-cancer role of prednisone argued by Patent Owner. As discussed in the prescribing literature, and as supported by Petitioner's expert testimony here, Zytiga's anti-cancer effects come from abiraterone acetate. Ex. 1002 ¶¶ 81–82, 85–88. We are unpersuaded that there is a nexus between the commercial method, namely, the administration of abiraterone acetate and prednisone, and any novel features of the claimed method. Petitioner has demonstrated that both abiraterone acetate and prednisone were known in the prior art. Patent Owner's assertions that the combination of these features drove Patent Owner's increased sales do not

demonstrate a nexus between any commercial success and the claimed invention of the ’438 patent.

Thus, on this record, it is not clear whether the sales of Zytiga are due to the method recited in the ’438 patent, or the known and patented abiraterone acetate itself. Consequently, we cannot conclude from the evidence before us that the commercial success of Zytiga was due to the merits of the invention recited in the claims of the ’438 patent. Accordingly, we determine that Petitioner presents sufficient evidence to rebut the presumption of nexus between the commercial success of Zytiga and the claimed method. We, therefore, are not persuaded that Patent Owner’s evidence of commercial success supports the nonobviousness of the challenged claims.

*4. Summary*

As detailed above, the secondary considerations of nonobviousness raised by Patent Owner are neutral or not in favor of the patentability of the challenged claims, and do not outweigh the other *Graham* factors in our obviousness analysis. We determine, therefore, that Petitioner has demonstrated that the preponderance of the evidence of record supports that it would have been obvious to the ordinary artisan at the time of invention to combine Gerber with either O’Donnell or Barrie, with a reasonable expectation of success of achieving the method of challenged claim 1. We also have considered Petitioner’s arguments and evidence as to dependent claims 2–20, which reasoning we adopt as our own. We are persuaded, based on those arguments, that Petitioner has demonstrated by a preponderance of the evidence that those claims would have been obvious based on the

combination of Gerber and O'Donnell (for claims 2–20) and Gerber and Barrie (for claims 2–4 and 6–11). *See* Pet. 42–50; Ex. 1002 ¶¶ 60–76.

*F. Patent Owner's Motion to Exclude*

Patent Owner filed a Motion to Exclude (Paper 69), to which Petitioner responded (Paper 76) and to which Patent Owner filed a Reply (Paper 80). The party moving to exclude evidence bears the burden of proof to establish that it is entitled to the relief requested, e.g., that the material sought to be excluded is inadmissible under the Federal Rules of Evidence. *See* 37 C.F.R. §§ 42.20(c), 42.62(a).

Patent Owner seeks to exclude Exhibits 1002 ¶ 30; 1017; 1017 [B-1]; 1028; 1040; 1041; 1046–51; 1053–55; 1057; 1064–66; 1088; 1089; 1091 ¶¶ 17–29, 31; 1092–95; 1097, ¶¶ 11–16, 95; 1100, 1102, 1103; 1104 ¶¶ 5–9, 11–13, 88–90, 92–95, and 119–22; 1117; 1125; and 1139. Paper 69, 10. Patent Owner seeks to exclude these exhibits as (a) expert declarations and exhibits that Patent Owner alleges are outside of the scope of the prior art permitted by 35 U.S.C. § 311(b); (b) sections of Petitioner's declarations that are not cited in the briefs, and therefore irrelevant and prejudicial; and (c) exhibits that lack authenticity or violate the hearsay rule. *Id.* at 1.

Petitioner responds that (a) the Board should consider all of Petitioner's commercial success evidence; (b) the Board should consider the full record of submitted evidence, all of which is relevant and supports Petitioner's obviousness positions; and (c) the Board should consider the exhibits objected to due to lack of authenticity and hearsay, arguing that Exhibits 1017 [B-1], 1028, 1048, 1049, 1053, 1055, 1057, 1088, 1092, 1095, 1117, and 1125 have been properly authenticated by timely served

supplemental evidence, and that Exhibits 1055, 1088, and 1095 are not inadmissible hearsay. Paper 76, 1–13.

Because we do not expressly rely upon Exhibits 1017 [B-1]; 1028; 1040; 1041; 1046–51; 1053–55; 1057; 1064–66; 1086; 1088; 1089; 1092–95; 1100, 1102, 1103; 1117, 1125; and 1139 in this Decision, Patent Owner's Motion to Exclude need not be decided as to these exhibits. Accordingly, Patent Owner's Motion to Exclude is dismissed as moot as to these Exhibits. Below, we address concerns regarding Exhibits 1002, 1017, 1091, 1097, and 1104.

We do not construe Petitioner's preliminary arguments concerning secondary considerations to be a ground on which this proceeding is based. 35 U.S.C. § 311(b). We credit Petitioner's argument that the evidence Patent Owner seeks to exclude is relevant to evaluating whether the Examiner erred in allowing the '438 patent and whether Patent Owner can establish commercial success in this proceeding. Paper 76, 5. We therefore find that Exhibit 1017 concerning secondary considerations is properly part of the record.

Regarding the portions of declarations and exhibits that were not specifically cited in Petitioner's papers, we disagree with Patent Owner that we should exclude these portions. In our proceedings, "[e]vidence consists of affidavits, transcripts of depositions, documents, and things. All evidence must be filed in the form of an exhibit." 37 C.F.R. § 42.63(a). An exhibit "must be filed with the first document in which it is cited." 37 C.F.R. § 42.6(c). The Petition, as filed, references Exhibit 1002 in its List of Exhibits. Pet. vi. Exhibit 1002 was filed along with the Petition. The Reply, as filed, references Exhibits 1091, 1097, and 1104 in its List of Exhibits.

Paper 56, 8–9. Exhibits 1091, 1097, and 1104 were filed along with the Reply. We find the references to these documents adequate to support the "cited" requirement in 37 C.F.R. § 42.6(c). We are unaware of any legal basis for striking uncited paragraphs of an expert declaration or unrelied-upon portions of an exhibit. Thus, the portions of Exhibits 1002, 1091, 1097, and 1104 sought to be excluded are not inadmissible, and we shall not exclude them as such.

Accordingly, Patent Owner's Motion to Exclude is *denied* as to Exhibits 1002, 1017, 1091, 1097, and 1104, and *dismissed* as to Exhibits 1017 [B-1]; 1028; 1040; 1041; 1046–51; 1053–55; 1057; 1064–66; 1086; 1088; 1089; 1092–95; 1100; 1102; 1103; 1117; 1125; and 1139.

*G. Petitioner's Motion to Exclude*

Petitioner filed a Motion to Exclude (Paper 72), to which Patent Owner responded (Paper 78) and to which Petitioner filed a Reply (Paper 81). The party moving to exclude evidence bears the burden of proof to establish that it is entitled to the relief requested, e.g., that the material sought to be excluded is inadmissible under the Federal Rules of Evidence. *See* 37 C.F.R. §§ 42.20(c), 42.62(a).

Petitioner seeks to exclude (a) Exhibits 2010, 2037, 2120, 2122, 2124, 2125, and 2127 as embodying testimony prepared specifically for IPR2016-00286; (b) Exhibit 2151 as embodying Patent Owner's Response in IPR2016-00286; (c) Exhibit 2134 as unauthenticated, hearsay, and incomplete; and (d) Ex. 2118 as hearsay. Paper 72, 1–13.

Because we do not expressly rely upon any of these exhibits in this Decision, Petitioner's Motion to Exclude need not be decided as to these exhibits. Accordingly, Petitioner's Motion to Exclude is *dismissed* as moot

as to Exhibits 2010, 2037, 2120, 2122, 2124, 2125, 2127, 2151, 2134, and 2118.

*H. Motions to Seal*

Patent Owner filed a Motion to Seal (Paper 34), moving to seal the confidential version of the Declaration of Dr. Vellturo (Exhibit 2044) as well as Exhibits 2092, 2093, and 2118. Patent Owner represents that the parties agreed to a modified version of the Board's Default Protective Order, submitted as Exhibit 2113, and submitted a redline of the Standing Protective Order as Exhibit 2114. Paper 34, 1.

Petitioner filed a Motion to Seal (Paper 57), moving to seal the confidential version of the Declaration of Dr. Auchus (Exhibit 1143) and the confidential version of the Declaration of Dr. Hoffman (Exhibit 1134).

The motions to seal are *granted* and the modified protective order *entered*.

There is an expectation that information will be made public where the information is identified in a final written decision, and that confidential information that is subject to a protective order ordinarily would become public 45 days after final judgment in a trial, unless a motion to expunge is granted. 37 C.F.R. § 42.56; Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,761 (Aug. 14, 2012). In rendering this Final Written Decision, it was not necessary to identify, nor discuss in detail, any confidential information. However, a party who is dissatisfied with this Final Written Decision may appeal the Decision pursuant to 35 U.S.C. § 141(c), and has 63 days after the date of this Decision to file a notice of appeal. 37 C.F.R. § 90.3(a). Thus, it remains necessary to maintain the record, as is, until resolution of an appeal, if any.

In view of the foregoing, the confidential documents filed in the instant proceeding will remain under seal, at least until the time period for filing a notice of appeal has expired or, if an appeal is taken, the appeal process has concluded. The record for the instant proceeding will be preserved in its entirety, and the confidential documents will not be expunged or made public, pending appeal. Notwithstanding 37 C.F.R. § 42.56 and the Office Patent Trial Practice Guide, neither a motion to expunge confidential documents nor a motion to maintain these documents under seal is necessary or authorized at this time. *See* 37 C.F.R. § 42.5(b).

*I. Conclusion*

Having considered the parties' arguments and evidence, we evaluate all of the evidence together to make a final determination of obviousness. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1075 (Fed. Cir. 2012) (stating that a fact finder must consider all evidence relating to obviousness before finding patent claims invalid). In so doing, we conclude that Petitioner has satisfied its burden of demonstrating, by a preponderance of the evidence, that the subject matter of claims 1–20 would have been obvious over the combination of Gerber and O'Donnell and that claims 1–4 and 6–11 would have been obvious over the combination of Gerber and Barrie.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–20 are held *unpatentable*;

FURTHER ORDERED that Patent Owner's Motion to Exclude is *denied* as to Exhibits 1002, 1017, 1091, 1097, and 1104 and *dismissed* as to

Exhibits 1017 [B-1]; 1028; 1040; 1041; 1046–51; 1053–55; 1057; 1064–66; 1086; 1088; 1089; 1092–95; 1100; 1102; 1103; 1117; 1125; and 1139;

FURTHER ORDERED that Petitioner's Motion to Exclude is *dismissed* as moot;

FURTHER ORDERED that the parties' Motions to Seal are *granted* and the modified protective order *entered*; and

FURTHER ORDERED, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Brandon M. White
Crystal Canterbury
PERKINS COIE LLP
bmwhite@perkinscoie.com
CCanterbury@perkinscoie.com

FOR PATENT OWNER:

Dianne B. Elderkin
Barbara L. Mullin
Ruben H. Munoz
AKIN GUMP STRAUSS HAUER & FELD LLP
delderkin@akingump.com
bmullin@akingump.com
rmunoz@akingump.com

Trials@uspto.gov
571-272-7822

Paper 87
Entered: December 3, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

MYLAN PHARMACEUTICALS INC., ACTAVIS LABORATORIES FL, INC., AMNEAL PHARMACEUTICALS LLC, AMNEAL PHARMACEUTICALS OF NEW YORK, LLC, DR. REDDY'S LABORATORIES, INC., DR. REDDY'S LABORATORIES, LTD., SUN PHARMACEUTICALS INDUSTRIES, LTD., SUN PHARMACEUTICALS INDUSTRIES, INC., TEVA PHARMACEUTICALS USA, INC., WEST-WARD PHARMACEUTICAL CORP., and HIKMA PHARMACEUTICALS, LLC,
Petitioner,

v.

JANSSEN ONCOLOGY, INC.,
Patent Owner.

---

Case IPR2016-01332[1]
Patent 8,822,438 B2

---

Before JEFFREY N. FREDMAN, KRISTINA M. KALAN and JACQUELINE T. HARLOW, *Administrative Patent Judges*.[2]

KALAN, *Administrative Patent Judge*.

DECISION
Denying Patent Owner's Request for Rehearing
*37 C.F.R. § 42.71(d)*

---

[1] Case IPR2017-00853 has been joined with this proceeding.
[2] A Panel Change Order issued on September 28, 2018, indicating that the judges named herein now constitute the panel. Paper 86.

# I. INTRODUCTION

Janssen Oncology, Inc. ("Patent Owner") filed a Request for Rehearing (Paper 85, "Request" or "Req.") of our Final Written Decision (Paper 84, "Final Written Decision" or "Dec.") in which claims 1–20 of U.S. Patent No. 8,822,438 B2 (Ex. 1001, "the '438 patent") are unpatentable. For the reasons that follow, Patent Owner's Request for Rehearing is denied.

# II. THE REQUEST FOR REHEARING

In pertinent part, 37 C.F.R. § 42.71(d) states:

> The burden of showing a decision should be modified lies with the party challenging the decision. The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, an opposition, or a reply.

Thus, a request for rehearing is not an opportunity merely to disagree with the Board's assessment of the arguments or weighing of the evidence, or to present new arguments or evidence.

Patent Owner requests rehearing to address three issues with our Final Written Decision: first, whether the Board misapprehended evidence regarding Petitioner's reasoning for administration of prednisone with abiraterone acetate; second, whether the Board improperly relied on new theories that Petitioners raised for the first time in the Reply to find a different motivation to combine prednisone with abiraterone acetate; and third, whether the Board misapprehended the Petitioner's assertions as to the 1000 mg dose of abiraterone acetate in claims 4, 11, 19, and 20. Req. 1–3.

We have reviewed Patent Owner's Request and carefully considered all the arguments presented. For the following reasons, we are not

persuaded that the Board misapprehended or overlooked arguments or evidence with respect to the contentions asserted by Patent Owner.

## III. DISCUSSION

### *(A) Patent Owner's First Argument*

Patent Owner argues that the Board "misapprehended the significance of Petitioner's admission that ketoconazole does not cause mineralocorticoid excess." Req. 3. Patent Owner indicates that, in its Response, it argued ketoconazole did not cause mineralocorticoid excess, and pointed to prior art that showed ketoconazole suppressed production of mineralocorticoids. *Id.* at 5 (citing PO Resp. 18–19). Patent Owner argues that the Board's focus on the fact that ketoconazole would inhibit production of cortisol misapprehended that the Petition "did not portray the supposed inhibition of the production of cortisol as an 'independent' reason" to administer prednisone with abiraterone acetate. *Id.* at 6–7.

We considered this evidence and argument in our Final Written Decision, particularly noting Patent Owner's argument that "there is no prior art evidence that ketoconazole causes mineralocorticoid excess." Dec. 17 (citing PO Resp. 18). We also considered Petitioner's countervailing evidence (*id.* at 17–18), Patent Owner's Identification of New Arguments and Evidence in Petitioner's Reply (Paper 65), and Petitioner's reply to the same (Paper 74). We also noted in our Final Written Decision that Petitioner's motivation to combine appeared to be premised on the adverse effects caused by reduced production of cortisol. Dec. 13. We also relied, in the Final Written Decision, on Dr. Garnick's testimony that CYP17 inhibitors undesirably suppressed the production of cortisol, which is necessary for other biochemical cycles in the body, and which led to adverse

side effects. *Id.* at 12–13 (citing Ex. 1002 ¶¶ 42, 44, 58). We also relied on Dr. Garnick's testimony that "in light of steroid synthesis inhibitors' known effects on the adrenal pathways," one of ordinary skill in the art "would have been motivated to administer a glucocorticoid with administered abiraterone acetate to counteract expected endocrine disruptions." Dec. 17 (citing Ex. 1097 ¶¶ 21–66). We expressly addressed Petitioner's arguments and evidence, Patent Owner's arguments and evidence, and the respective testimony on this issue, and did not overlook Patent Owner's testimony or other testimony regarding the relationship between ketoconazole and mineralocorticoid excess. Nor are we persuaded, given our consideration and analysis of the testimony and other evidence, that we misapprehended the import of this testimony and evidence, or Petitioner's reliance on the same for Petitioner's arguments to support motivation to combine the relied-upon references.

*(B) Patent Owner's Second Argument*

Patent Owner argues that the Board overlooked or misapprehended evidence that abiraterone acetate does not cause adrenal insufficiency. Req. 11. Patent Owner argues that the Board relied on Petitioner's new theory, presented for the first time in the Reply, that skilled person would have been motivated to combine abiraterone acetate with prednisone because abiraterone acetate might cause "adrenal insufficiency" and/or a "low adrenal reserve." *Id.* Patent Owner also faults the Board for overlooking or misapprehending the Synacthen test results and the follow-on abiraterone acetate monotherapy study. *Id.* at 13.

As noted above, we considered Patent Owner's Identification of New Arguments (Paper 74) in rendering our Final Written Decision, as well

Petitioner's Reply (Paper 78) and the arguments presented by both parties on this issue. Dec. 2, 16–19; *see also Ericsson Inc. v. Intellectual Ventures I LLC*, 901 F.3d 1374, 1380 (Fed. Cir. 2018) (stating that reply arguments should not be parsed "with too fine a filter"). The arguments and evidence identified in Patent Owner's second argument here are part of a broader argument concerning cortisol deficiency as a result of abiraterone acetate and/or ketoconazole activity. We stated in the Final Written Decision that "we understand that ketoconazole and abiraterone acetate do not have identical mechanisms," but noted that the parties "appear to agree that, based on their respective mechanisms of action, administration of ketoconazole would inhibit production of cortisol, and administration of abiraterone acetate inhibits one of the pathways of cortisol production." Dec. 18 (citing Pet. 26; Tr. 12:18–19; Ex. 1003, 2318). We also considered and discussed the results of the Synacthen test. Dec. 20–22. Patent Owner's disagreement with our conclusions is not a proper basis for a rehearing request. Thus, our Final Written Decision, as part of a broader inquiry, looked not only at the differences, but also at the similarities, of the mechanisms of ketoconazole and abiraterone, and to the comparative discussions of both in the prior art, to determine that one of ordinary skill would have been aware of the differences and the similarities in the mechanisms. Dec. 18 (citing Ex. 1003, 2318, Figure 1). We are not persuaded that this constitutes overlooking or misapprehending aspects of Patent Owner's argument concerning cortisol deficiency.

Patent Owner also argues in the introduction of its second argument (Req. 2) that the Board disregarded the presumption of validity that patents—including those undergoing inter partes review—are entitled to

under 35 U.S.C. § 282. Patent Owner further argues that the Board overlooked or misapprehended that evidence that skilled artisans evaluated O'Donnell and nevertheless proceeded to undertake studies based on abiraterone acetate monotherapy. Req. 13. Patent Owner, however, does not point us to where these argument were raised previously. 37 C.F.R. § 42.71(d). Therefore, Petitioners did not have an opportunity to respond to these issues. Nor did Patent Owner previously address the question of why the presumption of validity in 35 U.S.C. § 282 controls inter partes review proceedings in light of the statement in 35 U.S.C. § 316(e) that "In an inter partes review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence." Accordingly, because Patent Owner does not demonstrate that these arguments were raised previously, and because we cannot be assured that Petitioner has had any opportunity to respond, we do not consider these arguments in our present order.

*(C) Patent Owner's Third Argument*

Patent Owner argues that the Board misapprehended that the prior art does not teach or suggest a 1000 mg abiraterone acetate dose. Req. 14. More particularly, Patent Owner faults the Board for adopting Petitioners' assertions made in support of its arguments that a skilled person would have been motivated to increase the dose of abiraterone acetate disclosed in the prior art references. *Id.* at 15*; see also* Dec. 43 ("We also have considered Petitioner's arguments and evidence as to dependent claims 2–20, which reasoning we adopt as our own.").

Patent Owner now presents a new argument that we misapprehended the teachings of the prior art with respect to claims 4, 11, 19, and 20.

Req. 14–15. Patent Owner, however, does not point out where this matter was previously raised. Because Patent Owner has not previously raised any of its arguments presented in the Request, we are not permitted to consider its arguments now. 37 C.F.R. § 42.71(d). Moreover, we did not overlook Patent Owner's arguments regarding these claims; rather, we considered and adopted Petitioner's arguments regarding these claims. Dec. 43; *cf. Cutsforth, Inc. v. Motive Power, Inc.*, 636 F. App'x 575 (Fed. Cir. 2016) (nonprecedential). Patent Owner's failure to argue specifically against these claims during trial does not permit Patent Owner to now present arguments in this regard.

## IV. CONCLUSION

We have reviewed and considered the arguments in Patent Owner's Request and conclude that Patent Owner has not carried its burden of demonstrating that the Board misapprehended or overlooked any matters in rendering the Final Written Decision. 37 C.F.R. § 42.71(d). Rather, Patent Owner uses its Request as an opportunity to argue positions with which we disagreed in our Final Written Decision. Merely disagreeing with our analysis or conclusions does not serve as a proper basis for a request for rehearing. Patent Owner also uses its Request to raise matters without adequately demonstrating where those matters previously were raised. Thus, Patent Owner's challenge does not meet the standard set forth for a request for rehearing.

The Request for Rehearing is *denied*.

FOR PETITIONER:
Brandon M. White
Crystal Canterbury
PERKINS COIE LLP
bmwhite@perkinscoie.com
CCanterbury@perkinscoie.com

FOR PATENT OWNER:
Dianne B. Elderkin
Barbara L. Mullin
Ruben H. Munoz
AKIN GUMP STRAUSS HAUER & FELD LLP
delderkin@akingump.com
bmullin@akingump.com
rmunoz@akingump.com

Trials@uspto.gov
571-272-7822

Paper 28
Entered: January 19, 2017

**BOARD AND PARTIES ONLY**

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

WOCKHARDT BIO AG,
Petitioner,

v.

JANSSEN ONCOLOGY, INC.,
Patent Owner.

---

Case IPR2016-01582
Patent 8,822,438 B2

---

Before LORA M. GREEN, RAMA G. ELLURU, and
KRISTINA M. KALAN, *Administrative Patent Judges.*

KALAN, *Administrative Patent Judge.*

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

# I. INTRODUCTION

Wockhardt Bio AG ("Petitioner") filed a Petition (Paper 4, "Pet.") to institute an *inter partes* review of claims 1–20 of U.S. Patent No. 8,822,438 B2 (Ex. 1001, "the '438 patent") pursuant to 35 U.S.C. §§ 311–319. Janssen Oncology, Inc. ("Patent Owner") filed a Preliminary Response (Paper 13, "Prelim. Resp."). Pursuant to Board authorization (Paper 17), Petitioner filed a Reply to Patent Owner's Preliminary Response (Paper 22, "Reply") and Patent Owner filed a Surreply to Petitioner's Reply (Paper 27, "Surreply"). Applying the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim, we institute an *inter partes* review as to claims 1–20 as discussed below.

Our findings of fact and conclusions of law, including those relating to the broadest reasonable construction of the patent claim terms, are based on the record developed thus far, prior to Patent Owner's Response. This is not a final decision as to the patentability of any challenged claim. Our final decision will be based on the full record developed during trial.

# II. BACKGROUND

## *A. Related Matters*

The parties indicate that the '438 patent is being asserted in a number of district court proceedings, some of which have been terminated. Pet. 66; Paper 8, 2–4. Of those, Patent Owner represents that the following proceedings have not been terminated: *BTG Int'l Ltd. v. Actavis Labs. FL, Inc.,* C.A. No. 2:15-cv-05909-KM-JBC (D. N.J.); *Janssen Biotech, Inc. v. Mylan Pharm. Inc.,* C.A. No. 1:15-cv-00130-IMK (N.D. W. Va.); *BTG Int'l Ltd. v. Amerigen Pharm., Inc.,* C.A. No. 2:16-cv-02449-KM-JBC (D. N.J.)

and *BTG Int'l Ltd. v. Glenmark Pharm. Inc.,* C.A. No. 2:16-cv-05909 (D. N.J.). Paper 8, 3–4. The '438 patent is the subject of *inter partes* review numbers IPR2016-00286 (instituted May 31, 2016), IPR2016-01337 (instituted and joined with IPR2016-00286 on September 19, 2016) and IPR2016-01332. *Id.* at 2–3. Patent Owner also states that the '438 patent "was the subject of *ex parte* reexamination request No. 90/020,096," but "will not be granted a filing date for failure to comply with the requirements of 37 C.F.R. § 1.501(a)." *Id.* at 2.

*B. The '438 Patent*

The '438 patent, titled "Methods and Compositions for Treating Cancer," describes methods that comprise "administering a 17α-hydroxylase/$C_{17, 20}$-lyase inhibitor, such as abiraterone acetate (i.e., 3β-acetoxy-17-(3-pyridyl)androsta-5,16-diene), in combination with at least one additional therapeutic agent such as an anti-cancer agent or a steroid." Ex. 1001, Title, Abstract. As described in the '438 patent, it is believed that testosterone and dihydrotestosterone promote the growth of prostate cancer. *Id.* at 1:49–51. Hormone therapy can be used to suppress the production or block the effects of hormones such as testosterone. *Id.* at 1:43–51.

The enzyme 17α-hydroxylase/$C_{17, 20}$-lyase ("CYP17") is involved in testosterone synthesis. *Id.* at 3:66–4:1. CYP17 inhibitors have been shown to be useful in the treatment of cancer, specifically, androgen-dependent disorders like prostate cancer. *Id.* at 5:23–27. Abiraterone acetate, a prodrug of abiraterone, is a CYP17 inhibitor. *Id.* at 2:10–12. The '438 patent describes administration of an effective amount of a CYP17 inhibitor, such as abiraterone acetate, with a steroid such as prednisone or dexamethasone. *Id.* at 2:9–3:20.

*C. Claims*

Claim 1 of the '438 patent is reproduced below:

> 1. A method for the treatment of a prostate cancer in a human comprising administering to said human a therapeutically effective amount of abiraterone acetate or a pharmaceutically acceptable salt thereof and a therapeutically effective amount of prednisone.

Ex. 1001, 16:16–20. Dependent claims 2–20 of the '438 patent describe additional limitations of the method, including the amount of abiraterone acetate and the amount of prednisone administered, and the type of prostate cancer being treated. *Id.* at 16:21–17:14.

*D. The Prior Art*

Petitioner relies on the following prior art:

1. Gerber, G.S. & Chodak, G.W., *Prostate specific antigen for assessing response to ketoconazole and prednisone in patients with hormone refractory metastatic cancer*, 144 J. Urol. 1177–79 (1990) ("Gerber") (Ex. 1004);
2. O'Donnell, A. et al., *Hormonal impact of the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor abiraterone acetate (CB7630) in patients with prostate cancer*, 90 British Journal of Cancer 2317–2325 (2004) ("O'Donnell") (Ex. 1005); and
3. Sartor, O. et al., *Effect of prednisone on prostate-specific antigen in patients with hormone-refractory prostate cancer*, 52 Urology 252–256 (1998) ("Sartor") (Ex. 1006).

Petitioner also relies on the Declarations of Dr. Paul A. Godley (Ex. 1002, the "Godley Declaration") and Dr. Robert Stoner (Ex. 1077, the "Stoner Declaration") in support of its arguments.

*E. The Asserted Ground*

Petitioner challenges claims 1–20 of the ’438 patent on the following ground:

| References | Basis | Claims Challenged |
|---|---|---|
| Gerber, O’Donnell, and Sartor | § 103(a) | 1–20 |

## III. ANALYSIS

We turn now to Petitioner’s asserted ground of unpatentability, Patent Owner’s arguments in the Preliminary Response, the Reply, the Surreply, and the supporting evidence to determine whether Petitioner has met the threshold standard of 35 U.S.C. § 314(a).

*A. Claim Interpretation*

The Board interprets claims in an unexpired patent using the “broadest reasonable construction in light of the specification of the patent in which [they] appear[].” 37 C.F.R. § 42.100(b); *see Cuozzo Speed Techs., LLC v. Lee*, 136 S.Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation standard). Under the broadest reasonable interpretation standard, claim terms are generally given their ordinary and customary meaning in view of the specification, as would be understood by one of ordinary skill in the art at the time of the invention. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

Petitioner proposes that we construe the claim terms “treat,” “treating,” “treatment,” and “therapeutically effective amount of prednisone.” Pet. 20–21. Petitioner notes that these claim terms have already been construed in IPR2016-00286, Paper 14, and states that it analyzes the claims under those constructions for the purpose of this proceeding. *Id*. Patent Owner does not

propose any claim constructions in its Preliminary Response. As proposed by Petitioner, we apply our claim constructions of "treat," "treating," "treatment," and "therapeutically effective amount of prednisone," as set forth in IPR2016-00286, to the present case. IPR2016-00286, Paper 14, 5–7.

The terms "treat," "treating," and "treatment" are discussed and defined explicitly in the specification of the '438 patent. Ex. 1001, 3:46–50. Accordingly, we construe those terms to "include the eradication, removal, modification, management or control of a tumor or primary, regional, or metastatic cancer cells or tissue and the minimization or delay of the spread of cancer."

Regarding the phrase "therapeutically effective amount of prednisone," the definition in the specification provides: "As used herein, and unless otherwise defined, the phrase 'therapeutically effective amount' when used in connection with a 17α- hydroxylase/$C_{17, 20}$-lyase inhibitor or therapeutic agent means an amount of the 17α-hydroxylase/$C_{17, 20}$-lyase inhibitor or therapeutic agent effective for treating a disease or disorder disclosed herein, such as cancer." Ex. 1001, 4:17–22. The specification's definition of "therapeutically effective amount," applies to a therapeutic agent. *Id.* The specification provides examples of a "therapeutic agent" such as "an anti-cancer agent or a steroid, e.g., a corticosteroid or, more specifically, a glucocorticoid." *Id.* at 1:14–16. Thus, the definition of "therapeutically effective amount" in the specification would apply to prednisone, a glucocorticoid. *Id.* at 3:10–11. Furthermore, claim 1 is directed to "A method for the treatment of a prostate cancer in a human." *Id.* at 16:16–17. Based on the definition and discussion the specification, and the manner in which the term is used in the claims, we construe "therapeutically effective

amount of prednisone" as "an amount of prednisone effective for treating prostate cancer."

*B. Ground Asserted by Petitioner*

Petitioner challenges claims 1–20 as obvious under 35 U.S.C. § 103(a) over Gerber, O'Donnell, and Sartor. Pet. 23–46.

*Gerber*

Gerber, which is titled "Prostate Specific Antigen for Assessing Response to Ketoconazole and Prednisone in Patients with Hormone Refractory Metastatic Prostate Cancer," discloses use of ketoconazole, a known CYP17 inhibitor and inhibitor of gonadal and adrenocortical steroid synthesis, with prednisone to treat patients with progressive prostate cancer. Ex. 1004, 1177. Gerber provides that patients exhibiting progressively increasing prostate specific antigen ("PSA") levels, when treated with ketoconazole and prednisone, experienced a decrease in PSA levels. *Id.* at 1178–79.

*O'Donnell*

O'Donnell, which is titled "Hormonal impact of the 17α-hydroxylase/$C_{17, 20}$-lyase inhibitor abiraterone acetate (CB7630) in patients with prostate cancer," discloses that treatment of prostate cancer with abiraterone acetate, at a dose of 500–800 mg, can successfully suppress testosterone levels. Ex. 1005, Abstract. O'Donnell also discloses that ketoconazole, another CYP17 inhibitor, has been evaluated as a possible agent with which to achieve decreased production of adrenal steroids, but that abiraterone acetate was developed as a more selective inhibitor. *Id.* at 2318. O'Donnell further discloses that adrenocortical suppression may require administration of replacement glucocorticoid. *Id.* at Abstract, 2323.

O'Donnell states that "[s]ome impact on adrenal reserve was predictable from the steroid synthesis pathway." *Id.* at 2323. Regarding administration of ketoconazole, O'Donnell states that "it is common practice to administer supplementary hydrocortisone" and that this may prove necessary with abiraterone acetate. *Id.* On the basis of the clinical evidence, O'Donnell reports that the need for concomitant therapy of abiraterone acetate with a glucocorticoid needs to be further investigated. *Id.*

*Sartor*

Sartor, which is titled "Effect of Prednisone on Prostate-Specific Antigen in Patients with Hormone-Refractory Prostate Cancer," discloses a trial in which patients with hormone-refractory progressive prostate cancer, who were not receiving concomitant anticancer therapies, were treated with 10 mg of prednisone orally two times a day. Ex. 1006, Abstract. Sartor discloses that administration of prednisone alone, as shown by its results, led to an average decline of 33% in PSA responses after initiating prednisone; a majority of patients had PSA progression-free survival for a matter of months following treatment. *Id.* at 254, Table III. Sartor concludes that prednisone "can decrease PSA by more than 50% in approximately one third of patients" and hypothesizes "a dose-responsive relationship between glucocorticoid dose and PSA decline." *Id.* at Abstract.

*Arguments*

Petitioner argues that Gerber teaches co-administering the CYP17 inhibitor ketoconazole with prednisone to treat prostate cancer. Pet. 28–29 (citing Ex. 1004, 1177–1179). Petitioner further argues that abiraterone acetate "was known to be a potent and more specific inhibitor of CYP17 than ketoconazole and it effectively reduced testosterone levels" (citing Ex. 1002

¶ 72) and that O'Donnell discloses administering abiraterone acetate to castrate and non-castrate males (citing Ex. 1005, 2320–2321, 2324). *Id.* at 29–30. Finally, Petitioner argues that "prednisone was known to treat prostate cancer, as well as to offset the side effects from administering a CYP17 inhibitor, such as abiraterone acetate and ketoconazole" (citing Ex. 1002 ¶¶ 75–84), and that Sartor "teaches administering 20 mg/day prednisone as a monotherapy in patients with mCRPC" (citing Ex. 1006, 252–254). *Id.* at 31. Petitioner presents a claim chart for claim 1, citing prior art disclosure that Petitioner alleges teaches each element of claim 1. *Id.* at 25–28.

Petitioner argues that one of ordinary skill in the art "would have had a reason to modify Gerber's method of administering ketoconazole to use abiraterone acetate, as taught in O'Donnell" because "abiraterone acetate is a potent and more selective inhibitor of CYP17 than ketoconazole and that abiraterone acetate effectively suppressed testosterone levels in both castrate and non-castrate males." Pet. 24 (citing Ex. 1002 ¶ 67). Additionally, Petitioner argues, one of ordinary skill in the art "would have had a reason to maintain coadministration of prednisone, as taught in Gerber, because prednisone was known to treat prostate cancer on its own, as demonstrated by Sartor." *Id.* (citing Ex. 1002 ¶ 68). Petitioner summarizes that one of ordinary skill in the art, reading Gerber, O'Donnell, and Sartor "would have had a reason to co-administer a therapeutically effective amount of prednisone with abiraterone acetate because (1) prednisone was known to treat prostate cancer and (2) prednisone would reduce the side effects of mineralocorticoid excess that could result from abiraterone acetate treatment." *Id.* at 33–34 (citing Ex. 1002 ¶¶ 83–84). Patent Owner does not specifically address Petitioner's arguments directed to how the prior art

allegedly teaches claim 1. *See generally* Prelim. Resp. Regarding dependent claims 2–20, Petitioner argues that the additional limitations found in the dependent claims also are obvious over Gerber, O'Donnell, and Sartor. *Id.* at 36–46. Patent Owner does not specifically address Petitioner's arguments directed to the dependent claims.

On this record, we are persuaded by Petitioner's arguments and presentation of the evidence. Gerber discloses co-administration of a glucocorticoid, prednisone, with ketoconazole for the safe and effective treatment of prostate cancer. Ex. 1004, 1179. O'Donnell suggests that co-administration of a glucocorticoid, of which prednisone is one, may be needed in connection with administration of abiraterone acetate in the treatment of prostate cancer. Ex. 1005, 2323. Ketoconazole and abiraterone acetate are both characterized as CYP17 inhibitors. *Id.* at 2318; Ex. 1002 ¶¶ 36, 38. Sartor discloses that, even without a concomitant anticancer therapy such as a CYP17 inhibitor, prednisone as a monotherapy results in a PSA decline in patients with hormone-refractory prostate cancer. Ex. 1006, 253–254. We are persuaded, on this record, that that a person of ordinary skill in the art "would have reasonably expected each of abiraterone acetate and prednisone to treat prostate cancer when co-administered" (Pet. 25) and that, therefore, Petitioner has demonstrated a reasonable likelihood of prevailing on its obviousness challenge to claim 1.

Claims 2–20 each depend directly or indirectly from claim 1. Petitioner contends these claims are also unpatentable under 35 U.S.C. § 103(a) based on Gerber, O'Donnell, and Sartor. Pet. 36–46. Concerning these claims, we determine that the supporting evidence demonstrates a

reasonable likelihood that Petitioner would prevail in its showing, the substance of which has not been addressed specifically by Patent Owner.

In view of the arguments and the evidence before us, therefore, we are persuaded that Petitioner has demonstrated a reasonable likelihood of prevailing on its assertion that claims 1–20 are obvious over Gerber, O'Donnell, and Sartor.

1. *Objective Indicia of Non-Obviousness*

Petitioner contends that the Patent Owner may try to rely on secondary considerations of non-obviousness. Pet. 46–65. Specifically, Petitioner pre-emptively raises arguments and evidence relating to unexpected results, commercial success, long-felt need and failure of others, and copying. Pet. 48–59. Patent Owner does not present any arguments directed to objective indicia of non-obviousness.

The issue of secondary considerations is highly fact-specific. At this stage of the proceeding, the record regarding such secondary considerations is incomplete. Based on the record before us, and Patent Owner's lack of argument on this issue, Petitioner's preemptive evidence regarding lack of objective indicia anticipates arguments not yet made by Patent Owner. Thus, we have an inadequate framework to determine whether evidence of secondary considerations is insufficient to preclude trial. Evidence of secondary considerations should be more fully evaluated in the context of a trial when the ultimate determination of obviousness is made. We conclude that the information presented in the Petition on the matter of obviousness establishes a reasonable likelihood that the Petitioner will prevail in challenges to claims 1–20 of the '438 patent, but we do not make any

determination as to objective indicia of non-obviousness on the record before us at present.

2. *Patent Owner's Arguments*

Patent Owner makes several arguments in its Preliminary Response, namely: (A) Petitioner fails to identify Amerigen as a real party-in-interest; and (B) the Petition should be denied under 35 U.S.C. § 325(d). We address these arguments in turn.

*(A) Real party-in-interest*

The Petition identifies as real parties-in-interest "Wockhardt Bio AG, Wockhardt Limited, Wockhardt USA LLC, Morton Grove Pharmaceuticals, Inc., and MGP Inc." Pet. 66. According to Patent Owner, however, because the Petition "fails to identify Amerigen as a RPI," it is "defective on its face and should be denied pursuant to 35 U.S.C. § 312(a)(2)." Prelim. Resp. 8.

A petition for *inter partes* review under 35 U.S.C. § 311 may be considered only if, among other things, the petition identifies all real parties-in-interest. 35 U.S.C. § 312(a)(2). The Office Patent Trial Practice Guide explains that, in the context of an *inter partes* review and at a general level, the real party-in-interest "is the party that desires review of the patent." Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012). The real party-in-interest "may be the petitioner itself, and/or it may be the party or parties at whose behest the petition has been filed." *Id.*

Whether a non-identified party is a real party-in-interest to a proceeding is "a highly fact-dependent question" that is assessed "on a case-by-case basis taking into consideration how courts have viewed the term[] 'real party-in-interest.'" *Id.* (citing *Taylor v. Sturgell*, 553 U.S. 880 (2008)). "A common consideration is whether the non-party exercised or could have

exercised control over a party's participation in a proceeding." *Id.* (citing *Taylor*, 553 U.S. at 893–95). Relevant factors may include the non-party's relationship with the petitioner; the non-party's relationship to the petition itself, including the nature and/or degree of involvement in the filing; and the nature of the petitioner. *Id.* at 48,760.

The Board generally accepts a petitioner's real party-in-interest identification at the time of filing the petition. 77 Fed. Reg. 48,680, 48,695 (Aug. 14, 2012) (Changes to Implement *Inter Partes* Review Proceedings, Post-Grant Review Proceedings, and Transitional Program for Covered Business Method Patents, Response to Comment 9) ("The Office generally will accept the petitioner's 'real party-in-interest' identification at the time of filing the petition."). A "patent owner may provide objective evidence to challenge the identification in a preliminary response, which the Board will consider in determining whether to grant the petition." *Id.*

[redacted]

[redacted]

Petitioner responds that Amerigen is not a real party-in-interest, because "Amerigen has never funded, controlled, or in any other way been involved in this proceeding." Reply 1. Relying on the Declaration of corporate representative Mr. Gopal Venkatesan (Ex. 1081), Petitioner asserts that Patent Owner has not demonstrated "that Amerigen funded or had any ability to control this proceeding;" that Petitioner and Amerigen "are entirely separate and unrelated corporations;" that Petitioner has "no corporate relationship with Amerigen, has never entered into a contract of any sort with Amerigen, has never had a financial dealings with Amerigen, and did not coordinate or otherwise collaborate with Amerigen with respect to this IPR." *Id.* Rather, Petitioner and Amerigen "are nothing more than codefendants in a joint defense group with respect to the underlying district court litigation" and "deliberately chose not to be involved in each other's IPR filings." *Id.* at 1–2. Petitioner characterizes the settlement negotiations embodied in Exhibit 2002 as inadmissible under Fed. R. Evid. 408 as compromise offers and negotiations, but nevertheless argues that these communications do not establish funding or control by Amerigen, nor that Petitioner has authority to settle a dispute on Amerigen's behalf. *Id.* at 6–7.

Patent Owner replies that the undisputed evidence demonstrates that Wockhardt and Amerigen are more than just codefendants in a patent lawsuit. Surreply 2. Patent Owner criticizes Mr. Venkatesan's declaration for failing

to refer to the communication between Petitioner's counsel and Patent Owner's counsel, and as not credible on the issue of control. *Id.* at 3–4.

Although we may consider the relationship between the parties, the focus of our real party-in-interest inquiry is the relationship between a party and a proceeding. *Aruze Gaming Macau, Ltd. v. MGT Gaming, Inc.*, Case IPR2014–01288, slip op. at 11 (PTAB Feb. 20, 2015) (Paper 13). Patent Owner may provide objective evidence to challenge Petitioner's identification of real parties-in-interest in a preliminary response; here, Patent Owner provided an exhibit containing an email exchange between counsel for Petitioner and counsel for Patent Owner as the initial basis for its allegation, supported by a Declaration by Patent Owner's counsel. We are not persuaded at this juncture that FRE 408 applies to the email exchange, as the evidence is being offered for a purpose other than to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction. We have reviewed this email exchange and the Declaration and do not find them supportive of Patent Owner's allegations.

[redacted]

[redacted] Patent Owner provides no other evidence regarding its allegations.

In view of the arguments and testimony presented by the parties at this juncture regarding whether Amerigen is a real party-in-interest to this proceeding, we are not persuaded that Petitioner "fails to identify Amerigen" as a real party-in-interest.

*(B) 35 U.S.C. § 325(d)*

Patent Owner requests that the Board exercise its discretion under 35 U.S.C. § 325(d) and decline to initiate *inter partes* review of the '438 patent because the Petition presents the same prior art and substantially the same arguments as those presented in co-pending IPRs. Prelim. Resp. 15–21.

In the Petition, Petitioner preemptively makes arguments directed to Patent Owner's anticipated § 325(d) arguments: (1) the Petition relies on a different combination of prior art than the 286 IPR, including Sartor; (2) the Petition addresses the Board's construction of "therapeutically effective amount of prednisone;" (3) Petitioner's ground relies on the Godley Declaration and the Stoner Declaration, which have not been previously considered by the Board; (4) Petitioner has not previously challenged the '438 Patent and is not a party to the 286 IPR; and (5) the 286 IPR is still in the beginning stages. Pet. 22.

Patent Owner argues, first, that the petition in the Argentum IPR and the present petition "rely on the same prior art and the same or substantially the same arguments raised in the Amerigen IPR." Prelim. Resp. 16. Patent Owner discounts Sartor as "adding nothing of substance to the prior art and arguments already presented in the Amerigen IPR." *Id.* at 18. Patent Owner further argues that Petitioner is involved in the Amerigen IPR, as argued in

connection with its real party-in-interest arguments; that Petitioner's addressing the Board's claim construction is insufficient to justify institution of this petition; and that the Amerigen IPR is no longer in its beginning stages. *Id.* at 19–20.

We have discretion under 35 U.S.C. § 325(d) to reject a petition when the same or substantially the same prior art or arguments were presented previously to Office. The relevant portions of that statute are reproduced below:

> In determining whether to institute or order a proceeding under this chapter, chapter 30, or chapter 31, the Director may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office.

35 U.S.C. § 325(d). In exercising our discretion under § 325(d), we take into account numerous factors, including the facts of each case, and the burden on the parties and the Board. *See Conopco, Inc. v. Proctor & Gamble Co.,* Case IPR2014-00506, slip op. at 4, 6 (PTAB Dec. 10, 2014) (Paper 25) (Informative), slip op. at 6 (PTAB July 7, 2014) (Paper 17), *cited in NVIDIA Corp. v. Samsung Elec. Co.,* Case IPR2016-00134, slip op. at 6–7 (PTAB May 4, 2016) (Paper 9); *see also* Amendments to the Rules of Practice for Trials Before the Patent Trial and Appeal Board, 77 Fed. Reg. 18750, 18759 (Apr. 1, 2016) ("[T]he current rules provide sufficient flexibility to address the unique factual scenarios presented to handle efficiently and fairly related proceedings before the Office on a case-by-case basis, and that the Office will continue to take into account the interests of justice and fairness to both petitioners and patent owners where multiple proceedings involving the same patent claims are before the Office.").

Although we have discretion to reject a petition when the same or substantially the same prior art or arguments previously were presented to the Office, we decline to exercise that discretion here. We agree that the present Petition and the Amerigen IPR petition rely on some of the same prior art. The present Petition, however, relies on Sartor, which was not a reference in the Amerigen IPR. The present Petition also does not rely on Barrie, a reference relied upon in the Amerigen IPR petition. Petitioner relies on different declarants than those relied upon in the Amerigen IPR. The depositions of those declarants, as well as the additional evidence and reference presented by Petitioner, may affect the course of this trial relative to the course of the trial in the Amerigen IPR.

Moreover, it appears that this case will involve arguments concerning objective indicia of non-obviousness, which involves a fact-specific analysis that often turns on evidence presented during trial. Pet. 46–65. A patent owner generally presents arguments based on objective indicia in response to a petitioner's allegations of obviousness. Here, Petitioner preemptively presented arguments directed to objective indicia. *Id.* Patent Owner presented arguments directed to objective indicia in its Preliminary Response in the Amerigen IPR (IPR2016-00286, Paper 12, 46–52), but has not presented the same arguments in the Preliminary Response in this case. As such, the objective indicia arguments possibly differ between the Amerigen IPR and the present case. Because evidence directed to objective indicia typically develops during trial, we cannot assume, at this stage, that the arguments to be made during the course of the trial are the same or similar to those made in IPR2016-00286.

Other than these differences, however, both the instant Petition and the petition in the Amerigen IPR assert similar challenges to patentability. We are mindful of the burden on Patent Owner and the Office to rehear the same or substantially the same prior art or arguments that were considered previously by the Office. However, given the similar challenges in these two proceedings, we do not perceive that either Patent Owner or the Board will be overwhelmed with an unreasonable number of challenges to patentability.

Unlike other cases in which we have exercised our discretion under § 325(d) to deny institution of a follow-on petition, based on the particular facts of this case, we are not presented with a second bite at the apple by an identical petitioner. In addition, in view of our grant, rather than denial, of institution in the Amerigen IPR, we do not perceive Petitioner as seeking to cure any problems of the petition in the Amerigen IPR with the filing of the present Petition. Also, we have not decided the outcome in IPR2016-00286.

In view of the challenges in the Petition, and having considered Patent Owner's Preliminary Response, we do not exercise our discretion to decline an *inter partes* review of the '438 patent under 35 U.S.C. § 325(d).

*C. Conclusion*

We conclude that Petitioner has demonstrated a reasonable likelihood of prevailing with respect to its challenge of claims 1–20 of the '438 patent. We have not made, however, a final determination under 35 U.S.C. § 318(a) with respect to the patentability of the challenged claims. In view of the timeline of the Amerigen IPR, and in view of the number of common issues between the cases, we implement a condensed schedule in the present case to allow for resolution of these two cases involving the '438 patent in relative proximity to each other.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that *inter partes* review is instituted on the following ground of unpatentability asserted in the Petition:

Claims 1–20 as obvious under 35 U.S.C. § 103(a) over Gerber, O'Donnell, and Sartor; and

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(a), *inter partes* review of the '438 patent is hereby instituted commencing on the entry date of this decision, and pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial; and

FURTHER ORDERED that the trial is limited to the ground identified above and no other grounds are authorized.

FOR PETITIONER:

Dennies Varughese
Deborah A. Sterling
Christopher M. Gallo
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
dvarughe-PTAB@skgf.com
dsterlin-PTAB@skgf.com
cgallo-PTAB@skgf.com

FOR PATENT OWNER:

Dianne Elderkin
Barbara Mullin
Ruben Munoz
Anthony Tridico
Jennifer Roscetti
delderkin@akingump.com
bmullin@akingump.com
rmunoz@akingump.com
anthony.tridico@finnegan.com
jennifer.roscetti@finnegan.com

Trials@uspto.gov
Tel: 571-272-7822

Paper 72
Entered: January 17, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

WOCKHARDT BIO AG,
Petitioner,

v.

JANSSEN ONCOLOGY, INC.,
Patent Owner.

---

Case IPR2016-01582
Patent 8,822,438 B2

---

Before LORA M. GREEN, RAMA G. ELLURU, and
KRISTINA M. KALAN, *Administrative Patent Judges*.

KALAN, *Administrative Patent Judge.*

# FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

## I. INTRODUCTION

Wockhardt Bio AG ("Petitioner") filed a Petition (Paper 4, "Pet.") to institute an *inter partes* review of claims 1–20 of U.S. Patent No. 8,822,438 B2 (Ex. 1001, "the '438 patent") pursuant to 35 U.S.C. §§ 311–319. Janssen Oncology, Inc. ("Patent Owner") filed a Preliminary Response (Paper 13, "Prelim. Resp."). We instituted an *inter partes* review of claims 1–20 on certain grounds of unpatentability alleged in the Petition (Paper 28, "Dec.").

After institution of trial, Patent Owner filed a Patent Owner Response (Paper 43, "PO Resp."). Petitioner filed a Reply (Paper 54, "Reply"). An oral hearing was held on May 24, 2017. A transcript of the hearing has been entered into the record. Paper 71 ("Tr.").

The Board has jurisdiction under 35 U.S.C. § 6. In this Final Written Decision, issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73, we determine that Petitioner has shown by a preponderance of the evidence that all claims of the '438 patent for which trial was instituted, namely, claims 1–20, are unpatentable.

## II. BACKGROUND

### *A. Related Matters*

The parties indicate that the '438 patent is being asserted in a number of district court proceedings, some of which have been terminated. Pet. 66; Paper 8, 2–4. Patent Owner represents that the following proceedings have not been terminated: *BTG Int'l Ltd. v. Actavis Labs. FL, Inc.,* C.A. No. 2:15-cv-05909-KM-JBC (D.N.J.), *Janssen Biotech, Inc. v. Mylan Pharms. Inc.,* C.A. No. 1:15-cv-00130-IMK (N.D. W. Va.), *BTG Int'l Ltd. v. Amerigen Pharms., Inc.,* C.A. No. 2:16-cv-02449-KM-JBC (D.N.J.), and *BTG Int'l Ltd.*

*v. Glenmark Pharms. Inc., USA*, C.A. No. 2:16-cv-05909 (D.N.J). Paper 32, 3.

Patent Owner also states that the '438 patent was the subject of *ex parte* reexamination request No. 90/020,096, but "will not be granted a filing date for failure to comply with the requirements of 37 C.F.R. § 1.501(a)." *Id.* at 2.

*B. The '438 Patent*

The '438 patent, titled "Methods and Compositions for Treating Cancer," describes methods that comprise "administering a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor, such as abiraterone acetate (i.e., 3β-acetoxy-17-(3-pyridyl)androsta-5,16-diene), in combination with at least one additional therapeutic agent such as an anti-cancer agent or a steroid." Ex. 1001, at [54], [57]. As described in the '438 patent, it is believed that testosterone and dihydrotestosterone promote the growth of prostate cancer. *Id.* at 1:49–51. Hormone therapy can be used to suppress the production or block the effects of hormones such as testosterone. *Id.* at 1:43–51.

The enzyme 17α-hydroxylase/$C_{17,20}$-lyase ("CYP17") is involved in testosterone synthesis. *Id.* at 3:66–4:1. CYP17 inhibitors have been shown to be useful in the treatment of cancer, specifically, androgen-dependent disorders like prostate cancer. *Id.* at 5:23–27. Abiraterone acetate, a prodrug of abiraterone, is a CYP17 inhibitor. *Id.* at 2:10–12.

The '438 patent describes administration of a therapeutically effective amount of a CYP17 inhibitor, such as abiraterone acetate, with a therapeutically effective amount of at least one additional therapeutic agent including, but not limited to, an anti-cancer agent, such as mitoxantrone, paclitaxel, docetaxel, leuprolide, goserelin, triptorelin, seocalcitol,

bicalutamide, or flutamide, or a steroid, such as hydrocortisone, prednisone, or dexamethasone. *Id.* at 2:9–3:20.

*C. Challenged Claims*

Claim 1 of the '438 patent is reproduced below:

> 1. A method for the treatment of a prostate cancer in a human comprising administering to said human a therapeutically effective amount of abiraterone acetate or a pharmaceutically acceptable salt thereof and a therapeutically effective amount of prednisone.

Ex. 1001, 16:16–20. Dependent claims 2–20 of the '438 patent describe additional limitations of the method, including the amount of abiraterone acetate and the amount of prednisone used and the type of prostate cancer being treated. *Id.* at 16:21–17:14.

*D. Prior Art References Relied Upon by Petitioner*

Petitioner relies on the following prior art:

1. Gerber, G.S. & Chodak, G.W., *Prostate specific antigen for assessing response to ketoconazole and prednisone in patients with hormone refractory metastatic prostate cancer*, 144 J. Urol. 1177–79 (1990) ("Gerber") (Ex. 1004);
2. O'Donnell, A. et al., *Hormonal impact of the 17α-hydroxylase/ $C_{17,20}$-lyase inhibitor abiraterone acetate (CB7630) in patients with prostate cancer*, 90 British Journal of Cancer 2317–25 (2004) ("O'Donnell") (Ex. 1005); and
3. Sartor, O. et al., *Effect of prednisone on prostate-specific antigen in patients with hormone-refractory prostate cancer*, 52 Urology 252–256 (1998) ("Sartor") (Ex. 1006).

*E. Instituted Grounds of Unpatentability*

We instituted *inter partes* review of claims 1–20 of the '438 patent on the following grounds:

| References | Basis | Claims Challenged |
|---|---|---|
| Gerber, O'Donnell, and Sartor | § 103(a) | 1–20 |

In support of its challenges, Petitioner relies on the declarations of Paul A. Godley, M.D., Ph.D., MPP (Ex. 1002; Ex. 1104; Ex. 1123; Ex. 1129), Robert Stoner, Ph.D. (Ex. 1077; Ex. 1103; Ex. 1122; Ex. 1130), and Ian McKeague, Ph.D. (Ex. 1106). Patent Owner relies on the declarations of Ian Judson, M.D. (Ex. 2028), Matthew Rettig, M.D. (Ex. 2038), Richard Auchus, M.D., Ph.D. (Ex. 2040), and Christopher A. Vellturo, Ph.D. (Ex. 2044).

## III. ANALYSIS

*A. Claim Interpretation*

The Board interprets claim terms in an unexpired patent according to the broadest reasonable construction in light of the specification of the patent in which they appear. *See Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation standard); 37 C.F.R. § 42.100(b). Under that standard, and absent any special definitions, we give claim terms their ordinary and customary meaning as would be understood by one of ordinary skill in the art at the time of the invention. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definitions for claim terms must be set forth with reasonable clarity, deliberateness, and precision. *See In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Only those terms which are in controversy need to be construed, and only to the extent necessary to resolve the controversy.

*See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Ltd.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'") (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

With respect to claim interpretation, "[u]sually [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1149 (Fed. Cir. 2012) (citations omitted). "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Thorner v. Sony Computer Entm't Am. LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012) (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)).

Petitioner proposes that we construe the claim terms "treat," "treating," "treatment," and "therapeutically effective amount of prednisone." Pet. 20–21. Petitioner notes that these claim terms have already been construed in IPR2016-00286,[1] Paper 14, and states that it analyzes the claims under those constructions for the purpose of this proceeding. *Id*. In our Decision on Institution, we applied our claim constructions of "treat," "treating," "treatment," and "therapeutically effective amount of prednisone," as set forth in IPR2016-00286, to the present case. Dec. 5–7; IPR2016-00286, Paper 14, 5–7. Thus, we construed those terms as follows:

---

[1] IPR2016-00286 is an earlier-filed case involving the '438 patent, the same grounds, and the same Patent Owner.

| Claim term(s) | Construction |
|---|---|
| "treat," "treating," and "treatment" | include the eradication, removal, modification, management or control of a tumor or primary, regional, or metastatic cancer cells or tissue and the minimization or delay of the spread of cancer<br>Ex. 1001, 3:46–50 |
| "therapeutically effective amount of prednisone" | an amount of prednisone effective for treating prostate cancer |

Patent Owner states: "Neither party has disputed the Board's interpretation of this claim term ['treat,' 'treating' and 'treatment'] and [Petitioner] has employed it in its Petition." PO Resp. 4. Patent Owner further states that "the Board's construction of 'treat,' 'treating' and 'treatment' should be maintained." *Id.* at 5.

Patent Owner also submitted a claim construction of the terms "treatment" and "treating" by the district court in a companion litigation. Ex. 2010. The district court, after a lengthy analysis, construed the disputed terms as follows: "*Treatment/treating* means the eradication, removal, modification, management or control of a tumor or primary, regional, or metastatic cancer cells or tissue and the minimization or delay of the spread of cancer." *Id.* at 30. The district court read out of the definition the term "includes." *Id.* Although we are not bound by the district court's reasoning and claim constructions in related proceedings, we do not disregard the determinations of a court interpreting the same claim term in a related patent in a concurrent proceeding. *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1326–27 (Fed. Cir. 2015) ("The fact that the board is not generally bound by a previous judicial interpretation of a disputed claim term does not mean, however, that it has no obligation to acknowledge that interpretation or to

assess whether it is consistent with the broadest reasonable construction of the term.”). Thus, although we acknowledge and have considered the district court’s interpretation, we retain our broadest reasonable construction of the terms “treat,” “treatment,” and “treating.”

We see no reason to modify our claim construction positions in light of the record developed at trial, and we maintain our claim constructions from the Decision on Institution for the purposes of this Decision. No other claim terms have been presented to us for construction following institution of trial, and we determine that no other claim terms require express construction.

*B. Principles of Law*

A claim is unpatentable under 35 U.S.C. § 103[2] if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int’l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). A decision on the ground of obviousness must include “articulated reasoning with some rational underpinning to support the legal conclusion of

[2] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) (“AIA”), amended 35 U.S.C. § 103. Because the ’438 patent has an effective filing date before the effective date of the applicable AIA amendments, throughout this Decision we refer to the pre-AIA versions of 35 U.S.C. § 103.

obviousness." *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006). The obviousness analysis "should be made explicit" and it "can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *KSR*, 550 U.S. at 418. We analyze the asserted grounds of unpatentability in accordance with the above-stated principles.

*C. Level of Skill in the Art*

We adopt Petitioner's contention that a person of ordinary skill in the art

> would be a treating clinician specializing in oncology, typically holding an M.D. degree, with at least five years of experience specializing in medical oncology. Alternatively, a POSA would have an M.D., with at least five years of experience specializing in urology and at least two years of clinical experience. A POSA would have also typically worked as part of a multi-disciplinary team and drawn upon not only his or her own skills, but also taken advantage of certain specialized skills of others in the team, to solve a given problem.

Pet. 3–4 (citations omitted). Patent Owner does not appear to dispute Petitioner's definition in its Patent Owner Response. *See generally* PO Resp. The level of ordinary skill in the art in this case is further demonstrated by the prior art asserted in the Petition. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

*D. Overview of the Prior Art*

*1. O'Donnell*

O'Donnell, which is titled "Hormonal impact of the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor abiraterone acetate (CB7630) in patients with prostate cancer," discloses that treatment of prostate cancer with

abiraterone acetate, at a dose of 500–800 mg, can successfully suppress testosterone levels. Ex. 1005, Abstract. O'Donnell also discloses that ketoconazole, another CYP17 inhibitor, has been evaluated as a possible agent with which to achieve decreased production of adrenal steroids, but that abiraterone acetate was developed as a more selective inhibitor. *Id.* at 2318. O'Donnell further discloses that adrenocortical suppression may require administration of replacement glucocorticoid. *Id.* at Abstract, 2323. O'Donnell states that "[s]ome impact on adrenal reserve was predictable from the steroid synthesis pathway." *Id.* at 2323. Regarding administration of ketoconazole, O'Donnell states that "it is common practice to administer supplementary hydrocortisone" and that this may prove necessary with abiraterone acetate. *Id.* On the basis of the clinical evidence, O'Donnell reports that the need for concomitant therapy of abiraterone acetate with a glucocorticoid needs to be further investigated. *Id.*

*2. Gerber*

Gerber, which is titled "Prostate Specific Antigen for Assessing Response to Ketoconazole and Prednisone in Patients with Hormone Refractory Metastatic Prostate Cancer," discloses use of ketoconazole, a known CYP17 enzyme inhibitor and inhibitor of gonadal and adrenocortical steroid synthesis, with prednisone to treat patients with progressive prostate cancer. Ex. 1004, 1177. Gerber provides that patients exhibiting progressively increasing prostate specific antigen ("PSA") levels, when treated with ketoconazole and prednisone, experienced a decrease in PSA levels. *Id.* at 1178–79. Based on its study, Gerber concludes that "there appears to be a small subgroup of patients with progressive prostate cancer despite hormonal therapy who will derive significant benefit from the

combination of ketoconazole and glucocorticoid replacement therapy." *Id.* at 1179.

*3. Sartor*

Sartor, which is titled "Effect of Prednisone on Prostate-Specific Antigen in Patients with Hormone-Refractory Prostate Cancer," discloses a trial in which patients with hormone-refractory progressive prostate cancer, who were not receiving concomitant anticancer therapies, were treated with 10 mg of prednisone orally two times a day. Ex. 1006, Abstract. Sartor discloses that administration of prednisone alone, as shown by its results, led to an average decline of 33% in PSA responses after initiating prednisone; a majority of patients had PSA progression-free survival for a matter of months following treatment. *Id.* at 254, Table III. Sartor concludes that prednisone "can decrease PSA by more than 50% in approximately one third of patients" and hypothesizes "a dose-responsive relationship between glucocorticoid dose and PSA decline." *Id.* at Abstract.

*E. Obviousness Analysis*

*1. Petitioner's Arguments*

Petitioner argues that Gerber teaches co-administering the CYP17 inhibitor ketoconazole with prednisone to treat prostate cancer. Pet. 28–29 (citing Ex. 1004, 1177–79). Petitioner further argues that abiraterone acetate "was known to be a potent and more specific inhibitor of CYP17 than ketoconazole and it effectively reduced testosterone levels" (citing Ex. 1002 ¶ 72) and that O'Donnell discloses administering abiraterone acetate to castrate and non-castrate males (citing Ex. 1005, 2320–21, 2324). *Id.* at 29–30. Petitioner argues that "prednisone was known to treat prostate cancer, as well as to offset the side effects from administering a CYP17 inhibitor, such

as abiraterone acetate and ketoconazole" (citing Ex. 1002 ¶¶ 75–84), and that Sartor "teaches administering 20 mg/day prednisone as a monotherapy in patients with mCRPC" (citing Ex. 1006, 252–54). *Id.* at 31. Petitioner presents a claim chart for claim 1, citing the prior art disclosures that Petitioner alleges teach each element of claim 1. *Id.* at 25–28. Petitioner further argues that one of ordinary skill in the art would have had a reasonable expectation of success in practicing the method of claim 1, because Gerber "teaches methods of treating prostate cancer safely and effectively using the CYP17 inhibitor ketoconazole," O'Donnell "teaches administering the more selective CYP17 inhibitor abiraterone acetate effectively suppresses testosterone levels—a focus of prostate cancer treatment—in castrate and non-castrate males with prostate cancer," and Sartor "discloses that mCRPC patients had a signification reduction in PSA levels, *i.e.*, ≥ 50%, when administered prednisone as a monotherapy." *Id.* at 34–35.

Petitioner argues that one of ordinary skill in the art "would have had a reason to modify Gerber's method of administering ketoconazole to use abiraterone acetate, as taught in O'Donnell" because "abiraterone acetate is a potent and more selective inhibitor of CYP17 than ketoconazole and that abiraterone acetate effectively suppressed testosterone levels in both castrate and non-castrate males." Pet. 24 (citing Ex. 1002 ¶ 67). Additionally, Petitioner argues, one of ordinary skill in the art "would have had a reason to maintain coadministration of prednisone, as taught in Gerber, because prednisone was known to treat prostate cancer on its own, as demonstrated by Sartor." *Id.* (citing Ex. 1002 ¶ 68). Petitioner summarizes that one of ordinary skill in the art, reading Gerber, O'Donnell, and Sartor, "would have

had a reason to co-administer a therapeutically effective amount of prednisone with abiraterone acetate because (1) prednisone was known to treat prostate cancer and (2) prednisone would reduce the side effects of mineralocorticoid excess that could result from abiraterone acetate treatment." *Id.* at 33–34 (citing Ex. 1002 ¶¶ 83–84).

Claims 2–20 each depend directly or indirectly from claim 1. Petitioner contends these dependent claims also are unpatentable under 35 U.S.C. § 103 based on Gerber, O'Donnell, and Sartor. Pet. 36–46.

*2. Patent Owner's Non-Obviousness Arguments*

Patent Owner presents a series of arguments directed to the art relied upon in Petitioner's ground, and arguments related to objective indicia of non-obviousness. PO Resp. 5–69. We address each in turn.

*a. Patent Owner's First Argument – Gerber*

Patent Owner argues that, contrary to Petitioner's assertions regarding the prior art's teachings about the use of ketoconazole and prednisone, Gerber does not establish that ketoconazole and prednisone was an effective treatment for prostate cancer. PO Resp. 5–6. First, Patent Owner argues that Gerber did not demonstrate to one of ordinary skill in the art that co-administration of ketoconazole and prednisone effectively treats prostate cancer. *Id.* at 6. Patent Owner criticizes Gerber for not being a controlled clinical trial and criticizes Gerber's methodology as falling short when measured against accepted standards. *Id.* at 7 (citing Ex. 1004, 1178; Ex. 2038 ¶ 86). Second, Patent Owner argues that clinical studies before 2006 taught that ketoconazole and prednisone therapy was not a safe and effective treatment for prostate cancer. *Id.* at 9. By 2006, Patent Owner argues, clinical trials showed that ketoconazole plus replacement

glucocorticoid provided only modest activity and no difference in survival from patients receiving only antiandrogen withdrawal, and did not justify phase 3 evaluation. *Id.*

Petitioner argues that, notwithstanding Patent Owner's attacks on Gerber as not being a controlled clinical trial, Gerber is prior art for all that it teaches, namely, the combination of ketoconazole and prednisone as treating prostate cancer. Reply 3 (citing Ex. 1104 ¶ 8). Petitioner replies that Gerber's methodology is sufficient to demonstrate that ketoconazole used with prednisone to treat prostate cancer has "modest activity," and that the claims require nothing more. *Id.* at 4.

We disagree that Petitioner's arguments and evidence regarding the administration of ketoconazole with prednisone are lacking. Gerber, despite the fact that it was not a controlled clinical trial, nevertheless is a peer-reviewed article published in a reputable journal, indicating that treatment with ketoconazole and prednisone demonstrated some degree of success in a group of patients. Ex. 1004. O'Donnell (2004), which is later in time than Gerber (1990), corroborates that in the clinical use of ketoconazole, it is "common practice" to administer supplementary hydrocortisone. Ex. 1005, 2323. Patent Owner's arguments do not undercut the teachings of Gerber, or Gerber's demonstration that the combination of ketoconazole and prednisone worked for some patients, in which it was reasonably well tolerated, considering the circumstances. Ex. 1002 ¶¶ 61, 71; Ex. 1004, 1079; *see Duramed Pharms., Inc. v. Watson Labs., Inc.*, 413 F. App'x 289, 294 (Fed. Cir. 2011) (a reference is "prior art for all that it discloses, and there is no requirement that a teaching in the prior art be scientifically tested, or even guarantee success"). Gerber reasonably stands for the proposition that

administration of ketoconazole and prednisone is tolerated and effective in a subset of patients, and at the time it was published, indicated some measure of efficacy for certain mCRPC patients.

*b. Patent Owner's Second Argument – O'Donnell*

Patent Owner argues that O'Donnell does not establish that abiraterone acetate has an anti-cancer effect, or suggest concomitant glucocorticoid replacement therapy. PO Resp. 10. Petitioner replies that O'Donnell teaches abiraterone acetate as a potent, more specific CYP17 inhibitor than ketoconazole, and provides a motivation for maintaining prednisone. Reply 5.

First, Patent Owner argues that O'Donnell was designed to assess the safety of abiraterone acetate, rather than its clinical effectiveness, and that O'Donnell found that "abiraterone acetate was very well tolerated and no serious adverse effects attributable to treatment were recorded" over the 12-day testing period. PO Resp. 10–12 (citing Ex. 1005, 2322). Petitioner replies that O'Donnell assessed abiraterone acetate for "testosterone suppression in castrate and non-castrate men with prostate cancer," which is a goal of prostate cancer treatment, and gives a person of ordinary skill in the art "more than adequate grounds to rely on O'Donnell's teachings." Reply 6 (citing Ex. 1002 ¶ 26). We find that O'Donnell's stated purpose of investigating the ability of abiraterone acetate to suppress testosterone in prostate cancer patients would have led one of ordinary skill in the art to rely on O'Donnell's teachings. Ex. 1005, 2317, Abstract. We recognize that the

study conducted in O'Donnell was limited in time and scope, but agree with Petitioner that this does not detract from O'Donnell's teachings.

Second, Patent Owner argues that abiraterone acetate and ketoconazole were known to cause different effects on steroid biosynthesis pathways. PO Resp. 13. Patent Owner emphasizes that ketoconazole "was known to be a *non-selective* steroid synthesis inhibitor" whereas abiraterone acetate "was known to be a *selective* CYP17 inhibitor" that targets only CYP17. *Id.* at 13–15 (citing Ex. 2038 ¶¶ 102, 106–08, Fig. 1; Ex. 1005, 2317–18). Petitioner replies that the differences in the steroid biosynthesis pathway between abiraterone acetate and ketoconazole are "inconsequential and irrelevant," focusing instead on the knowledge that "both ketoconazole and abiraterone were CYP17 inhibitors used for the treatment of prostate cancer, and that abiraterone was known in the art to be a potent, more selective inhibitor of CYP17 than ketoconazole." Reply 6 (citing Ex. 1002 ¶¶ 37–39, 62–65).

Based on the information presented during trial, we understand that ketoconazole and abiraterone acetate do not have identical mechanisms. *See, e.g.*, Ex. 1005, 2318, Figure 1. As noted by both Petitioner and Patent Owner, however, abiraterone acetate and ketoconazole are both CYP17 inhibitors. Pet. 11–13; PO Resp. 13–15. Although Patent Owner urges us to focus on the differences in the mechanisms of operation of ketoconazole and abiraterone acetate (PO Resp. 13–15), we look not only at the differences, but also at the similarities.

The evidence demonstrates that one of ordinary skill would have been aware of the differences and the similarities in the mechanisms, and nevertheless would have compared and analogized between the two. Ex. 1005, 2318, Figure 1; Ex. 1002 ¶ 67. O'Donnell refers to ketoconazole

in its discussion of abiraterone acetate, indicating that teachings regarding ketoconazole administration were a starting point for exploration of abiraterone acetate administration. Ex. 1005, 2318. O'Donnell, after evaluating ketoconazole as an agent, turns to an evaluation of abiraterone acetate as a more selective CYP17 inhibitor, i.e., as an improvement on ketoconazole. Ex. 1005, 2318. After presenting the results from its studies, O'Donnell discusses that, in the clinical use of ketoconazole, "it is common practice to administer supplementary hydrocortisone" and that, therefore, "further studies with abiraterone acetate will be required to ascertain if concomitant therapy with glucocorticoid is required on a continuous basis, at times of physiological stress, if patients become symptomatic or indeed at all." *Id.* at 2323. This statement represents the proposition that one of ordinary skill in the art would use the example of ketoconazole's clinical use to take the next investigative steps with abiraterone acetate. We have not been presented with evidence that dissuades us from taking this statement at face value. Thus, we are persuaded that one of ordinary skill in the art would understand that both ketoconazole and abiraterone are CYP17 inhibitors, albeit with different mechanisms. With this knowledge, and given the teachings of the prior art on administration of ketoconazole and administration of abiraterone acetate, we find that one of ordinary skill in the art would look to the administration of ketoconazole for guidance on how to administer abiraterone acetate.

Third, Patent Owner argues that abiraterone acetate was known to not cause the same side effects as ketoconazole. PO Resp. 16. Patent Owner elaborates that "a skilled person would not have expected abiraterone acetate to cause clinically meaningful reductions in glucocorticoid production, and

thus would not cause the same impact on adrenal functions as ketoconazole." *Id.* at 16–17 (citing Ex. 2038 ¶ 133). Petitioner replies that Patent Owner carefully admits that a person of ordinary skill in the art would have expected abiraterone acetate to inhibit cortisol production. Reply 7 (citing PO Resp. 16–17). Nevertheless, Petitioner argues, one of ordinary skill "would have sought to keep prednisone when administering abiraterone, expecting a decrease in cortisol due to inhibition of CYP17 by abiraterone." Reply 7 (citing Ex. 1104 ¶ 20).

Both parties present evidence that, based on their respective mechanisms of action, administration of ketoconazole would inhibit production of cortisol, and administration of abiraterone acetate inhibits at least one of the pathways of cortisol production. Pet. 11–13; Ex. 2038 ¶ 100, Figs. 4–5; Tr. 14:21–16:5; Ex. 1005, 2318. Patent Owner states that abiraterone acetate "does not have the same inhibitory effect on cortisol production as ketoconazole" but appears to agree that abiraterone acetate inhibits cortisol to some degree. PO Resp. 15, 16–17. Petitioner additionally asserts that Dr. Rettig's figures omit a second pathway by which abiraterone acetate inhibits cortisol production. Reply 6–7 (citing Ex. 2038 ¶ 100, Figs. 4–5); Ex. 1104 ¶ 16. Based on the evidence presented, we agree with Petitioner and find that the action of abiraterone acetate would lead to decreased production of cortisol sufficient to alert one of ordinary skill in the art to the existence of such a decrease.

Fourth, Patent Owner argues that there is no evidence that ketoconazole causes mineralocorticoid excess. PO Resp. 17. Rather, Patent

Owner argues, ketoconazole reduces mineralocorticoid production in patients. *Id.* at 18 (citing Ex. 2038 ¶ 104; Ex. 2040 ¶¶ 37–38, 59).

Fifth, Patent Owner argues that there was no evidence, in 2006, that abiraterone acetate would cause mineralocorticoid excess. *Id.* at 19. More particularly, Patent Owner argues that O'Donnell does not mention mineralocorticoid excess, nor does other prior art. *Id.* at 18–19 (citing Ex. 2038 ¶¶ 161–64).

Petitioner replies that one of ordinary skill in the art "would have predicted that abiraterone drive[s] the production of excess mineralocorticoids." Reply 8 (citing Ex. 1002 ¶¶ 35, 79–81; Ex. 1104 ¶¶ 33–36). Petitioner further replies that Patent Owner's witness admitted that corticosterone levels would increase and compensate for the lack of cortisol, and that glucocorticoid supplementation is part of the "cornerstone of therapy" in patients "with congenital 17α-hydroxylase/17,20-lyase deficiency." Reply 8–9 (citing Ex. 2040 ¶ 47; Ex. 1089, 79:2–80:22, 91:10–93:10).

Petitioner appears to agree with Patent Owner that ketoconazole does not cause mineralocorticoid excess. Tr. 16:12–15 ("Now you have a second problem with abiraterone that you don't have with ketoconazole that is solved again with glucocorticoid supplementation like prednisone. And that problem is mineralocorticoid excess."). However, regarding the production of excess mineralocorticoids with abiraterone acetate, we are persuaded that Petitioner's evidence demonstrates that one of ordinary skill in the art would have understood the possibility or probability of that outcome. Petitioner has reasonably established that one of ordinary skill in the art would have looked at mineralocorticoid production in the CYP17 inhibition scheme to assess the

possibility of mineralocorticoid imbalance in the administration of abiraterone acetate. *See* Ex. 1002 ¶ 35; Ex. 1104 ¶¶ 33–36. In addition, Petitioner has reasonably established that one of ordinary skill in the art would have analogized to congenital CYP17 deficiency, to assess the possibility of mineralocorticoid excess in patients administered abiraterone acetate. *See* Ex. 1104 ¶¶ 32–33; Ex. 1090, 104–05; Ex. 1089, 91:10–93:10; Reply 8. Even though the analogy is not necessarily perfect or complete, an analogy to the problems arising from a congenital CYP17 deficiency likely would shed light on a CYP17 inhibition in other, non-congenital situations. *Id.* We are not persuaded that the lack of explicit discussion of mineralocorticoid excess in Gerber or O'Donnell would discourage the analogy.

Sixth, Patent Owner argues that O'Donnell establishes no need for glucocorticoid replacement with abiraterone acetate. PO Resp. 20. Patent Owner interprets O'Donnell as reporting "clinical results demonstrating *no need* for glucocorticoid replacement treatment with abiraterone acetate." *Id.* (citing Ex. 1005, 2323; Ex. 2038 ¶¶ 128–29).

Seventh, Patent Owner argues that O'Donnell cautions against glucocorticoid replacement therapy without a clinical justification. *Id.* at 21. Patent Owner relies on O'Donnell's statement that the "omission of glucocorticoid replacement when treating with aminoglutethimide and ketoconazole has been shown to be safe and effective" to argue that giving glucocorticoid replacement therapy to prostate cancer patients would have to

be clinically justified. *Id.* at 22 (citing Ex. 1005, 2323; Ex. 2038 ¶¶ 122, 128–29).

Eighth, Patent Owner argues that O'Donnell's ACTH stimulation test results did not establish a need for glucocorticoid replacement therapy with abiraterone acetate. *Id.* at 23. The Synacthen test results reported in O'Donnell, Patent Owner argues, "do not allow any meaningful conclusions to be drawn." *Id.* at 24 (citing Ex. 2038 ¶ 120–21; Ex. 2040 ¶¶ 11–14, 27–29, 32–34). Moreover, Patent Owner argues, the O'Donnell authors and contemporaneous publications reach the same conclusion. *Id.* at 25 (citing Ex. 1008, 1245; Ex. 1005, 2324).

Petitioner counters Patent Owner's position that "O'Donnell establishes no need for glucocorticoid replacement with abiraterone," arguing that (1) Gerber's teaching of prednisone co-administration would have led one of ordinary skill in the art to continue co-administration of prednisone with abiraterone acetate; (2) O'Donnell showed patients reporting abnormal ACTH tests; and (3) O'Donnell specifically suggested three options regarding using glucocorticoids with abiraterone. Reply 9–10. Petitioner also replies that O'Donnell's statement that "further studies with abiraterone acetate will be required" is an acknowledgment that glucocorticoids can and may be used with abiraterone acetate. *Id.* at 10.

We agree with Petitioner's plain reading of O'Donnell as indicating further investigation of the necessity of co-administration of a glucocorticoid with abiraterone acetate. O'Donnell clearly states that adrenocortical suppression may require administration of replacement glucocorticoid. Ex. 1005, Abstract, 2323. O'Donnell also states that "[s]ome impact on adrenal reserve was predictable from the steroid synthesis pathway." *Id.*

at 2323. Regarding administration of ketoconazole, O'Donnell states that "it is common practice to administer supplementary hydrocortisone" and that this may prove necessary with abiraterone acetate. *Id.* On the basis of the clinical evidence, O'Donnell reports that the need for concomitant therapy of abiraterone acetate with a glucocorticoid needs to be further investigated. *Id.* We disagree with Patent Owner that O'Donnell establishes that there is no need for glucocorticoid replacement with abiraterone acetate. Based on a plain reading, O'Donnell evaluates the evidence and expresses concerns regarding co-administration of a glucocorticoid with abiraterone acetate; it does not conclude that such co-administration is unnecessary.

Regarding Patent Owner's arguments about the risks of administering glucocorticoids, we are not persuaded that those risks outweigh the positive effects in seriously ill patients with limited life expectancy, such that a person of ordinary skill in the art would have been dissuaded from administering glucocorticoids to a mCRPC patient. We have sufficient evidence before us that the risks of glucocorticoid therapy were known, that the longevity of mCRPC patients was short, that glucocorticoid therapy was reasonably well tolerated in the short term, and that any long-term side effects would have been viewed by one of ordinary skill in the art in light of the same. Pet. 24–25, 33; Reply 8–9, 14 (citing Ex. 1002 ¶ 83; Ex. 1104 ¶¶ 21–22). Thus, we find that one of ordinary skill in the art would not have been dissuaded from administering abiraterone acetate with prednisone, but rather, would have been motivated to co-administer prednisone with abiraterone acetate.

Regarding the interpretation of O'Donnell's Synacthen test, we do not agree that the results "do not allow any meaningful conclusions to be drawn." PO Resp. 24. We are persuaded that one of ordinary skill in the art would

understand the results of this test to be an indicator that something was amiss with the O'Donnell Study C patients' cortisol levels following administration of abiraterone acetate. Results of the Synacthen test led O'Donnell to conclude that further studies were needed to determine whether glucocorticoid replacement would be necessary. Ex. 1005, 2323. We understand Patent Owner's position that the Synacthen test "only measures cortisol production, not total glucocorticoid levels in the body" (PO Resp. 24), but do not perceive that a complete picture of a patient's glucocorticoid production is required for one of ordinary skill in the art to be motivated to explore whether glucocorticoid replacement therapy was necessary. Petitioner's expert opines that O'Donnell's results for the Study C patients were "abnormal" and that one of ordinary skill in the art "would have thought to start the patient on a glucocorticoid such as prednisone as a way to avoid issues that would arise from the cortisol deficiency." Ex. 1104 ¶¶ 29–30 (citing Ex. 1009, 2133); Ex. 1002 ¶¶ 64, 83. We credit this testimony as supporting Petitioner's argument that one of ordinary skill in the art, upon reviewing O'Donnell's Synacthen test results and statement regarding impact on adrenal reserve, would not conclude that they lack any significance; rather, they would conclude that they are significant enough to merit further investigation of administration of abiraterone acetate with glucocorticoids.

*c. Patent Owner's Third Argument – Sartor*

Patent Owner argues that Sartor does not show that prednisone was known to be effective in treating prostate cancer in 2006. PO Resp. 26. By August 2006, Patent Owner argues, one of ordinary skill in the art "would not have considered glucocorticoids, including prednisone, to be an effective

treatment of prostate cancer, but instead to only have a role in treating certain side effects of other drugs or in managing the patient's symptoms." *Id.* at 27 (citing Ex. 2038 ¶¶ 195–98; Ex. 1002 ¶ 116). Petitioner replies that Patent Owner has not rebutted that Sartor "establishes that prednisone was known to treat prostate cancer before the '438 patent priority date." Reply 10.

First, Patent Owner argues, Sartor did not establish to a skilled person in 2006 that prednisone "treats prostate cancer." PO Resp. 28. Patent Owner relies on contemporaneous publications criticizing Sartor, and on Petitioner's expert, to argue that Sartor is of limited usefulness. *Id.* at 28–29 (citing Ex. 1036, 557; Ex. 2038 ¶ 204; Ex. 2161, 87:7–88:18). Patent Owner also critiques the data within Sartor itself as being "quite poor," and as failing to demonstrate that prednisone provided meaningful effects in prostate cancer treatment. *Id.* at 29–30 (citing Ex. 2038 ¶ 203; Ex. 2161, 120:20–121:17). Petitioner rebuffs Patent Owner's attacks on Sartor as being a "'retrospective' chart review study," replying that Patent Owner's presents no authority requiring that clinical data come from a particular type of trial. Reply 11.

Sartor, like Gerber, is a peer-reviewed article published in a reputable journal. Ex. 1006; Ex. 1004. Despite the fact that Sartor was a chart review, Sartor nevertheless indicates that treatment with prednisone demonstrated some degree of success in a group of patients. Ex. 1006. Patent Owner's arguments do not undercut the teachings of Sartor, or Sartor's demonstration that prednisone worked for some patients, in which it was reasonably well tolerated, considering the circumstances. Ex. 1006, 252, 255–56; *see In re Fritch*, 972 F.2d 1260, 1264–65 (Fed. Cir. 1992) ("It is well settled that a prior art reference is relevant for all that it teaches to those of ordinary skill in the art."). Sartor reasonably stands for the proposition that administration of

prednisone is tolerated and effective in a subset of patients, and at the time it was published, indicated some measure of efficacy for certain mCRPC patients.

Second, Patent Owner argues that by 2006 it was well known that glucocorticoids elicit only transient PSA responses that do not effectively treat prostate cancer. PO Resp. 30. According to the contemporaneous literature, Patent Owner argues, the "modest PSA responses observed in some patients administered glucocorticoids were generally short-lived, inferior to chemotherapy even in managing patients' symptoms, and had no meaningful clinical effect." *Id*. (citing Ex. 2038 ¶¶ 205, 209). Petitioner replies that "a decline in PSA, no matter how 'modest,' still indicates a positive treatment effect from prednisone," and Patent Owner's admission that Sartor shows a "modest" increased survival rate suffices to meet the limitations of the challenged claims. Reply 11 (citing Ex. 1104 ¶¶ 5, 25; Ex. 1002 ¶¶ 76–78). We agree with Petitioner that use of PSA responses as a metric indicates that certain prostate cancer patients demonstrated some positive results following administration of prednisone. Such a response would meet the limitations of the challenged claims, as argued by Petitioner. Moreover, we note that Patent Owner's unexpected results arguments, below, use PSA levels as the metric by which to measure efficacy of various prostate cancer drug combination. Reply 4 n.2. Thus, Sartor's focus on PSA responses does not diminish the relevance of its results.

Third, Patent Owner argues that glucocorticoids were given to manage unique side effects of ketoconazole or cytotoxic chemotherapy agents. PO Resp. 32. These side effects stem from ketoconazole's inhibition of production of all steroids, Patent Owner argues, and nothing in 2006

suggested abiraterone acetate caused such side effects. *Id.* (citing Ex. 2038 ¶¶ 148–49, 198). Petitioner replies that "whether prednisone was administered concurrently with anti-cancer therapies to treat side effects of those therapies is not dispositive of whether prednisone also has prostate cancer 'treatment' activity." Reply 12. We have addressed Patent Owner's argument that nothing suggested that abiraterone acetate caused the same side effects as ketoconazole in connection with our discussion of the mechanisms of the two compounds, above. Patent Owner also fails to address Petitioner's position that Sartor would have been combined with Gerber and O'Donnell not only because prednisone would have ameliorated certain side effects, but because prednisone had its own anti-cancer activity.

Fourth, Patent Owner argues that Petitioner's expert agrees that prednisone was not known to have anti-cancer treatment effects in prostate cancer patients. PO Resp. 33 (citing Ex. 1002 ¶ 116). Patent Owner refers to Dr. Godley's testimony that no treating physician would prescribe prednisone alone as an anti-cancer agent to a patient with prostate cancer, except for palliative treatment in patients that had progressed on all other available treatments. *Id.* (citing Ex. 1002 ¶ 116). Petitioner replies that Patent Owner mischaracterizes Dr. Godley's testimony; it should be read as "regardless of whether he would prescribe prednisone 'alone,' [Dr. Godley] maintained that prednisone was shown to have anti-prostate-cancer treatment activity." Reply 12. Having considered Dr. Godley's testimony, we understand Dr. Godley's interpretation of Sartor to be consistent with Petitioner's position regarding Sartor, i.e., that prednisone has its own anti-cancer effect. Ex. 1002 ¶ 116; Ex. 2162, 61:15–62:17. Additionally, Dr. Godley states that prednisone could be prescribed for palliative treatment, which, as we discuss

herein, is a treatment permitted by the language of the claims. Ex. 2162, 66:1–10, 66:17–67:1.

*d. Patent Owner's Fourth Argument*

Patent Owner argues that a skilled person would have found no reason to treat prostate cancer patients with abiraterone acetate and prednisone in 2006. PO Resp. 35.

First, Patent Owner argues that docetaxel chemotherapy had become the standard of care by August 2006, and that secondary hormone therapy was disfavored. PO Resp. 36. This, according to Patent Owner, caused researchers in this field to shift their focus to docetaxel-based regimens and other classes of agents. *Id.* (citing Ex. 2031, 231; Ex. 2161 24:2–8). Petitioner replies that the prior art's use of docetaxel does not "teach away" because (1) one of ordinary skill in the art would look beyond the currently established standard of care; (2) the art as a whole does not "teach away"; and (3) neither docetaxel nor any other then-existing therapies for prostate cancer would have discouraged one of ordinary skill in the art from considering the teachings of Gerber, O'Donnell, and Sartor. Reply 16–17. Regarding Patent Owner's argument that research in the field was focused on agents other than secondary hormonal agents, this does not foreclose or teach away from investigation of a compound such as abiraterone acetate for the treatment of prostate cancer. *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) (explaining "[t]he prior art's mere disclosure of more than one alternative does not constitute a teaching away from any of these alternatives because such disclosure does not criticize, discredit, or otherwise discourage the solution claimed"). We are not presented with any evidence that criticizes, discredits, or otherwise discourages use of abiraterone acetate. On

the contrary, abiraterone acetate was already patented and described in printed publications by 2006. *See* Ex. 1005; Ex. 1030. Accordingly, we find that one of ordinary skill in the art seeking to improve upon prostate cancer treatment would have reasonably looked to abiraterone acetate.

Second, Patent Owner argues that glucocorticoids, in 2006, were not given to mCRPC patients absent a compelling clinical justification. PO Resp. 38. Patent Owner argues that even low doses of steroids had been shown to cause serious side effects, including osteoporosis, immunosuppression, hypertension, induction of resistance in tumor cells, steroid myopathy, and gastrointestinal toxicity and bleeds, increase in bone and other metastases, and could fuel prostate cancer growth. *Id.* at 38–41. Thus, Patent Owner argues, a skilled person would have avoided continuous administration of glucocorticoids in patients exhibiting a reduction of cortisol production. *Id.* at 40, 42 (citing Ex. 2038 ¶¶ 137, 146). Petitioner argues that, at best, Patent Owner has shown "that the art might reflect some 'concerns' about combining prednisone with abiraterone" but that does not mean such use is not warranted, beneficial, or would not have been obvious. Reply 14. Rather, Petitioner argues, all drugs "carry some concerns over side-effects, and those concerns are weighed against the benefits of use." *Id.* at 17–18 (citing Ex. 1104 ¶ 27). According to Petitioner, the "overwhelming prior art of evidence shows prednisone and other glucocorticoids" routinely being used for prostate cancer treatment. *Id.* at 18.

We have already addressed a version of this argument, above, finding that although glucocorticoids have certain risks, we are not persuaded that those risks outweigh the positive effects in seriously ill patients with limited life expectancy, such that a person of ordinary skill in the art would have

been dissuaded from administering glucocorticoids to a mCRPC patient. We have sufficient evidence before us that the risks of glucocorticoid therapy were known and that glucocorticoids were routinely used for prostate cancer treatment, and are persuaded that one of ordinary skill in the art would have been motivated to co-administer prednisone with abiraterone acetate.

Third, Patent Owner argues, a skilled person would have treated symptoms of mineralocorticoid excess with other drugs. PO Resp. 43. These drugs would have included mineralocorticoid antagonists such as eplerenone, anti-hypertensives, diuretics, and potassium supplements. *Id.* (citing Ex. 2038 ¶¶ 170–71; Ex. 2040 ¶¶ 66–67). Petitioner argues that Patent Owner has not established why a person of ordinary skill in the art would have preferred eplerenone over prednisone. Reply 18–19. The existence of alternative treatments for mineralocorticoid excess, as discussed by Patent Owner, does not persuade us that one of ordinary skill in the art would employ these alternatives to the exclusion of prednisone. We are presented with no persuasive evidence that negates the reasons discussed for combining an abiraterone acetate with prednisone with a reasonable expectation of successfully treating prostate cancer. *In re Fulton*, 391 F.3d at 1200 (stating a reason to combine does not require a finding that such combination is "the preferred, or most desirable, combination").

*e. Patent Owner's Fifth Argument*

Patent Owner argues that a skilled person would have had no reasonable expectation of success in achieving the '438 patent invention. PO Resp. 45. First, Patent Owner argues, the prior art provided no basis for a skilled person to expect prednisone would treat prostate cancer. *Id.* According to Patent Owner, the evidence in August 2006 shows that a skilled

person would not have expected that prednisone would be effective in treating prostate cancer, but could instead worsen the patient's cancer. *Id.* at 47. Second, Patent Owner argues that the unpredictability of drug combination therapy in prostate cancer further precludes obviousness. *Id.* at 49.

In making this argument, Patent Owner does not contest, but does discuss, our claim constructions of "therapeutically effective amount of prednisone," as well as "treat," "treating," and "treatment." PO Resp. 45–46. Our construction of "treat," "treating," and "treatment" comes directly from the specification: these terms "include the eradication, removal, modification, management or control of a tumor or primary, regional, or metastatic cancer cells or tissue and the minimization or delay of the spread of cancer." We construed "therapeutically effective amount of prednisone" as "an amount of prednisone effective for treating prostate cancer," which invokes the term "treating."

The specification is directed to the administration of abiraterone acetate with "at least one additional therapeutic agent, *such an as anti-cancer agent or a steroid*." Ex. 1001, 1:10–12 (emphasis added). Therefore, the specification identifies, as therapeutic agents, both anti-cancer agents and steroids (the specification does not explicitly define "therapeutic agent"). The specification explicitly defines "anti-cancer agent" as "any therapeutic agent that directly or indirectly kills cancer cells or directly or indirectly prohibits, stops or reduces the proliferation of cancer cells." *Id.* at 4:8–16; *see also supra* (construing "anti-cancer agent"). The specification lists many examples of anti-cancer agents. *See, e.g.*, Ex. 1001, 3:17–18 (listing mitoxantrone, paclitaxel, docetaxel, leuprolide, goserelin, triptorelin,

seocalcitol, bicalutamide, and flutamide), 7:43–51 (listing hormone ablation agents, anti-androgen agents, differentiating agents, anti-neoplastic agents, kinase inhibitors, anti-metabolite agents, alkylating agents, *antibiotic agents,* immunological agents, interferon-type agents, intercalating agents, growth factor inhibitors, cell cycle inhibitors, enzymes, topoisomerase inhibitors, biological response modifiers, mitotic inhibitors, matrix metalloprotease inhibitors, genetic therapeutics, and anti-androgens) (emphasis added), 9:53–10:11. Thus, as set forth by the specification, antibiotic agents are one example of anti-cancer agents. *Id.* at 7:46. The specification lists examples of antibiotic agents, and includes in this list dexamethasone, corticosteroids such as hydrocortisone, *prednisone*, and prednisolone. *Id.* at 9:30–46. Therefore, prednisone, as an antibiotic agent, is an anti-cancer agent, according to the specification.

The specification does not explicitly define "steroid." The specification lists a few examples of steroids, namely, "corticosteroids or glucocorticoids" (*id.* at 10: 16–17), "hydrocortisone, *prednisone*, or dexamethasone" (*id.* at 3:19–20, 10:20–21 (emphasis added)), and "prednisolone" (*id.* at 10:35). In discussing administration of steroids, the specification provides that the "amount of the steroid administered to a mammal having cancer is an amount that is sufficient to *treat* the cancer whether administered *alone* or in combination with a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor." *Id.* at 10:21–24 (emphasis added).

The specification, therefore, appears to make a distinction between anti-cancer agents, on the one hand, and steroids, on the other hand. They are treated in the specification as two different categories of therapeutic agents. *See id.* at 3:15–20 ("a therapeutically effective amount of at least one

additional anti-cancer agent, such as, but not limited to, mitoxantrone, paclitaxel, docetaxel, leuprolide, goserelin, triptorelin, seocalcitol, bicalutamide, flutamide, or a steroid including, but not limited to, hydrocortisone, prednisone, or dexamethasone.”).

The anti-cancer agent exemplars in the specification have an anti-cancer effect, as that term is defined. The four steroid examples given (dexamethasone, hydrocortisone, prednisone, and prednisolone), which are identified as antibiotic agents and therefore anti-cancer agents, presumably have an anti-cancer effect. However, because steroids are discussed separately from anti-cancer agents in the specification, they are treated differently than anti-cancer agents: the identified steroids are anti-cancer agents, but they also are treated by the specification as a different category of therapeutic agents. Although steroids may have anti-cancer effects, as suggested by the evidence we have before us in the specification and at trial, the specification does not foreclose that they may also have other therapeutic effects. It would make little sense for the specification to identify the four steroid examples given as anti-cancer agents, and then to address them again as steroids, if these four steroid examples did not have an effect apart from an anti-cancer effect.

Treatment, according to the ’438 specification, therefore, can include eradication of a tumor, as would be expected of an anti-cancer agent. Treatment, however, need not exclude other effects that may be provided by steroids. Treatment by steroids can also refer to the other treatments that are “included” in the construction of “treat,” “treating,” and “treatment,” such as management or control of a tumor, cancer cells or tissue, and minimization or delay of the spread of cancer. “As a patent law term of art, ‘includes’ means

'comprising.'" *SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1284 (Fed. Cir. 2005) (citations omitted). The terms "management" and "control" in the definition also do not foreclose that the terms "treat," "treatment," or "treating" may refer to different effects derived from administration of steroids, apart from anti-cancer effects, such as palliative effects.

We construed "therapeutically effective amount of prednisone" as "an amount of prednisone effective for treating prostate cancer." Thus, because "treating" can "include" a number of actions, prednisone may be used to "treat" prostate cancer, perhaps by an anti-cancer effect, or perhaps by some other mechanism. Thus, we determine that Petitioner has met its burden that the prior art provides a reasonable expectation that prednisone could be used as a therapeutic agent in the treatment of prostate cancer. Moreover, in this case, in which Petitioner relies on Sartor to demonstrate that prednisone has its own anti-cancer effect, we find that prednisone would "treat" prostate cancer under either definition.

Claim 1, which is directed to the administration of abiraterone acetate and prednisone, does not require a particular result. It does require a "therapeutically effective amount" of each component, but as we have discussed above, the claim language does not require any synergistic anti-cancer results. Therefore, Patent Owner's reasonable expectation of success argument, viewed in light of the language of the challenged claims and the evidence of record, does not convince us that the Petitioner has not established by a preponderance of the evidence a reasonable expectation of achieving the challenged claims.

*3. Objective Indicia of Non-Obviousness*

In its Petition, Petitioner contends that the Patent Owner may try to rely on secondary considerations of non-obviousness. Pet. 46–65. Specifically, the Petition raises arguments related to unexpected results, commercial success, long-felt need, and copying. *Id.*

In its Response, Patent Owner presents arguments directed to objective indicia of nonobviousness. PO Resp. 50–69. Patent Owner argues that the objective indicia of non-obviousness demonstrate: 1) unexpected results; 2) skepticism and the failure of others; 3) the claimed invention has met a long-felt need; and 4) commercial success. PO Resp. 50–68.

In its Reply, Petitioner presents arguments related to unexpected results, skepticism, failure of others, long-felt need, and commercial success. Reply 19–26.

Factual inquiries for an obviousness determination include secondary considerations based on evaluation and crediting of objective evidence of nonobviousness. *Graham*, 383 U.S. at 17. Secondary considerations may include any of the following: long-felt but unsolved needs, failure of others, unexpected results, commercial success, copying, licensing, and praise. *Id.* The totality of the evidence submitted may show that the challenged claims would not have been obvious to one of ordinary skill in the art. *In re Piasecki*, 745 F.2d 1468, 1471–72 (Fed. Cir. 1984). Before we make our final obviousness determination, we must consider the evidence of obviousness anew in light of any evidence of secondary considerations of nonobviousness presented by Patent Owner. *See Graham*, 383 U.S. at 17–18 ("Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the

circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."); *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012) ("This objective evidence must be 'considered as part of all the evidence, not just when the decisionmaker remains in doubt after reviewing the art.'" (quoting *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39 (Fed. Cir. 1983))).

All types of objective evidence of nonobviousness must be shown to have a nexus to the claimed invention. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) (nexus generally); *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996) (commercial success); *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011) (unexpected results); *Rambus Inc. v. Rea*, 731 F.3d 1248, 1256 (Fed. Cir. 2013) (long-felt need). The stronger the showing of nexus, the greater the weight accorded the objective evidence of nonobviousness. *See Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 306 (Fed. Cir. 1985).

*a. Unexpected Results*

Patent Owner asserts that unexpected results are demonstrated by the Phase I/II study in which abiraterone acetate was administered as a monotherapy and also together with dexamethasone, a glucocorticoid. PO Resp. 51–54. "Remarkably, many patients in this trial began responding again to treatment" when dexamethasone was added to the treatment regimen after a patient stopped responding to abiraterone acetate monotherapy. *Id.* at 52–53. Patent Owner presents a table comparing abiraterone acetate monotherapy to abiraterone acetate administered with dexamethasone (in clinical trial COU-AA-001, from Ex. 1022) and to abiraterone acetate

administered with prednisone (in clinical trial COU-AA-002, from Ex. 1021) to argue that patients given abiraterone acetate with prednisone responded for more than twice as long on average as those given abiraterone acetate alone. *Id.* at 55. Patent Owner adds that, in Phase III trials, patients had a longer time to PSA progression compared to the Phase II abiraterone acetate monotherapy studies, and experienced an overall survival benefit from the combination. *Id.* at 55–56. Patent Owner also discounts Petitioner's criticisms of the unexpected results as "baseless," stating that Petitioner's focus on median PSA to assess the extent of disease in patient populations reveals the weakness of these assertions. *Id.* at 57–58.

In the Petition, Petitioner argues that unexpected results raised during prosecution do not weigh in favor of patentability, because applicants argued unexpected results based on a comparison of abiraterone acetate and prednisone versus prednisone alone. Pet. 48. Petitioner also argues that "both abiraterone acetate and prednisone were both well-known in the prior art before August 25, 2006" and, therefore, Patent Owner's alleged unexpected results have no nexus to the '438 patent. *Id.* at 53. In the Reply, Petitioner argues that the Response (1) fails to report the confidence intervals around the median time to PSA progression ("TTPP") values; (2) demonstrates no difference in median TTPP between patients who received abiraterone acetate alone and those who received an abiraterone-prednisone combination; (3) improperly compares data from patient populations in separate clinical trials; and (4) relies on clinical studies that were not designed to measure any effect of prednisone. Reply 21–22.

Regarding Patent Owner's comparison of abiraterone acetate monotherapy with abiraterone acetate/dexamethasone therapy, we agree with

Petitioner that "to the extent that [Patent Owner] tries to draw any conclusion between studies that involve a combination with dexamethasone, we respectfully submit that there's no nexus there" in that "[d]examethasone is not what's claimed and there's no nexus to the claims." Tr. 19:17–20, 20:2–3. Although dexamethasone and prednisone are both glucocorticoids, Patent Owner does not point us to satisfactory evidence as to why the ordinary artisan would consider dexamethasone and prednisone to be interchangeable for the purpose of comparing results. *Cf.* Ex. 2038 ¶ 240 (stating that a person of ordinary skill would "understand the dexamethasone extension study results to be due to a class effect of glucocorticoids" without further citation). Because the claims cover prednisone, and not any other glucocorticoid, the results of the combination of dexamethasone with abiraterone acetate are of limited use, as we are not informed of the similarities or differences of the mechanism of action of those glucocorticoids or how the mechanism leads to the asserted unexpected results.

Moreover, to the extent the table purportedly compares the abiraterone acetate monotherapy to abiraterone acetate administered with prednisone, the table compares the abiraterone acetate monotherapy administered in clinical trial COU-AA-001 with the abiraterone acetate administered with prednisone in clinical trial COU-AA-002, without explaining or accounting for the differences between the two trials. Tr. 20:10–19.

We determine that there is insufficient evidence that the alleged unpredictable and unexpected results of abiraterone acetate and prednisone are objective indicia of nonobviousness of the challenged claims. Patent Owner does not sufficiently tie the allegedly unpredictable and unexpected

result to the administration of abiraterone acetate and prednisone as claimed. Thus, we determine this consideration does not weigh in favor of the patentability of the challenged claims.

*b. Skepticism and the Failure of Others*

Patent Owner describes the history of abiraterone acetate development as a series of starts and stops. PO Resp. 61–62. The sponsor of the research described in O'Donnell, according to Patent Owner, terminated its clinical development in 1999. *Id.* at 61. No clinical data concerning abiraterone acetate was published until O'Donnell in 2004. *Id.* Other potential therapeutic agents and regimens for prostate cancer were investigated without success. *Id.* at 62.

Petitioner argues that Patent Owner's evidence demonstrating its predecessor's efforts to license abiraterone is overshadowed by O'Donnell's 2004 publication detailing the benefits of abiraterone. Reply 23. Moreover, Petitioner argues, if there were any skepticism, it was to the abiraterone compound itself. *Id.*

"Evidence of industry skepticism weighs in favor of non-obviousness. If industry participants or skilled artisans are skeptical about whether or how a problem could be solved or the workability of the claimed solution, it favors non-obviousness." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1335 (Fed. Cir. 2016).

Based on Patent Owner's evidence, it does appear that abiraterone acetate was viewed with some skepticism until the application for the '438 patent was filed in 2006. However, abiraterone acetate was also previously

patented in 1997[3] and, therefore, at least some in the industry had overcome their skepticism sufficiently to undertake research on and to seek a patent on the invention of abiraterone acetate alone. Moreover, the claims at issue are directed to the combination of abiraterone acetate with prednisone, whereas Patent Owner's arguments are directed to the purported skepticism of the industry toward abiraterone acetate alone, which falls short of establishing a nexus between skepticism of the industry and the challenged claims. Finally, the "failure of others" argument as it relates to the combination of abiraterone acetate with prednisone may have come about as a result of other factors, such as a blocking patent (Barrie), as we discuss more fully below. Thus, we determine that these factors do not weigh in favor of patentability of the challenged claims.

*c. Long-Felt Need*

According to Patent Owner, prior to the invention claimed in the '438 patent, "prognosis for men with mCRPC was dismal," and thus, "there was an urgent need for new treatments that would improve survival." PO Resp. 63.

In the Petition, Petitioner argues that there is no showing of long-felt and unmet need or failure of others because (1) "administering abiraterone acetate and prednisone both individually for treating prostate cancer was well-known in the art by August 25, 2006"; (2) "co-administering abiraterone acetate and prednisone did not provide any unexpectedly superior results for treating prostate cancer"; (3) "co-administering prednisone with abiraterone acetate did not satisfy any need to make abiraterone acetate significantly

---

[3] U.S. Patent No. 5,604,213 to Barrie, issued February 18, 1997 ("Barrie") (Ex. 1030).

more effective in prolonging progression-free survival"; and (4) prednisone had long been the standard of care in prostate cancer treatment and prednisone had already been administered with another CYP17 inhibitor, ketoconazole." Pet. 64–65. In the Reply, Petitioner reiterates these points. Reply 23–24.

We determine that, although drugs that contribute to increasing cancer patient survival rates nearly always satisfy a long-felt need, Patent Owner has not presented sufficient evidence that a specific long-felt need existed for the method of administering abiraterone acetate and prednisone claimed in the '438 patent. Abiraterone acetate's availability (and underutilization) for approximately a decade prior to issuance of the '438 patent undermines Patent Owner's argument that a long-felt need existed for any regimen based on abiraterone acetate. The record also indicates that, although there were drawbacks to the existing drugs, there were other drugs on the market that were available to prostate cancer patients. Ex. 1002 ¶¶ 28–29; Ex. 2038 ¶ 60. We are not satisfied that long-felt need is necessarily objective indicia of nonobviousness of the challenged claims. Thus, we determine this consideration is neutral regarding the patentability of the challenged claims.

*d. Commercial Success*

Patent Owner argues that "ZYTIGA®-based therapy has been an outstanding commercial success, with U.S. sales reaching $1.07 billion in 2015 alone and $1.09 billion in 2016." PO Resp. 64. Patent Owner further argues that, under any definition of the relevant market, Zytiga's "combination therapy has achieved substantial market share, demonstrating it enjoys significant commercial success." *Id.* at 64–65. To support its argument, Patent Owner presents evidence of market share. *Id.* at 65 (citing

Ex. 1012, 6–8; Ex. 2044 ¶¶ 8–9, 64–68, Appendix C, C-1, D; Ex. 2134). Patent Owner also presents evidence that there is a nexus between the ’438 patent claims and the commercial success of Zytiga-based therapy. *Id.* at 66 (citing Ex. 2038 ¶¶ 253–54, 258; Ex. 2044 ¶ 62). Patent Owner also argues that any blocking patent argument is flawed, in that Barrie was available for licensing between 2000 and 2004. *Id.* at 68–69.

In its Petition, Petitioner argues that the existence of a blocking patent (Barrie) and of FDA-based exclusivity limits the applicability of any evidence of commercial success to overcome a prima facie case of obviousness. Pet. 55 (citing *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1376–77 (Fed. Cir. 2005)). In discussing Patent Owner’s licensing history of the abiraterone acetate patent, Petitioner argues that (1) Patent Owner’s argument that only the drug was licensed does not rebut the “blocking patent” activity of Barrie; (2) Patent Owner does not elaborate as to whether the license was exclusive or non-exclusive; (3) Patent Owner does not support its assertion that the licensed party failed to arrive at the ’438 patent claims or that abiraterone was available for licensing. *Id.* at 58. Petitioner also disputes that there is any nexus between the Zytiga sales and the ’438 patent. *Id.* at 60. More particularly, Petitioner argues that (1) the ’438 patent cannot claim invention of the abiraterone or prednisone compounds themselves; (2) both abiraterone and prednisone were well-known in the prior art, as was administering prednisone with other anti-cancer agents, including CYP17 inhibitors; and (3) the lack of evidence that Zytiga’s sales are driven by the benefits of adding prednisone to the treatment of abiraterone acetate. *Id.* at 60 (citing Ex. 1077 ¶¶ 33–35). Finally, Petitioner argues that Xtandi has taken Zytiga’s market share, and the

prosecution history's evidence of commercial success is flawed. *Id.* at 62–64. In its Reply, Petitioner does not materially dispute the $1.07 billion or $ 1.09 billion annually in sales figures. Petitioner recaps other arguments from its Petition, namely, failure to demonstrate nexus, that Zytiga's sales were driven by non-patented factors, loss of Zytiga's market share to Xtandi, Patent Owner's exclusive focus on marketing expenses, and the blocking patent argument. Reply 24–26.

"When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention." *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997); *WBIP*, 829 F.3d at 1329. That presumption of nexus, however, is rebuttable, as "a patent challenger may respond by presenting evidence that shows the proffered objective evidence was 'due to extraneous factors other than the patented invention.'" *WBIP*, 829 F.3d at 1329 (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1393 (Fed. Cir. 1988)).

There is no real dispute that Zytiga is commercially successful in terms of dollar figures. PO Resp. 64. However, as discussed herein, abiraterone acetate was previously known and patented. Ex. 1030. "Where 'market entry by others was precluded [due to blocking patents], the inference of non-obviousness of [the asserted claims], from evidence of commercial success, is weak.'" *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 740 (Fed. Cir. 2013) (quoting *Merck & Co.*, 395 F.3d at 1377). Even if the Barrie patent were available for licensing and was actively shopped around to other companies during 2000 (after which a previous license expired) and 2004

(when the predecessor of Patent Owner took a license), the record evidence does not indicate that those efforts in this span of time remove the deterrent effect of the blocking patent. PO Resp. 68–69 (citing Ex. 2044 ¶¶ 30–33); Reply 23 (citing Ex. 1103 ¶¶ 21–26, 44); Tr. 44:1–14. Thus, although the revenues generated by Zytiga are substantial, the commercial success of Zytiga is mitigated by the existence of a blocking patent. We are persuaded, rather, by Petitioner's argument that the blocking patent would have deterred others from exploring the commercial potential of abiraterone acetate, and thus, that blocking patent to abiraterone acetate limits the applicability of other evidence of commercial success.

We also note Petitioner's argument that there is no nexus between the commercial success and the claimed invention, in that the record evidence attributes Zytiga's commercial success to abiraterone acetate, rather than to the combination of abiraterone acetate and prednisone. Reply 24–25. In this case, if the feature that created the commercial success was known in the prior art, i.e. abiraterone acetate, the success is not pertinent to the issue of obviousness. *Galderma Labs.*, 737 F.3d at 740. As the Zytiga prescribing information indicates, the stated purpose of co-administration of prednisone or "a corticosteroid" is reducing the incidence of adverse reactions due to CYP17 inhibition. Ex. 1052, 3–6 ("[c]o-administration of a corticosteroid" suppresses ACTH drive, resulting in a reduction in the incidence and severity of adverse reactions such as hypertension, hypokalemia, and fluid retention as a consequence of increased mineralocorticoid levels resulting from CYP17 inhibition); Ex. 1062, 2–3 (co-administration of a corticosteroid suppresses the ACTH drive, reducing the incidence and severity of mineralocorticoid adverse reactions). This literature's discussion acknowledges the previously-

known roles of abiraterone acetate and prednisone, and the discussion of a corticosteroid generally contradicts the specific anti-cancer role of prednisone argued by Patent Owner. We are unpersuaded that there is a nexus between the commercial method, namely, the administration of abiraterone acetate and prednisone, and any novel features of the claimed method. Petitioner has demonstrated that both abiraterone acetate and prednisone were known in the prior art. Patent Owner's assertions that the combination of these features drove Patent Owner's increased sales do not demonstrate a nexus between any commercial success and the claimed invention of the '438 patent.

Thus, on this record, it is not clear whether the sales of Zytiga are due to the method recited in the '438 patent, or the known and patented abiraterone acetate itself. Consequently, we cannot conclude from the evidence before us that the commercial success of Zytiga was due to the merits of the invention recited in the claims of the '438 patent. Accordingly, we determine that Petitioner presents sufficient evidence to rebut the presumption of nexus between the commercial success of Zytiga and the claimed method. We, therefore, are not persuaded that Patent Owner's evidence of commercial success supports the nonobviousness of the challenged claims.

*4. Summary*

As detailed above, the secondary considerations of nonobviousness raised by Patent Owner are neutral or not in favor of the patentability of the challenged claims, and do not outweigh the other *Graham* factors in our obviousness analysis. We determine, therefore, that Petitioner has demonstrated that the preponderance of the evidence of record supports that it would have been obvious to the ordinary artisan at the time of invention to

combine Gerber, O'Donnell, and Sartor with a reasonable expectation of success of achieving the method of challenged claim 1. We also have considered Petitioner's arguments and evidence as to dependent claims 2–20, which reasoning we adopt as our own. We are persuaded, based on those arguments, that Petitioner has demonstrated by a preponderance of the evidence that those claims would have been obvious based on the combination of Gerber, O'Donnell, and Sartor. *See* Pet. 36–46; Ex. 1002 ¶¶ 87–105.

*F. Motion to Exclude*

Patent Owner filed a Motion to Exclude (Paper 63), to which Petitioner responded (Paper 66) and to which Patent Owner filed a Reply (Paper 70). The party moving to exclude evidence bears the burden of proof to establish that it is entitled to the relief requested, e.g., that the material sought to be excluded is inadmissible under the Federal Rules of Evidence. *See* 37 C.F.R. §§ 42.20(c), 42.62(a).

Patent Owner seeks to exclude Exhibits 1002 ¶¶ 46–57, 106, 117, and 119–23; 1013; 1034; 1048–76; 1077, including but not limited to, ¶¶ 13–22, 24–32, and 72; 1078, 1080; 1082; 1084; 1086; 1087; 1093; 1094; 1100; 1102; 1103 ¶¶ 5–10, 12, 15–19, 27–30, 37, 39–41, and 43; 1104 ¶¶ 3–4, 6–7, 9–13, 15, 17–19, 28, 31, 37–38, 40, 42, 44, 46, and 48; 1106 ¶¶ 17–33, 36, 38–41, 43–49, 51–53, and 56–61; 1107–14; and 1116–19. Paper 63, 15. Patent Owner seeks to exclude these exhibits as (a) expert declarations and exhibits that Patent Owner alleges are outside of the scope of the prior art permitted by 35 U.S.C. § 311(b); (b) sections of Petitioner's declarations and related exhibits that are not cited in the papers, and therefore irrelevant and

prejudicial; and (c) exhibits that lack authenticity or violate the hearsay rule. *Id.* at 2.

Petitioner responds that (a) Exhibits 1077, 1048–76, 1078 and 1078 are relevant; (b) portions of Exhibits 1002, 1077, 1103, and 1104 along with Exhibits 1013, 1048, 1050, 1051, 1053–55, 1059, 1066, 1067, 1073–76, 1080, 1082, 1084, 1086, 1093, 1094, 1107–14, and 1116–19 are relevant; (c) Exhibits 1050, 1063, 1065, 1066, 1069, 1074, 1087, 1094, 1100, 1102, 1109, 1112, and 1116, 1034, 1057, 1060–61, 1067, 1068, 1070–73, 1080, 1114, 1119, and Attachments B-1 and B-2 of Exhibit 1077 have been authenticated; and (d) Exhibits 1057, 1060–61, 1065, 1067–73, 1080, 1087, 1100, 1102, and 1109 are not hearsay. Paper 66, 1–12.

Because we do not expressly rely upon Exhibits 1013; 1034; 1048–51, 1053–61, 1063–76; 1078, 1080; 1082; 1084; 1086; 1087; 1093; 1094; 1100; 1102; 1106 ¶¶ 17–33, 36, 38–41, 43–49, 51–53, and 56–61; 1107–14; and 1116–19 in this Decision, Patent Owner's Motion to Exclude need not be decided as to these exhibits. Accordingly, Patent Owner's Motion to Exclude is dismissed as moot as to these Exhibits. Below, we address concerns regarding Exhibits 1002, 1052, 1062, 1077, 1103, and 1104.

We disagree that Exhibits 1052 and 1062, upon which Dr. Stoner relies in his declaration, should be excluded. We do not construe Petitioner's preliminary arguments concerning secondary considerations to be a ground on which this proceeding is based. 35 U.S.C. § 311(b). We credit Petitioner's argument that Patent Owner "itself attempted to claim commercial success as an objective indicia of non-obviousness in its Patent Owner's Response." Paper 66, 2. We find that Exhibits 1052 and 1062 are properly part of the record.

Regarding the portions of Exhibit 1002, 1077, 1103, and 1104 that were not specifically cited in Petitioner's reply, we disagree with Patent Owner that we should exclude these portions. In our proceedings, "[e]vidence consists of affidavits, transcripts of depositions, documents, and things. All evidence must be filed in the form of an exhibit." 37 C.F.R. § 42.63(a). An exhibit "must be filed with the first document in which it is cited." 37 C.F.R. § 42.6(c). The Petition, as filed, references Exhibit 1002 in its List of Exhibits. Pet. i. The Exhibit List (Paper 53) filed with the Reply (Paper 54) references Exhibits 1077, 1103, and 1104. Paper 53, 11. Exhibits 1077, 1103, and 1104 were filed along with the Reply. We find the references to Exhibits 1077, 1103, and 1104 adequate to support the "cited" requirement in 37 C.F.R. § 42.6(c). We are unaware of any legal basis for striking uncited paragraphs of an expert declaration. Thus, the portions of Exhibits 1077, 1103, and 1104 sought to be excluded are not inadmissible, and we shall not exclude them as such.

Accordingly, Patent Owner's Motion to Exclude is *denied* as to Exhibits 1002 ¶¶ 46–57, 106, 117, and 119–23; 1052, 1062, 1077, including but not limited to, ¶¶ 13–22, 24–32, and 72; 1103 ¶¶ 5–10, 12, 15–19, 27–30, 37, 39–41, and 43; and 1104 ¶¶ 3–4, 6–7, 9–13, 15, 17–19, 28, 31, 37–38, 40, 42, 44, 46, and 48, and *dismissed* as to Exhibits 1013; 1034; 1048–51, 1053–61, 1063–76; 1078, 1080; 1082; 1084; 1086; 1087; 1093; 1094; 1100; 1102; 1106 ¶¶ 17–33, 36, 38–41, 43–49, 51–53, and 56–61; 1107–14; and 1116–19.

*G. Motions to Seal*

Patent Owner filed a motion to seal the confidential versions of the Patent Owner Preliminary Response, as well as Exhibits 2002 and 2003. Paper 11. Patent Owner represents that the parties agreed to a modified

version of the Board's Default Protective Order, submitted as Exhibit 2006, and submitted a redline of the Standing Protective Order as Exhibit 2007. *Id.* at 2. Patent Owner filed another Motion to Seal the confidential version of its Surreply to Patent Owner Preliminary Response. Paper 25. Finally, Patent Owner filed a motion to seal the confidential version of the Declaration of Dr. Vellturo (Exhibit 2044) and the deposition transcript of Dr. Godley (Exhibit 2161), as well as Exhibits 2092, 2093, and 2118. Paper 41.

Petitioner filed a Motion to Seal (Paper 52), moving to seal the confidential version of the Declaration of Dr. Auchus (Exhibit 1089) and the confidential version of the Second Declaration of Dr. Stoner (Exhibit 1103).

The motions to seal are *granted* and the modified protective order *entered*.

There is an expectation that information will be made public where the information is identified in a final written decision, and that confidential information that is subject to a protective order ordinarily would become public 45 days after final judgment in a trial, unless a motion to expunge is granted. 37 C.F.R. § 42.56; Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,761 (Aug. 14, 2012). In rendering this Final Written Decision, it was not necessary to identify, nor discuss in detail, any confidential information. However, a party who is dissatisfied with this Final Written Decision may appeal the Decision pursuant to 35 U.S.C. § 141(c), and has 63 days after the date of this Decision to file a notice of appeal. 37 C.F.R. § 90.3(a). Thus, it remains necessary to maintain the record, as is, until resolution of an appeal, if any.

In view of the foregoing, the confidential documents filed in the instant proceeding will remain under seal, at least until the time period for filing a notice of appeal has expired or, if an appeal is taken, the appeal process has concluded. The record for the instant proceeding will be preserved in its entirety, and the confidential documents will not be expunged or made public, pending appeal. Notwithstanding 37 C.F.R. § 42.56 and the Office Patent Trial Practice Guide, neither a motion to expunge confidential documents nor a motion to maintain these documents under seal is necessary or authorized at this time. *See* 37 C.F.R. § 42.5(b).

*H. Conclusion*

Having considered the parties' arguments and evidence, we evaluate all of the evidence together to make a final determination of obviousness. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1075 (Fed. Cir. 2012) (stating that a fact finder must consider all evidence relating to obviousness before finding patent claims invalid). In so doing, we conclude that Petitioner has satisfied its burden of demonstrating, by a preponderance of the evidence, that the subject matter of claims 1–20 would have been obvious over the combination of Gerber, O'Donnell, and Sartor.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–20 are held *unpatentable*;

FURTHER ORDERED that Patent Owner's Motion to Exclude is *denied* as to Exhibits 1002 ¶¶ 46–57, 106, 117, and 119–23; 1052, 1062, 1077, including but not limited to, ¶¶ 13–22, 24–32, and 72; 1103 ¶¶ 5–10, 12, 15–19, 27–30, 37, 39–41, and 43; and 1104 ¶¶ 3–4, 6–7, 9–13, 15, 17–19,

28, 31, 37–38, 40, 42, 44, 46, and 48, and *dismissed* as to Exhibits 1013; 1034; 1048–51, 1053–61, 1063–76; 1078, 1080; 1082; 1084; 1086; 1087; 1093; 1094; 1100; 1102; 1106 ¶¶ 17–33, 36, 38–41, 43–49, 51–53, and 56–61; 1107–14; and 1116–19; and

FURTHER ORDERED, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Dennies Varughese
Deborah Sterling
Lestin Kenton
Ralph Powers
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
dvarughe@skgf.com
dsterlin-ptab@skgf.com
lkenton-ptab@skgf.com
tpowers@skgf.com

FOR PATENT OWNER:

Dianne B. Elderkin
Barbara L. Mullin
Ruben H. Munoz
AKIN GUMP STRAUSS HAUER & FELD LLP
JANS-SYTIGA@akingump.com

Anthony C. Tridico
Jennifer H. Roscetti
FINNEGAN HENDERSON FARABOW
GARRETT & DUNNER, LLP
anthony.tridico@finnegan.com
jennifer.roscetti@finnegan.com

Trials@uspto.gov
571-272-7822

Paper 76
Entered: December 3, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

WOCKHARDT BIO AG,
Petitioner,

v.

JANSSEN ONCOLOGY, INC.,
Patent Owner.

---

Case IPR2016-01582
Patent 8,822,438 B2

---

Before JEFFREY N. FREDMAN, KRISTINA M. KALAN and JACQUELINE T. HARLOW, *Administrative Patent Judges*.[1]

KALAN, *Administrative Patent Judge*.

DECISION
Denying Patent Owner's Request for Rehearing
*37 C.F.R. § 42.71(d)*

[1] A Panel Change Order issued on September 28, 2018, indicating that the judges named herein now constitute the panel. Paper 75.

## I. INTRODUCTION

Janssen Oncology, Inc. ("Patent Owner") filed a Request for Rehearing (Paper 73, "Request" or "Req.") of our Final Written Decision (Paper 72, "Final Written Decision" or "Dec.") in which claims 1–20 of U.S. Patent No. 8,822,438 B2 (Ex. 1001, "the '438 patent") are unpatentable. For the reasons that follow, Patent Owner's Request for Rehearing is denied.

## II. THE REQUEST FOR REHEARING

In pertinent part, 37 C.F.R. § 42.71(d) states:

> The burden of showing a decision should be modified lies with the party challenging the decision. The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, an opposition, or a reply.

Thus, a request for rehearing is not an opportunity merely to disagree with the Board's assessment of the arguments or weighing of the evidence, or to present new arguments or evidence.

Patent Owner requests rehearing to address issues with our Final Written Decision, which Patent Owner groups into two arguments: first, whether the Board misapprehended evidence regarding Petitioner's reasoning for administration of prednisone with abiraterone acetate and whether the Board overlooked or misapprehended the evidence regarding motivation to combine abiraterone acetate with prednisone based on the teachings of Sartor; and second, whether the Board misapprehended Petitioner's arguments as to the 1000 mg dose of abiraterone acetate in claims 4, 11, 19, and 20. Req. 1–4.

We have reviewed Patent Owner's Request and carefully considered all the arguments presented. For the following reasons, we are not persuaded that the Board misapprehended or overlooked arguments or evidence with respect to the contentions asserted by Patent Owner.

## III. DISCUSSION

### *(A) Patent Owner's First Arguments*

Patent Owner argues that the Board "misapprehended or overlooked that Petitioner's admissions negated the motivation to combine in the Petition." Req. 4. Patent Owner argues that the Board overlooked Dr. Godley's testimony that "no treating physician would prescribe prednisone alone as an anti-cancer agent to a patient with prostate cancer" (Ex. 1002 ¶ 116), which Patent Owner argues is an admission "at odds with the Board's findings." *Id.* at 6. Patent Owner further argues that we overlooked that Dr. Godley testified that Sartor is just a chart review that a skilled researcher would not rely on. *Id.* at 7. Patent Owner also argues that the Board advanced a new "palliation"-based motivation theory. *Id.* at 7–8. In sum, Patent Owner argues that the Board overlooked or misapprehended the evidence demonstrating there was no motivation to combine abiraterone acetate with prednisone based on the teachings of Sartor. Req. 11–12.

In our Final Written Decision, in connection with our assessment of motivation to combine Sartor with Gerber and O'Donnell, we addressed the disputed portion of Dr. Godley's testimony directly. Dec. 26 ("Fourth, Patent Owner argues that Petitioner's expert agrees that prednisone was not known to have anti-cancer treatment effects in prostate cancer patients.") There, we agreed with Petitioner that Dr. Godley's interpretation of Sartor was "consistent with Petitioner's position regarding Sartor, i.e., that

prednisone has its own anti-cancer effect." *Id.* (citing Ex. 1002 ¶ 116; Ex. 2162, 61:15–62:17). Patent Owner's disagreement with our analysis is not a proper basis for a rehearing request. Regarding the Board's consideration of Sartor's credibility, we evaluated the evidence and testimony before us to conclude that, despite the fact that Sartor was a chart review, it is a "peer-reviewed article published in a reputable journal" and its format did not undercut its teachings. Dec. 24. Regarding the Board's use of the word "palliative," we disagree that such use constitutes a new theory advanced by the Board. Req. 7–8. Rather, we used the term "palliative" three times in the Final Written Decision—once to accurately quote the language used by Dr. Godley in his Declaration (Dec. 26 (citing Ex. 1002 ¶ 116)), once to accurately quote Dr. Godley's testimony (Dec. 26–27 (citing Ex. 2162, 66:1–10, 66:17–67:1), and once in our discussion of claim construction (Dec. 33). None of these instances advances a new theory. Although we noted that Dr. Godley stated that prednisone could be prescribed for palliative treatment in reconciling that statement with our claim construction (*id.* at 26–27), we relied on Petitioner's arguments in chief regarding reasons to combine Gerber, O'Donnell, and Sartor in reaching our ultimate determination of unpatentability. *Id.* at 11–13.

Patent Owner also argues that the Board disregarded the presumption of validity that patents—including those undergoing inter partes review—are entitled to under 35 U.S.C. § 282. Req. 3–4, 10–11. Patent Owner, however, does not point us to where this argument was raised previously. 37 C.F.R. § 42.71(d). Therefore, Petitioners did not have an opportunity to respond to this issue, nor did Patent Owner previously address the question of why the presumption of validity in 35 U.S.C. § 282 controls inter partes

review proceedings in light of the statement in 35 U.S.C. § 316(e) that "In an inter partes review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence." Accordingly, because Patent Owner does not demonstrate that this argument was raised previously and because we cannot be assured that Petitioner has had any opportunity to respond, we do not consider this argument in our present order.

We considered the disputed evidence and argument in our Final Written Decision, and thus, we are not persuaded that we overlooked it. Dec. 26. We also are not persuaded by Patent Owner's arguments that we misapprehended the evidence and arguments, or that we improperly created a new theory. In sum, we are not persuaded by Patent Owner's arguments that we should grant a request for rehearing based on this group of arguments.

*(B) Patent Owner's Second Argument*

Patent Owner argues that the Board misapprehended that the prior art did not teach or suggest a 1000 mg abiraterone acetate dose as required by claims 4, 11, 19, and 20. Req. 12. More particularly, Patent Owner faults the Board for adopting Petitioners' assertions made in support of its arguments that a skilled person would have been motivated to increase the dose of abiraterone acetate disclosed in the prior art references. *Id.* at 13; *see also* Dec. 45 ("We also have considered Petitioner's arguments and evidence as to dependent claims 2–20, which reasoning we adopt as our own.").

Patent Owner now presents a new argument that we misapprehended the teachings of the prior art with respect to claims 4, 11, 19, and 20.

Req. 12–14. Patent Owner, however, does not point out where this matter was previously raised. Because Patent Owner has not previously raised any of its arguments presented in the Request, we are not permitted to consider its arguments now. 37 C.F.R. § 42.71(d). Moreover, we did not overlook Patent Owner's arguments regarding these claims; rather, we considered and adopted Petitioner's arguments regarding these claims. Dec. 45; *cf. Cutsforth, Inc. v. Motive Power, Inc.*, 636 F. App'x 575 (Fed. Cir. 2016) (nonprecedential). Patent Owner's failure to argue specifically against these claims during trial does not permit Patent Owner to now present arguments in this regard.

IV. CONCLUSION

We have reviewed and considered the arguments in Patent Owner's Request and conclude that Patent Owner has not carried its burden of demonstrating that the Board misapprehended or overlooked any matters in rendering the Final Written Decision. 37 C.F.R. § 42.71(d). Rather, Patent Owner uses its Request as an opportunity to argue positions with which we disagreed in our Final Written Decision. Merely disagreeing with our analysis or conclusions does not serve as a proper basis for a request for rehearing. Patent Owner also uses its Request to raise matters without adequately demonstrating where those matters previously were raised. Thus, Patent Owner's challenge does not meet the standard set forth for a request for rehearing.

The Request for Rehearing is *denied*.

FOR PETITIONER:
Dennies Varughese
Deborah Sterling
Lestin Kenton
Ralph Powers
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
dvarughe@skgf.com
dsterlin-ptab@skgf.com
lkenton-ptab@skgf.com
tpowers@skgf.com

FOR PATENT OWNER:
Dianne B. Elderkin
Barbara L. Mullin
Ruben H. Munoz
AKIN GUMP STRAUSS HAUER & FELD LLP
delderkin@akingump.com
bmullin@akingump.com
rmunoz@akingump.com
JANS-SYTIGA@akingump.com

Anthony C. Tridico
Jennifer H. Roscetti
FINNEGAN HENDERSON FARABOW
GARRETT & DUNNER, LLP
anthony.tridico@finnegan.com
jennifer.roscetti@finnegan.com

U 7563822

THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

**December 22, 2015**

**THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:**

**U.S. PATENT:** *8,822,438*
**ISSUE DATE:** *September 02, 2014*

**By Authority of the**
**Under Secretary of Commerce for Intellectual Property**
**and Director of the United States Patent and Trademark Office**

**SYLVIA HOLLEY**
**Certifying Officer**

UNITED STATES PATENT AND TRADEMARK OFFICE · DEPARTMENT OF COMMERCE

US008822438B2

(12) **United States Patent**
**Auerbach et al.**

(10) **Patent No.: US 8,822,438 B2**
(45) **Date of Patent: Sep. 2, 2014**

(54) **METHODS AND COMPOSITIONS FOR TREATING CANCER**

(75) Inventors: **Alan H. Auerbach**, Hermosa Beach, CA (US); **Arie S. Belldegrum**, Los Angeles, CA (US)

(73) Assignee: **Janssen Oncology, Inc.**, Los Angeles, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/034,340**

(22) Filed: **Feb. 24, 2011**

(65) **Prior Publication Data**

US 2011/0144016 A1 Jun. 16, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 11/844,440, filed on Aug. 24, 2007, now abandoned.

(60) Provisional application No. 60/921,506, filed on Aug. 25, 2006.

(51) **Int. Cl.**
*A61K 31/56* (2006.01)
*A61K 31/58* (2006.01)

(52) **U.S. Cl.**
CPC .................................... ***A61K 31/58*** (2013.01)
USPC .......................................... **514/170**; 514/180

(58) **Field of Classification Search**
USPC ................................................ 514/170, 182
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2006/0030608 A1 2/2006 Nelson et al.

FOREIGN PATENT DOCUMENTS

EP 2478907 7/2012
WO 2006027266 3/2006

OTHER PUBLICATIONS

O'Donnell et al., British Journal of Cancer, 2004;90:2317-2325.*
Tannock et al., J. Clin. Oncol., 1996;14:1 756-1764.*
ASCO Cancer Foundation, Poster Session F: Hormone Refractory, ASCO, 2005.
Bruno et al, Targeting cytochrome P450 enzymes: A new approach in anti-cancer drug development, Elsevier, 2007, pp. 5047-5060, vol. 15.
Cannell, 100th Annual Meeting of the American Association for Cancer Research, Los Angeles, CA, USA;, http://oncology.thelancet.com, 2007, pp. 471, vol. 8.
Collins, et al. "A Systematic Review of the effectiveness of Docetaxel and Mitoxantrone for the Treatement of Metastatic Hormone-Refractory Prostate Cancer", British J. of Cancer, 95, pp. 457-462 (2006).
Cougar Biotechnology, Cougar Biotechnology Announces Initiation of Phase I/II Trial for CB7630 (Arbiraterone Acetate), Cougar Biotechnology, Dec. 14, 2004.
Cougar Biotechnology, Cougar Biotechnology Announces Presentation of Positive CB7630 Clinical Data at AACR-NCI-EORTC International Conference on Molecular Targets and Cancer Therapeutics, Cougar Biotechnology, Oct. 2007.
Cougar Biotechnology, Cougar Biotechnology Announces Presentation of Positive CB7630 Clinical Data at ESMO Conference, Drugs.com, Jul. 2007.
Cougar Biotechnology, Cougar Biotechnology announces presentation of positive phase I and phase II data at ASCO Prostate Cancer Symposium, Cougar Biotechnology, Feb. 23, 2007.
Cougar Biotechnology, Cougar Biotechnology presents CB7630 Phase I clinical data at the 2005 Prostate Cancer Symposium, AllBusiness, 2005.
Cougar Biotechnology, Cougar Biotechnology presents positive CB7630 Clinical Data at AACR Annual Meeting Late-Breaking Clinical Trials Session, Cougar Biotechnology, Apr. 17, 2007.
Cougar Biotechnology, Cougar Technology Announces Presentation of Positive CB7630 Clinical Data at ASCO Annual Meeting, The Free Library, Jun. 4, 2007.
De Bono et al, Inhibition of CYP450c17 by abiraterone administered once daily to castrate patients with prostate cancer resistant to LHRH analogues, anti-androgens and steriod therapy is well tolerated . . . , The institute of Cancer Research, 2007.
De Coster, et al., Effects of High-Dose Ketoconazole and Dexamethason on ACTH-Stimulated Adrenal Steriodogenesis in Orchiectomized Prostatic Cancer Patients, ACTA Endocrinologica (Copenh), 1987, pp. 265-271, vol. 115.
Duc et al, In Vitro and in vivo models for the evaluation of potent inhibitors of male rat 17 -hydroxylase/C-lyase, Pergamon, 2003, pp. 537-542, vol. 84.
Endocrinology, Inhibition of Androgen Synthesis in Human Testicular and Prostatic Microsomes and in Male Rats by Novel Steroidal Compounds, Endocrinology, 1999, pp. 2891-2897, vol. 140 No. 6.
Fossa, et al., Weekly Docetaxel and Prednisone Versus Prednisolone Alone in Androgen-Independent Prostate Cancer: A Randomized Phase II Study, European Urology, 2007, pp. 1691-1699, vol. 52.
Gerber, et al., Prostate Specific Antigen for Assessing Response to Ketoconazole and Prednisone in Patients with Hormone Refractory Metastatic Prostate Cancer, The Journal of Urology, 1990, pp. 1177-1179, vol. 1444, No. 5.
Hakki et al, CYP17- and CYP11B-dependent steriod hydroxylases as drug development targets, Elsevier, 2006, pp. 27-52, vol. 11.
Harris, et al., Low Dose Ketoconazole with Replacement Doses of Hydrocortisone in Patients with Progressive Androgen Independent Prostate Cancer, The Journal of Urology, 2002, pp. 542-545, vol. 168.
Moreira et al, Synthesis and evaluation of novel 17-indazole androstene derivatives designed as CYP17 inhibitors, Elsevier, 2007, pp. 939-948, vol. 72.
Newell et al, The Cancer Research UK experience of pre-clinical toxicology studies to support early clinical trials with novel cancer therapies, Elsevier, 2004, pp. 899-906, vol. 40.

(Continued)

*Primary Examiner* — San-Ming Hui

(57) **ABSTRACT**

Methods and compositions for treating cancer are described herein. More particularly, the methods for treating cancer comprise administering a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor, such as abiraterone acetate (i.e., 3β-acetoxy-17-(3-pyridyl)androsta-5,16-diene), in combination with at least one additional therapeutic agent such as an anti-cancer agent or a steroid. Furthermore, disclosed are compositions comprising a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor, and at least one additional therapeutic agent, such as an anti-cancer agent or a steroid.

**20 Claims, No Drawings**

**Copy provided by USPTO from the PIRS Image Database on 12/21/2015**

(56) **References Cited**

OTHER PUBLICATIONS

Petrylak, et al., Future Directions in the Treatment of Androgen-Independent Prostate Cancer, Urology, 2005, pp. 8-13, vol. 65, Supplement 6A.
Scholz, et al., Long-Term Outcome for Men with Androgen Independent Prostate Cancer Treated with Ketoconazole and Hydrocortisone, The Journal of Urology, 2005, pp. 1947-1952, vol. 173.
Small et al, The Case for Socondary Hormaonal Therapies in the Chemotherapy Age, The Journal of Urology, 2006, pp. S66-S71, vol. 176.
Wikipedia, Corticosteriod, undated, website, 2013.
Third Party Observations dated Oct. 18, 2012 for EP Appln. No. 07837326.3.
Third Party Observations dated Mar. 28, 2013 for EP Appln. No. 07837326.3.
Third Party Observations dated Jul. 1, 2013 for EP Appln. No. 07837326.3.
Berry, W. et al. Phase III Study of Mitoxantrone Plus Low Dose Prednisone Versus Low Dose Prednisone Alone in Patients with Asymptomatic Hormone Refractory Prostate Cancer, The Journal of Urology, 2002, pp. 2439-2443, vol. 168.
Chang, Ching-Yi, et al. Glucocorticoids Manifest Androgenic Activity in a Cell Derived from a Metastatic Prostate Cancer, Cancer Research, 2001, pp. 8712-8717, vol. 61.
Dorff, TB, Crawford, ED. Management and challenges of corticosteroid therapy in men with metastatic castrate-resistant prostate cancer, Annals of Oncology, 2013, pp. 31-38, vol. 24(1).
Efstathiou, Eleni, et al. Effects of Abiraterone Acetate on Androgen Signaling in Castrate-Resistant Prostate Cancer in Bone, American Society of Clinical Oncology, Journal of Clinical Oncology, 2011, pp. 1-8.
Huggins, Charles, et al. Studies on Prostatic Cancer.I. The Effect of Castration, of Estrogen and of Androgen Injection on Serum Phosphatases in Metastatic Carcinoma of the Prostate, Cancer Research, 1941, pp. 293-297, vol. 1.
Mostaghel, EA. et al. Molecular Pathways: Targeting resistance in the androgen receptor for therapeutic benefit, Clin Cancer Res, Dec. 4, 2013.
Nishimura, Kazuo, et al. Potential Mechanism for the Effects of Dexamethasone on Growth of Androgen-Independent Prostate Cancer, Journal of the National Cancer Institute, 2001, pp. 1739-1746, vol. 93.
Oudar, Stephane, et al. Actualite dans le cancer de la prostate, Synthese, Bull Cancer 2005; 92 (10), pp. 865-873 (relevance in English abstract).
Petrylak, et al. Docetaxel and Estramustine Compared with Mitoxantrone and Prednisone for Advanced Refractory Prostate Cancer, The New England Journal of Medicine, 2004, pp. 1513-1520, vol. 351.
Ryan, et al., Aberaterone Acetate in Metastatic Prostate Cancer Without Previous Chemotherapy, The New England Journal of Medicine, 2013, 368:138-148.
Sartor, et al, Abiraterone Prolongs Survival in Metastatic Prostate Cancer, Nature Reviews Clinical Oncology, 2011, pp. 515-516, vol. 8.
Tannock, IF, et al. Docetaxel plus prednisone or mitoxantrone plus prednisone for advanced prostate cancer, The New England Journal of Medicine, 2004, pp. 1502-1512, vol. 351(15).
Assessment Report for Zytiga (abiraterone) published 2011 by the CHMP of the EMA.
Auchuz-3, R.J,, "The genetics, pathophysiology, and the management of human deficiencies of P450c17", Endocrinol Metab Clin North Am (2001), 30, p. 101-119.
Ayub, M., Inhibition of testicular 17a-hydroxylase and 17,20-Iyase but not 3B-hydroxysteroid dehydrogenase-isomerase or 17B-hydroxysteroid oxidoreductase by ketoconazole and other imidazole drugs, Journal of Steroid Biochemistry (1987) 28(5), p. 521-531.
Campbell-Walsh Urology, Ninth Edition, Saunders, vol. 3, Chapters 104 and 105, 2007.
Cecil Textbook of Medicine, Wyngaarden & Smith 18th edition; Chapter on "Glucocorticosteroid Therapy", Wyngaarden & Smith 18th edition, (1988) p. 128-131.
Coudar Biotechnology Inc. with the U.S. Securities and Exchange Commission, Form 10-QSB, 2013.
Czock, et al., "Pharmacokinetics and Pharmacodynamics of Systemically Administered Glucocorticoids", Pharmacokinet (2005), 44(1), p. 61-98.
Ergun-Longmire, Berrin, et al., "Two Novel Mutations Found in a Patient with 17a-Hydroxylase Enzyme Deficiency", The Journal of Clinical Endocrinology & Metabolism (2006), 91(10), p. 4179-4182.
Fakih, et al., Urology (2002) 60, p. 553-561.
Friel, Patrick N., et al., "Suppression of adrenal function by low-dose prednisone: assessment with 24-hour urinary steroid hormone profiles—A review of five cases", Alternative Medicine Review (2006), 11(1).
Internet article: http://clinicaltrials.gov/archive/NCT00485303/2007_06_11.
Information concerning Zytiga (abiraterone acetate) from http://www.kompendium.ch/prod/pnr/1183238/de?Platform=Desktop as of Mar. 25, 2014.
Internet article: http://clinicaltrials.gov/ct2/show/study/NCT00485303?sec=X501, 2014.
Mostaghel, E.A., "Abiraterone in the treatment of metastatic castration-resistant prostate cancer", Cancer Management Res. (2014) 6, p. 39-51.
Osaba, D., et al., "Health-Related Quality of Life in Men with Metastatic Prostate Cancer Treated with Prednisone alone or Mitoxantrone and Prednisone", J Clin. Oncol. (1999), 17(6), p. 165-1663.
Petrylak, D.P., "New Paradigms for Advanced Prostate Cancer", Rev. Urol. (2007), 9, Suppl. 2, S3-S12.
Prostate Cancer Principles and Practice, Taylor & Francis (2006) Chapter 93.
Reid, A., et al., "Annals of Oncology", Educational and Abstract Book of the ESMO Conference Lugano (ECLU), (2007), 18(Supplement 9), ix173-ix174. Abstract 50PD.
Remington, The Science and Practice of Pharmacy, 20th Edition (2000), p. 1363-1370.
Runge, Marschall S., et al., Principles of Molecular Medicine; Second edition; (2006) Humana Press Inc. ISBN: 1-58829-202-9. pp. 365-376 and 482-484.
Sills, Irene N., et al., "17a-hydroxylase deficiency in a genetic male and female sibling pair", Int. J. Gynaecol. Obstet., (1981), 19, p. 473-479.
Summary of Product Characteristics for Zytiga 250mg tablets (Jan. 16, 2014).
Tannock., et al., "Docetaxel Plus Prednisone or Mitoxantrone Plus Prednisone for Advanced Prostate Cancer", Journal of Urology (2005), 173(2), p. 456.
The reply of applicant (i.e. the Proprietor of herein opposed patent) dated Jun. 4, 2013 in relation to the corresponding US2011/0144016A1 US proceedings.
Wang, C., et al., "Hypertension due to 17a-Hydroxylase deficiency", Australian and New Zealand Journal of Medicine (1978), 8(3), p. 295-299.
Yano, A., et al., "Glucocorticoids Suppress Tumor Angiogensis and In vivo Growth of Prostate Cancer Cells", Clin. Cancer Res., (2006) 12, 3003-3009.
Statement of Opposition, Actavis Group PTC ehf, 2014.
Statement of Opposition, Alfred E. Tiefenbacher, 2014.
Statement of Opposition, Alison Gallafent, 2014.
Statement of Opposition, Arnold Siedsma, 2014.
Statement of Opposition, Cabinet Lavoix, 2014.
Statement of Opposition, Galenicum Health, S.L., 2014.
Statement of Opposition, Generics Ltd., 2014.
Statement of Opposition, Helm AG, 2014.
Statement of Opposition, Hetero Drugs, 2014.
Statement of Opposition, Isenbruck Bosl Horschler LLP, 2014.
Statement of Opposition, Laboratorios Leon Farma, S.A., 2014.
Statement of Opposition, Maiwald Patentanwalts GmbH, 2014.
Statement of Opposition, Stada Arzneimittel, 2014.
Statement of Opposition, Synthon B.V., 2014.

Copy provided by USPTO from the PIRS Image Database on 12/21/2015

(56) **References Cited**

OTHER PUBLICATIONS

Statement of Opposition, Teva Pharmaceutical Industries, Ltd., 2014.
Statement of Opposition, Zentiva k.s., 2014.
Carducci, M.A,, "What is more exciting? The Activity of Docetaxel in Early Prostate Cancer or the Successful Collaboration between Urologists and Medical Oncologists to complete a study in early Prostate Cancer'?", Journal of Clinical Oncology (2005), vol. 23, No. 15, pp. 3304-3307.
Sahu, B., et al,, "FoxA1 Specifies Unique Androgen and Glucocorticoid Receptor Binding Events in Prostate Cancer Cells", Cancer Research (2013), vol. 73, pp. 1570-1580.
Storlie, J.A., et al., "Prostate Specific Antigen Levels and Clinical Response to Low Dose Dexamethasone for Hormone-Refractory Metastatic Prostate Carcinoma", Cancer (1995) vol. 76, No. 1, p. 96-100.
Tanagho, E.A., et al., "The Leading Single-Volume Resource in Urology", Smith's General Urology, 16th Edition, (2004), Chapter 19, pp. 321-323; Chapter 22, pp. 380-385.
Tomic, R., et al,, "Hormonal Effects of High Dose Medroxyprogesterone Acetate Treatment in Males with Renal or Prostatic Adenocarcinoma", (1988), vol. 22 (1), Abstract.
Venkitaraman, R., et al., "Efficacy of Low-Dose Dexarnethasone in Castration-Refractory Prostate Cancer", BJU Int (2008), 101, pp. 1756-1764.
Vogelzang, N.J., Curriculum Vitae, 15 pages.
Yana, A., et al., "Glucocorticoids Suppress Tumor Lymphandiogenesis of Prostate Cancer Cells", Clin Cancer Res (2006), vol. 12, pp. 6012-6017.
Declaration by Dr. Jacqueline Anne Warner in the matter of Opposition by Northern Rivers Pty Ltd., 25 pages, 2004.
Declaration by Helen Grimes in the matter of Opposition by Northern Rivers Pty Ltd., 43 pages, 2004.
Statement of Opposition, Actavis Group PTC ehf.
Statement of Opposition, Alfred E. Tiefenbacher (translated in English).
Statement of Opposition, Arnold Siedsma (Synthon B.V.).
Statement of Opposition, Cabinet Lavoix.
Statement of Opposition, Galenicum Health, S.L.
Statement of Opposition, Generics Ltd.
Statement of Opposition, Helm AG (translated in English).
Statement of Opposition, Hetero Drugs.
Statement of Opposition, Laboratorios Leon Farma, S.A.
Statement of Opposition, Maiwald Patentanwalts GmbH.
Statement of Opposition, Stada Arzneimittel AG (translated in English).
Statement of Opposition, Teva Pharmaceutical Industries, Ltd.

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 12/21/2015

# METHODS AND COMPOSITIONS FOR TREATING CANCER

## FIELD OF THE INVENTION

Methods and compositions for treating cancer are described herein. More particularly, the methods for treating cancer comprise administering a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor, such as abiraterone acetate (i.e., 3β-acetoxy-17-(3-pyridyl) androsta-5,16-diene), in combination with at least one additional therapeutic agent, such as an anti-cancer agent or a steroid. Furthermore, disclosed are compositions comprising a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor, and at least one additional therapeutic agent such as an anti-cancer agent or a steroid, e.g., a corticosteroid or, more specifically, a glucocorticoid.

## BACKGROUND

The number of people diagnosed with cancer has significantly increased. Of special interest are individuals diagnosed with androgen-dependent disorders, such as prostate cancer, and estrogen-dependent disorders, such as breast cancer since such diagnoses are increasing in number at an alarming rate.

Prostate cancer is currently the most common non-skin cancer and the second leading cause of cancer-related death in men after lung cancer. The primary course of treatment for patients diagnosed with organ-confined prostate cancer is usually prostatectomy or radiotherapy. Not only are these treatments highly invasive and have undesirable side effects, such localized treatments are not effective on prostate cancer after it has metastasized. Moreover, a large percent of individuals who receive localized treatments will suffer from recurring cancer.

Additionally, breast cancer incidence in women has increased from one out of every 20 women in 1960 to one out of every eight women in 2005. Moreover, it is the most common cancer among white and African-American women. Similar to treating prostate cancer, most options for women diagnosed with breast cancer are highly invasive and have significant side-effects. Such treatments include surgery, radiation and chemotherapy.

Hormone therapy is another treatment option for individuals diagnosed with prostate or breast cancer. Hormone therapy is a form of systemic treatment for prostate or breast cancer wherein hormone ablation agents are used to suppress the production or block the effects of hormones, such as estrogen and progesterone in the body, which are believed to promote the growth of breast cancer, as well as testosterone and dihydrotestosterone, which are believed to promote the growth of prostate cancer. Moreover, hormone therapy is less invasive than surgery and does not have many of the side effects associated with chemotherapy or radiation. Hormone therapy can also be used by itself or in addition to localized therapy and has shown to be effective in individuals whose cancer has metastasized.

Even though hormone therapy is less invasive and can be used on more advanced stages of cancer, some individuals administered current hormone therapy treatments may not show a significant response or may not show any response at all to such treatments. Additionally, some patients treated with current hormone therapy treatments may also suffer from relapsing or recurring cancer. Currently, such refractory cancer patients are left with very few treatment options.

Despite the progress made in the treatment of cancer, there remains a need for more effective ways to treat cancer such as, but not limited to, prostate cancer and breast cancer. Additionally, there is a need for effective anti-cancer treatment options for patients who are not responding to current anti-cancer treatments. Also, there is a need for effective anti-cancer treatment options for patients whose cancer has recurred.



## SUMMARY OF THE INVENTION

Described herein are methods for treating a cancer in which a therapeutically effective amount of a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor, such as abiraterone acetate (i.e. 3β-acetoxy-17-(3-pyridyl)androsta-5,16-diene), is administered to a patient, e.g., a patient in need thereof, in combination with a therapeutically effective amount of at least one additional therapeutic agent including, but not limited to, an anti-cancer agent or steroid. Such methods can also provide an effective treatment for individuals with a refractory cancer, including individuals who are currently undergoing a cancer treatment. Therefore, in certain embodiments, the method is directed to treating a refractory cancer in a patient, in which a therapeutically effective amount of 17α-hydroxylase/$C_{17,20}$-lyase inhibitor is administered to a patient currently receiving an anti-cancer agent.

For example, in certain embodiments, the method for the treatment of a cancer in a mammal comprises administering an amount of about 0.01 mg/kg/day to about 100 mg/kg/day of abiraterone acetate and an amount of about 0.1 mg/m$^2$ to about 20 mg/m$^2$ of mitoxantrone.

In another embodiment, the method for the treatment of a cancer in a mammal comprises administering an amount of about 0.01 mg/kg/day to about 100 mg/kg/day of abiraterone acetate and an amount of about 1 mg/m$^2$ to about 175 mg/m$^2$ of paclitaxel.

In still other embodiments, the method for the treatment of a cancer in a mammal comprises administering an amount of about 0.01 mg/kg/day to about 100 mg/kg/day of abiraterone acetate and an amount of about 1 mg/m$^2$ to about 100 mg/m$^2$ of docetaxel.

Furthermore, described herein is a method for the treatment of a cancer in a mammal comprising administering an amount of about 0.01 mg/kg/day to about 100 mg/kg/day of abiraterone acetate; and an amount of about 0.01 mg to about 200 mg of leuprolide, wherein the leuprolide is administered over a period of about 3 days to about 12 months.

In other embodiments, the method for the treatment of a cancer in a mammal comprises administering an amount of about 0.01 mg/kg/day to about 100 mg/kg/day of abiraterone acetate and an amount of about 0.01 mg to about 20 mg of goserelin, wherein the goserelin is administered over a period of about 28 days to about 3 months.

Additionally, in another embodiment, the method for the treatment of a cancer in a mammal comprises administering an amount of about 0.01 mg/kg/day to about 100 mg/kg/day of abiraterone acetate and an amount of about 0.01 mg to about 20 mg of triptorelin, wherein the triptorelin is administered over a period of about 1 month.

The method for the treatment of a cancer in a mammal can also comprise administering an amount of about 0.01 mg/kg/day to about 100 mg/kg/day of abiraterone acetate and an amount of about 0.1 μg/day to about 500 μg/day of seocalcitol, such as about 100 μg/day of seocalcitol.

Also, the method for the treatment of a cancer in a mammal can comprise administering an amount of about 0.01 mg/kg/day to about 100 mg/kg/day of abiraterone acetate and an amount of about 1 mg/day to about 300 mg/day of bicalutamide.

Copy provided by USPTO from the PIRS Image Database on 12/21/2015

In yet another embodiment, the method for the treatment of a cancer in a mammal can comprise administering an amount of about 0.01 mg/kg/day to about 100 mg/kg/day of abiraterone acetate and an amount of about 1 mg/day to about 2000 mg/day of flutamide.

Moreover, the method for the treatment of a cancer in a mammal can comprise administering an amount of about 50 mg/day to about 2000 mg/day of abiraterone acetate and an amount of about 0.01 mg/day to about 500 mg/day of a glucocorticoid including, but not limited to, hydrocortisone, prednisone or dexamethasone.

Also described herein are compositions for the treatment of cancer that comprise a combination of a therapeutically effective amount of at least one 17α-hydroxylase/$C_{17,20}$-lyase inhibitor and a therapeutically effective amount of at least one additional anti-cancer agent, such as, but not limited to, mitoxantrone, paclitaxel, docetaxel, leuprolide, goserelin, triptorelin, seocalcitol, bicalutamide, flutamide, or a steroid including, but not limited to, hydrocortisone, prednisone, or dexamethasone.

Finally, single unit dosage forms comprising abiraterone acetate and a glucocorticoid, optionally with carriers, diluents or excipients, are contemplated. Also, kits comprising at least one 17α-hydroxylase/$C_{17,20}$-lyase inhibitor and an additional anti cancer agent or steroid are contemplated. For example, the kit may include a vial containing abiraterone acetate and another vial containing a glucocorticoid.

## DEFINITIONS

As used herein and unless otherwise defined the word "cancer," refers to the growth, division or proliferation of abnormal cells in the body. Cancers that can be treated with the methods and the compositions described herein include, but are not limited to, prostate cancer, breast cancer, adrenal cancer, leukemia, lymphoma, myeloma, Waldenström's macroglobulinemia, monoclonal gammopathy, benign monoclonal gammopathy, heavy chain disease, bone and connective tissue sarcoma, brain tumors, thyroid cancer, pancreatic cancer, pituitary cancer, eye cancer, vaginal cancer, vulvar cancer, cervical cancer, uterine cancer, ovarian cancer, esophageal cancer, stomach cancer, colon cancer, rectal cancer, liver cancer, gallbladder cancer, cholangiocarcinoma, lung cancer, testicular cancer, penal cancer, oral cancer, skin cancer, kidney cancers, Wilms' tumor and bladder cancer.

As used herein, and unless otherwise defined, the terms "treat," "treating" and "treatment" include the eradication, removal, modification, management or control of a tumor or primary, regional, or metastatic cancer cells or tissue and the minimization or delay of the spread of cancer.

As used herein, and unless otherwise defined, the term "patient" means an animal, including but not limited to an animal such as a human, monkey, cow, horse, sheep, pig, chicken, turkey, quail, cat, dog, mouse, rat, rabbit, or guinea pig. In one embodiment, the patient is a mammal and in another embodiment the patient is a human. In certain embodiments, the patient can be an adult male or female. In some embodiments, the patient is a male of age about 30 years to about 85 years. In other embodiments, the patient is a female of age about 30 years to about 85 years. In a particular embodiment, the patient has or is susceptible to having (e.g., through genetic or environmental factors) cancer. In a further embodiment, the patient has or is susceptible to having (e.g., through genetic or environmental factors) a tumor. In other embodiments, the patient can be castrated or non-castrated.

The term "17α-hydroxylase/$C_{17,20}$-lyase inhibitor" as used herein refers to an inhibitor of 17α-hydroxylase/$C_{17,20}$-lyase, (which is an enzyme in testosterone synthesis), an analog thereof, derivative thereof, metabolite thereof or pharmaceutically acceptable salt thereof. Also, unless otherwise noted, reference to a particular 17α-hydroxylase/$C_{17,20}$-lyase inhibitor can include analogs, derivatives, metabolites or pharmaceutically acceptable salts of such particular 17α-hydroxylase/$C_{17,20}$-lyase inhibitor.

The term "anti-cancer agent" as used herein refers to any therapeutic agent that directly or indirectly kills cancer cells or directly or indirectly prohibits stops or reduces the proliferation of cancer cells. It should be noted that even though throughout this specification and in the claims the phrase "anti-cancer agent" is written as a singular noun, for example; "an anti-cancer agent" or "the anti-cancer agent," the phrase "anti-cancer agent" should not be interpreted as being limited to the inclusion of a single anti-cancer agent.

As used herein, and unless otherwise defined, the phrase "therapeutically effective amount" when used in connection with a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor or therapeutic agent means an amount of the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor or therapeutic agent effective for treating a disease or disorder disclosed herein, such as cancer.

As used herein and unless otherwise defined the phrase "refractory cancer," means cancer that is not responding to an anti-cancer treatment or cancer that is not responding sufficiently to an anti-cancer treatment. Refractory cancer can also include recurring or relapsing cancer.

As used herein and unless otherwise defined the phrase "refractory patient," means a patient who has refractory cancer.

As used herein and unless otherwise defined the phrase "relapse cancer," means cancer that was at one time responsive to an anti-cancer treatment but has become no longer responsive to such treatment or is no longer responding sufficiently to such treatment.

As used herein and unless otherwise defined the phrase "recurring cancer," means cancer that has returned after a patient has been earlier diagnosed with cancer, under gone treatment or had been previously diagnosed as cancer-free.

As used herein and unless otherwise defined the term "derivative" refers to a chemically modified compound wherein the chemical modification takes place at one or more functional groups of the compound. The derivative may retain or improve the pharmacological activity of the compound from which it is derived.

As used herein and unless otherwise defined the term "analog" refers to a chemical compound that is structurally similar to another but differs slightly in composition (as in the replacement of one atom by an atom of a different element or in the presence of a particular functional group).

As used herein and unless otherwise defined the phrase "pharmaceutically acceptable salt" refers to any salt of a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor which retains the biological effectiveness of the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor. Examples of pharmaceutically acceptable salts include, but are not limited to, acetates, sulfates, pyrosulfates, bisulfates, sulfites, bisulfites, phosphates, monohydrogenphosphates, dihydrogenphosphates, metaphosphates, pyrophosphates, chlorides, bromides, iodides, acetates, propionates, decanoates, caprylates, acrylates, formates, isobutyrates, caproates, heptanoates, propiolates, oxalates, malonates, succinates, suberates, sebacates, fumarates, maleates, butyne-1,4-dioates, hexyne-1,6-dioates, benzoates, chlorobenzoates, methylbenzoates, dinitrobenzoates, hydroxybenzoates, methoxybenzoates, phthalates, sulfonates, xylenesulfonates, phylacetates, phenylpropionates, phenylbutyrates, citrates, lactates, gamma-hydroxybutyrates,

Copy provided by USPTO from the PIRS Image Database on 12/21/2015

glycollates, tartarates, alkanesulfonates (e.g. methane-sulfonate or mesylate), propanesulfonates, naphthalene-1-sulfonates, naphthalene-2-sulfonates, and mandelates. Several of the officially approved salts are listed in Remington: The Science and Practice of Pharmacy, Mack Publ. Co., Easton.

## DETAILED DESCRIPTION OF THE INVENTION

The methods described herein for treating cancer comprise administering to a mammal, preferably a human, a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor in addition to at least one therapeutic agent, such as an anti-cancer agent or steroid, particularly a glucocorticoid. The compositions described herein comprise a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor and at least one additional therapeutic agent, such as an anti-cancer agent or steroid, particularly a corticosteroid or glucocorticoid. Other anti-cancer treatments such as, administration of yet another anti-cancer agent, radiotherapy, chemotherapy, photodynamic therapy, surgery or other immunotherapy, can be used with the methods and compositions.

17α-Hydroxylase/$C_{17,20}$-Lyase Inhibitors

17α-hydroxylase/$C_{17,20}$-lyase inhibitors have been shown to be useful in the treatment of cancer, specifically hormone-dependent disorders such as, androgen-dependent and estrogen-dependent disorders like prostate cancer and breast cancer respectively, as described in U.S. Pat. No. 5,604,213 to Barrie et al., which is herein incorporated by reference in its entirety.

In certain embodiments, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor can be 17-(3-pyridyl)androsta-5,16-dien-3βol; 17-(3-pyridyl)androsta-3,5,16-triene; 17-(3-pyridyl)androsta-4,16-dien-3-one; 17-(3-pyridyl)estra-1,3,5[10],16-tetraen-3-ol; 17-(3-pyridyl)-5α-androst-16-en-3α-ol; 17-(3-pyridyl)-5α-androst-16-en-3-one; 17-(3-pyridyl)-androsta-4,16-diene-3,11-dione; 17-(3-pyridyl)-androsta-3,5,16-trien-3-ol; 6α- and 6β-fluoro-17-(3-pyridyl)androsta-4,16-dien-3-one; 17-(3-pyridyl)androsta-4,16-dien-3,6-dione; 3α-trifluoromethyl-17-(3-pyridyl)androst-16-en-3β-ol or their acid addition salts and 3-esters as well as metabolites, analogs, derivatives or a pharmaceutically acceptable salt thereof.

In certain embodiments, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor can have the structure of formula (I):

(I)




wherein X represents the residue of the A, B and C rings of a steroid which can be, without limitation, androstan-3α- or 3β-ol; androst-5-en-3β- or 3β-ol; androst-4-en-3-one; androst-2-ene; androst-4-ene; androst-5-ene; androsta-5,7-dien-3α or 3β-ol; androsta-1,4-dien-3-one; androsta-3,5-diene; androsta-3,5-diene-3-ol; estra-1,3,5[10]-triene; estra-1,3,5[10]-trien-3-ol; 5α-androstan-3-one; androst-4-ene-3,11-dione; 6-fluoroandrost-4-ene-3-one; or androstan-4-ene-3,6-dione; each of which, where structurally permissible, can be further derivatized in one or more of the following ways, including, but not limited to, to form 3-esters; to have one or more carbon or carbon ring double bonds in any of the 5,6-, 6,7-, 7,8-, 9,11- and 11,12-positions; as 3-oximes; as 3-methylenes; as 3-carboxylates; as 3-nitriles; as 3-nitros; as 3-desoxy derivatives; to have one or more hydroxy, halo, $C_{1-4}$-alkyl, trifluoro-methyl, $C_{1-4}$-alkoxy, $C_{1-4}$-alkanoyloxy, benzoyloxy, oxo, methylene or alkenyl substituents in the A, B, or C-ring; or to be 19-nor;

R represents a hydrogen atom or an alkyl group of 1-4 carbon atoms;

$R^{14}$ represents a hydrogen atom, a halogen atom or an alkyl group of 1 to 4 carbon atoms;

each of the $R^{15}$ substituents independently represents a hydrogen atom or an alkyl or alkoxy group of 1-4 carbon atoms, a hydroxy group or an alkylcarbonyloxy group of 2 to 5 carbon atoms or together represent an oxo or methylene group or $R^{14}$ and one of the $R^{15}$ groups together represent a double bond and the other $R^{15}$ group represents a hydrogen atom or an alkyl group of 1 to 4 carbon atoms; and

$R^{16}$ represents a hydrogen atom, halogen atom, or an alkyl group of 1 to 4 carbon atoms, in the form of the free bases or pharmaceutically acceptable acid addition salts, but excluding 3β-acetoxy-17-(3-pyridyl)androsta-5,14,16-triene, 3β,15α- and 3β,15β-diacetoxy-17-(3-pyridyl) androsta-5,16-diene and 3β-methoxy-17-(3-pyridyl-5α-androst-16-ene.

Suitable inhibitors also include metabolites, derivatives, analogs, or pharmaceutically acceptable salts of formula (I).

In another embodiment, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor can have the structure of formula (I):

(I)




wherein R represents hydrogen or a lower acyl group having 1 to 4 carbons. Suitable inhibitors also include derivatives, analogs, or pharmaceutically acceptable salts of formula (I).

In still another embodiment, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor can be a 3β-alkanoyloxy-17-(3-pyridyl) androsta-5,16-diene in which the alkanoyloxy group has from 2 to 4 carbon atoms.

In a preferred embodiment, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor comprises abiraterone acetate or 3β-acetoxy-17-(3-pyridyl)androsta-5,16-diene which has the following structural formula:

(II)




and pharmaceutically acceptable salts thereof.

Copy provided by USPTO from the PIRS Image Database on 12/21/2015

Preferred salts of abiraterone acetate and methods of making such salts are also disclosed in U.S. Provisional Application No. 60/603,559 to Hunt, which is incorporated by reference in its entirety. Preferred salts include, but are not limited to, acetates, citrates, lactates, alkanesulfonates (e.g. methanesulfonate or mesylate) and tartarates. Of special interest is the abiraterone acetate mesylate salt (i.e. 3β-acetoxy-17-(3-pyridyl)androsta-5,16-diene mesylate salt) which has the following structural formula:

(III)



The 17α-hydroxylase/$C_{17,20}$-lyase inhibitors can be made according to any method known to one skilled in the art. For example, such inhibitors can be synthesized according to the method disclosed in U.S. Pat. Nos. 5,604,213 and 5,618,807 to Barrie et al., herein incorporated by reference. Another method of making 17α-hydroxlase/$C_{17,20}$-lyase inhibitors is disclosed in U.S. provisional application 60/603,558 to Bury, herein incorporated by reference.

The amount of 17α-hydroxylase/$C_{17,20}$-lyase inhibitor administered to a mammal having cancer is an amount that is sufficient to treat the cancer, whether the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor is administered alone or in combination with an additional anti-cancer treatment, such as an additional anti-cancer agent.

Additional Therapeutic Agents

Suitable compounds that can be used in addition to 17α-hydroxylase/$C_{17,20}$-lyase inhibitors as an anti-cancer agent include, but are not limited to, hormone ablation agents, anti-androgen agents, differentiating agents, anti-neoplastic agents, kinase inhibitors, anti-metabolite agents, alkylating agents, antibiotic agents, immunological agents, interferon-type agents, intercalating agents, growth factor inhibitors, cell cycle inhibitors, enzymes, topoisomerase inhibitors, biological response modifiers, mitotic inhibitors, matrix metalloprotease inhibitors, genetic therapeutics, and anti-androgens. The amount of the additional anti-cancer agent administered to a mammal having cancer is an amount that is sufficient to treat the cancer whether administered alone or in combination with a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor. Below are lists of examples of some of the above classes of anti-cancer agents. The examples are not all inclusive and are for purposes of illustration and not for purposes of limitation. Many of the examples below could be listed in multiple classes of anti-cancer agents and are not restricted in any way to the class in which they are listed in.

Suitable hormonal ablation agents include, but are not limited to, androgen ablation agents and estrogen ablation agents. In preferred embodiments, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor is administered with a hormonal ablation agent, such as deslorelin, leuprolide, goserelin or triptorelin. Even though throughout this specification and in the claims the phrase "hormonal ablation agent" is written as a singular noun, for example; "a hormonal ablation agent" or "the hormonal ablation agent," the phrase "hormonal ablation agent" should not be interpreted as being limited to the inclusion of a single hormonal ablation agent. The amount of the hormonal ablation agent administered to a mammal having cancer is an amount that is sufficient to treat the cancer whether administered alone or in combination with a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor.

Suitable anti-androgen agents include but are not limited to bicalutamide, flutamide and nilutamide. The amount of the anti-androgen agent administered to a mammal having cancer is an amount that is sufficient to treat the cancer whether administered alone or in combination with a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor.

In another embodiment, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor may be administered with a differentiating agent. Suitable differentiating agents include, but are not limited to, polyamine inhibitors; vitamin D and its analogs, such as, calcitriol, doxercalciferol and seocalcitol; metabolites of vitamin A, such as, ATRA, retinoic acid, retinoids; short-chain fatty acids; phenylbutyrate; and nonsteroidal anti-inflammatory agents. The amount of the differentiating agent administered to a mammal having cancer is an amount that is sufficient to treat the cancer whether administered alone or in combination with a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor.

In another preferred embodiment, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor may be administered with an anti-neoplastic agent, including, but not limited to, tubulin interacting agents, topoisomerase inhibitors and agents, acitretin, alstonine, amonafide, amphethinile, amsacrine, ankinomycin, anti-neoplaston, aphidicolin glycinate, asparaginase, baccharin, batracylin, benfluron, benzotript, bromofosfamide, caracemide, carmethizole hydrochloride, chlorsulfaquinoxalone, clanfenur, claviridenone, crisnatol, curaderm, cytarabine, cytocytin, dacarbazine, datelliptinium, dihaematoporphyrin ether, dihydrolenperone, dinaline, distamycin, docetaxel, elliprabin, elliptinium acetate, epothilones, ergotamine, etoposide, etretinate, fenretinide, gallium nitrate, genkwadaphnin, hexadecylphosphocholine, homoharringtonine, hydroxyurea, ilmofosine, isoglutamine, isotretinoin, leukoregulin, lonidamine, merbarone, merocyanlne derivatives, methylanilinoacridine, minactivin, mitonafide, mitoquidone, mitoxantrone, mopidamol, motretinide, N-(retinoyl)amino acids, N-acylated-dehydroalanines, nafazatrom, nocodazole derivative, ocreotide, oquizanocinc, paclitaxel, pancratistatin, pazelliptine, piroxantrone, polyhaematoporphyrin, polypreic acid, probimane, procarbazine, proglumide, razoxane, retelliptine, spatol, spirocyclopropane derivatives, spirogermanium, strypoldinone, superoxide dismutase, teniposide, thaliblastine, tocotrienol, topotecan, ukrain, vinblastine sulfate, vincristine, vindesine, vinestramide, vinorelbine, vintriptol, vinzolidine, and withanolides. The amount of the anti-neoplastic agent administered to a mammal having cancer is an amount that is sufficient to treat the cancer whether administered alone or in combination with a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor.

The 17α-hydroxylase/$C_{17,20}$-lyase inhibitors may also be used with a kinase inhibitor including p38 inhibitors and CDK inhibitors, TNF inhibitors, metallomatrix proteases inhibitors (MMP), COX-2 inhibitors including celecoxib, rofecoxib, parecoxib, valdecoxib, and etoricoxib, SOD mimics or $\alpha_v\beta_3$ inhibitors. The amount of the kinase inhibitor administered to a mammal having cancer is an amount that is sufficient to treat the cancer whether administered alone or in combination with a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor.

In another embodiment, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor may be administered with an anti-metabolite agent.

Copy provided by USPTO from the PIRS Image Database on 12/21/2015

Suitable anti-metabolite agents may be selected from, but not limited to, 5-FU-fibrinogen, acanthifolic acid, aminothiadiazole, brequinar sodium, carmofur, cyclopentyl cytosine, cytarabine phosphate stearate, cytarabine conjugates, dezaguanine, dideoxycytidine, dideoxyguanosine, didox, doxifluridine, fazarabine, floxuridine, fludarabine phosphate, 5-fluorouracil, N-(2'-furanidyl)-5-fluorouracil, isopropyl pyrrolizine, methobenzaprim, methotrexate, norspermidine, pentostatin, piritrexim, plicamycin, thioguanine, tiazofurin, trimetrexate, tyrosine kinase inhibitors, and uricytin. The amount of the anti-metabolite agent administered to a mammal having cancer is an amount that is sufficient to treat the cancer whether administered alone or in combination with a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor.

In another embodiment, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor may be administered with an alkylating agent. Suitable alkylating agents may be selected from, but not limited to, aldo-phosphamide analogues, altretamine, anaxirone, bestrabucil, budotitane, carboplatin, carmustine, chlorambucil, cisplatin, cyclophosphamide, cyplatate, diphenylspiromustine, diplatinum cytostatic, elmustine, estramustine phosphate sodium, fotemustine, hepsul-fam, ifosfamide, iproplatin, lomustine, mafosfamide, mitolactol, oxaliplatin, prednimustine, ranimustine, semustine, spiromustine, tauromustine, temozolomide, teroxirone, tetraplatin and trimelamol. The amount of the alkylating agent administered to a mammal having cancer is an amount that is sufficient to treat the cancer whether administered alone or in combination with a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor.

In another preferred embodiment, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor may be administered with an antibiotic agent. Suitable antibiotic agents may be selected from, but not limited to, aclarubicin, actinomycin D, actinoplanone, adriamycin, aeroplysinin derivative, amrubicin, anthracycline, azino-mycin-A, bisucaberin, bleomycin sulfate, bryostatin-1, calichemycin, chromoximycin, dactinomycin, daunorubicin, ditrisarubicin B, dexamethasone, doxorubicin, doxorubicin-fibrinogen, elsamicin-A, epirubicin, erbstatin, esorubicin, esperamicin-A1, esperamicin-A1b, fostriecin, glidobactin, gregatin-A, grincamycin, herbimycin, corticosteroids such as hydrocortisone, idarubicin, illudins, kazusamycin, kesarirhodins, menogaril, mitomycin, neoenactin, oxalysine, oxaunomycin, peplomycin, pilatin, pirarubicin, porothramycin, prednisone, prednisolone, pyrindanycin A, rapamycin, rhizoxin, rodorubicin, sibanomicin, siwenmycin, sorangicin-A, sparsomycin, talisomycin, terpentecin, thrazine, tricrozarin A, and zorubicin. The amount of the antibiotic agent administered to a mammal having cancer is an amount that is sufficient to treat the cancer whether administered alone or in combination with a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor.

Alternatively, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitors may also be used with other anti-cancer agents, including but not limited to, acemannan, aclarubicin, aldesleukin, alemtuzumab, alitretinoin, altretamine, amifostine, amsacrine, anagrelide, anastrozole, ancestim, bexarotene, broxuridine, capecitabine, celmoleukin, cetrorelix, cladribine, clotrimazole, daclizumab, dexrazoxane, dilazep, docosanol, doxifluridine, bromocriptine, carmustine, cytarabine, diclofenac, edelfosine, edrecolomab, eflornithine, emitefur, exemestane, exisulind, fadrozole, filgrastim, finasteride, fludarabine phosphate, formestane, fotemustine, gallium nitrate, gemcitabine, glycopine, heptaplatin, ibandronic acid, imiquimod, iobenguane, irinotecan, irsogladine, lanreotide, leflunomide, lenograstim, lentinan sulfate, letrozole, liarozole, lobaplatin, lonidamine, masoprocol, melarsoprol, metoclopramide, mifepristone, miltefosine, mirimostim, mitoguazone, mitolactol, molgramostim, nafarelin, nartograstim, nedaplatin, nilutamide, noscapine, oprelvekin, osaterone, oxaliplatin, pamidronic acid, pegaspargase, pentosan polysulfate sodium, pentostatin, picibanil, pirarubicin, porfimer sodium, raloxifene, raltitrexed, rasburicase, rituximab, romurtide, sargramostim, sizofiran, sobuzoxane, sonermin, suramin, tasonermin, tazarotene, tegafur, temoporfin, temozolomide, teniposide, tetrachlorodecaoxide, thalidomide, thymalfasin, thyrotropin alfa, topotecan, toremifene, trastuzumab, treosulfan, tretinoin, trilostane, trimetrexate, ubenimex, valrubicin, verteporfin, vinorelbine. The amount of the anti-cancer agent administered to a mammal having cancer is an amount that is sufficient to treat the cancer whether administered alone or in combination with a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor.

The 17α-hydroxylase/$C_{17,20}$-lyase inhibitors may also be administered or combined with steroids, such as corticosteroids or glucocorticoids. The 17α-hydroxylase/$C_{17,20}$-lyase inhibitors and the steroid may be administered in the same or in different compositions. Non-limiting examples of suitable steroids include hydrocortisone, prednisone, or dexamethasone. The amount of the steroid administered to a mammal having cancer is an amount that is sufficient to treat the cancer whether administered alone or in combination with a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor.

In one embodiment, provided herein are methods and compositions comprising both abiraterone acetate and a steroid particularly a corticosteroid, or more particularly a glucocorticoid. Steroids within the scope of the disclosure include, but are not limited to, (1) hydrocortisone (cortisol; cyprionate (e.g., CORTEF), oral; sodium phosphate injection (HYDROCORTONE PHOSPHATE); sodium succinate (e.g., A-HYDROCORT, Solu-CORTEF); cortisone acetate oral or injection forms, etc.), (2) dexamethasone (e.g., Decadron, oral; Decadron-LA injection, etc.), (3) prednisolone (e.g., Delta-CORTEF, prednisolone acetate (ECONOPRED), prednisolone sodium phosphate (HYDELTRASOL), prednisolone tebutate (HYDELTRA-TBA, etc.)), or (4) prednisone DELTASONE, etc.) and combinations thereof. See, e.g., GOODMAN & GILMAN'S THE PHARMACOLOGICAL BASIS OF THERAPEUTICS, 10TH EDITION 2001.

In a specific embodiment, single unit solid oral dosage forms which comprise an amount from about 50 mg to about 300 mg of abiraterone acetate and an amount from about 0.5 mg to about 3.0 mg of a steroid, e.g., glucocorticoid in a single composition, optionally with excipients, carriers, diluents, etc. is contemplated. For instance, the single unit dosage form can comprise about 250 mg of abiraterone acetate and about 1.0 mg, 1.25 mg, 1.5 mg, or 2.0 mg of a steroid, such as but not limited to corticosteroids or glucocorticoids.

Administration of the 17α-Hydroxylase/$C_{17,20}$-Lyase Inhibitor and an Additional Therapeutic Agent

The 17α-hydroxylase/$C_{17,20}$-lyase inhibitor and the additional therapeutic agent, such as an anti-cancer agent or a steroid can be administered by any method known to one skilled in the art. In certain embodiments, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor and the additional therapeutic agent can be in separate compositions prior to administration. In the alternative, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor and the additional therapeutic agent can be combined into a single composition for administration.

The 17α-hydroxylase/$C_{17,20}$-lyase inhibitor and the additional therapeutic agent can be administered sequentially or simultaneously. If administered sequentially, the order of administration is flexible. For instance, 17α-hydroxylase/$C_{17,20}$-lyase inhibitor acetate can be administered prior to administration of the additional therapeutic agent. Alterna-

Copy provided by USPTO from the PIRS Image Database on 12/21/2015

tively, administration of the additional therapeutic agent can precede administration of 17α-hydroxylase/$C_{17,20}$-lyase inhibitor.

Whether they are administered as separate compositions or in one composition, each composition is preferably pharmaceutically suitable for administration. Moreover, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor and the therapeutic agent, if administered separately, can be administered by the same or different modes of administration. Examples of modes of administration include parenteral (e.g., subcutaneous, intramuscular, intraorbital, intracapsular, intraspinal, intrasternal, intravenous, intradetinal, intraperitoneal, intraportal, intraarterial, intrathecal, transmucosal, intra-articular, and intrapleural), transdermal (e.g., topical), epidural, and mucosal (e.g., intranasal) injection or infusion, as well as oral, inhalation, pulmonary, and rectal administration. In specific embodiments, both are oral.

For example, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor can be administered transdermally and the additional therapeutic agent can be administered parenterally. Alternatively, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor can be administered orally, such as in a tablet, caplet or capsule, while the additional therapeutic agent can be administered intravenously. Such intravenous administered therapeutic agents include, but are not limited to, docetaxel injections, such as Taxotere®; paclitaxel injections, such as Paclitaxel® and mitoxantrone injections, such as Novantrone®. Also, the additional therapeutic agent can be in the form of depots or implants such as leuprolide depots and implants, e.g. Viadur® and Lupron Depot®; triptorelin depots, e.g. Trelstar®; goserelin implants, e.g. Zoladex®.

The suitable daily dosage of the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor depends upon a number of factors, including, the nature of the severity of the condition to be treated, the particular inhibitor, the route of administration and the age, weight, and response of the individual patient. Suitable daily dosages of 17α-hydroxylase/$C_{17,20}$-lyase inhibitors can generally range from about 0.0001 mg/kg/day to about 1000 mg/kg/day, or from about 0.001 mg/kg/day to about 200 mg/kg/day, or from about 0.01 mg/kg/day to about 200 mg/kg/day, or from about 0.01 mg/kg/day to about 100 mg/kg/day in single or multiple doses.

In some embodiments, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor can be administered in an amount from about 0.004 mg/day to about 5,000 mg/day, or from about 0.04 mg/day to about 3,000 mg/day, or from about 0.4 mg/day to about 1500 mg/day. In certain embodiments, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor can be administered in an amount from about 0.1 mg/day to about 2000 mg/day or from about 1 mg/day to about 2000 mg/day or from about 50 mg/day to about 2000 mg/day or from about 100 mg/day to about 1500 mg/day or from about 5 mg/day to about 1,000 mg/day or from about 5 mg/day to about 900 mg/day or from about 10 mg/day to about 800 mg/day or from about 15 mg/day to about 700 mg/day or from about 20 mg/day to about 600 mg/day or from about 25 mg/day to about 500 mg/day in single or multiple doses.

In certain embodiments, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor is co-administered with an additional anti-cancer agent such as mitoxantrone, paclitaxel or docetaxel. For example, a method for the treatment of a cancer in a mammal comprises administering an amount of abiraterone acetate and an amount of mitoxantrone. For example, the abiraterone acetate can be administered in an amount of about 0.01 mg/kg/day to about 100 mg/kg/day and the mitoxantrone can be administered in an amount of about 0.1 mg/m$^2$ to about 20 mg/m$^2$. Preferably, the mitoxantrone is administered over a period of between about 10 to about 20 minutes once every 21 days.

Also, a method for the treatment of a cancer in a mammal can comprise administering an amount of abiraterone acetate and an amount of paclitaxel. In one embodiment, the abiraterone acetate can be administered in an amount of about 0.01 mg/kg/day to about 100 mg/kg/day and the paclitaxel can be administered in the amount of about 1 mg/m$^2$ to about 175 mg/m$^2$. Preferably, the paclitaxel is administered over a period of between about 2 to about 5 hours once every three months.

Additionally, a method for the treatment of a cancer in a mammal comprises administering an amount of abiraterone acetate and an amount of docetaxel. For example, the abiraterone acetate can be administered in an amount of about 0.01 mg/kg/day to about 100 mg/kg/day and the docetaxel can be administered in an amount of about 1 mg/m$^2$ to about 100 mg/m$^2$. Preferably, the docetaxel is administered over a period of between about 1 to about 2 hours once every three weeks.

In certain embodiments, the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor is administered along with an anti-cancer agent that comprises a hormonal ablation agent, including, but not limited to, leuprolide, goserelin, or triptorelin. For example, one method for the treatment of a cancer in a mammal also comprises administering an amount of abiraterone acetate and an amount of leuprolide. The amount of abiraterone acetate can be about 0.01 mg/kg/day to about 100 mg/kg/day and the amount of leuprolide can be about 0.01 mg to about 200 mg over a period of about 3 days to about 12 months. Preferably, the leuprolide is administered in the amount of about 3.6 mg of leuprolide over a period of about 3 days to about 12 months.

Additionally, the methods for the treatment of cancer in a mammal include administering an amount of abiraterone acetate and an amount of goserelin. For example, the amount of abiraterone acetate can be about 0.01 mg/kg/day to about 100 mg/kg/day and the amount of goserelin can be about 0.01 mg to about 20 mg over a period of about 28 days to about 3 months. Preferably, the goserelin is administered in the amount of about 3.6 mg to about 10.8 mg over a period of about 28 days to about 3 months.

In certain embodiments the methods for the treatment of cancer in a mammal comprises administering an amount of abiraterone acetate and an amount of triptorelin. For example, the amount of abiraterone acetate can be about 0.01 mg/kg/day to about 100 mg/kg/day and the amount of triptorelin can be about 0.01 mg to about 20 mg, over a period of about 1 month, preferably the triptorelin is administered in the amount of about 3.75 mg over a period of about 1 month.

Also, in one embodiment, the method for the treatment of a cancer in a mammal comprises administering an amount of abiraterone acetate and an amount of seocalcitol. For instance, the method involves administering an amount of about 0.01 mg/kg/day to about 100 mg/kg/day of abiraterone acetate and an amount of about 0.1 μg/day to about 500 μg/day of seocalcitol, such as about 100 μg/day of seocalcitol.

In another embodiment, the method for the treatment of a cancer in a mammal comprises administering an amount of abiraterone acetate and an amount of bicalutamide. For instance, the method involves administering an amount of about 0.01 mg/kg/day to about 100 mg/kg/day of abiraterone acetate and an amount of about 1 mg/day to about 300 mg/day of bicalutamide.

In yet another embodiment, the method for the treatment of a cancer in a mammal comprises administering an amount of

Copy provided by USPTO from the PIRS Image Database on 12/21/2015

abiraterone acetate and an amount of flutamide. For example, the method comprises administering an amount of about 0.01 mg/kg/day to about 100 mg/kg/day of abiraterone acetate and an amount of about 1 mg/day to about 2000 mg/day of flutamide.

Moreover, the method for the treatment of a cancer in a mammal can comprise administering an amount of a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor such as abiraterone acetate and an amount of a glucocorticoid including, but not limited to, hydrocortisone, prednisone or dexamethasone. For example, the method can comprise administering an amount of about 50 mg/day to about 2000 mg/day of abiraterone acetate and an amount of about 0.01 mg/day to about 500 mg/day of hydrocortisone. In other instances, the method can comprise administering an amount of about 500 mg/day to about 1500 mg/day of abiraterone acetate and an amount of about 10 mg/day to about 250 mg/day of hydrocortisone.

The method for the treatment of a cancer can also comprise administering an amount of a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor, such as abiraterone acetate, and an amount of a glucocorticoid, such as prednisone. For example, the method can comprise administering an amount of about 50 mg/day to about 2000 mg/day of abiraterone acetate and an amount of about 0.01 mg/day to about 500 mg/day of prednisone. Also, the method can comprise administering an amount of about 500 mg/day to about 1500 mg/day of abiraterone acetate and an amount of about 10 mg/day to about 250 mg/day of prednisone.

In addition, the method for the treatment of a cancer can also comprise administering an amount of a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor, such as abiraterone acetate, and an amount of a glucocorticoid, such as dexamethasone. For example, the method can comprise administering an amount of about 50 mg/day to about 2000 mg/day of abiraterone acetate and an amount of about 0.01 mg/day to about 500 mg/day of dexamethasone. Also, the method can comprise administering an amount of about 500 mg/day to about 1500 mg/day of abiraterone acetate and an amount of about 0.5 mg/day to about 25 mg/day of dexamethasone.

Compositions Containing a 17α-Hydroxylase/$C_{17,20}$-Lyase Inhibitor and an Additional Therapeutic Agent

In certain embodiments, the compositions can contain a combination of a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor, preferably abiraterone acetate, and any of the therapeutic agents recited above. Whether the 17α-hydroxylase/$C_{17,20}$-lyase inhibitor and the additional therapeutic agent are administered in separate compositions or as a single composition, the compositions can take various forms. For example, the compositions can take the form of solutions, suspensions, emulsions, tablets, pills, capsules, powders or sustained-release formulations, depending on the intended route of administration.

For topical or transdermal administration, the compositions can be formulated as solutions, gels, ointments, creams, suspensions or salves.

For oral administration, the compositions may be formulated as tablets, pills, dragees, troches, capsules, liquids, gels, syrups, slurries, suspensions and the like, for oral ingestion by a patient to be treated.

The composition may also be formulated in rectal or vaginal compositions such as suppositories or retention enemas that contain conventional suppository bases such as cocoa butter or other glycerides.

In addition to the formulations described previously, the composition may also be formulated as a depot preparation. Such long acting formulations may be administered by implantation (for example subcutaneously or intramuscularly) or by intramuscular injection. Thus, for example, the therapeutic agents may be formulated with suitable polymeric or hydrophobic materials (for example as an emulsion in an acceptable oil) or ion exchange resins, or as sparingly soluble derivatives, for example, as a sparingly soluble salt.

Additionally, the composition may be delivered using a sustained-release system, such as semi-permeable matrices of solid polymers containing the composition. Various forms of sustained-release materials have been established and are well known by those skilled in the art. Sustained-release capsules may, depending on their chemical nature can release the composition over a period of hours, days, weeks, months. For example a sustained release capsule can release the compositions over a period of 100 days or longer. Depending on the chemical nature and the biological stability of the composition, additional strategies for stabilization may be employed.

The compositions can further comprise a pharmaceutically acceptable carrier. The term "carrier" refers to a diluent, adjuvant (e.g., Freund's adjuvant (complete and incomplete)), excipient, or vehicle with which the therapeutic is administered.

For parenteral administrations, the composition can comprise one or more of the following carriers: a sterile diluent such as water for injection, saline solution, fixed oils, polyethylene glycols, glycerin, propylene glycol or other synthetic solvents; antibacterial agents such as benzyl alcohol or methyl parabens; antioxidants such as ascorbic acid or sodium hi sulfite; chelating agents such as ethylenediaminetetraacetic acid; buffers such as acetates, citrates or phosphates and agents for the adjustment of tonicity such as sodium chloride or dextrose. The parenteral preparation can be enclosed in ampules, disposable syringes or multiple dose vials made of glass or plastic.

For oral solid formulations suitable carriers include fillers such as sugars, e.g., lactose, sucrose, mannitol and sorbitol; cellulose preparations such as maize starch, wheat starch, rice starch, potato starch, gelatin, gum tragacanth, methyl cellulose, hydroxypropylmethyl-cellulose, sodium carboxymethylcellulose, fats and oils; granulating agents; and binding agents such as microcrystalline cellulose, gum tragacanth or gelatin; disintegrating agents, such as cross-linked polyvinylpyrrolidone, agar, or alginic acid or a salt thereof such as sodium alginate, Primogel, or corn starch; lubricants, such as magnesium stearate or Sterotes; glidants, such as colloidal silicon dioxide; a sweetening agent, such as sucrose or saccharin; or flavoring agents, such as peppermint, methyl salicylate, or orange flavoring. If desired, solid dosage forms may be sugar-coated or enteric-coated using standard techniques.

For intravenous administration, suitable carriers include physiological saline, bacteriostatic water, phosphate buffered saline (PBS). In all cases, the composition must be sterile and should be fluid to the extent that easy injectability with a syringe. It must be stable under the conditions of manufacture and storage and must be preserved against the contaminating action of microorganisms such as bacteria and fungi. The carrier can be a solvent or dispersion medium containing, for example, water, ethanol, polyol (for example, glycerol, propylene glycol, and liquid polyethylene glycol, and the like), and suitable mixtures thereof. The proper fluidity can be maintained, for example, by the use of a coating such as lecithin, by the maintenance of the required particle size in the case of dispersion and by the use of surfactants. Prevention of the action of microorganisms can be achieved by various antibacterial and antifungal agents, for example, parabens, chlorobutanol, phenol, ascorbic acid, thimerosal, and the like. In many cases, it will be preferable to include isotonic agents,

Copy provided by USPTO from the PIRS Image Database on 12/21/2015

for example, sugars; polyalcohols such as mannitol, sorbitol; sodium chloride in the composition. Prolonged absorption of the injectable compositions can be brought about by including in the composition an agent which delays absorption, for example, aluminum monostearate and gelatin.

Also for intravenous administration, the compositions may be formulated in solutions, preferably in physiologically compatible buffers such as Hanks's solution, Ringer's solution, or physiological saline buffer. The solution may contain formulatory agents such as suspending, stabilizing and/or dispersing agents. In a preferred embodiment, the compositions are formulated in sterile solutions.

For transmucosal administration, penetrants appropriate to the barrier to be permeated are used in the formulation. Such penetrants are generally known in the art, and include, for example, for transmucosal administration, detergents, bile salts, and fusidic acid derivatives. Transmucosal administration can be accomplished through the use of nasal sprays or suppositories.

For administration by inhalation, the compositions may be formulated as an aerosol spray from pressurized packs or a nebulizer, with the use of a suitable propellant, e.g., dichlorodifluoromethane, trichlorofluoromethane, dichlorotetrafluoroethane, carbon dioxide or other suitable gas. In the case of a pressurized aerosol, the dosage unit may be determined by providing a valve to deliver a metered amount. Capsules and cartridges of gelatin for use in an inhaler or insufflator may be formulated containing a powder mix of the composition and a suitable powder base such as lactose or starch.

The pharmaceutical compositions may be manufactured by means of conventional mixing, dissolving, granulating, dragee-making, levigating, emulsifying, encapsulating, entrapping or lyophilizing processes.

One example of a composition comprising a 17α-hydroxylase/$C_{17,20}$-lyase inhibitor and an additional therapeutic agent is an oral composition or composition suitable for oral administration comprising abiraterone acetate in combination with a steroid. For example, the oral composition can be a solid dosage form such as a pill, a tablet or a capsule. The oral composition can comprise about 10 mg, 25 mg, 50 mg, 75 mg, 100 mg, 150 mg, 200 mg, 250 mg, 300 mg, 350 mg, 400 mg, 450 mg, 500 mg, 550 mg, 600 mg, 650 mg, 700 mg, 750 mg, 800 mg, 850 mg, 900 mg, 950 mg, or 1000 mg of abiraterone acetate. The oral composition can comprises about 0.25 mg, 0.5 mg, 0.75 mg, 1.0 mg, 1.25 mg, 1.5 mg, 1.75 mg, 2.0 mg, 2.25 mg, 2.5 mg, 2.75 mg, 3.0 mg, 3.25 mg, 3.5 mg, 3.75 mg, 4.0 mg, 4.25 mg, 4.5 mg, 4.75 mg, 5.0 mg, 7.5 mg, 10 mg, 20 mg, 30 mg, 40 mg or 50 mg of a steroid, such as a glucocorticoid.

In one embodiment, the oral composition can comprise about 50 mg to about 500 mg of abiraterone acetate and an amount of about 0.25 mg to about 3.5 mg of the steroid, such as hydrocortisone, prednisone or dexamethasone. In other instances, the composition can comprise about 50 mg to about 300 mg of abiraterone acetate and an amount of about 1.0 mg to about 2.5 mg of the steroid, such as hydrocortisone, prednisone or dexamethasone. In another embodiment the composition can comprise about 50 mg to about 300 mg of abiraterone acetate and about 0.5 mg to about 3.0 mg of a steroid. For example, the oral composition can be a tablet containing 250 mg of abiraterone acetate; 1.25 mg or 2.0 mg of a steroid, such as hydrocortisone, prednisone or dexamethasone; and one or more carriers, excipients, diluents or additional ingredients. Additionally, the oral composition can be a capsule containing 250 mg of abiraterone acetate; 1.25 mg or 2.0 mg of a steroid, such as hydrocortisone, prednisone or dexamethasone; and one or more carriers, excipients, diluents or additional ingredients.

The description contained herein is for purposes of illustration and not for purposes of limitation. The methods and compositions described herein can comprise any feature described herein either alone or in combination with any other feature(s) described herein. Changes and modifications may be made to the embodiments of the description. Furthermore, obvious changes, modifications or variations will occur to those skilled in the art. Also, all references cited above are incorporated herein, in their entirety, for all purposes related to this disclosure.

What is claimed is:

**1**. A method for the treatment of a prostate cancer in a human comprising administering to said human a therapeutically effective amount of abiraterone acetate or a pharmaceutically acceptable salt thereof and a therapeutically effective amount of prednisone.

**2**. The method of claim **1**, wherein the therapeutically effective amount of the abiraterone acetate or pharmaceutically acceptable salt thereof is from about 50 mg/day to about 2000 mg/day.

**3**. The method of claim **2**, wherein the therapeutically effective amount of the abiraterone acetate or pharmaceutically acceptable salt thereof is from about 500 mg/day to about 1500 mg/day.

**4**. The method of claim **3**, wherein the therapeutically effective amount of the abiraterone acetate or pharmaceutically acceptable salt thereof is about 1000 mg/day.

**5**. The method of claim **1**, wherein the therapeutically effective amount of the abiraterone acetate or a pharmaceutically acceptable salt thereof is administered in at least one dosage form comprising about 250 mg of abiraterone acetate or a pharmaceutically acceptable salt thereof.

**6**. The method of claim **1**, wherein the therapeutically effective amount of the prednisone is from about 0.01 mg/day to about 500 mg/day.

**7**. The method of claim **6**, wherein the therapeutically effective amount of the prednisone is from about 10 mg/day to about 250 mg/day.

**8**. The method of claim **7**, wherein the therapeutically effective amount of the prednisone is about 10 mg/day.

**9**. The method of claim **1**, wherein the therapeutically effective amount of the prednisone is administered in at least one dosage form comprising about 5 mg of prednisone.

**10**. The method of claim **1**, comprising administering to said human about 500 mg/day to about 1500 mg/day of abiraterone acetate or a pharmaceutically acceptable salt thereof and about 0.01 mg/day to about 500 mg/day of prednisone.

**11**. The method of claim **10**, comprising administering to said human about 1000 mg/day of abiraterone acetate or a pharmaceutically acceptable salt thereof and about 10 mg/day of prednisone.

**12**. The method of claim **1**, wherein said prostate cancer is refractory prostate cancer.

**13**. The method of claim **12**, wherein the refractory prostate cancer is not responding to at least one anti-cancer agent.

**14**. The method of claim **13**, wherein the at least one anti-cancer agent comprises a hormonal ablation agent, an anti-androgen agent, or an anti-neoplastic agent.

**15**. The method of claim **14**, wherein the hormonal ablation agent comprises deslorelin, leuprolide, goserelin, or triptorelin.

**16**. The method of claim **14**, wherein the anti-androgen agent comprises bicalutamide, flutamide, or nilutamide.

Copy provided by USPTO from the PIRS Image Database on 12/21/2015

17. The method of claim 14, wherein the anti-neoplastic agent comprises docetaxel.

18. The method of claim 12, comprising administering to said human about 500 mg/day to about 1500 mg/day of abiraterone acetate or a pharmaceutically acceptable salt thereof and about 0.01 mg/day to about 500 mg/day of prednisone.

19. The method of claim 18, comprising administering to said human about 1000 mg/day of abiraterone acetate or a pharmaceutically acceptable salt thereof and about 10 mg/day of prednisone.

20. The method of claim 17, comprising administering to said human about 1000 mg/day of abiraterone acetate or a pharmaceutically acceptable salt thereof and about 10 mg/day of prednisone.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 12/21/2015

**CERTIFICATE OF SERVICE**

I hereby certify that on January 18, 2019, I electronically filed the foregoing using the Court's CM/ECF system, which will send notifications to all counsel registered to receive electronic notices.

/s/ Constantine L. Trela, Jr.
Constantine L. Trela, Jr.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Circuit Rule 32(a), because it contains 13,967 words (as determined by the Microsoft Word 2016 word-processing system used to prepare the brief), excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using the Microsoft Word 2016 word-processing system in 14-point Times New Roman font.

/s/ Constantine L. Trela, Jr.
Constantine L. Trela, Jr.